**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ESTATE OF ANDREW DAVIS GOOD and KRISTI GOOD, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | DOCKET NO. 20-cv-1431 |
| BARBARA RODRIGUEZ-SANTANA, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT DEPUTY SHERIFF BARBARA GUNNET'S STATEMENT OF FACTS
SUBMITTED IN SUPPORT OF SUMMARY JUDGMENT**

Pursuant to the procedures outlined in Judge Schmehl's policies and procedures,

Defendant, Lancaster County Sheriff's Deputy Barbara Gunnet ("Deputy Gunnet")[1] by and

through her attorneys, MacMain, Connell & Leinhauser, LLC, respectfully submits the present

**Defendant's** Statement of Relevant Material Facts.  The present Defendant's Statement of Facts

(DSOF) includes (1) both those facts to which all parties agree and are contained in the

separately-filed Statement of Undisputed Facts (SOUF), and (2) for consistency and ease of

reading, **those additional facts that Defendant submits are material and uncontested – but**

**to which Plaintiff does not agree based on relevance, materiality, accuracy, or some**

**combination of all three.  Those facts that are solely Defendants are designated herein in**

**bold.**

**Introduction and Procedural History**

1.      Plaintiffs, the Estate of Andrew Davis Good and Kristi Good initiated the instant

action by filing their initial Complaint on March 16, 2020, which named as Defendants Deputy

---

[1] Plaintiffs name Defendant Barbara Gunnet by her maiden name, "Barbara Rodriguez-Santana" in their Complaint and First Amended Complaint.

Gunnet, Lancaster County, Sheriff Christopher R. Leppler, Akron Borough Police Officer Greg

Stone, Borough of Akron, Borough of Ephrata, and John Doe Defendants 1 - 30. *See*, ECF Doc.

No. 1. (Undisputed).

2.      On June 9, 2020, Plaintiffs voluntarily dismissed Defendants Borough of Akron

and Officer Greg Stone. *See*, ECF Doc. No. 18. (Undisputed).

3.      On September 10, 2020, Plaintiffs filed their Motion to Amend their Complaint.

*See*, ECF Doc. No. 21. (Undisputed).

4.      On September 28, 2020, the Court granted Plaintiffs' Motion Seeking Leave to

Amend their Complaint. *See*, ECF Doc. No. 25. (Undisputed).

5.      On September 28, 2020, Plaintiffs filed their First Amended Complaint, naming

as a Defendant only Deputy Gunnet, and asserting two claims pursuant to 42 U.S.C. §1983 –

Deliberate Indifference under the Eighth Amendment and Excessive Force under the Fourth

Amendment. *See*, ECF Doc. No. 29. (Undisputed).

**Initial Arrest of Andrew Good on April 14, 2018**

6.      On April 14, 2018, Andrew Good was taken into custody by Akron Borough and

Ephrata Borough police officers on an outstanding Lancaster County warrant for violation of

probation/parole. *See generally*, Ephrata Police Department Incident Report attached hereto as

*Exhibit A*. (Undisputed).

7.      **During the initial arrest on April 14, 2018, Good attempted to flee, resisted**

**arrest, and had to be tasered by arresting officers.** *Id.* **(Plaintiff disputes as immaterial to**

**the issues upon Summary Judgment).**

8.      Once Good was subdued and taken into custody, he was transported by the

arresting officers to the Wellspan Ephrata Community Hospital for examination. *See*, *Exhibit B*

at page 8.  (Undisputed).

**Initial Response by Deputy Gunnet to Ephrata Community Hospital**

9.      Deputy Gunnet is a Sheriff's Deputy for Lancaster County, and has been so employed since February 2016.  *See*, Deputy Gunnet's deposition attached hereto as *Exhibit B* at page 7.  (Undisputed).

10.     On April 14, 2018, Deputy Gunnet was working as the on-call deputy.  *See*, *Exhibit B* at pages 13-14.  (Undisputed).

11.     As part of her duties as the on-call deputy, Deputy Gunnet, responded to calls from dispatch to pick up and transport arrested individuals to the Lancaster County Prison.  *See*, *Exhibit B* at pages 14-15.  (Undisputed).

12.     On April 14, 2018, Deputy Gunnet was dispatched to the Ephrata Community Hospital to pick up and transport Good to Lancaster County Prison following his arrest by Ephrata Borough and Akron Borough police officers.  *See*, *Exhibit B* at pages 15-16. (Undisputed).

13.     At approximately 5:00 p.m. on April 14, 2018, Deputy Gunnet arrived at the Ephrata Community Hospital to take custody of Good and to transport him to Lancaster County Prison.  *See*, *Exhibit A* at page 16.  (Undisputed).

14.     **After her arrival at the hospital, Deputy Gunnet took over custody of Good from Sergeant Greg Stone of the Akron Borough Police Department.  *See*, *Exhibit B* at page 28.  (Plaintiff disputes as incomplete as to explain the incident, fails to address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).**

15.     **During the custody transition, Deputy Gunnet placed Good in leg shackles**

3

and handcuffed Good with his hands situated to the front and attached to a waistbelt. *See,*
*Exhibit B* at pages 28-31. (Plaintiff disputes as incomplete as to explain the incident, fails to
address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet
properly applied leg shackles to the Plaintiff).

16.     Once Good was secured in shackles and handcuffs, Deputy Gunnet, escorted
Good on foot out and around the hospital to her vehicle, parked in the parking lot by the
main entrance of the emergency room. *See, Exhibit B* at page 32, and Video Surveillance
from Ephrata Community Hospital, attached hereto as *Exhibit C.* (Plaintiff disputes as
incomplete as to explain the incident, fails to address the violations of Lancaster County
CEW policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).

<u>Good's Resistance and Flight from Custody</u>

17.     Deputy Gunnet instructed Good to enter the vehicle. *See, Exhibit B* at page
36. (Plaintiff disputes as incomplete as to explain the incident, fails to address the
violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied
leg shackles to the Plaintiff).

18.     Good did not comply with the verbal instructions to get in the vehicle. *See,*
*Exhibit B* at pages 36-37. (Plaintiff disputes as incomplete as to explain the incident, fails to
address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet
properly applied leg shackles to the Plaintiff).

19.     Deputy Gunnet attempted to grab Good's arm to guide him into the vehicle,
but Good pushed and pulled away from these attempts. *See, Exhibit B* at pages 38-39 and
*Exhibit C.* (Plaintiff disputes as incomplete as to explain the incident, fails to address the
violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied

4

leg shackles to the Plaintiff).

20.     Deputy Gunnet utilized her police radio to request assistance from other officers in the area to get Good into her vehicle. *See, Exhibit B* at pages 40-41. (Plaintiff disputes as incomplete as to explain the incident, fails to address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).

21.     Good attempted to grab Deputy Gunnet's Taser during her attempts to physically place Good in the vehicle. *See, Exhibit B* at pages 42-43. (Plaintiff disputes as incomplete as to explain the incident, fails to address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).

22.     Good turned from Deputy Gunnet and fled, on foot, into the hospital parking lot. *See, Exhibit B* at page 44 and *Exhibit C.* (Plaintiff disputes as incomplete as to explain the incident, fails to address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).

23.     Deputy Gunnet pursued Good and drew and fired her Taser at Good during his flight from custody. *See, Exhibit B* at page 44 and *Exhibit C.* (Plaintiff disputes as incomplete as to explain the incident, fails to address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).

24.     Good fell to the ground following the Taser deployment. *See, Exhibit B* at pages 44-47. (Plaintiff disputes as incomplete as to explain the incident, fails to address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).

25.     Good got back on his feet following the first Taser deployment. *See, Exhibit*

*B* at page 47. (Plaintiff disputes as incomplete as to explain the incident, fails to address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).

26.     Upon getting back on his feet, Good resumed his flight from Deputy Gunnet. *See, Exhibit B* at page 49. (Plaintiff disputes as incomplete as to explain the incident, fails to address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).

27.     Deputy Gunnet deployed her Taser a second time at Good. *See, Exhibit B* at page 49 and *Exhibit C*. (Plaintiff disputes as incomplete as to explain the incident, fails to address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).

28.     Good rolled and ran down a small embankment on the side of Ephrata Hospital, and continued running away from Deputy Gunnet following the second Taser deployment. *See, Exhibit B* at page 50 and *Exhibit C*. (Plaintiff disputes as incomplete as to explain the incident, fails to address the violations of Lancaster County CEW policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).

29.     It is unknown if this second discharge made contact with Good and caused him to fall, or if the fall was the result of Good's flight, the shackles restricting his gait, the slope of the embankment, the loose woodchips/mulch on the embankment, or a combination of some or all of the above. (Plaintiff disputes as not a statement of fact).

30.     At some point during his flight from Deputy Gunnet, Good was able to free one of his legs from the shackles, giving his legs free range of motion. *See, Exhibit C*. (Plaintiff disputes incomplete as to explain the incident, fails to address the violations of

**Lancaster County policy, assumes that Sheriff Gunnet properly applied leg shackles to the Plaintiff).**

31.    Good continued running away from Deputy Gunnet, across a two-lane road, and into the nearby woods surrounding Cocalico Creek. *See, Exhibit B* at page 51 and *Exhibit C*. (Undisputed).

32.    **During the course of Good's escape and flight from Deputy Gunnet, there were bystanders entering and exiting the Ephrata Community Hospital on foot, and vehicles driving within the parking lot and on the roadways where the incident took place.** *See, Exhibit C.* **(Plaintiff disputes as immaterial).**

<u>**Good's Continued Flight Into Woods and Cocalico Creek**</u>

33.    Deputy Gunnet lost sight of Good when he entered the woods. *See, Exhibit B* at page 52. (Undisputed).

34.    Officer Beth Rivera of the Ephrata Borough Police Department responded to the scene and began searching for Good with Deputy Gunnet. *See, Exhibit B* at page 53, and Deposition Transcript of Officer Beth Rivera attached hereto as *Exhibit D* at pages 12-15. (Undisputed).

35.    Deputy Gunnet and Officer Rivera located Good by the Cocalico Creek bank. *See, Exhibit B* at page 53 and *Exhibit D* at page 18. (Undisputed).

36.    When Deputy Gunnet and Officer Rivera arrived at the bank of Cocalico Creek, Good was already in the water, away from the creek bank. *See, Exhibit B* at page 57 and *Exhibit D* at page 21. (Undisputed).

37.    Good submerged in Cocalico Creek, and Deputy Gunnet and Officer Rivera lost sight of Good. *See, Exhibit B* at page 58 and *Exhibit D* at page 30. (Undisputed).

7

38.     Officer Rivera removed her duty belt and attached gear and entered the water in an attempt to rescue and regain custody over Andrew Good.  *See, Exhibit D* at page 30. (Undisputed).

39.     Deputy Gunnet remained on the creek bank as she and Officer Rivera were the only two officers on location at the time Officer Rivera entered the water.  *See, Exhibit B* at page 60.  (Undisputed).

40.     Additional officers responded to the scene and entered the water in an attempt to locate Good.  *See, Exhibit D* at page 32.  (Undisputed).

41.     Officers continued their search for Good in Cocalico Creek until he was eventually discovered, deceased.  *See, Exhibit D* at page 32.  (Undisputed).

42.     No officers deployed their tasers at Good while he was in the water.  *See, Exhibit B* at page 66.  (Undisputed).

43.     Following examination by Forensic Pathologist, Dr. Wayne K. Ross, Good's cause of death was determined to be "fresh water drowning," with the manner of death being "accidental."  *See,* Forensic Pathologist's Report, attached hereto as *Exhibit E,* at page 13. (Undisputed).

44.     **On at least one prior occasion, Good successfully navigated across Cocalico Creek in a different location, during the course of a flight from apprehension by police officers.  (Plaintiff disputes as immaterial to Sheriff Gunnet's deployment of the taser upon Mr. Good.  Incomplete statement as to explain the incident, immaterial to the deployment of the taser with respect to Sheriff Gunnet).**

8

**MacMain, Connell & Leinhauser, LLC**

Dated: <u>December 30, 2020</u>     By:   <u>*/s/ David J. MacMain*</u>
                                   David J. MacMain, Esquire
                                   Andrew J. Davis, Esquire
                                   Attorney I.D. No. 59320/316460
                                   433 W. Market Street, Suite 200
                                   West Chester, PA 19382
                                   *Attorneys for Defendant Lancaster County*
                                   *Sheriff's Deputy Barbara Gunnet*

## CERTIFICATE OF SERVICE

I, David J. MacMain, hereby certify that on this 30th day of December, 2020, a copy of

the foregoing *Statement of Undisputed Facts In Support of Defendant's Motion for Summary*

*Judgment* was served upon the following via ECF notification:

Graham F. Baird, Esquire
Two Penn Center
1500 JFK Boulevard, Suite 1240
Philadelphia, PA 19102
*Attorney for Plaintiffs*

**Respectfully submitted,**

**MacMain, Connell & Leinhauser, LLC**

BY:     */s/ David J. MacMain*
        David J. MacMain, Esquire
        Andrew J. Davis, Esquire
        Attorney I.D. Nos. 59320/316460
        433 W. Market Street, Suite 200
        West Chester, PA 19382
        Tel: (484) 318-7703
        *Attorneys for Defendant Lancaster County Sheriff's*
        *Deputy Barbara Gunnet*

# EXHIBIT A

# Incident Report



**EPHRATA POLICE DEPARTMENT**
**124 SOUTH STATE ST**
**EPHRATA, PA  17522**

**Phone: (717)738-9200**

| Approved Report ✓ MATTHEW E LUCKY | | Municipality | **EPHRATA BOROUGH (408)** |
|---|---|---|---|
| | | Report Type | **INCIDENT** |

| Incident # | Reference # |
|---|---|
| **4101661B18** | **1804017136** |

Location     **3 N. NINTH ST - AKRON 17501**

Landmark

| Criminal Code | Title | : |
| | Section | : |
| | Sub-Section | : |
| | Description | : |

Premise

Point of Entry
Meth. of Entry

| UCR Codes | 4105 | **ASSIST - OTHER AGENCY CASE** |

Patrol Zone    Grid

Reported    **04/14/2018** @ **16:30** (Sat)

Discovered       @

Last Secure      @

Received        Dispatched

Arrived   **16:31**    Cleared    **16:58**

Status

Disposition

Clear Date

Badge      **612 - OFC. DANIEL M ALBAUGH**

## Additional Officers

| Officers | | Date | Activity |
|---|---|---|---|
| 419 | SGT. ERIC M SCHMITT | / / | |
| 802 | OFC. BRYCE DAVIS | / / | |

| Investigating Officer | | Date | Approving Officer | | Date |
|---|---|---|---|---|---|
| | Signature | | | Signature | |

| 4101661B18 | 1804017136 | 4105 - ASSIST - OTHER AGENCY CASE |
|---|---|---|

## Persons Involved

### GOOD, ANDREW DAVIS

Arrest Date :                    Disposition Date :

| Role<br>OTHER (NOI, ETC) | Incident Classification<br>4105  ASSIST - OTHER AGENCY CASE | How Charged | Disposition |
|---|---|---|---|

Alias
Age-DOB ▮▮▮▮▮▮
Race **WHITE**
Sex **MALE**
Ethnicity **NON-HISPANIC**
Marital Stat **SINGLE**
Residency **Resident**
SSN ▮▮▮▮▮
Gang
Tattoo  L SHLD, R SHLD, L BREAST, L HAND
Clothing
GBM Id
 -Entered   / /
 -Released  / /
OLN/State ▮▮▮▮▮
Injury

Height  **5'09"**
Weight  **162**
Hair  **BROWN**
Eyes  **HAZEL**
Build  **THIN**
Complex. **LIGHT**

Home Addr ▮▮▮▮▮

Home Ph #
Work Ph # ▮▮▮▮▮
Cell Ph #
Other Ph #
E-Mail
Employer

Occupation **UNEMPLOYED**
Addl Addr ▮▮▮▮▮

No Photo

## Main Narrative
### OFC. DANIEL M ALBAUGH (612)

04/14/2018 16:30 - 612   OFC. DANIEL M ALBAUGH

**SOURCE OF ACTIVITY:**
On 04/14/2018 at 1631 hours, I responded to the address of 3. N. Ninth St. Akron Borough with Sgt. Schmitt and Officer Davis to provide mutual aid to Akron Borough Police Officer Rogers to serve a Lancaster County bench warrant on Andrew Davis Good (DOB: ▮▮▮▮▮ ).

**SCENE DESCRIPTION:**
This incident occurred at the address of 3 N. Ninth St. Akron Borough.  This address is a multi-unit apartment building.  Good was initially located on the north side of the building on an exterior deck on the second floor of the building.

**OFFICER OBSERVATIONS AND ACTIONS:**
I proceeded to the west side of the apartment complex with Sgt. Schmitt while Officer Rogers and Officer Davis entered from the east side and located Good on the north side of the building.  I heard Officer Davis transmit on his radio that Good was on the second-floor deck.  I began to travel to the north side of the building.  As I rounded the corner of the building, I heard what sounded like a physical altercation.  I approached the stairwell that Officer Rogers and Davis had traversed, and I observed Andrew Good run down the stairs and travel west towards me.  Upon seeing me, Good changed direction and headed north.

As I began to pursue Good, I heard the sound of a Taser being discharged.  Good was not impacted by the Taser which was later determined to have been fired by Officer Rogers.  Good continued to run down a small alleyway and across N. Ninth St. in a southern direction.  I chased Good across Main St. and into the yard of 820 Main St.  I subsequently withdrew my Taser and

| 4101661B18 | 1804017136 | 4105 - ASSIST - OTHER AGENCY CASE |
|---|---|---|

fired it at Good's back. The Taser was ineffective, and it is unknown if the Taser probes made contact. I attempted to drive stun Good with the Taser which was unsuccessful at stopping Good. I reholstered my Taser and continued to chase Good to the Rear of the property where I was able to take Good to the ground. I secured Good on the ground until Officer Rogers, and Officer Davis arrived. While on the ground, Good continued to actively resist. I again advised Good that he was under arrest and told him to stop resisting. Good refused to comply and continually tried to stand up and pull his arms towards the center of his body. Officer Rogers, Davis, Sgt. Schmitt and Officer Martin assisted in putting Good in handcuffs and leg shackles. While Good was being restrained, he repeated that "He's not going back go jail" and "I cant go back". I escorted Good to Officer Martin's patrol vehicle with the assistance of Officer Davis.

I subsequently returned to the front yard of 820 Main St. Akron, where I collected the discharged Taser leads. I was unable to locate the Taser probes.

I completed both a Use of Force Report and Taser Use Report for this incident. I provided each report to my supervisor, Sgt. Schmitt.

**EVIDENCE:**
1 - I submitted one Taser cartridge Serial #: C4102X410 into the Beast Evidence System as evidence.



| 4101661B18 | 1804017136 | 4105 - ASSIST - OTHER AGENCY CASE |
|---|---|---|

**Supplemental Narrative**
**OFC. BRYCE DAVIS (802)**

SUPPLEMENTAL 04/15/2018 12:44 - 802   OFC. BRYCE DAVIS

**SUPPLEMENTAL REPORT #4101661B18**
**OFFICER DAVIS**

**SOURCE OF ACTIVITY:**
On 4/14/18 at approximately 1630 hours I responded to 3 N. 9th St. Akron, PA to assist with a warrant service for Andrew Good.

**SCENE DISCRIPTION:**
3 N. 9th St. Akron, PA is a vinyl sided apartment building with 3 floors. The warrant service was initiated for an apartment on the second floor. The foot pursuit started on the deck of the second floor to the rear of the building and around a small building to the rear on the north side of the apartment building. The pursuit then crossed over 9th St. and toward a parking lot and then crossed Main St. The pursuit ended behind the brick Akron Insurance Associates building that is located on the south west corner of the intersection of 9th St. and Main St. in Akron.

**OFFICER OBSERVATIONS/ACTIONS:**
I parked my patrol vehicle on Main St. Akron between 9th St. and 10th St. I approached on foot to the east side of the apartment building. I followed Akron Police Department (APD) Officer (Ofc.) Rogers down the driveway and to the rear of the building. Ofc. Rogers and I walked around the back corner of the building with approximately 15+ feet between us and the building to look up the rear stairs to the back door on the second floor. I did not see anyone at the top of the stairs on the deck area.
As Ofc. Rogers ascended the stairs, about three quarters of the way to the top he started to talk to someone. I could not hear what was being said. As I got near the top of the stairs I saw Ofc. Rogers reach for a male's arm and state that the male, who I then recognized at Andrew Good, Was under arrest due to a bench warrant through the Lancaster County Sheriff's office. Good then pulled away from Ofc. Rogers and they both moved toward the door that lead into the apartment building. Ofc. Rogers attempted to gain control of Good's arms and Good pushed Ofc. Rogers into the railing of the deck.
I was on the top step when Good charged at me with his shoulder and pushed me into the wall. I attempted to grab Good's arm but he was already pulling away from me and was running down the stairs. Ofc. Rogers followed Good down the stairs with me behind him. At the bottom of the stairs Ofc. Rogers deployed his Taser but the device failed to incapacitate Good. Good ran around a small building on the north side of the apartment building. Good then crossed over to the west side of 9th St., ran south, crossed Main St., and went behind the brick Akron Insurance Associates building. As we were running south Ephrata Poilce Ofc. Albaugh joined the foot pursuit and gave Good commands to stop running because he was under arrest. Ofc. Albaugh was able to catch Good and assisted him to the ground to be handcuffed. Good continued to resist arrest and would not give up his hands to be placed in handcuffs. I placed one handcuff on Good's left wrist and handed it to Ofc. Albaugh. I grabbed Goods legs and pulled them straight to get him flat on the ground. I tried to keep Goods legs under control while Ofc. Albaugh and Ofc. Rogers attempted to place the handcuffs on Goods wrists. Good continued to resist arrest while Ofc. Albaugh continued to give commands to stop resisting and that Good was under arrest. We were able to secure Good's hand in the handcuffs and Ephrata Police Ofc. Martin arrived with leg shackles. I assisted Ofc. Martin with placing the leg shackles on Good's legs.

EPHRATA000004

| 4101661B18 | 1804017136 | | 4105 - ASSIST - OTHER AGENCY CASE |
|---|---|---|---|

After we were able to get Good handcuffed I assisted with searching Good for any weapons or illegal items. I found multiple pieces of paper and Good's cell phone. All items were turned over to Ofc. Rogers immediately.

I along with Ofc. Albaugh walked Good to Ofc. Martin's patrol vehicle and secured him in the rear passenger seat.

After securing Good, I assisted with looking for the Taser wires and probes. I found a single Taser wire and two green doors to the cartridge Ofc. Rogers deployed. I returned these items to Ofc. Rogers.

I cleared the scene at approximately 1500 hours.

| 4101661B18 | 1804017136 | | 4105 - ASSIST - OTHER AGENCY CASE |

**Supplemental Narrative**
**SGT. ERIC M SCHMITT (419)**

SUPPLEMENTAL 04/15/2018 16:16 - 419   SGT. ERIC M SCHMITT

SOURCE OF ACTIVITY:

On 04-14-18 at approximately 1530hrs. Officer Rodgers with Akron Borough Police contacted me regarding the location of Andrew Good; DOB: ███      Rodgers requested assistance with attempting to locate Good to take him into custody regarding an outstanding Lancaster County Sheriff's warrant for probation/parole violation.

OFFICER OBSERVATIONS AND ACTIONS:

Off. Rodgers advise he received information that Andrew Good would be at an apartment building at 3 N. 9th Street, Akron around 1630hrs.   Off. Rodgers stated he would like the Ephrata Police Departments assistance with possible apprehension if he is found at the address.

After reconfirming the current status of the Lancaster Sheriff's warrant, Off. Davis, Albaugh and I met Off Rodgers at 1630hrs in Akron Borough along Main St just east of N. 9th Street intersection.   Off Rodgers reported he received updated information that Andrew Good was currently at the back/rear of the apartment building sitting on a small porch at the top of a outside wooden stairway.   The stairway is a common stairway with a door at the top which accesses into a hallway for second floor apartments at 3 N. 9th St.

I advised Off. Davis to accompany Off. Rodgers to the rear stairway and Off. Albaugh and I will positioned ourselves on the sidewalk along 9th St to the southwest of the build.   I moved to a small walk way located between the apartment building and adjoining property building so as to observed Off. Davis at the stairway.   I peered around the apartment building and Off. Davis motioned that he and Off. Rodgers were walking up the stairway.  I decided to reposition myself to the interior ground level hallway and stairway in the event Good fled through the building in an attempt to flee out the ground level door. I observed that Off. Albaugh move back to the Main Street side of the building.

I walked inside the building and immediately heard muffled noises coming from the second floor area so I worked my way up to the second floor where I did not locate any person(s) or officers.  I went to a door which accessed the rear wooden porch and stairs and upon exiting the building I did not locate Off. Davis or Rodgers.   I did find a young female standing on the stairway and asked where the police officers were but the female did not answer.   I noticed more people on a side porch near 9 N. 9th St and as I approached they stated the officers tried to taser the guy, apparently missed so they chased him out onto 9th St.   I moved out to 9th street and did not see any officers but noticed numerous citizen in Weiser's Grocery store parking lot looking across Main Street (south) toward another parking lot and Playground Alley area.

I ran toward the parking lot (rear 820 Main St) and Playground Alley and observed a few people standing, looking up along a drive that went back out to S. 9th St. The on-lookers pointed toward S. 9th St and stated they are up there.   I located Off. Albaugh, Davis and Rodgers holding a shirtless male on the ground.   The shirtless male was stating something to the effect of, fuck you I'm not getting cuffed, get the fuck off me.   I approached and immediately recognized the male as Andrew Good.  Good observed me approach and pleaded with me, "Schmitt tell them to let me go" of which I advised Good to

| 4101661B18 | 1804017136 | 4105 - ASSIST - OTHER AGENCY CASE |
|---|---|---|

just calm down so we can handcuff him.   I advised him several times to stop struggling and resisting, to just relax so we can get his arms back to handcuff him.   He continued to keep his right arm up and out above his head refusing to let Off. Rodgers bring his arm down behind his back.   Good continued to scream and yell that he was not going back to jail, fuck you guys, let me go, I'm not getting handcuffed.   I told him several times to calm down, relax that we would not going to let him go he just needed to allow us to handcuff him.

During the continued attempts to handcuff Good two other males approached, one with a red shirt who Good called out to as Denny.   Good said several times tell these guys to let me the fuck go (or similar words).   The male in the red shirt (Denny) started to yell to Good to stop struggling and let the cops handcuff you, I told you to turn yourself in, stop fighting with them (or similar words).   The male in the red shirt, as we continued to struggle with Good, continued to try and convince Good to comply with the police.

Off Rodgers and I were finally able to maneuver Good's right arm to his back area close enough to his left arm/hand so as to complete the handcuffing process.  Two sets of hand cuffs were used so as to not have to completely maneuver Good's hands/arms to close to each other while completing the cuffing process.  Once the handcuffs were securely fastened I met with Off. Martin in front of 820 S. 9th St for leg shackles; Off. Martin and Davis applied the shackles to Good's ankles.   Good was escorted to Off. Martin's vehicle and Off. Rodgers requested assistance with transporting Good to the Wellspan Ephrata Community Hospital for medical treatment.

Off. Albaugh, Davis and I returned to the wooden stairs area where we recovered the wires and green plastic taser cartridge "doors".   Off. Albaugh returned to the area where he deployed his taser and recovered his cartridge and taser wires.

 I responded the hospital to check on Off. Rodgers, Martin and Andrew Good's status.   I found Off. Rodgers at the hospital guarding Good who was now handcuffed to the front of his body and still wearing the leg shackles.  Off.  Rodgers advised he would be OK guarding Good and thanked us for the assistance.

| 4101661B18 | 1804017136 | 4105 - ASSIST - OTHER AGENCY CASE |
|---|---|---|

**Supplemental Narrative**
**OFC. SCOTT P MARTIN (705)**

SUPPLEMENTAL 04/18/2018 06:45 - 705   OFC. SCOTT P MARTIN

**Officer Observations/Actions:**
On Saturday 4/14/18 at approximately 1640hrs, I responded to the area of 3 N. 9th Street in Akron to assist other units who were already on scene and had just served a warrant on Andrew Good. I began to respond initially after hearing units on our tac channel sounding as though Good was not being cooperative. While enroute, Sgt. Schmitt requested that a unit bring a pair of shackles for Mr. Good.

On arrival, I located units to the south side of 820 Main Street. I retrieved a pair of shackles from the trunk of my cruiser (8217) and responded to their location. I observed good face-down with Officer Rogers of Akron PD and Officer Albaugh on top of him attempting to restrain him. I could hear officer Albaugh advising Good to stop resisting. I placed one shackle/cuff on each ankle to aid in securing Good's feet/legs. They were double-locked and checked for tightness. Good was not wearing a shirt and I could observe that he had scrapes on his head as well as different areas of his body. I was advised by Officer Albaugh that Good fled on foot and a brief foot-chase ensued. Good is known to me to run from police from dealings in the past. At 1644hrs, I advised LCWC/dispatch that we had a prisoner in custody.

Good was placed into the back of my patrol car. After discussing the issue with Officer Rogers of Akron, Sgt. Schmitt advised to transport Good to our department to await the Sheriff's Department due to already having another prisoner there awaiting transport by the duty deputy. At 1647hrs, activated the in-car video to record the transport. I advised LCWC that I was enroute to our station with Good.

Immediately after beginning transport, Good began complaining of severe pain in his left shoulder. He repeated several times that his shoulder hurt and I asked him if he needed or wanted medical attention to which he replied, "yes". I advised Sgt. Schmitt of his request for medical treatment and suggested that he be transported directly to Ephrata Community Hospital (ECH) rather than to station and call an ambulance. He advised he would have to check with Officer Rogers due to Good being their prisoner. Officer Albaugh advised that he was with Officer Rogers and that Officer Rogers had approved transporting directly to ECH. I advised LCWC at 1650hrs that I was now transporting Good to ECH and requested that they notify them that we were enroute.

I arrived at ECH with Good at 1653hrs and escorted him inside and was directed by staff to a room just inside the entrance. Good laid on the bed and awaited treatment. Once in the room, Good began asking to be handcuffed in the front due to the pain in his shoulder. I suggested he roll to his right side and advised that he would need to await Officer Rogers for him to make the decision about how he was handcuffed.

Officer Rogers arrived at approximately 1700hrs and met us in Good's room. Good asked Officer Rogers if could move the handcuffs the front. Officer Rogers agreed and moved the handcuffs to the front. He was still wearing two sets of cuffs at the time. Officer Rogers kept both sets of cuffs on his hands after moving them to the front. Good was then preliminarily checked by the doctor who ordered X-rays. I heard the doctor ask Good if he had been drinking and Good replied that he had not stopped drinking since the night before.

I remained on scene and assisted ER staff and Officer Rogers with escorting Good to the X-ray area and back to the room. Good remained handcuffed and shackled in the ER bed the entire time. At approximately 1745hrs, I left the hospital after making sure Officer Rogers did not need anything. Officer

| 4101661B18 | 1804017136 | 4105 - ASSIST - OTHER AGENCY CASE |
|---|---|---|

Rogers advised that he was fine and was in the room with Good who remained handcuffed and shackled as I left.


EPHRATA000009

# EXHIBIT B



Deposition of:

**Barbara Gunnett**

*August 17, 2020*

In the Matter of:

**Estate of Andrew Davis Good v.
Rodriguez-Santana, Barbara**

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

                       -  -  -

3

ESTATE OF ANDREW DAVIS          :
4    GOOD,                            :
                                 :
5          Plaintiff,               :
                                 :
6    v.                              :    DOCKET NO. 20-1431
                                 :
7    BARBARA RODRIGUEZ-SANTANA,      :
     LANCASTER COUNTY,               :
8    CHRISTOPHER LEPPLER,            :
     BOROUGH OF EPHRATA,             :
9                                    :
           Defendants.             :
10

11                     -  -  -

              Monday, August 17, 2020
12                     -  -  -

13

14          Oral Deposition of BARBARA GUNNETT, held
15   in the Law Offices of MAC MAIN LAW GROUP, LLC,
16   located at 433 West Market Street, Suite 200,
17   West Chester, Pennsylvania, commencing approximately
18   at 11:45 a.m. on the above date before Holly J.
19   Cross, a Registered Professional Reporter and Notary
20   Public.

21

22                     -  -  -

              VERITEXT LEGAL SOLUTIONS
23                MID-ATLANTIC REGION
              1801 Market Street, Suite 1800
24          Philadelphia, Pennsylvania 19103

Page 2

1    A P P E A R A N C E S:

2

3         LAW OFFICES OF ERIC A. SHORE, P.C.
          BY:  GRAHAM BAIRD, ESQUIRE
4         Two Penn Center
          1500 John F. Kennedy Boulevard, Suite 1240
5         Philadelphia, PA  19110
          (215) 627-9999
6         GrahamB@EricShore.com
          Counsel for Plaintiff

7

8

          MAC MAIN LAW GROUP, P.C.
9         BY:  DAVID J. MAC MAIN, ESQUIRE
          BY:  ANDREW DAVIS, ESQUIRE
10        433 West Market Street, Suite 200
          West Chester, PA  19382
11        (484) 318-7106
          DMacMain@MacMainLaw.com
12        Counsel for Defendants
          Barbara Gunnett, Lancaster County, Christopher
13        Leppler

14

15        MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
          BY:  CHRISTOPHER P. BOYLE, ESQUIRE
16        2000 Market Street, Suite 2300
          Philadelphia, PA  19103
17        (215) 575-4555
          CPBoyle@mdwcg.com
18        Counsel for Defendant
          Borough of Ephrata

19

20

     ALSO PRESENT:

21

          Kristi Good

22

23

24

Page 3

1                    I N D E X

                        - - -

2

3   Testimony of:  BARBARA GUNNETT

4   By Mr. Baird....................5

5   By Mr. MacMain.................66

6

7

                        - - -

8              E X H I B I T S

                        - - -

9

    NUMBER              DESCRIPTION              PAGE

10
                    (None offered.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1                    DEPOSITION SUPPORT INDEX

2

3     INSTRUCTION NOT TO ANSWER:

4     Page          Line

5       10            10

6

7     REQUEST FOR PRODUCTION OF DOCUMENTS:

8     Page          Line        Description

9     (None)

10

11    STIPULATIONS:

12    Page          Line

13      5             1

14

15    QUESTIONS MARKED:

16    Page          Line

17    (None)

18

19

20

21

22

23

24

BARBARA GUNNETT

Page 5

1               (It is hereby stipulated and

2         agreed by and among counsel for the

3         respective parties that reading, signing,

4         sealing, certification and filing are

5         waived and that all objections, except as

6         to the form of the question, be reserved

7         until the time of trial. )

8               - - -

9         BARBARA GUNNETT, having been duly sworn,

10   was examined and testified as follows:

11               - - -

12               EXAMINATION

13   BY MR. BAIRD:

14       Q      Good morning.  My name is Graham Baird,

15   and I represent Kristi Good and the Estate of Andrew

16   Good in a lawsuit that's been filed against you and

17   others arising out of an incident that occurred back

18   on April 14th of 2018.  Today we're here for your

19   deposition.

20               Could you state your name for the record,

21   please?

22       A      Barbara Gunnett.

23       Q      Ms. Gunnett, have you ever been deposed

24   before?

BARBARA GUNNETT

Page 6

1     A     I have not.

2     Q     Okay.  You were present for Ms. Good's

3  deposition; correct?

4     A     Correct.

5     Q     Okay.  And your attorney, Mr. MacMain,

6  had given Ms. Good some instructions about

7  depositions, and you observed the process.  Would

8  you like me to go over some instructions for you?

9     A     I don't believe it's necessary.

10    Q     All right.  If you need to -- just one

11 thing:  If you need to take a break for any reason,

12 please tell me, and we'll do that.  Okay?

13    A     Okay.

14    Q     Have you ever been known by any other

15 names?

16    A     Yes.

17    Q     What other names?

18    A     My maiden name, Barbara

19 Rodriguez-Santana.

20    Q     And at the time of this incident in 2018,

21 you were known as Barbara Rodriguez-Santana; is that

22 accurate?

23    A     Yes.

24    Q     And who do you currently work for?

BARBARA GUNNETT

Page 7

1      A      I work for the Lancaster County Sheriff's

2  Department.

3      Q      And what is your current rank or job

4  title?

5      A      Deputy sheriff.

6      Q      Have you ever worked for any other law

7  enforcement agencies?

8      A      Yes, I have.

9      Q      What other law enforcement agencies?

10     A      Same capacity but with Dauphin County.

11     Q      Can you say that again?  I'm sorry.

12     A      Dauphin County as a deputy sheriff.

13     Q      Okay.  Any other law enforcement

14  agencies?

15     A      No.

16     Q      How long have you worked for the

17  Lancaster County Sheriff's Department?

18     A      Since February of 2016.

19     Q      And when did you work for the Dauphin

20  County Sheriff's Department?

21     A      From October of 2014 until February of

22  2016.

23     Q      Why did you leave the Dauphin County

24  Sheriff's Department?

BARBARA GUNNETT

Page 8

1      A      Because I was residing in Lancaster
2  County.

3      Q      And can you explain that for me, why that
4  prompted you to leave the Dauphin County Sheriff's
5  Department?

6      A      I wanted to avoid the commute for work,
7  so I found job where I currently was living.

8      Q      Okay.  And your name change was
9  associated with you being married?

10     A      Correct.

11     Q      And when did that happen?

12     A      That happened in October of 2018.

13     Q      Okay.  And what is your husband's name?

14     A      Is that relevant?

15            MR. MAC MAIN:  You can give his first
16  name.

17            THE WITNESS:  Okay.  First name Shawn.

18  BY MR. BAIRD:

19     Q      S-H-A-W-N?

20     A      Yes.

21     Q      Is Shawn Gunnett employed in law
22  enforcement?

23            MR. MAC MAIN:  You can answer that.

24            THE WITNESS:  Yes.

BARBARA GUNNETT

Page 9

BY MR. BAIRD:

1

2     Q     And where is he employed?

3     A     Lancaster.

4     Q     Is he employed with the Lancaster County

5 Sheriff's Department?

6     A     He's not.

7     Q     Can you tell me what agency or police

8 department he is employed with?

9          MR. MAC MAIN:  You can answer that.

10         THE WITNESS:  Lancaster city.

11 BY MR. BAIRD:

12    Q     Okay.  Besides this lawsuit have you ever

13 been sued before?

14    A     I have not.

15    Q     Okay.  Have you ever been subject to a

16 complaint, a citizen's complaint, involving

17 excessive force?

18    A     I have not.

19    Q     Have you ever been suspended or

20 disciplined by the Lancaster County Sheriff's

21 Department?

22         MR. MAC MAIN:  Related to anything

23 involving a citizen?

24         MR. BAIRD:  Just a general question.

BARBARA GUNNETT

Page 10

1          MR. MAC MAIN:  Well, I'm going to object

2     to that unless it has to do with some kind of

3     mistreatment of a citizen or dishonesty.  I'm going

4     to limit the question to that.

5          MR. BAIRD:  Well, you can't limit the

6     question.

7          MR. MAC MAIN:  Well, I am.

8          MR. BAIRD:  You're going to instruct her

9     not to answer that question?

10          MR. MAC MAIN:  If she was disciplined for

11    something unrelated to mistreatment of citizens or

12    dishonesty, she's not going to answer it.

13          MR. BAIRD:  Okay.  So just let the record

14    show that Mr. MacMain has instructed his client not

15    to answer my question.

16    BY MR. BAIRD:

17     Q     Have you ever been suspended or

18    disciplined arising out of any citizen's complaint?

19     A     No.

20     Q     All right.  You were interviewed several

21    times in connection with this incident involving

22    Andrew Good; correct?

23     A     I gave two interviews.

24     Q     All right.  My understanding is that one

BARBARA GUNNETT

Page 11

1    of the interviews occurred on the night of the

2    incident; correct?

3        A        Correct.

4        Q        And you gave that interview to James

5    Zahm; is that right?

6        A        Correct, county detective.

7        Q        Can you say that again?  I couldn't hear

8    you.

9        A        County detective.

10       Q        Okay.  And then you gave another

11   interview to someone at the sheriff's department; is

12   that correct?

13       A        Correct.

14       Q        Okay.  And that was Lieutenant Shaffer;

15   is that right?

16       A        Correct.

17       Q        And my understanding is that interview

18   with Lieutenant Shaffer occurred over two separate

19   days; is that right?

20       A        Yes.

21       Q        All right.  Did you give any other

22   statements or interviews concerning this incident to

23   anyone else?

24       A        I did not.

BARBARA GUNNETT

Page 12

1    Q    Did you have an opportunity to review

2  your statements or interviews prior to your

3  deposition here today?

4    A    I have, yes.

5    Q    Okay.  And was there anything contained

6  in those interviews that you found incorrect or

7  untruthful?

8    A    No.

9    Q    Okay.  So the information that you

10  provided to James Zahm and Lieutenant Shaffer was

11  true and accurate at the time; correct?

12    A    Correct.

13    Q    Okay.  Were you placed on an

14  administrative leave as a result of the

15  investigation involving Mr. Good's death?

16    A    Yes.

17    Q    And how long were you on administrative

18  leave, if you can recall?

19    A    Probably like less than 30 days.

20    Q    And that was an administrative leave with

21  pay; correct?

22    A    Correct.

23    Q    Have you ever been placed on any other

24  administrative leaves?

BARBARA GUNNETT

Page 13

1      A      No.

2      Q      Okay.  And after you returned to the

3   sheriff's department, were you under any kind of

4   restrictions or conditions of your return to work as

5   a sheriff's deputy?

6      A      No.

7      Q      And to this day you are performing all

8   the duties expected of you to be a sheriff's deputy

9   for Lancaster County?

10     A      Yes.

11     Q      Have you ever filed a lawsuit against

12  anyone?

13     A      I have not.

14     Q      Okay.  Now, on the date of this incident,

15  tell me what you -- tell me what you did on the date

16  of the incident.

17     A      Prior to the incident itself or...

18     Q      If you could, why don't we start with why

19  were you going to the WellSpan Ephrata Hospital?

20     A      Okay.  I was the on-call deputy that

21  week, and that was on a Saturday.  I started at

22  12:00 p.m., and I was supposed to be on call until

23  midnight that day.  I received a call around

24  4:00 o'clock for a pickup in Ephrata.  I did the

BARBARA GUNNETT

Page 14

1   pickup.  And sometime on the way there or the way to

2   the prison, I received a call that Akron Borough had

3   another person for me to pick up on a probation

4   violation warrant, and that was Andrew.

5        Q     Okay.  The first person that you picked

6   up, had you already transported that person to the

7   jail prior to receiving the call to go pick up

8   Andrew?

9        A     I believe I received the call on the way

10  to the prison, so I was probably still with that

11  person.  I can't recall the situation.

12       Q     Do you remember why you had picked up the

13  first person?

14       A     No.

15       Q     Was that person a male or a female?

16       A     It was a male.

17       Q     Okay.  Do you remember how you came to

18  obtain custody over that first person?

19       A     Can you be specific?

20       Q     Were they already under arrest prior to

21  you going to pick them up?

22       A     Yes.  They were at the Ephrata Police

23  Department.

24       Q     Okay.  What does it mean when you say

BARBARA GUNNETT

1  you're the on-call deputy?  Can you describe what

2  your duties are?

3       A      Yes.  We, as the deputies, have different

4  responsibilities.  We have court deputies, we have

5  civil deputies, and then we have the on-call deputy.

6  The on-call deputy, there's two shifts, the one --

7  they're all Monday through Sunday night.  I'm the

8  first shift.  It's from midnight until noon on the

9  weekends, and then from 8:00 in the morning until

10  midnight during weekdays.  The second shift -- that

11  was the shift that I had at that time -- was from

12  Monday, 4:00 p.m., until Sunday at midnight -- until

13  Monday midnight.  They're seven days.

14       Q      Okay.

15       A      So during those times we deal with all

16  the warrants out of our business hours.

17       Q      Okay.  And when you say deal with

18  warrants, can you describe that for me?  What does

19  that mean?

20       A      Yes, yes, they could be domestic

21  relations bench warrants -- all kind of bench

22  warrants:  domestic relations bench warrants, fines

23  and costs bench warrants, parole violations.

24       Q      Okay.  And I think that you testified

BARBARA GUNNETT

Page 16

1  earlier that you received a call to go to the

2  hospital to pick up Andrew on a probation warrant;

3  is that right?

4      A      Correct, yes.

5      Q      Okay.  And so at the time that you're

6  going to the hospital, you knew that you were

7  picking up someone for a violation of probation; is

8  that right?

9      A      Correct.

10     Q      Did you know anything else about Andrew

11 prior to arriving at the hospital?

12     A      I did not.

13     Q      Did you know anything about his criminal

14 history or background prior to you arriving at the

15 hospital?

16     A      I did not.

17     Q      When you arrived at the hospital, about

18 what time was it?

19     A      It would have been around 5:00 o'clock.

20     Q      And from the time that you got the call

21 until the time that you arrived at the hospital, do

22 you remember about how long that was?

23     A      Probably between a half hour and

24 45 minutes.

BARBARA GUNNETT

Page 17

1      Q      Did you receive any additional calls
2   during that 30- to 45-minute time frame about
3   Andrew's status or your status or where were you or
4   anything of that nature?
5      A      Yes.  Normally when we get a call for
6   somebody that's at the hospital, we will contact
7   security and let them notify us when the person is
8   ready to be discharged, so we will go over.  So that
9   was what I was planning on, but then I received a
10  call from another officer stating that I had to go
11  relieve him to the hospital because he couldn't stay
12  with Andrew at the hospital.
13     Q      Do you know if that was Officer Stone
14  that you received a call from?
15     A      The first time it was Officer Rogers.
16  The second time, I believe, it would have been
17  Officer Stone, Sergeant Stone.
18     Q      So you received two calls prior to
19  arriving at the hospital with regards to Andrew; is
20  that right?
21     A      At least, yes.
22     Q      All right.  Are there other calls that
23  you remember with regards to Andrew?
24     A      Not that I can recall.

BARBARA GUNNETT

Page 18

1      Q      And the first call was placed by Officer

2  Rogers; correct?

3      A      Correct.

4      Q      And the second call was placed by Officer

5  Stone; correct?

6      A      I believe, yes.

7      Q      Okay.  Do you remember Officer Stone

8  advising you as to why he could not remain with

9  Andrew while he was being examined by the medical

10 people there?

11     A      Yes.  He said he was the only officer on

12 the shift.

13     Q      And so he had to go out and patrol and

14 take other calls; is that the --

15     A      Yes.

16     Q      -- the idea?

17     A      Yes.

18     Q      All right.  And did you say anything to

19 either Officer Rogers or Officer Stone on these

20 calls?

21     A      Other than advising him of my ETA, I

22 don't believe so.

23     Q      All right.  Did you tell them that you

24 had another person with you that you were

BARBARA GUNNETT

Page 19

1   transporting to jail?

2       A      At the time I spoke with him, I had

3   already taken that person to the prison.

4       Q      At the time you spoke with Officer Stone;

5   correct?

6       A      Correct.

7       Q      How about the time you spoke with Officer

8   Rogers?  Had you already explained to him -- had you

9   already taken the previous prisoner to jail?

10      A      I can't recall if when he called the

11  first time I was on the way to the prison or I was

12  leaving the prison, but either way, yes.

13      Q      All right.  Did you talk to any security

14  personnel at Ephrata Hospital prior to you arriving

15  there?

16      A      I did not.

17      Q      Okay.  And when you arrived at Ephrata

18  Hospital, did you talk with Officer Stone?

19      A      Yes.

20      Q      Okay.  Can you tell me about that

21  conversation?

22      A      After I arrived, Officer Stone mentioned

23  that he couldn't stay with Andrew because he had to

24  leave on duties on shift.  He didn't mention

BARBARA GUNNETT

1    anything else.  He only mentioned some other

2    instances where Andrew wasn't cooperative, but

3    that's pretty much the extent of the conversation.

4        Q      All right.

5        A      Nothing really to do that day in

6    particular.

7        Q      So Officer Stone did not tell you

8    anything about Andrew's prior activities that day?

9        A      He did not.

10       Q      Was Andrew present when you and Officer

11   Stone were having this discussion?

12       A      He was in the room.  We were, I believe,

13   outside the entrance of the room.

14       Q      Was he in a hospital room?

15       A      Yes.

16       Q      In the ER?

17       A      Yes, I believe so.

18       Q      Okay.  Were there any other security

19   personnel watching Andrew at the time while you and

20   Officer Stone were outside of the room having a

21   discussion?

22       A      No.

23       Q      Okay.  Was Andrew in the room with a

24   doctor or a nurse at the time that you were talking

BARBARA GUNNETT

Page 21

1   with Officer Stone outside the room?

2       A       I don't recall.  We didn't leave the

3   room.  We were just staying far away from him so we

4   could have the conversation, so we were present, but

5   not right close to him.

6       Q       Oh, okay.

7       A       So he was never unattended.

8       Q       So he was not unattended?

9       A       None of the time.

10      Q       All right.  Did he have handcuffs on or

11  shackles on at the time when you first arrived?

12      A       I believe he was cuffed to the bed with

13  the one hand.

14      Q       And what was Andrew doing when you first

15  arrived?

16      A       I don't recall.  He was using the bed.

17      Q       Okay.  And about how big was that

18  hospital room?

19      A       I don't know.  Probably half the size of

20  this room maybe or a third.

21      Q       Okay.

22      A       Not big.

23      Q       And you and Officer Stone had a

24  conversation in the room but away from Andrew; is

BARBARA GUNNETT

Page 22

1   that correct?

2       A       Yes, right outside the room by the

3   entrance of the room.

4       Q       So the door was open?

5       A       Yes.

6       Q       Were you in the doorway, kind of?

7       A       Yes.

8       Q       Okay.  Were you either -- were you still

9   inside the room or outside the room with the door

10  open?

11      A       Outside with the door open.

12      Q       Did you see any nurses or doctors come

13  and go into that room while you were talking to

14  Officer Stone?

15      A       I don't specifically recall.

16      Q       Okay.  What did Officer Stone tell you

17  about Andrew's prior activities previously in the

18  day?

19      A       Nothing.  He did not mention anything

20  prior to me arriving.

21      Q       What was Andrew's physical appearance

22  when you arrived?

23      A       It looked like he had some scratches.  He

24  wasn't wearing a shirt.

BARBARA GUNNETT

Page 23

1    Q      Okay.  Do you remember where the
2  scratches were?
3    A      Probably face and chest area.
4    Q      Okay.  You say probably.  Did you
5  actually see --
6    A      I did see.  I believe it's on my
7  interview.
8    Q      All right.  Did you see any Taser prongs
9  in Andrew --
10   A      I did not.
11   Q      -- when you first came in?
12   A      Sorry.  I did not.
13   Q      Okay.  While you were present did you
14  ever see any doctors take Andrew to be x-rayed?
15   A      No.  That was another thing that we were
16  talking there, because he had to get some x-rays
17  redone on his wrist, because the first one -- I
18  believe the first ones he had the handcuffs on, so
19  they had to redo them.
20   Q      You weren't there for the first x-rays;
21  correct?
22   A      Correct.
23   Q      Were you there for the second --
24   A      Yes.

BARBARA GUNNETT

Page 24

1   Q      -- set of x-rays?

2   A      Yes.

3   Q      All right.  Did you accompany Andrew to

4   the x-ray room with the medical people?

5   A      Yes.  Both officers, Sergeant Stone and

6   I, went to the x-ray room with Andrew.

7   Q      Okay.  Did you have any conversations

8   with Andrew while you were escorting him to the

9   x-ray room?

10  A      I did not.

11  Q      Do you know about how long that escort

12  occurred after you had arrived?

13  A      I don't recall the amount of time.

14  Q      Do you think it was more than half an

15  hour?

16  A      No.  It would have been 15 to 20 minutes.

17  Q      At any time did you ever see any Taser

18  prongs imbedded into Andrew's body?

19  A      I did not.

20  Q      Okay.  Did Officer Stone tell you

21  anything about Andrew's history?

22  A      He did mention some other encounters they

23  have had previously, where apparently Andrew

24  assaulted another officer or something like that.

BARBARA GUNNETT

Page 25

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | But it was not that day. |

3    Q       Okay.  So Officer Stone told you about
4  another incident where Andrew had assaulted an
5  officer.

6    A       Correct.

7    Q       Okay.  Did he say anything else about
8  Andrew?

9    A       Not that I can recall.

10    Q       Did he ever call him an asshole?

11    A       Did I call who?

12    Q       Did Officer Stone refer to Andrew as an
13  asshole?

14    A       I believe he did.

15    Q       Do you remember how many times he did
16  that?

17    A       A couple of times.

18    Q       Did you ask him what he meant by that?

19    A       That was when he was explaining how an
20  asshole he was when he assaulted the other officer
21  and how he was not compliant previous times.

22    Q       Okay.  Did he give you any details about
23  how Andrew was not compliant?

24    A       He did not.

BARBARA GUNNETT

Page 26

1      Q      Okay.  Did you ask him what he meant by

2  that?

3      A      I did not.

4      Q      Did you ask him what he meant by Andrew

5  being an asshole?

6      A      I did not.

7      Q      Did you ask him any details about the

8  previous time that he had allegedly assaulted an

9  officer?

10     A      I did not.

11     Q      Did Officer Stone volunteer any other

12 information about Andrew?

13     A      Not that I can recall.

14     Q      Did he tell you why Andrew was being

15 transported to jail?

16     A      I believe he said something about his

17 wrist.  They had to check his wrist.

18     Q      About why he was transported to jail?

19     A      Oh, I'm sorry.  To jail?

20     Q      Right.

21     A      No.  I was aware that he was a bench

22 warrant, so that's why I knew he was going to jail

23 on our bench warrant.

24     Q      Did Stone tell you anything about what

BARBARA GUNNETT

Page 27

1   the bench warrant was for or why it was issued?

2       A       I had knowledge about what the warrant

3   was for, about being a parole violation.

4       Q       So you had knowledge of that.

5       A       Correct.

6       Q       All right.  Where did that knowledge come

7   from?

8       A       From the system that we use to pull our

9   warrants.

10      Q       The computer.

11      A       Correct.

12      Q       Okay.  Did Stone tell you anything about

13  why Andrew was being transported, or did you have a

14  discussion with him about that?

15      A       No.

16      Q       Okay.  Did you have any knowledge that

17  Andrew Good had left a rehab or eloped from a rehab

18  facility and that was why the bench warrant was

19  issued for him?

20      A       I did not.

21      Q       Okay.  What was Mr. Good's height, if you

22  can remember?

23      A       I don't know his height.  Probably a

24  couple of inches taller than I am.

BARBARA GUNNETT

Page 28

1     Q     And what about his weight?  What do you

2  think?  Do you know what his weight was?

3     A     He was a thin build.  I don't know his

4  weight.

5     Q     And when you saw him, he had his shirt

6  off.  Was he wearing shoes?  Do you remember?

7     A     Yes.

8     Q     Was he wearing pants?

9     A     Yes.

10    Q     Okay.  At some point Officer Stone left;

11  correct?

12    A     Correct.

13    Q     All right.  Do you remember anything

14  about him leaving?

15    A     We had to change the gear in the x-ray

16  room.  We went back to the original room that we

17  were in.  Sergeant Stone stayed there for a couple

18  of minutes, just talked to Andrew for a couple of

19  minutes, and then he left.

20    Q     And when you said exchanging gear, can

21  you describe what that means?

22    A     Yes.  I took the handcuffs that he had

23  from Officer Stone and placed my handcuffs and then

24  put my shackles on.

BARBARA GUNNETT

Page 29

1      Q      Your shackles?

2      A      Yes.

3      Q      Okay.  Prior to you placing your shackles

4   on Andrew, was he at any time shackled that you

5   could observe?

6      A      I can't recall.

7      Q      Do you know whether Officer Stone had any

8   shackles with him that day?

9      A      I don't recall.

10     Q      Did you attach the handcuffs to a belt

11  loop around Andrew's waist?

12     A      Before we left the hospital.

13     Q      Can you say that again?  I'm sorry.

14     A      Before we left the hospital.

15     Q      All right.  And tell me -- describe for

16  me how you affixed the shackles to him.

17     A      We were in the x-ray room, and I put the

18  shackles on like I do to every other prisoner that I

19  deal with.  I double lock them, make sure they don't

20  get tighter and they're not unsecured, and after

21  that he wanted to go to the bathroom.  So he used

22  the bathroom without handcuffs on, came back, and

23  then I placed my handcuffs on in the front.

24     Q      Okay.  Did you check the shackles again

BARBARA GUNNETT

Page 30

1    when he came back from the bathroom?

2         A     No.

3         Q     And when you say double lock the

4    shackles, tell me what you mean by that.

5         A     By double locking, it's when you push the

6    secure part of the shackles so that they don't move.

7         Q     Okay.

8         A     So they're secured in place.

9         Q     And did you put those shackles around his

10   ankles?

11        A     I did.

12        Q     Was he wearing socks?

13        A     I don't recall.

14        Q     Did you put the shackles on over his

15   pants?

16        A     No.

17        Q     Okay.  And how long after you were in the

18   x-ray room did you leave the hospital with Andrew?

19        A     I don't recall the exact amount of time.

20   We were just waiting for the x-ray results to come

21   back and have him medically discharged.

22        Q     Do you think you were there for more than

23   an hour?

24        A     I don't believe so.

BARBARA GUNNETT

1      Q      Were there any other officers present at

2   the time that you were going to leave the hospital

3   with Andrew?

4      A      No.

5      Q      Where were you in the hospital when you

6   secured the handcuffs to the belt loop?

7      A      In the room that Andrew was in.

8      Q      The original examination room?

9      A      Correct.

10      Q      At any time was he talking to you --

11   Andrew -- saying anything to you?

12      A      Not really.

13      Q      Did he say anything at all?

14      A.      Not that I can recall.

15      Q      I think I read in one of your interviews

16   that you said that he was looking at your Taser on

17   your belt.

18      A      So he was looking at my belt.

19      Q      And when did he do that?

20      A      When we were waiting for the x-ray

21   results.

22      Q      Were you in the x-ray room or the exam

23   room again?

24      A      The exam room.

BARBARA GUNNETT

Page 32

1     Q       And did you say anything to him when he
2  was looking at your belt?
3     A       No.  He just made me feel uncomfortable,
4  so I just sat down on the chair next to the bed.
5     Q       All right.  So tell me what happened
6  after you secured his handcuffs to the belt loop and
7  were going to leave the hospital.  Tell me what
8  happened.
9     A       I grabbed the belt in the back.  I
10 directed him where to go to where the car was.
11    Q       And where was the car?
12    A       The car was parked in front of the main
13 entrance of the emergency room.
14    Q       All right.  And then what did you do?
15 Where did you go?
16    A       I walked him down the sidewalk and then
17 the crosswalk and to the car.
18    Q       And did he say anything to you during
19 that time?
20    A       No.
21    Q       All right.  What happened when you got to
22 the car?
23    A       When I got to the car, the car was
24 locked, so I had to manually open the front door and

BARBARA GUNNETT

Page 33

1    push a button to unlock all doors, so I had to let

2    go of him in order to do that.

3         Q      You had to manually unlock the driver's

4    side door?

5         A      Correct.

6         Q      Okay.  And so you --

7         A      The passenger -- the passenger front

8    door.

9         Q      Oh, okay.  So you unlocked the passenger

10   side front door manually.

11        A      Correct.

12        Q      All right.  And what did Andrew do when

13   you were unlocking the door?

14        A      I just instructed him to face the car and

15   do not move.

16        Q      And did you need an actual key?

17        A      Yes.

18        Q      And so you unlocked the passenger side

19   door and then hit the door unlock button?

20        A      Correct.

21        Q      All right.  Did Andrew move or do

22   anything during that time period?

23        A      He did.

24        Q      What did he do?

BARBARA GUNNETT

Page 34

1      A      I believe he was leaning on the

2  passenger's rear side of the car at that point.

3      Q      Okay.  So he was leaning on it?

4      A      Yes.

5      Q      Was he running away at that point when

6  you let go of him?

7      A      No.

8      Q      How long did it take for you to unlock

9  the door when you had let go of him?

10     A      A couple of seconds.

11     Q      And he was leaning on the rear passenger

12  side of the vehicle; correct?

13     A      Correct.

14     Q      And why did you need to let go of him in

15  order to manually unlock the car?

16     A      Because I needed to unlock the door, open

17  the door, and push the button to unlock the door.  I

18  wasn't going to be able to do all that with one hand

19  and holding him with the other.

20     Q      Where were your keys, the car keys?

21     A      On my possession.  I don't specifically

22  recall where specifically.

23     Q      I mean, are they on your belt?  Are they

24  in your pocket?

BARBARA GUNNETT

Page 35

1    A       I usually hang them on the antenna of the

2    radio.

3    Q       But you don't remember where they were on

4    the date of the incident?

5    A       Not specifically.

6    Q       All right.  And so were you able to

7    unlock the door, open the door and unlock and hit

8    the door unlock button while Andrew was still

9    present leaning against the car?

10   A       Correct.

11   Q       Okay.  And then what happened next after

12   that?

13   A       Then I had to put my hand on his shoulder

14   in order to open the door, because he was blocking

15   it, so I said -- I don't think I said something.  I

16   just, like, put my hand on him and tried to open the

17   door, and then he said, "Don't fucking touch me."

18   Q       So by that point he was leaning against

19   the rear passenger side door; correct?

20   A       Towards the end, yes.

21   Q       And you couldn't open the door because he

22   was leaning against it.

23   A       Correct.

24   Q       All right.  And so you moved him with

BARBARA GUNNETT

Page 36

1  your left hand?

2      A      Yes.

3      Q      And then opened the door with your right

4  hand; correct?

5      A      Correct.

6      Q      And then what happened?

7      A      Like I said, "Don't fucking touch me,"

8  and I instructed him several times to get in the

9  car.

10      Q      And what did you say when you instructed

11  him to get in the car?

12      A      He said he just wants to get some fresh

13  air, because he knows he's going to be gone for a

14  while.

15      Q      And what did you say?

16      A      I said that he if got in the car, we'll

17  roll the windows down for him so he could get some

18  fresh air.

19      Q      Okay.  And what did he say in response to

20  that?

21      A      He kept resisting.  He said he just wants

22  to get some fresh air.

23      Q      All right.  And he wasn't trying to run

24  away from you at this point; correct?

BARBARA GUNNETT

1      A      No, but he wasn't complying with my

2  directions to get in the car.

3      Q      All right.  And you didn't have your --

4  did you ever again put your hand on his belt?

5      A      No.

6      Q      Okay.  At any time did you see his

7  shackle come loose or undone from the time that you

8  put them on until this resisting that you're talking

9  about at the vehicle?

10     A      I didn't, but I did find it very strange

11 how he was, like, walking a little faster than I was

12 when we were walking to the car.

13     Q      So at that point you noticed that he

14 was -- he was walking faster than someone in

15 shackles should be able to?

16     A      Correct.

17     Q      All right.  Did you say anything to him

18 or look at his shackles or say stop or --

19     A      No.  I just held the belt tighter so he

20 would slow down.

21     Q      All right.  Did you tell me everything

22 about this back-and-forth discussion that you had

23 with him, about getting in the car versus him

24 staying outside the car to get fresh air?  Were

BARBARA GUNNETT

Page 38

1   there any other things said?

2       A       Like -- just, like, to get in the car or

3   I will -- at one point I believe I said that I will

4   charge him with resisting arrest if he didn't get in

5   the car.  I don't recall saying anything else.

6       Q       Did he say anything else to you?

7       A       No.

8       Q       What happened next after that?

9       A       After that I grabbed his arm and tried to

10  get him in the car, and he kept pushing and pulling

11  away from me.  At that point, I believe, I called

12  for assistance on the radio.

13      Q       Okay.  How many times -- so was it once

14  that you grabbed onto his arm and tried to put him

15  into the car and then he pushed away, or did you try

16  a couple of times?

17      A       There were several times that I tried --

18  attempted to get him to get in the car.

19      Q       Are you yelling at him or telling him,

20  "Get in the car"?

21      A       I'm telling him, "Get in the car,"

22  firmly.

23      Q       And what was he saying to you?

24      A       The same thing, that he just wanted to

BARBARA GUNNETT

Page 39

1  get some fresh air.

2      Q     All right.  And then what happened after

3  that?

4      A     At this point we kept, like -- I kept

5  trying to pull him to get into the car, and he kept

6  pulling away from me, and we moved further away from

7  the door.  That's when we begin to kind of, like,

8  struggle, me pulling him and he kind of, like,

9  pulling away from me.

10     Q     Okay.  Do you know how many times you

11  went back and forth with him in terms of the

12  discussion that you were having with him?

13     A     I didn't count them, but there were

14  several times that I instructed him to get in the

15  car and him not complying with it.

16     Q     Okay.  Do you think it was more than five

17  times?

18     A     I don't recall.  Probably.

19     Q     And yet at some point you called for

20  assistance; correct?

21     A     Correct.

22     Q     Okay.  What was the status of you and

23  Andrew in this incident at the time you called for

24  assistance?

BARBARA GUNNETT

Page 40

1     A     About me being the only officer present

2 and him not going into the car, so I felt like I

3 needed somebody to help me get him in the car.

4     Q     At this point you did not choose to Taser

5 him; correct?

6     A     Correct.

7     Q     Why did you not choose to Taser him at

8 this point?

9     A     Because his action at that time, I didn't

10 feel like it needed to be tased.

11     Q     Despite the fact that he was already

12 resisting you; correct?

13     A     Correct.

14     Q     And he was already, as you put it,

15 struggling with you; correct?

16     A     Correct.

17     Q     And at that point you elected not to tase

18 him.

19     A     Correct.

20     Q     Did you know that he had been tased prior

21 in the day?

22     A     I did not.

23     Q     Okay.  When you called for radio

24 assistance, did anyone respond to you through the

BARBARA GUNNETT

Page 41

1    radio?

2        A       I don't recall.

3        Q       And when you call for assistance on that

4    radio, who receives that transmission?

5        A       County radio dispatcher.

6        Q       And you can't remember whether the county

7    radio dispatcher responded to you at all or said

8    anything to you?

9        A       I don't recall.

10       Q       All right.  And then what happened next

11   after that?

12       A       After that that's when -- I believe I

13   told him that if he didn't get into the car, I was

14   going to tase him.

15       Q       And what did he say to that?

16       A       I don't recall.

17       Q       All right.  And then what happened next

18   after that?

19       A       We kept, like, struggling back and forth.

20   At one point I felt his shoulders move, like, weird,

21   and when I looked down, he was trying to grab my

22   Taser.

23       Q       And at the time tell me where in relation

24   to him you were.

BARBARA GUNNETT

Page 42

1       A       I was in close proximity to him.

2       Q       And his handcuffs are cuffed to his belt;

3    correct?

4       A       Correct.

5       Q       All right.  And you felt his shoulders

6    move.  Were you grabbing him around the shoulders?

7       A       I was not.

8       Q       Tell me how you felt his shoulders move

9    weirdly.

10      A       Because he was in close proximity to me,

11   and I just, like, felt his shoulders moved in a

12   weird way.

13      Q       You were face-to-face with him?

14      A       Correct.

15      Q       All right.  And where was your Taser kept

16   on your belt?

17      A       On my left side, nondominant hand.

18      Q       You're left-handed?

19      A       No, nondominant-hand side.

20      Q       I'm sorry.  I misheard that.  And on your

21   right hand you keep your firearm; is that true?

22      A       Correct.

23      Q       And how did you know that he was trying

24   to grab your Taser?

BARBARA GUNNETT

Page 43

1     A      Because I saw his hands trying to grab my

2   Taser on my left side.

3     Q      All right.

4     A      And he said, "Yeah, I tried to get your

5   Taser."

6     Q      He said that?

7     A      He did.

8     Q      All right.  And he said, "What are you

9   going to do?  Shoot me now?"

10    A      Correct.

11    Q      And what did you say?

12    A      I don't recall if I said anything.

13    Q      All right.  And you still hadn't tasered

14  him at this point.

15    A      Correct.

16    Q      Why not?

17    A      Because I didn't think it was necessary

18  at that point.

19    Q      How long is this struggle occurring?  How

20  long did this take?

21    A      Couple of minutes.

22    Q      Okay.  And after he says, "Yeah, I was

23  trying to get your Taser.  What are you going to do?

24  Shoot me now," did you say anything to him at that

BARBARA GUNNETT

Page 44

1    point?

2       A       I don't recall if I said anything.

3       Q       You don't remember what, if anything, you

4    said?

5       A       Correct.

6       Q       All right.  And then what happened after

7    that?

8       A       And then at that point he turned around

9    and ran from me.

10      Q       All right.  Did he break -- did you have

11   any kind of grip or hold on him at the time that he

12   broke away and ran?

13      A       I did not.

14      Q       Okay.  And then what happened after he

15   broke away and ran?  Did you make another radio

16   call?

17      A       No.  I pulled my Taser, and I deployed my

18   first cartridge.

19      Q       And so when he broke away and ran from

20   you, you deployed your Taser, and did it hit him?

21      A       I believe so.

22      Q       And did you see it hit him?

23      A       I did not see it.  I saw him fall on the

24   ground.

BARBARA GUNNETT

Page 45

1    Q      In the parking lot?

2    A      Correct.

3    Q      All right.  And you were using the

4  trigger pull, shooting the cartridges out; correct?

5    A      Correct.

6    Q      Okay.  Do you know where you hit him with

7  the Taser, where the prongs hit him?

8    A      I do not.  I aimed for the upper back.  I

9  don't know where it hit him.

10   Q      Okay.  And did you attempt to engage the

11 electrical charge while he had fallen down?

12   A      I believe I told him to stay on the

13 ground or I was going to give him another round.

14   Q      So at the time that the prongs deployed

15 and hit him, he hit the ground; correct?

16   A      Correct.

17   Q      And at the time that the prongs hit him,

18 there was an electrical charge that accompanied

19 those prongs; correct?

20   A      Correct.

21   Q      Do you think it was the electrical charge

22 that resulted in him falling down?

23   A      I do not know that.

24   Q      Okay.  Did you see him trip over anything

BARBARA GUNNETT

Page 46

1   or...

2       A      I saw him fall to the ground.

3       Q      How far away from him were you when you

4   first deployed your Taser?

5       A      Probably the same distance between you

6   and me.  Maybe a little farther.  Maybe from here to

7   the door.

8       Q      Okay.

9       A      So 10 feet, 15.

10              MR. MAC MAIN:  Yeah, I mean, I think what

11  she's describing --

12              MR. BAIRD:  You to the door is 10 feet, I

13  would say, 15 -- yeah, 10 feet probably.

14              MR. MAC MAIN:  So between 5 to 10 feet

15  away.  Is that fair?

16              MR. BAIRD:  That's an estimate, yeah.

17              MR. MAC MAIN:  Yeah, that's why I said

18  about, yeah.

19              MR. BAIRD:  Yeah.

20  BY MR. BAIRD:

21       Q      All right.  And then you told him you

22  were going to give him another charge, electrical

23  charge, if he didn't stop resisting; correct?

24       A      Correct.

BARBARA GUNNETT

Page 47

1    Q      Okay.  Do you remember what words you
2   used?

3    A      I don't recall the specific words that I
4   used.

5    Q      Okay.  It probably wasn't my clumsy words
6   that I just said; right?  Probably not.

7           All right.  What did he do after that?
8   Did he yell at you?  Did he respond to you in any
9   way?

10   A      He kept saying, "Why are you doing this
11  to me?"

12   Q      Okay.  And did you say, "Because you just
13  tried to run away"?

14   A      I don't believe I said anything.

15   Q      Okay.  Did you get him with another
16  charge?

17   A      I don't recall.  I might have.  I don't
18  recall.

19   Q      But at some point he gets up off the
20  ground; correct?

21   A      Correct.

22   Q      Okay.  Had you ever used your Taser prior
23  to this date?

24   A      On another person, no.

BARBARA GUNNETT

Page 48

1      Q      In training you had used it to deploy;
2  correct?
3      A      Correct.
4      Q      Had you ever observed other sheriff's
5  deputies deploying their Taser on another person?
6      A      Besides training purposes, no.
7      Q      Okay.  How long did it take from the time
8  that you deployed your Taser on Andrew to the point
9  that he got back up on his feet?  Do you know?
10     A      I don't know.
11     Q      Was it very fast that that happened?  Was
12  it --
13     A      I will guess so, but I'm not sure, yes.
14     Q      Okay.
15            MR. MAC MAIN:  Don't guess at anything.
16            THE WITNESS:  I'm sorry.
17  BY MR. BAIRD:
18     Q      All right.  At any time did you observe
19  the shackles that Andrew had that were attached to
20  him come off?  Did you see that at any time?
21     A      I did not.
22            MR. MAC MAIN:  Are you talking about any
23  time during the incident, or are we still in this
24  little window between the first and when he runs?

BARBARA GUNNETT

Page 49

1          MR. BAIRD:   That was a clumsy question.

2  I was referring to the entire incident.

3  BY MR. BAIRD:

4     Q    At any time did you see the shackles come

5  off of him?

6     A    I did not.

7     Q    Okay.   And after Andrew had gotten back

8  up to his feet, tell me what happened then.

9     A    He began to flee from me again.   To this

10  point I deployed my second and last cartridge

11  available and called -- radioed that he was running

12  away from me.

13     Q    All right.   And when you say you deployed

14  two cartridges, those are the only two cartridges

15  that you had available at the time; correct?

16     A    Correct.

17     Q    Okay.   And that is standard equipment for

18  all sheriff's deputies to just have two cartridges;

19  right?

20     A    Correct.

21     Q    That's how the conducted-electrical

22  weapons are made; right?

23     A    For that model that we were carrying in

24  our department, yes.

BARBARA GUNNETT

Page 50

1    Q      All right.  And how many prongs come out

2  on each one of those cartridges?

3    A      Two.

4    Q      And did you see those prongs hit Andrew

5  on both of your deployments?

6    A      I did not see where the prongs hit him.

7    Q      Okay.  When Andrew was fleeing from you,

8  were you on level ground, or was there a slope?

9    A      There's a slope.

10    Q      Okay.  And I've seen a video of -- some

11  surveillance video of this where he -- where Andrew

12  is running down the hill, and you're running down

13  the hill, too, after him.  Have you seen that video?

14    A      Yes.

15    Q      Okay.  Do you know where that video came

16  from?

17    A      I believe from the security cameras.

18    Q      At the hospital; right?

19    A      At the hospital, correct.

20    Q      All right.  And at some point did you

21  ever try to grab Andrew or pick him up?  You heard

22  my client's testimony about how she wanted you to

23  grab onto him or hold him.

24    A      Correct.

BARBARA GUNNETT

Page 51

1     Q     Did you ever do that?

2     A     I did not.

3     Q     Did you ever think you had an opportunity

4 to try to grab him or otherwise restrain him with

5 physical force?

6     A     I did not.

7     Q     Did you think about whether you could do

8 that at the time?

9     A     I did not.

10     Q     Where did Andrew go after he got up and

11 started running?

12     A     He run to the wooded area next to the

13 hospital.

14     Q     Okay.  And there's a creek down there;

15 correct?

16     A     No, I didn't know that at the time.  I

17 wasn't familiar with the area.

18     Q     Was the creek hidden from -- could you

19 see the creek from where your vantage point was when

20 you were running down the hill?

21     A     No.

22     Q     What did you observe Andrew do after he

23 had gotten up and was running towards the wooded

24 area?

BARBARA GUNNETT

Page 52

1      A      After he run to the wooded area, I saw

2   him disappear into the wooded area.

3      Q      And at that time you had called again for

4   assistance; correct?

5      A      I believe so.

6      Q      Do you remember what you were thinking at

7   the time that you saw him disappear?

8      A      Me being unfamiliar with the area, I was

9   just waiting for backup to arrive.

10      Q      Did you proceed into the wooded area

11   after him?

12      A      Not until backup arrived.

13      Q      And tell me the reason for that.

14      A      Safety issue.

15      Q      Okay.  And when you say a safety issue,

16   was it a safety issue for you?  For the public?  For

17   Andrew?  Tell me about that.

18      A      All of the above.  I'm not familiar -- I

19   wasn't familiar with the area.  I don't know why he

20   ran to -- I don't know if somebody was waiting there

21   for him.  I was there by myself, so I had to wait

22   for backup.

23      Q      Okay.  Did you ever see Andrew again on

24   that date?

BARBARA GUNNETT

Page 53

1    A       Yes.

2    Q       Tell me about that.

3    A       After Officer Rivera from Ephrata Police

4   Department arrived, we began to search for Andrew

5   for several minutes until I finally spotted him by

6   the creek.

7    Q       And is that Officer Beth Rivera?

8    A       Yes.

9    Q       How long did it take for her to get

10  there?

11   A       I don't recall the specific time.

12   Q       Was it more than 10 minutes?

13   A       You mean for her to arrive to the scene?

14   Q       Yes.

15   A       Yes.

16   Q       From the time that you saw Andrew

17  disappear into the woods versus the time that she

18  arrived, it was more than 10 minutes?

19   A       Probably not.

20   Q       Okay.

21   A       In answer to your question.

22   Q       From the time that you saw him disappear

23  into the woods until Officer Rivera arrived, about

24  how long was that?

BARBARA GUNNETT

Page 54

1    A      Like five minutes.

2    Q      Were you talking on the radio with anyone

3  during that five-minute time period?

4    A      I believe the dispatchers were trying to

5  get my location.

6    Q      All right.  And were you giving them your

7  location?

8    A      Yes.

9    Q      Anything else?  Did anyone else talk to

10  you during that time period that -- while you were

11  waiting for Officer Rivera?

12    A      I notified my supervisor of the

13  situation, the ongoing situation.

14    Q      Okay.  Was that Sheriff Leppler?

15    A      No.  That was Sergeant Bradley Breneman.

16    Q      Okay.

17    A      Who was the on-call supervisor that day.

18    Q      And you called him on the radio; correct?

19    A      On the phone.

20    Q      On your cell phone?

21    A      On the work cell phone, yes.

22    Q      All right.  And what did he say to you on

23  the phone?

24    A      I don't recall.

BARBARA GUNNETT

Page 55

1     Q      At any time did you see anybody else

2   deploy any Tasers on --

3     A      No.

4     Q      -- Andrew?

5     A      Sorry.

6     Q      That's okay.

7     A      No.

8     Q      When you saw him on the bank of the

9   creek, what was he doing?

10    A      He was sitting down.

11    Q      Did you see whether his hands were

12   cuffed?

13    A      No.

14    Q      Did you see him with his face towards you

15   or his back towards you?

16    A      I was only able to see the full back.

17    Q      Did you notice anything else about him

18   while he was sitting down?

19    A      I did not.

20    Q      At any time did you see him stand up?

21    A      I did not.

22    Q      Did you yell out to anyone that you saw

23   him?

24    A      I walked up to Officer Rivera and

BARBARA GUNNETT

Page 56

1    informed her that I had seen him.

2        Q       Okay.

3        A       And pointed in the direction where he

4    was.

5        Q       Did you ever yell to Andrew?

6        A       I believe Officer Rivera and I were

7    yelling out his name.

8        Q       At the time that you saw him, did you

9    yell out to him?

10       A       I did not.

11       Q       And what was the reason why you didn't

12   yell to him there?

13       A       To use that as my advantage so he didn't

14   know we were coming for him.

15       Q       But then you lost sight of him again; is

16   that true?

17       A       We had to walk around all the branches

18   and trees to go to the point where he was, so at

19   that point I did lose sight of him.

20       Q       From the time period that you saw him

21   sitting down by the creek until you lost sight of

22   him again, about how long was that time period?

23       A       It would have been a couple of seconds.

24       Q       Did you ever see him again after losing

BARBARA GUNNETT

Page 57

1  sight of him?

2      A      Yes.

3      Q      Tell me about that.

4      A      When we arrived to the area together, we

5  initially saw him.  He was in the water.

6      Q      What body parts did you see of him in the

7  water?

8      A      From the chest up.

9      Q      Okay.  Could you tell whether he was

10  standing on the bottom of the creek when you saw

11  him?

12      A      I was unable to tell.

13      Q      Could you see his arms at all?

14      A      No.

15      Q      How far out into the creek was he when

16  you observed him again?

17      A      Well, pretty far.  I don't know the exact

18  distance, but it was further than the door, so

19  further away -- more than 10, 15 feet away.

20      Q      Did you yell to him?

21      A      I don't recall.

22      Q      Do you know whether Officer Rivera yelled

23  to him?

24      A      I believe she did.

BARBARA GUNNETT

Page 58

1      Q      Okay.  Did you ever lose sight of him

2  again?

3      A      Yes.

4      Q      Tell me about that.

5      A      After he kept getting deeper into the

6  creek, it was only at this point where his head was

7  the only thing visible, and then a couple of times

8  his head went down below the water, and then after a

9  couple of times it didn't arise.

10      Q      And at any time did you yell to him?

11      A      I don't recall.

12      Q      And you think Officer Rivera yelled to

13  him?

14      A      I believe she did.

15      Q      Do you know what she yelled?

16      A      I believe she was saying his name,

17  Andrew.

18            MR. BAIRD:  Okay.

19            MS. GOOD:  Can we have a break?

20            MR. BAIRD:  Yeah, sure.

21            MR. MAC MAIN:  Sure.

22               (A recess was taken.)

23  BY MR. BAIRD:

24      Q      All right.  Ms. Gunnett, did you see --

BARBARA GUNNETT

Page 59

1    when Andrew was sitting on the bank of the creek,

2    did you see any Taser prongs in him?

3        A    No.

4        Q    Okay.  About how far away from him were

5    you?

6        A    When I first saw him?

7        Q    Yeah.

8        A    It was far away.

9        Q    When you next saw him when he was in the

10   creek, how close to the creek were you?

11       A    A couple of feet away.

12       Q    So you were on the bank of the creek when

13   you saw him in the water; correct?

14       A    Correct.

15       Q    Did you ever see him actually enter the

16   water?

17       A    I did not.

18       Q    Do you know whether anyone else actually

19   saw him enter the water that you're aware of?

20       A    I'm not aware.  I don't know.

21       Q    And when you and Officer Rivera were

22   searching, how close was Officer Rivera to you?

23       A    A couple of feet away.

24       Q    Were there any other officers present at

1    that time?

2        A    No.

3        Q    Did you ever enter the water to try to

4    get Mr. Good in custody?

5        A    I did not.

6        Q    Okay.  And why didn't you go into the

7    water?

8        A    Different reasons:  First one, Officer

9    Rivera was already in the water, and we were the

10   only two officers on the scene; secondly, I'm not

11   trained in water rescue.

12       Q    Do you know whether Officer Rivera is

13   trained in water rescue?

14       A    I do not know.

15       Q    Okay.  Did you at any time ever see

16   Andrew Good again?

17       A    No.

18       Q    Okay.  And after that happened what did

19   you do?

20       A    Can you be more specific as to what?

21       Q    Yeah, yeah, that was a bad question.

22            Was Officer Rivera able to get to Andrew?

23       A    No.

24       Q    Okay.  What did she do to try to go into

BARBARA GUNNETT

Page 61

1   the water?  Did she put down her equipment?  Did she

2   grab onto a tree to try to secure her footsteps?

3       A      The only thing I recall is she took her

4   duty belt with all of her gear off.

5       Q      Did she swim out into the creek?

6       A      No.  She got into the water.  I don't

7   know how far she did.

8       Q      Okay.  At some point other officers

9   arrived; correct?

10      A      Correct.

11      Q      Okay.  Did you see any of these other

12  officers arrive from where you were next to the

13  creek?

14      A      What do you mean?

15      Q      At the time you're standing next to the

16  creek and you watch Officer Rivera walking out into

17  the creek, were there any other officers present at

18  that time?

19      A      No.

20      Q      What was on the other side of the creek,

21  if you remember?

22      A      I don't know.

23      Q      Was it more woods?

24      A      I believe so.

BARBARA GUNNETT

Page 62

1      Q     Do you remember if you saw any roads on

2  the other side of the creek --

3      A     I don't know.

4      Q     -- from where you were standing?

5      A     No.

6      Q     Okay.  Did you ever have any

7  conversations with anyone prior to giving your

8  statement about what had happened?

9      A     I did not.

10     Q     What about your supervisor?  Did you talk

11  to him at all prior to giving your statement about

12  what had happened?

13     A     As far as the prisoner ran away from my

14  custody, that's as far as it went.

15     Q     You didn't get into any detail with your

16  supervisor about what had happened?

17     A     I did not.

18     Q     Did you ever talk to Sheriff Leppler

19  about this incident?

20     A     I did not.

21     Q     Lancaster County has a policy with

22  regards to the use of your electronic-controlled

23  weapon.  Are you aware of that policy?

24     A     Yes.

BARBARA GUNNETT

Page 63

1       Q       Did you ever read it before this incident

2  occurred?

3       A       Yes.

4       Q       Okay.  How many trainings did you

5  undertake with regards to the use of your

6  electronic-controlled weapon?

7       A       We do a recertification every year.

8       Q       Okay.  And so by that time would it be

9  fair to say that you had undertaken two trainings on

10 that?

11      A       Yes.

12      Q       With Lancaster County Sheriff's

13 Department; correct?

14      A       Correct.

15      Q       All right.  Were you ever trained on the

16 use of a Taser or an electronic-controlled weapon by

17 Dauphin County?

18      A       Yes.

19      Q       Did those trainings differ in any way

20 that you can remember?

21      A       Yeah.  The model that we were carrying in

22 Lancaster County was different from Dauphin County.

23      Q       How was it different?  Can you tell me

24 about that?

BARBARA GUNNETT

Page 64

1    A    Yes.  The one that I was carrying with

2 Lancaster County, you're able to carry two

3 cartridges at one time and deploy them individually;

4 and the ones for Dauphin County, you had to recharge

5 the one cartridge after deployment of the first one.

6    Q    Okay.  Have you ever received any

7 training from any source with regards to the use of

8 the electronic-controlled weapon that you're not to

9 deploy it on someone who has an opioid addiction?

10    A    No.  The things that we go through in

11 training is about deployment on elderly, kids, low

12 mass individuals, and pregnant women.

13    Q    Have you ever at any time received any

14 training on the use of the conducted-electrical

15 weapon that you should not use it on people who have

16 heart problems?

17    A    That's included in the training.

18    Q    Have you ever received any trainings that

19 you should not use a Taser on anyone who is under

20 the influence of opiates?

21    A    Not specifically that.

22    Q    How about generally?

23    A    Not that I can recall.

24         MR. MAC MAIN:  Generally under the

BARBARA GUNNETT

Page 65

1    influence of drugs?  Is that your general --

2              MR. BAIRD:  Sure.

3              THE WITNESS:  Not that I'm aware of.

4              MR. BAIRD:  All right.  And just so we're

5    clear, she said not specifically.

6    BY MR. BAIRD:

7         Q    I'm trying to find out if there's some

8    other kind of general instruction given to you with

9    regards to someone who's under the influence of any

10   kind of --

11        A    No, not that I can recall.

12        Q    Did you ever receive any training from

13   Lancaster County that you should not be deploying a

14   Taser on individuals who are handcuffed?

15        A    It all depends on the circumstances.

16        Q    The totality of the circumstances?

17        A    Correct.

18        Q    Okay.  Had you ever received training

19   that you should not deploy a conducted-electrical

20   weapon on individuals who are standing in water?

21        A    Correct.

22        Q    Okay.  Besides the deployment of the

23   cartridges, the weapon that you used can also be

24   used to drive stun individuals; correct?

BARBARA GUNNETT

Page 66

1     A     Correct.

2     Q     And can you just describe what a drive

3  stun is for the record?

4     A     Drive stun is just, like, giving an

5  electrical shock directly on the skin.

6           MR. BAIRD:  All right.  I think that's

7  all the questions I have for you, Sheriff Gunnett.

8           MR. BOYLE:  Nothing from me.  Thank you

9  for coming in.

10          MR. MAC MAIN:  I actually have a few.

11                    EXAMINATION

12  BY MR. MAC MAIN:

13     Q     At any point did you -- well, let me ask

14  you this:  At any point did you ever tase Mr. Good

15  while he was in the water?

16     A     I did not.

17     Q     Did you observe anybody tase him while he

18  was in the water?

19     A     I did not.

20     Q     You said when you last saw him, he was on

21  the bank of the creek, then you lost -- you lost

22  vision, and the next thing you knew is you and

23  Officer Rivera came around and he was now into the

24  water up to his chest about 10 to 15 feet in.

BARBARA GUNNETT

Page 67

1      A      Correct.

2      Q      Was there anybody -- when you and Officer

3  Rivera got down to the bed of the creek, was there

4  anyone else there besides Mr. Good?

5      A      Can you specify --

6      Q      Sure.

7      A      Anybody with him or anybody in the area?

8      Q      Anybody who could have possibly pushed

9  him in the creek between the time you last saw him

10 and when you and Officer Rivera got down to the

11 bank.

12     A      No.  He was the only one.

13     Q      And you didn't push him in?

14     A      I did not.

15     Q      Officer Rivera didn't push him in?

16     A      She did not.

17            MR. MAC MAIN:  Okay.  That's all the

18 questions I have.  Thank you.

19            MR. BAIRD:  No follow-up.

20                      -  -  -

21            (The witness was excused.)

22                      -  -  -

23            (The deposition concluded at

24 approximately 1:00 p.m.)

BARBARA GUNNETT

Page 68

1               C E R T I F I C A T E
2
3
4          I do hereby certify that I am a Notary
Public in good standing; that the aforesaid
5   testimony was taken before me at the time and place
indicated; that said deponent was by me duly sworn
6   to tell the truth, the whole truth, and nothing but
the truth; that the testimony of said deponent was
7   correctly recorded in machine shorthand by me and
thereafter transcribed under my supervision with
8   computer-aided transcription; that the deposition is
a true and correct record of the testimony given by
9   the deponent; that a review of the transcript by the
deponent was not requested; and that I am neither of
10  counsel nor kin to any party in said action nor
interested in the outcome thereof.
11
          I declare under penalty of perjury that
12  the foregoing is true and correct.  Dated this
1st day of September, 2020.
13
14
15
16
17          
18
          Holly J. Cross
          Notary Public
19
20
21
22
23
24

| & |
| --- |
| **&** 2:15 |

| **1** |
| --- |
| **1** 4:13 |
| **10** 4:5,5 46:9,12,13 |
| 46:14 53:12,18 |
| 57:19 66:24 |
| **1194** 68:18 |
| **11:45** 1:18 |
| **1240** 2:4 |
| **12:00** 13:22 |
| **14th** 5:18 |
| **15** 24:16 46:9,13 |
| 57:19 66:24 |
| **1500** 2:4 |
| **17** 1:11 |
| **1800** 1:23 |
| **1801** 1:23 |
| **19103** 1:24 2:16 |
| **19110** 2:5 |
| **19382** 2:10 |
| **1:00** 67:24 |
| **1st** 68:12 |

| **2** |
| --- |
| **20** 24:16 |
| **20-1431** 1:6 |
| **200** 1:16 2:10 |
| **2000** 2:16 |
| **2014** 7:21 |
| **2016** 7:18,22 |
| **2018** 5:18 6:20 |
| 8:12 |
| **2020** 1:11 68:12 |
| **215** 2:5,17 |
| **2300** 2:16 |

| **3** |
| --- |
| **30** 12:19 17:2 |
| **318-7106** 2:11 |

| **4** |
| --- |
| **433** 1:16 2:10 |
| **45** 16:24 17:2 |
| **484** 2:11 |
| **4:00** 13:24 15:12 |

| **5** |
| --- |
| **5** 3:4 4:13 46:14 |
| **575-4555** 2:17 |
| **5:00** 16:19 |

| **6** |
| --- |
| **627-9999** 2:5 |
| **66** 3:5 |

| **8** |
| --- |
| **8:00** 15:9 |

| **a** |
| --- |
| **a.m.** 1:18 |
| **able** 34:18 35:6 |
| 37:15 55:16 60:22 |
| 64:2 |
| **accompanied** 45:18 |
| **accompany** 24:3 |
| **accurate** 6:22 12:11 |
| **action** 40:9 68:10 |
| **activities** 20:8 22:17 |
| **actual** 33:16 |
| **addiction** 64:9 |
| **additional** 17:1 |
| **administrative** 12:14,17,20,24 |
| **advantage** 56:13 |
| **advising** 18:8,21 |
| **affixed** 29:16 |
| **aforesaid** 68:4 |
| **agencies** 7:7,9,14 |
| **agency** 9:7 |

agreed 5:2
aided 68:8
aimed 45:8
air 36:13,18,22 37:24 39:1
akron 14:2
allegedly 26:8
amount 24:13 30:19
andrew 1:3 2:9 5:15 10:22 14:4,8 16:2,10 17:12,19 17:23 18:9 19:23 20:2,10,19,23 21:14,24 23:9,14 24:3,6,8,23 25:4,8 25:12,23 26:4,12 26:14 27:13,17 28:18 29:4 30:18 31:3,7,11 33:12,21 35:8 39:23 48:8 48:19 49:7 50:4,7 50:11,21 51:10,22 52:17,23 53:4,16 55:4 56:5 58:17 59:1 60:16,22
andrew's 17:3 20:8 22:17,21 24:18,21 29:11
ankles 30:10
answer 4:3 8:23 9:9 10:9,12,15 53:21
antenna 35:1
anybody 55:1 66:17 67:2,7,7,8
apparently 24:23
appearance 22:21
approximately 1:17 67:24

april 5:18
area 23:3 51:12,17 51:24 52:1,2,8,10 52:19 57:4 67:7
arising 5:17 10:18
arm 38:9,14
arms 57:13
arrest 14:20 38:4
arrive 52:9 53:13 61:12
arrived 16:17,21 19:17,22 21:11,15 22:22 24:12 52:12 53:4,18,23 57:4 61:9
arriving 16:11,14 17:19 19:14 22:20
assaulted 24:24 25:4,20 26:8
asshole 25:10,13 25:20 26:5
assistance 38:12 39:20,24 40:24 41:3 52:4
associated 8:9
atlantic 1:23
attach 29:10
attached 48:19
attempt 45:10
attempted 38:18
attorney 6:5
august 1:11
available 49:11,15
avoid 8:6
aware 26:21 59:19 59:20 62:23 65:3

| **b** |
| --- |
| **b** 3:8 |
| **back** 5:17 28:16 29:22 30:1,21 32:9 37:22 39:11 |

[back - correct]

41:19 45:8 48:9
49:7 55:15,16
**background**  16:14
**backup**  52:9,12,22
**bad**  60:21
**baird**  2:3 3:4 5:13
5:14 8:18 9:1,11
9:24 10:5,8,13,16
46:12,16,19,20
48:17 49:1,3
58:18,20,23 65:2,4
65:6 66:6 67:19
**bank**  55:8 59:1,12
66:21 67:11
**barbara**  1:7,14
2:12 3:3 5:9,22
6:18,21
**bathroom**  29:21
29:22 30:1
**bed**  21:12,16 32:4
67:3
**began**  49:9 53:4
**believe**  6:9 14:9
17:16 18:6,22
20:12,17 21:12
23:6,18 25:14
26:16 30:24 34:1
38:3,11 41:12
44:21 45:12 47:14
50:17 52:5 54:4
56:6 57:24 58:14
58:16 61:24
**belt**  29:10 31:6,17
31:18 32:2,6,9
34:23 37:4,19
42:2,16 61:4
**bench**  15:21,21,22
15:23 26:21,23
27:1,18
**beth**  53:7

**big**  21:17,22
**blocking**  35:14
**body**  24:18 57:6
**borough**  1:8 2:18
14:2
**bottom**  57:10
**boulevard**  2:4
**boyle**  2:15 66:8
**bradley**  54:15
**branches**  56:17
**break**  6:11 44:10
58:19
**breneman**  54:15
**broke**  44:12,15,19
**build**  28:3
**business**  15:16
**button**  33:1,19
34:17 35:8

**c**

**c**  2:1 68:1,1
**call**  13:20,22,23
14:2,7,9 15:1,5,6
16:1,20 17:5,10,14
18:1,4 25:10,11
41:3 44:16 54:17
**called**  19:10 38:11
39:19,23 40:23
49:11 52:3 54:18
**calls**  17:1,18,22
18:14,20
**cameras**  50:17
**capacity**  7:10
**car**  32:10,11,12,17
32:22,23,23 33:14
34:2,15,20 35:9
36:9,11,16 37:2,12
37:23,24 38:2,5,10
38:15,18,20,21
39:5,15 40:2,3
41:13

**carry**  64:2
**carrying**  49:23
63:21 64:1
**cartridge**  44:18
49:10 64:5
**cartridges**  45:4
49:14,14,18 50:2
64:3 65:23
**cell**  54:20,21
**center**  2:4
**certification**  5:4
**certify**  68:4
**chair**  32:4
**change**  8:8 28:15
**charge**  38:4 45:11
45:18,21 46:22,23
47:16
**check**  26:17 29:24
**chest**  23:3 57:8
66:24
**chester**  1:17 2:10
**choose**  40:4,7
**christopher**  1:8
2:12,15
**circumstances**
65:15,16
**citizen**  9:23 10:3
**citizen's**  9:16
10:18
**citizens**  10:11
**city**  9:10
**civil**  15:5
**clear**  65:5
**client**  10:14
**client's**  50:22
**close**  21:5 42:1,10
59:10,22
**clumsy**  47:5 49:1
**coleman**  2:15
**come**  22:12 27:6
30:20 37:7 48:20

49:4 50:1
**coming**  56:14 66:9
**commencing**  1:17
**commute**  8:6
**complaint**  9:16,16
10:18
**compliant**  25:21
25:23
**complying**  37:1
39:15
**computer**  27:10
68:8
**concerning**  11:22
**concluded**  67:23
**conditions**  13:4
**conducted**  49:21
64:14 65:19
**connection**  10:21
**contact**  17:6
**contained**  12:5
**controlled**  62:22
63:6,16 64:8
**conversation**
19:21 20:3 21:4
21:24
**conversations**
24:7 62:7
**cooperative**  20:2
**correct**  6:3,4 8:10
10:22 11:2,3,6,12
11:13,16 12:11,12
12:21,22 16:4,9
18:2,3,5 19:5,6
22:1 23:21,22
25:6 27:5,11
28:11,12 31:9
33:5,11,20 34:12
34:13 35:10,19,23
36:4,5,24 37:16
39:20,21 40:5,6,12
40:13,15,16,19

[correct - elected]

42:3,4,14,22 43:10
43:15 44:5 45:2,4
45:5,15,16,19,20
46:23,24 47:20,21
48:2,3 49:15,16,20
50:19,24 51:16
52:4 54:18 59:13
59:14 61:9,10
63:13,14 65:17,21
65:24 66:1 67:1
68:8,12
**correctly** 68:7
**costs** 15:23
**counsel** 2:6,12,18
5:2 68:10
**count** 39:13
**county** 1:7 2:12
7:1,10,12,17,20,23
8:2,4 9:4,20 11:6
11:9 13:9 41:5,6
62:21 63:12,17,22
63:22 64:2,4
65:13
**couple** 25:17
27:24 28:17,18
34:10 38:16 43:21
56:23 58:7,9
59:11,23
**court** 1:1 15:4
**cpboyle** 2:17
**creek** 51:14,18,19
53:6 55:9 56:21
57:10,15 58:6
59:1,10,10,12 61:5
61:13,16,17,20
62:2 66:21 67:3,9
66:13
**criminal** 16:13
**cross** 1:19 68:18
**crosswalk** 32:17
**cuffed** 21:12 42:2
55:12

**current** 7:3
**currently** 6:24 8:7
**custody** 14:18
60:4 62:14

**d**

**d** 3:1
**date** 1:18 13:14,15
35:4 47:23 52:24
**dated** 68:12
**dauphin** 7:10,12
7:19,23 8:4 63:17
63:22 64:4
**david** 2:9
**davis** 1:3 2:9
**day** 13:7,23 20:5,8
22:18 25:2 29:8
40:21 54:17 68:12
**days** 11:19 12:19
15:13
**deal** 15:15,17
29:19
**death** 12:15
**declare** 68:11
**deeper** 58:5
**defendant** 2:18
**defendants** 1:9
2:12
**dennehey** 2:15
**department** 7:2,17
7:20,24 8:5 9:5,8
9:21 11:11 13:3
14:23 49:24 53:4
63:13
**depends** 65:15
**deploy** 48:1 55:2
64:3,9 65:19
**deployed** 44:17,20
45:14 46:4 48:8
49:10,13
**deploying** 48:5
65:13

**deployment** 64:5
64:11 65:22
**deployments** 50:5
**deponent** 68:5,6,9
68:9
**deposed** 5:23
**deposition** 1:14
4:1 5:19 6:3 12:3
67:23 68:8
**depositions** 6:7
**deputies** 15:3,4,5
48:5 49:18
**deputy** 7:5,12 13:5
13:8,20 15:1,5,6
**describe** 15:1,18
28:21 29:15 66:2
**describing** 46:11
**description** 3:9
4:8
**despite** 40:11
**detail** 62:15
**details** 25:22 26:7
**detective** 11:6,9
**differ** 63:19
**different** 15:3 60:8
63:22,23
**directed** 32:10
**direction** 56:3
**directions** 37:2
**directly** 66:5
**disappear** 52:2,7
53:17,22
**discharged** 17:8
30:21
**disciplined** 9:20
10:10,18
**discussion** 20:11
20:21 27:14 37:22
39:12
**dishonesty** 10:3,12

**dispatcher** 41:5,7
**dispatchers** 54:4
**distance** 46:5
57:18
**district** 1:1,1
**dmacmain** 2:11
**docket** 1:6
**doctor** 20:24
**doctors** 22:12
23:14
**documents** 4:7
**doing** 21:14 47:10
55:9
**domestic** 15:20,22
**door** 22:4,9,11
32:24 33:4,8,10,13
33:19,19 34:9,16
34:17,17 35:7,7,8
35:14,17,19,21
36:3 39:7 46:7,12
57:18
**doors** 33:1
**doorway** 22:6
**double** 29:19 30:3
30:5
**drive** 65:24 66:2,4
**driver's** 33:3
**drugs** 65:1
**duly** 5:9 68:5
**duties** 13:8 15:2
19:24
**duty** 61:4

**e**

**e** 2:1,1 3:1,8 68:1,1
**earlier** 16:1
**eastern** 1:1
**either** 18:19 19:12
22:8
**elderly** 64:11
**elected** 40:17

electrical  45:11,18
  45:21 46:22 49:21
  64:14 65:19 66:5
electronic  62:22
  63:6,16 64:8
eloped  27:17
emergency  32:13
employed  8:21 9:2
  9:4,8
encounters  24:22
enforcement  7:7,9
  7:13 8:22
engage  45:10
enter  59:15,19
  60:3
entire  49:2
entrance  20:13
  22:3 32:13
ephrata  1:8 2:18
  13:19,24 14:22
  19:14,17 53:3
equipment  49:17
  61:1
er  20:16
eric  2:3
ericshore.com  2:6
escort  24:11
escorting  24:8
esquire  2:3,9,9,15
estate  1:3 5:15
estimate  46:16
eta  18:21
exact  30:19 57:17
exam  31:22,24
examination  5:12
  31:8 66:11
examined  5:10
  18:9
excessive  9:17
exchanging  28:20

excused  67:21
expected  13:8
explain  8:3
explained  19:8
explaining  25:19
extent  20:3

**f**

f  2:4 68:1
face  23:3 33:14
  42:13,13 55:14
facility  27:18
fact  40:11
fair  46:15 63:9
fall  44:23 46:2
fallen  45:11
falling  45:22
familiar  51:17
  52:18,19
far  21:3 46:3
  57:15,17 59:4,8
  61:7 62:13,14
farther  46:6
fast  48:11
faster  37:11,14
february  7:18,21
feel  32:3 40:10
feet  46:9,12,13,14
  48:9 49:8 57:19
  59:11,23 66:24
felt  40:2 41:20
  42:5,8,11
female  14:15
filed  5:16 13:11
filing  5:4
finally  53:5
find  37:10 65:7
fines  15:22
firearm  42:21
firmly  38:22
first  8:15,17 14:5
  14:13,18 15:8

17:15 18:1 19:11
  21:11,14 23:11,17
  23:18,20 44:18
  46:4 48:24 59:6
  60:8 64:5
five  39:16 54:1,3
flee  49:9
fleeing  50:7
follow  67:19
follows  5:10
footsteps  61:2
force  9:17 51:5
foregoing  68:12
form  5:6
forth  37:22 39:11
  41:19
found  8:7 12:6
frame  17:2
fresh  36:12,18,22
  37:24 39:1
front  29:23 32:12
  32:24 33:7,10
fucking  35:17 36:7
full  55:16
further  39:6 57:18
  57:19

**g**

gear  28:15,20 61:4
general  9:24 65:1
  65:8
generally  64:22,24
getting  37:23 58:5
give  8:15 11:21
  25:22 45:13 46:22
given  6:6 65:8
  68:8
giving  54:6 62:7
  62:11 66:4
go  6:8 14:7 16:1
  17:8,10 18:13
  22:13 29:21 32:10

32:15 33:2 34:6,9
  34:14 51:10 56:18
  60:6,24 64:10
goggin  2:15
going  10:1,3,8,12
  13:19 14:21 16:6
  26:22 31:2 32:7
  34:18 36:13 40:2
  41:14 43:9,23
  45:13 46:22
good  1:4 2:21 5:14
  5:15,16 6:6 10:22
  27:17 58:19 60:4
  60:16 66:14 67:4
  68:4
good's  6:2 12:15
  27:21
gotten  49:7 51:23
grab  41:21 42:24
  43:1 50:21,23
  51:4 61:2
grabbed  32:9 38:9
  38:14
grabbing  42:6
graham  2:3 5:14
grahamb  2:6
grip  44:11
ground  44:24
  45:13,15 46:2
  47:20 50:8
group  1:15 2:8
guess  48:13,15
gunnett  1:14 2:12
  3:3 5:9,22,23 8:21
  58:24 66:7

**h**

h  3:8 8:19
half  16:23 21:19
  24:14
hand  21:13 34:18
  35:13,16 36:1,4

37:4 42:17,19,21
**handcuffed** 65:14
**handcuffs** 21:10
  23:18 28:22,23
  29:10,22,23 31:6
  32:6 42:2
**handed** 42:18
**hands** 43:1 55:11
**hang** 35:1
**happen** 8:11
**happened** 8:12
  32:5,8,21 35:11
  36:6 38:8 39:2
  41:10,17 44:6,14
  48:11 49:8 60:18
  62:8,12,16
**head** 58:6,8
**hear** 11:7
**heard** 50:21
**heart** 64:16
**height** 27:21,23
**held** 1:14 37:19
**help** 40:3
**hidden** 51:18
**hill** 50:12,13 51:20
**history** 16:14
  24:21
**hit** 33:19 35:7
  44:20,22 45:6,7,9
  45:15,15,17 50:4,6
**hold** 44:11 50:23
**holding** 34:19
**holly** 1:18 68:18
**hospital** 13:19
  16:2,6,11,15,17,21
  17:6,11,12,19
  19:14,18 20:14
  21:18 29:12,14
  30:18 31:2,5 32:7
  50:18,19 51:13

**hour** 16:23 24:15
  30:23
**hours** 15:16
**husband's** 8:13

**i**

**idea** 18:16
**imbedded** 24:18
**inches** 27:24
**incident** 5:17 6:20
  10:21 11:2,22
  13:14,16,17 25:4
  35:4 39:23 48:23
  49:2 62:19 63:1
**included** 64:17
**incorrect** 12:6
**index** 4:1
**indicated** 68:5
**individually** 64:3
**individuals** 64:12
  65:14,20,24
**influence** 64:20
  65:1,9
**information** 12:9
  26:12
**informed** 56:1
**initially** 57:5
**inside** 22:9
**instances** 20:2
**instruct** 10:8
**instructed** 10:14
  33:14 36:8,10
  39:14
**instruction** 4:3
  65:8
**instructions** 6:6,8
**interested** 68:10
**interview** 11:4,11
  11:17 23:7
**interviewed** 10:20
**interviews** 10:23
  11:1,22 12:2,6

31:15
**investigation**
  12:15
**involving** 9:16,23
  10:21 12:15
**issue** 52:14,15,16
**issued** 27:1,19

**j**

**j** 1:18 2:9 68:18
**jail** 14:7 19:1,9
  26:15,18,19,22
**james** 11:4 12:10
**job** 7:3 8:7
**john** 2:4

**k**

**keep** 42:21
**kennedy** 2:4
**kept** 36:21 38:10
  39:4,4,5 41:19
  42:15 47:10 58:5
**key** 33:16
**keys** 34:20,20
**kids** 64:11
**kin** 68:10
**kind** 10:2 13:3
  15:21 22:6 39:7,8
  44:11 65:8,10
**knew** 16:6 26:22
  66:22
**know** 16:10,13
  17:13 21:19 24:11
  27:23 28:2,3 29:7
  39:10 40:20 42:23
  45:6,9,23 48:9,10
  50:15 51:16 52:19
  52:20 56:14 57:17
  57:22 58:15 59:18
  59:20 60:12,14
  61:7,22 62:3

**knowledge** 27:2,4
  27:6,16
**known** 6:14,21
**knows** 36:13
**kristi** 2:21 5:15

**l**

**lancaster** 1:7 2:12
  7:1,17 8:1 9:3,4
  9:10,20 13:9
  62:21 63:12,22
  64:2 65:13
**law** 1:15,15 2:3,8
  7:6,9,13 8:21
**lawsuit** 5:16 9:12
  13:11
**leaning** 34:1,3,11
  35:9,18,22
**leave** 7:23 8:4
  12:14,18,20 19:24
  21:2 30:18 31:2
  32:7
**leaves** 12:24
**leaving** 19:12
  28:14
**left** 27:17 28:10,19
  29:12,14 36:1
  42:17,18 43:2
**legal** 1:22
**leppler** 1:8 2:13
  54:14 62:18
**level** 50:8
**lieutenant** 11:14
  11:18 12:10
**limit** 10:4,5
**line** 4:4,8,12,16
**little** 37:11 46:6
  48:24
**living** 8:7
**llc** 1:15
**located** 1:16

[location - okay]

location  54:5,7
lock  29:19 30:3
locked  32:24
locking  30:5
long  7:16 12:17
  16:22 24:11 30:17
  34:8 43:19,20
  48:7 53:9,24
  56:22
look  37:18
looked  22:23
  41:21
looking  31:16,18
  32:2
loop  29:11 31:6
  32:6
loose  37:7
lose  56:19 58:1
losing  56:24
lost  56:15,21 66:21
  66:21
lot  45:1
low  64:11

**m**

mac  1:15 2:8,9
  8:15,23 9:9,22
  10:1,7,10 46:10,14
  46:17 48:15,22
  58:21 64:24 66:10
  66:12 67:17
machine  68:7
macmain  3:5 6:5
  10:14
macmainlaw.com
  2:11
maiden  6:18
main  1:15 2:8,9
  8:15,23 9:9,22
  10:1,7,10 32:12
  46:10,14,17 48:15
  48:22 58:21 64:24

66:10,12 67:17
male  14:15,16
manually  32:24
  33:3,10 34:15
marked  4:15
market  1:16,23
  2:10,16
married  8:9
marshall  2:15
mass  64:12
mdwcg.com  2:17
mean  14:24 15:19
  30:4 34:23 46:10
  53:13 61:14
means  28:21
meant  25:18 26:1
  26:4
medical  18:9 24:4
medically  30:21
mention  19:24
  22:19 24:22
mentioned  19:22
  20:1
mid  1:23
midnight  13:23
  15:8,10,12,13
minute  17:2 54:3
minutes  16:24
  24:16 28:18,19
  43:21 53:5,12,18
  54:1
misheard  42:20
mistreatment  10:3
  10:11
model  49:23 63:21
monday  1:11 15:7
  15:12,13
morning  5:14 15:9
move  30:6 33:15
  33:21 41:20 42:6
  42:8

moved  35:24 39:6
  42:11

**n**

n  2:1 3:1 8:19
name  5:14,20 6:18
  8:8,13,16,17 56:7
  58:16
names  6:15,17
nature  17:4
necessary  6:9
  43:17
need  6:10,11 33:16
  34:14
needed  34:16 40:3
  40:10
neither  68:9
never  21:7
night  11:1 15:7
nondominant
  42:17,19
noon  15:8
normally  17:5
notary  1:19 68:4
  68:19
notice  55:17
noticed  37:13
notified  54:12
notify  17:7
number  3:9
nurse  20:24
nurses  22:12

**o**

o'clock  13:24
  16:19
object  10:1
objections  5:5
observe  29:5
  48:18 51:22 66:17
observed  6:7 48:4
  57:16

obtain  14:18
occurred  5:17
  11:1,18 24:12
  63:2
occurring  43:19
october  7:21 8:12
offered  3:10
officer  17:10,13,15
  17:17 18:1,4,7,11
  18:19,19 19:4,7,18
  19:22 20:7,10,20
  21:1,23 22:14,16
  24:20,24 25:3,5,12
  25:20 26:9,11
  28:10,23 29:7
  40:1 53:3,7,23
  54:11 55:24 56:6
  57:22 58:12 59:21
  59:22 60:8,12,22
  61:16 66:23 67:2
  67:10,15
officers  24:5 31:1
  59:24 60:10 61:8
  61:12,17
offices  1:15 2:3
oh  21:6 26:19 33:9
okay  6:2,5,12,13
  7:13 8:8,13,17
  9:12,15 10:13
  11:10,14 12:5,9,13
  13:2,14,20 14:5,17
  14:24 15:14,17,24
  16:5 18:7 19:17
  19:20 20:18,23
  21:6,17,21 22:8,16
  23:1,4,13 24:7,20
  25:1,3,7,22 26:1
  27:12,16,21 28:10
  29:3,24 30:7,17
  33:6,9 34:3 35:11
  36:19 37:6 38:13

| | | | |
|---|---|---|---|
| 39:10,16,22 40:23 43:22 44:14 45:6 45:10,24 46:8 47:1,5,12,15,22 48:7,14 49:7,17 50:7,10,15 51:14 52:15,23 53:20 54:14,16 55:6 56:2 57:9 58:1,18 59:4 60:6,15,18,24 61:8,11 62:6 63:4 63:8 64:6 65:18 65:22 67:17 | pants 28:8 30:15 | pickup 13:24 14:1 | prison 14:2,10 |

**once** 38:13
**ones** 23:18 64:4
**ongoing** 54:13
**open** 22:4,10,11
  32:24 34:16 35:7
  35:14,16,21
**opened** 36:3
**opiates** 64:20
**opioid** 64:9
**opportunity** 12:1
  51:3
**oral** 1:14
**order** 33:2 34:15
  35:14
**original** 28:16
  31:8
**outcome** 68:10
**outside** 20:13,20
  21:1 22:2,9,11
  37:24

**p**

**p** 2:1,1,15
**p.c.** 2:3,8
**p.m.** 13:22 15:12
  67:24
**pa** 2:5,10,16
**page** 3:9 4:4,8,12
  4:16

**parked** 32:12
**parking** 45:1
**parole** 15:23 27:3
**part** 30:6
**particular** 20:6
**parties** 5:3
**parts** 57:6
**party** 68:10
**passenger** 33:7,7,9
  33:18 34:11 35:19
**passenger's** 34:2
**patrol** 18:13
**pay** 12:21
**penalty** 68:11
**penn** 2:4
**pennsylvania** 1:1
  1:17,24
**people** 18:10 24:4
  64:15
**performing** 13:7
**period** 33:22 54:3
  54:10 56:20,22
**perjury** 68:11
**person** 14:3,5,6,11
  14:13,15,18 17:7
  18:24 19:3 47:24
  48:5
**personnel** 19:14
  20:19
**philadelphia** 1:24
  2:5,16
**phone** 54:19,20,21
  54:23
**physical** 22:21
  51:5
**pick** 14:3,7,21
  16:2 50:21
**picked** 14:5,12
**picking** 16:7

**place** 30:8 68:5
**placed** 12:13,23
  18:1,4 28:23
  29:23
**placing** 29:3
**plaintiff** 1:5 2:6
**planning** 17:9
**please** 5:21 6:12
**pocket** 34:24
**point** 28:10 34:2,5
  35:18 36:24 37:13
  38:3,11 39:4,19
  40:4,8,17 41:20
  43:14,18 44:1,8
  47:19 48:8 49:10
  50:20 51:19 56:18
  56:19 58:6 61:8
  66:13,14
**pointed** 56:3
**police** 9:7 14:22
  53:3
**policy** 62:21,23
**possession** 34:21
**possibly** 67:8
**pregnant** 64:12
**present** 2:20 6:2
  20:10 21:4 23:13
  31:1 35:9 40:1
  59:24 61:17
**pretty** 20:3 57:17
**previous** 19:9
  25:21 26:8
**previously** 22:17
  24:23
**prior** 12:2 13:17
  14:7,20 16:11,14
  17:18 19:14 20:8
  22:17,20 29:3
  40:20 47:22 62:7
  62:11

  19:3,11,12
**prisoner** 19:9
  29:18 62:13
**probably** 12:19
  14:10 16:23 21:19
  23:3,4 27:23
  39:18 46:5,13
  47:5,6 53:19
**probation** 14:3
  16:2,7
**problems** 64:16
**proceed** 52:10
**process** 6:7
**production** 4:7
**professional** 1:19
**prompted** 8:4
**prongs** 23:8 24:18
  45:7,14,17,19 50:1
  50:4,6 59:2
**provided** 12:10
**proximity** 42:1,10
**public** 1:20 52:16
  68:4,19
**pull** 27:8 39:5 45:4
**pulled** 44:17
**pulling** 38:10 39:6
  39:8,9
**purposes** 48:6
**push** 30:5 33:1
  34:17 67:13,15
**pushed** 38:15 67:8
**pushing** 38:10
**put** 28:24 29:17
  30:9,14 35:13,16
  37:4,8 38:14
  40:14 61:1

**q**

**question** 5:6 9:24
  10:4,6,9,15 49:1
  53:21 60:21

**questions** 4:15
66:7 67:18

**r**

**r** 2:1 68:1
**radio** 35:2 38:12
40:23 41:1,4,5,7
44:15 54:2,18
**radioed** 49:11
**ran** 44:9,12,15,19
52:20 62:13
**rank** 7:3
**ray** 24:4,6,9 28:15
29:17 30:18,20
31:20,22
**rayed** 23:14
**rays** 23:16,20 24:1
**read** 31:15 63:1
**reading** 5:3
**ready** 17:8
**really** 20:5 31:12
**rear** 34:2,11 35:19
**reason** 6:11 52:13
56:11
**reasons** 60:8
**recall** 12:18 14:11
17:24 19:10 21:2
21:16 22:15 24:13
25:9 26:13 29:6,9
30:13,19 31:14
34:22 38:5 39:18
41:2,9,16 43:12
44:2 47:3,17,18
53:11 54:24 57:21
58:11 61:3 64:23
65:11
**receive** 17:1 65:12
**received** 13:23
14:2,9 16:1 17:9
17:14,18 64:6,13
64:18 65:18

**receives** 41:4
**receiving** 14:7
**recertification**
63:7
**recess** 58:22
**recharge** 64:4
**record** 5:20 10:13
66:3 68:8
**recorded** 68:7
**redo** 23:19
**redone** 23:17
**refer** 25:12
**referring** 49:2
**regards** 17:19,23
62:22 63:5 64:7
65:9
**region** 1:23
**registered** 1:19
**rehab** 27:17,17
**related** 9:22
**relation** 41:23
**relations** 15:21,22
**relevant** 8:14
**relieve** 17:11
**remain** 18:8
**remember** 14:12
14:17 16:22 17:23
18:7 23:1 25:15
27:22 28:6,13
35:3 41:6 44:3
47:1 52:6 61:21
62:1 63:20
**reporter** 1:19
**represent** 5:15
**request** 4:7
**requested** 68:9
**rescue** 60:11,13
**reserved** 5:6
**residing** 8:1
**resisting** 36:21
37:8 38:4 40:12

46:23
**respective** 5:3
**respond** 40:24
47:8
**responded** 41:7
**response** 36:19
**responsibilities**
15:4
**restrain** 51:4
**restrictions** 13:4
**result** 12:14
**resulted** 45:22
**results** 30:20
31:21
**return** 13:4
**returned** 13:2
**review** 12:1 68:9
**right** 6:10 10:20
10:24 11:5,15,19
11:21 16:3,8
17:20,22 18:18,23
19:13 20:4 21:5
21:10 22:2 23:8
24:3 26:20 27:6
28:13 29:15 32:5
32:14,21 33:12,21
35:6,24 36:3,23
37:3,17,21 39:2
41:10,17 42:5,15
42:21 43:3,8,13
44:6,10 45:3
46:21 47:6,7
48:18 49:13,19,22
50:1,18,20 54:6,22
58:24 63:15 65:4
66:6
**rivera** 53:3,7,23
54:11 55:24 56:6
57:22 58:12 59:21
59:22 60:9,12,22
61:16 66:23 67:3

67:10,15
**roads** 62:1
**rodriguez** 1:7 6:19
6:21
**rogers** 17:15 18:2
18:19 19:8
**roll** 36:17
**room** 20:12,13,14
20:20,23 21:1,3,18
21:20,24 22:2,3,9
22:9,13 24:4,6,9
28:16,16 29:17
30:18 31:7,8,22,23
31:24 32:13
**round** 45:13
**run** 36:23 47:13
51:12 52:1
**running** 34:5
49:11 50:12,12
51:11,20,23
**runs** 48:24

**s**

**s** 2:1 3:8 8:19
**safety** 52:14,15,16
**santana** 1:7 6:19
6:21
**sat** 32:4
**saturday** 13:21
**saw** 28:5 43:1
44:23 46:2 52:1,7
53:16,22 55:8,22
56:8,20 57:5,10
59:6,9,13,19 62:1
66:20 67:9
**saying** 31:11 38:5
38:23 47:10 58:16
**says** 43:22
**scene** 53:13 60:10
**scratches** 22:23
23:2

| | | | |
|---|---|---|---|
| **sealing** 5:4 | **sheriff** 7:5,12 | **sorry** 7:11 23:12 | **stop** 37:18 46:23 |
| **search** 53:4 | 54:14 62:18 66:7 | 26:19 29:13 42:20 | **strange** 37:10 |
| **searching** 59:22 | **sheriff's** 7:1,17,20 | 48:16 55:5 | **street** 1:16,23 2:10 |
| **second** 15:10 | 7:24 8:4 9:5,20 | **source** 64:7 | 2:16 |
| 17:16 18:4 23:23 | 11:11 13:3,5,8 | **specific** 14:19 47:3 | **struggle** 39:8 |
| 49:10 | 48:4 49:18 63:12 | 53:11 60:20 | 43:19 |
| **secondly** 60:10 | **shift** 15:8,10,11 | **specifically** 22:15 | **struggling** 40:15 |
| **seconds** 34:10 | 18:12 19:24 | 34:21,22 35:5 | 41:19 |
| 56:23 | **shifts** 15:6 | 64:21 65:5 | **stun** 65:24 66:3,4 |
| **secure** 30:6 61:2 | **shirt** 22:24 28:5 | **specify** 67:5 | **subject** 9:15 |
| **secured** 30:8 31:6 | **shock** 66:5 | **spoke** 19:2,4,7 | **sued** 9:13 |
| 32:6 | **shoes** 28:6 | **spotted** 53:5 | **suite** 1:16,23 2:4 |
| **security** 17:7 | **shoot** 43:9,24 | **stand** 55:20 | 2:10,16 |
| 19:13 20:18 50:17 | **shooting** 45:4 | **standard** 49:17 | **sunday** 15:7,12 |
| **see** 22:12 23:5,6,8 | **shore** 2:3 | **standing** 57:10 | **supervision** 68:7 |
| 23:14 24:17 37:6 | **shorthand** 68:7 | 61:15 62:4 65:20 | **supervisor** 54:12 |
| 44:22,23 45:24 | **shoulder** 35:13 | 68:4 | 54:17 62:10,16 |
| 48:20 49:4 50:4,6 | **shoulders** 41:20 | **start** 13:18 | **support** 4:1 |
| 51:19 52:23 55:1 | 42:5,6,8,11 | **started** 13:21 | **supposed** 13:22 |
| 55:11,14,16,20 | **show** 10:14 | 51:11 | **sure** 29:19 48:13 |
| 56:24 57:6,13 | **side** 33:4,10,18 | **state** 5:20 | 58:20,21 65:2 |
| 58:24 59:2,15 | 34:2,12 35:19 | **statement** 62:8,11 | 67:6 |
| 60:15 61:11 | 42:17,19 43:2 | **statements** 11:22 | **surveillance** 50:11 |
| **seen** 50:10,13 56:1 | 61:20 62:2 | 12:2 | **suspended** 9:19 |
| **separate** 11:18 | **sidewalk** 32:16 | **states** 1:1 | 10:17 |
| **september** 68:12 | **sight** 56:15,19,21 | **stating** 17:10 | **swim** 61:5 |
| **sergeant** 17:17 | 57:1 58:1 | **status** 17:3,3 39:22 | **sworn** 5:9 68:5 |
| 24:5 28:17 54:15 | **signature** 68:18 | **stay** 17:11 19:23 | **system** 27:8 |
| **set** 24:1 | **signing** 5:3 | 45:12 | t |
| **seven** 15:13 | **sitting** 55:10,18 | **stayed** 28:17 | |
| **shackle** 37:7 | 56:21 59:1 | **staying** 21:3 37:24 | **t** 3:8 68:1,1 |
| **shackled** 29:4 | **situation** 14:11 | **stipulated** 5:1 | **take** 6:11 18:14 |
| **shackles** 21:11 | 54:13,13 | **stipulations** 4:11 | 23:14 34:8 43:20 |
| 28:24 29:1,3,8,16 | **size** 21:19 | **stone** 17:13,17,17 | 48:7 53:9 |
| 29:18,24 30:4,6,9 | **skin** 66:5 | 18:5,7,19 19:4,18 | **taken** 19:3,9 58:22 |
| 30:14 37:15,18 | **slope** 50:8,9 | 19:22 20:7,11,20 | 68:5 |
| 48:19 49:4 | **slow** 37:20 | 21:1,23 22:14,16 | **talk** 19:13,18 54:9 |
| **shaffer** 11:14,18 | **socks** 30:12 | 24:5,20 25:3,12 | 62:10,18 |
| 12:10 | **solutions** 1:22 | 26:11,24 27:12 | **talked** 28:18 |
| **shawn** 8:17,21 | **somebody** 17:6 | 28:10,17,23 29:7 | **talking** 20:24 |
| | 40:3 52:20 | | 22:13 23:16 31:10 |
| | | | 37:8 48:22 54:2 |

taller 27:24
tase 40:17 41:14
　66:14,17
tased 40:10,20
taser 23:8 24:17
　31:16 40:4,7
　41:22 42:15,24
　43:2,5,23 44:17,20
　45:7 46:4 47:22
　48:5,8 59:2 63:16
　64:19 65:14
tasered 43:13
tasers 55:2
tell 6:12 9:7 13:15
　13:15 18:23 19:20
　20:7 22:16 24:20
　26:14,24 27:12
　29:15 30:4 32:5,7
　37:21 41:23 42:8
　49:8 52:13,17
　53:2 57:3,9,12
　58:4 63:23 68:6
telling 38:19,21
terms 39:11
testified 5:10
　15:24
testimony 3:3
　50:22 68:5,6,8
thank 66:8 67:18
thereof 68:10
thin 28:3
thing 6:11 23:15
　38:24 58:7 61:3
　66:22
things 38:1 64:10
think 15:24 24:14
　28:2 30:22 31:15
　35:15 39:16 43:17
　45:21 46:10 51:3
　51:7 58:12 66:6

thinking 52:6
third 21:20
tighter 29:20
　37:19
time 5:7 6:20
　12:11 15:11 16:5
　16:18,20,21 17:2
　17:15,16 19:2,4,7
　19:11 20:19,24
　21:9,11 24:13,17
　26:8 29:4 30:19
　31:2,10 32:19
　33:22 37:6,7
　39:23 40:9 41:23
　44:11 45:14,17
　48:7,18,20,23 49:4
　49:15 51:8,16
　52:3,7 53:11,16,17
　53:22 54:3,10
　55:1,20 56:8,20,22
　58:10 60:1,15
　61:15,18 63:8
　64:3,13 67:9 68:5
times 10:21 15:15
　25:15,17,21 36:8
　38:13,16,17 39:10
　39:14,17 58:7,9
title 7:4
today 5:18 12:3
told 25:3 41:13
　45:12 46:21
totality 65:16
touch 35:17 36:7
trained 60:11,13
　63:15
training 48:1,6
　64:7,11,14,17
　65:12,18
trainings 63:4,9
　63:19 64:18

transcribed 68:7
transcript 68:9
transcription 68:8
transmission 41:4
transported 14:6
　26:15,18 27:13
transporting 19:1
tree 61:2
trees 56:18
trial 5:7
tried 35:16 38:9
　38:14,17 43:4
　47:13
trigger 45:4
trip 45:24
true 12:11 42:21
　56:16 68:8,12
truth 68:6,6,6
try 38:15 50:21
　51:4 60:3,24 61:2
trying 36:23 39:5
　41:21 42:23 43:1
　43:23 54:4 65:7
turned 44:8
two 2:4 10:23
　11:18 15:6 17:18
　49:14,14,18 50:3
　60:10 63:9 64:2

**u**

unable 57:12
unattended 21:7,8
uncomfortable
　32:3
understanding
　10:24 11:17
undertake 63:5
undertaken 63:9
undone 37:7
unfamiliar 52:8
united 1:1

unlock 33:1,3,19
　34:8,15,16,17 35:7
　35:7,8
unlocked 33:9,18
unlocking 33:13
unrelated 10:11
unsecured 29:20
untruthful 12:7
upper 45:8
use 27:8 56:13
　62:22 63:5,16
　64:7,14,15,19
usually 35:1

**v**

v 1:6
vantage 51:19
vehicle 34:12 37:9
veritext 1:22
versus 37:23 53:17
video 50:10,11,13
　50:15
violation 14:4 16:7
　27:3
violations 15:23
visible 58:7
vision 66:22
volunteer 26:11

**w**

w 8:19
waist 29:11
wait 52:21
waiting 30:20
　31:20 52:9,20
　54:11
waived 5:5
walk 56:17
walked 32:16
　55:24
walking 37:11,12
　37:14 61:16

**wanted**  8:6 29:21
  38:24 50:22
**wants**  36:12,21
**warner**  2:15
**warrant**  14:4 16:2
  26:22,23 27:1,2,18
**warrants**  15:16,18
  15:21,22,22,23
  27:9
**watch**  61:16
**watching**  20:19
**water**  57:5,7 58:8
  59:13,16,19 60:3,7
  60:9,11,13 61:1,6
  65:20 66:15,18,24
**way**  14:1,1,9 19:11
  19:12 42:12 47:9
  63:19
**weapon**  62:23
  63:6,16 64:8,15
  65:20,23
**weapons**  49:22
**wearing**  22:24
  28:6,8 30:12
**week**  13:21
**weekdays**  15:10
**weekends**  15:9
**weight**  28:1,2,4
**weird**  41:20 42:12
**weirdly**  42:9
**wellspan**  13:19
**went**  24:6 28:16
  39:11 58:8 62:14
**west**  1:16,17 2:10
  2:10
**window**  48:24
**windows**  36:17
**witness**  8:17,24
  9:10 48:16 65:3
  67:21

**women**  64:12
**wooded**  51:12,23
  52:1,2,10
**woods**  53:17,23
  61:23
**words**  47:1,3,5
**work**  6:24 7:1,19
  8:6 13:4 54:21
**worked**  7:6,16
**wrist**  23:17 26:17
  26:17

### x

**x**  3:1,8 23:14,16
  23:20 24:1,4,6,9
  28:15 29:17 30:18
  30:20 31:20,22

### y

**yeah**  43:4,22
  46:10,13,16,17,18
  46:19 58:20 59:7
  60:21,21 63:21
**year**  63:7
**yell**  47:8 55:22
  56:5,9,12 57:20
  58:10
**yelled**  57:22 58:12
  58:15
**yelling**  38:19 56:7

### z

**zahm**  11:5 12:10

Commonwealth of Pennsylvania Rules of Civil

Procedure

Title 231, Chapter 4000

Depositions and Discovery

Rule 4017

(c) When the testimony is fully transcribed a copy
of the deposition with the original signature page
shall be submitted to the witness for inspection
and signing and shall be read to or by the witness
and shall be signed by the witness, unless the
inspection, reading and signing are waived by the
witness and by all parties who attended the taking
of the deposition, or the witness is ill or cannot
be found or refuses to sign. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the person before
whom it was taken with a statement of the reasons
given by the witness for making the changes. If the
deposition is not signed by the witness within
thirty days of its submission to the witness, the
person before whom the deposition was taken shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the refusal to sign together with the reason, if

any, given therefor; and the deposition may then be used as fully as though signed, unless the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.


DISCLAIMER:   THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.   PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT C

VIDEO SURVEILLANCE

FROM

EPHRATA COMMUNITY HOSPITAL

(Previously Produced Through Discovery and

Bates Labeled as LC0157)


FLASH DRIVE SENT TO COURT ON DECEMBER 30, 2020

# EXHIBIT D



Deposition of:
## Officer Beth Rivera

*August 18, 2020*

In the Matter of:

## Estate Of Andrew Davis Good Vs. Lancaster County, Et Al

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

Page 1

1            UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                  CIVIL ACTION
                 -    -    -
3

ESTATE OF ANDREW DAVIS GOOD:  NO.:  20-1431
4                              :
                Plaintiff, :
5                              :
6         v.                   :
                               :
6 LANCASTER COUNTY, et al      :
7                              :
                Defendants.:
8
9                -    -    -
10           August 18, 2020
11               -    -    -
12          Oral deposition of OFFICER BETH
13      RIVERA, taken pursuant to notice, held at
14      MacMain, Connell & Leinhauser, 433 West
15      Market Street, Suite 200, West Chester,
16      Pennsylvania 19382, beginning at
17      approximately 9:50 a.m., before Mary
18      Hammond, a Registered Professional
19      Reporter and Notary Public in the state of
20      Pennsylvania.
21               -    -    -
22
23
24

```
1    A-P-P-E-A-R-A-N-C-E-S
2
     ERIC A. SHORE LAW OFFICES
3    BY:  GRAHAM BAIRD, ESQUIRE
     Two Penn Center
4    Suite 1240
     1500 John F. Kennedy Boulevard
5    Philadelphia, Pennsylvania  19102
     (215) 627-9999
6    grahamb@ericshore.com
     Counsel for Plaintiff, Estate of Andrew Davis Good
7
8
     MARSHALL DENNEHEY
9    BY:  CHRISTOPHER P. BOYLE, ESQUIRE
     2000 Market Street
10   Suite 2300
     Philadelphia, Pennsylvania  19103
11   (215)  575-4555
     cpboyle@mdwcg.com
12   Counsel for Defendant, Ephrata Borough
13
14   MACMAIN LAW GROUP, LLC
     BY:  DAVID MACMAIN, ESQUIRE
15   BY:  ANDREW DAVIS, ESQUIRE
     433 West Market Street
16   Suite 200
     West Chester, Pennsylvania 19382
17   (484) 318-7106
     dmacmain@macmainlaw.com
18   Counsel for Defendant, Lancaster County
19
20
21
22
23
24
```

```
                                              Page 3
 1
 2                        -    -    -
 3                     I-N-D-E-X
 4                        -    -    -
 5    WITNESS:
 6    OFFICER BETH RIVERA
 7                         PAGE
 8    BY MR. BAIRD         4
 9    BY MR. BOYLE         --
10    BY MR. MACMAIN       39
11
12
13
14                        -    -    -
15                  E-X-H-I-B-I-T-S
16                        -    -    -
17     NAME           DESCRIPTION          PAGE
18              (Whereupon, there were no exhibits
19          marked at this time.)
20
21
22
23
24
```

Page 4

1                    -    -    -

2             P-R-O-C-E-E-D-I-N-G-S

3                    -    -    -

4             (By agreement of counsel, the

5        sealing, certification and filing are

6        waived, and all objections as to the form

7        of the question, are reserved until the

8        time of trial.)

9                    -    -    -

10            OFFICER BETH RIVERA, after having

11       been first duly sworn, was examined and

12       testified as follows:

13                   -    -    -

14            MR. BAIRD:  Graham, G-R-A-H-A-M,

15       Baird, B-A-I-R-D.  I represent the

16       plaintiffs, Estate of Andrew Good and

17       Kristi, K-R-I-S-T-I, Good.

18            MR. BOYLE:  Christopher Boyle, and I

19       have Ephrata Borough, and the witness

20       today, Officer Beth Rivera.

21            MR. MACMAIN:  David MacMain.  I

22       represent Lancaster County, Lancaster

23       County Sheriff, Lancaster County Sheriff's

24       Deputy Gunnet.

Page 5

1          MR. DAVIS:  Andrew Davis, Lancaster

2      County, Deputy Gunnet, and Lancaster

3      County Sheriff.

4          MR. BOYLE:  Read and sign.

5                    -    -    -

6              DIRECT EXAMINATION

7                    -    -    -

8   BY MR. BAIRD:

9      Q.   Good morning, Ms. Rivera.

10      A.   Good morning.

11      Q.   My name is Graham Baird.  I'm a lawyer who

12   represents the plaintiff in a lawsuit that has been

13   filed against some individual defendants and some

14   law enforcement agencies and some municipal entities

15   arising out of an incident that occurred back on

16   April 14, 2018.  Today we are here for your

17   deposition.

18          Have you ever given a deposition before?

19      A.   No.

20      Q.   I am going to give you some instructions

21   and guidance to make this go as quickly and smoothly

22   as possible, okay?

23      A.   Okay.

24      Q.   I am here and the other lawyers are here

Page 6

1    to ask you some questions about what you know and

2    remember about that incident and your involvement in

3    it.

4            Your legal obligation is to provide

5    answers to those questions to the best you can; do

6    you understand that?

7        A.   Yes.

8        Q.   When you are giving answers, it is very

9    helpful for all of us, including the court reporter

10   who is transcribing everything that is said in the

11   room, that you answer the question verbally.

12   Shaking your head, nodding your head, "uh-huh,"

13   "un-un," we try to stay away from those.  It's hard

14   to understand.

15           And when you go back and read the

16   transcript, it may not be clear what your answer

17   was; is that okay?

18       A.   Yes.

19       Q.   Alongside of that, you and I should

20   only -- one person should be speaking at a time,

21   okay?

22       A.   Okay.

23       Q.   So please wait for me to ask my question,

24   and I will certainly give you the courtesy to wait

1  for you to complete answer before I ask another

2  question, okay?

3      A.   Okay.

4      Q.   If your attorney objects to one of my

5  questions, stop, let him place his objection on the

6  record, and then he can instruct you to answer or

7  not answer depending on what that objection is,

8  okay?

9      A.   Okay.

10     Q.   All right.  If you need break for any

11 reason, go ahead and let me know and we can stop and

12 take a break, okay?

13     A.   Okay.

14     Q.   If you do not understand one of my

15 questions, if you don't hear one of my questions,

16 also please let me know and I will try and ask it

17 more clearly or so it can be heard, okay?

18     A.   Okay.

19     Q.   All right.  Do not guess at anything, all

20 right?  If you don't understand one of my questions,

21 please speak up and say so because if you answer it,

22 the record is going to assume -- anyone reading the

23 transcript is going to assume that you understood

24 what the question was because you answered it, okay?

Page 8

```
 1        A.    All right.
 2        Q.    I don't think there is anything else in
 3   terms of instructions.  I don't expect this to go
 4   too long, but, again, if you need a break for any
 5   reason, just let me know, okay?
 6        A.    Sure.
 7        Q.    Can you state your full name for the
 8   record?
 9        A.    Beth Rivera.
10        Q.    And who do you currently work for?
11        A.    Ephrata Police Department.
12        Q.    And what is your current rank or job
13   title?
14        A.    Patrol Officer.
15        Q.    How long have you had that job?
16        A.    Four and a half years.
17        Q.    Have you ever been employed by any other
18   law enforcement entities?
19        A.    No.
20        Q.    Can you tell me a little bit about your
21   educational background?
22        A.    I have a bachelor's degree in criminal
23   justice from Messiah, and then I have a master's
24   degree in criminal justice from Penn State
```

Page 9

1   Harrisburg.

2       Q.   And when did you get your master's degree?

3       A.   In 2012.

4       Q.   And when did you get your bachelor's

5   degree?

6       A.   Actually, that was -- 2012, I got my

7   bachelor's; and, 2014, I got my master's.

8       Q.   And did you immediately seek out

9   employment in the law enforcement area after

10  obtaining your master's degree?

11      A.   I did.

12      Q.   And -- all right.

13           Have you had any other employment

14  opportunities in any security field of any kind?

15      A.   I worked at Metro Bank as a fraud

16  investigator for counterfeit checks.

17      Q.   When did you that?

18      A.   That was after my master's but before

19  being hired with Ephrata Police Department, so 2014

20  time.

21      Q.   How long did you keep that job?

22      A.   About six months.

23      Q.   And then why did you leave that job?

24      A.   I was going into the academy for -- to go

Page 10

1  for the police academy.

2      Q.    Did you already have a job with the

3  Ephrata Borough at the time you entered the police

4  academy?

5      A.    No.

6      Q.    Have you ever been subject to any

7  disciplinary actions in connection with your

8  employment at Ephrata Borough?

9      A.    No.

10                MR. BOYLE:  Objection to the

11                relevance of this for a fact witness.

12                But you can answer.

13                THE WITNESS:  No.

14  BY MR. BAIRD:

15      Q.    Now, we're here for to talk about answer

16  incident that occurred back in April 14, 2018.

17                Do you remember what you were doing that

18  day before going to the WellSpan Ephrata Hospital

19  area?

20      A.    I was -- I started my shift at 6:00 p.m.

21      Q.    And what were you doing prior to starting

22  your shift, were you at home?

23      A.    I don't remember.

24      Q.    And why did you -- about what time did you

Page 11

1   end up going to the WellSpan Ephrata Hospital area?

2        A.   Around 7:45 p.m., I was dispatched.

3        Q.   Do you remember what the call said as to

4   why you were dispatched?

5        A.   Initially, I was dispatched to assist the

6   Sheriff's Department with a prisoner that they had

7   at the hospital.

8        Q.   And that was the original call at 7:45

9   that you received?

10       A.   Correct.

11       Q.   Did you receive any other dispatch calls

12  after that initial call?

13       A.   Yes.  As I was leaving the station, they

14  updated the call that the prisoner had escaped

15  custody.

16       Q.   About how long after the initial call was

17  that second call received by you?

18       A.   Probably within seconds.

19       Q.   Was there any other information

20  transmitted to you in that initial call about what

21  assistance was required with the regard to the

22  prisoner?

23       A.   Not initially, no.

24       Q.   Do you remember where you were when you

Page 12

1    got the call?

2         A.    I was at the station.

3         Q.    At Ephrata Borough?

4         A.    Yes.

5         Q.    And about how far away from the police

6    station is the hospital?

7         A.    It's about two to three miles.

8         Q.    And you immediately responded to those

9    calls and drove to the hospital, correct?

10        A.    Yes.

11        Q.    What did you see when you first arrived?

12        A.    I pulled into a parking lot belonging to

13   the hospital that was near the KFC, which is what I

14   was told he was near that area.

15        Q.    Who told you that he was near the KFC?

16        A.    I was dispatched that by County.

17        Q.    And then what did you do after that?

18        A.    I got out of my vehicle and started

19   walking toward the wood line, which is where he was

20   said to have gone in the woods, or near the woods,

21   near the KFC.

22        Q.    Did you see any other officers at that

23   time when you started approaching the wood line?

24        A.    I did see Ephrata Community Hospital

Page 13

1   security staff along the wood line, so I walked

2   toward them.

3       Q.    How many individuals were there from the

4   hospital, the security staff?

5       A.    I don't know.

6       Q.    Was it more then one?

7       A.    Yes.

8       Q.    Was it more than five?

9       A.    I don't believe so.

10      Q.    Did you talk with any of the security

11  staff as you approached them?

12      A.    I did.  And they told me that the sheriff

13  was up ahead -- like up around the wood line.

14      Q.    And at this point could you see the

15  sheriff?

16      A.    I don't recall that I could see her.

17      Q.    Do you recall how much light there was?

18      A.    I didn't need a flashlight to see.

19      Q.    But it was around 7:45, though, correct?

20      A.    Yeah.  It was like dusk, but I had no

21  problem seeing without a flashlight.

22      Q.    At that point, did you see Andrew Good,

23  the prisoner at issue?

24      A.    No.

Page 14

1      Q.   At any time, did you -- did you have any

2   other conversations with any of the security people

3   from the hospital at that point?

4      A.   No.   They took me up to where the sheriff

5   was, so I could meet with her.

6      Q.   From where you were standing near the wood

7   line, could you see the creek?

8      A.   No.

9      Q.   About how far into the woods is the creek

10  bed?

11     A.   I don't know.

12          MR. BOYLE:   Objection.   Just from

13          where she first met the sheriff from where

14          she first arrived?

15          MR. BAIRD:   From the wood line to the

16          creek.

17          MR. BOYLE:   It's a long wood line,

18          Counsel.   So where along the wood line do

19          you want her to estimate?

20  BY MR. BAIRD:

21     Q.   When you were first approaching the

22  security guards where they were standing, about how

23  far in is the creek?

24     A.   I don't know because I don't recall seeing

1  the creek, so I'm not sure.

2      Q.   Did you ever talk to the sheriff?

3      A.   Yes.

4      Q.   Tell me about that conversation, the first

5  one you had.

6      A.   I asked her what happened and she

7  explained to me that there was a scuffle at her

8  vehicle with Andrew Good and he attempted to grab

9  her taser, so she attempted to tase him twice and he

10  removed probes and ran from her, and a shackle on

11  his leg had come undone as he was running.

12      Q.   So she told you that a shackle on his leg

13  had come undone while he was running?

14      A.   Yes.

15      Q.   And she also told you that he had removed

16  the taser probes that she had tased him with?

17      A.   Yes.

18      Q.   Have you ever used your taser before?

19      A.   No.

20      Q.   Do you carry a taser?

21      A.   Yes.

22      Q.   Do you know if it's the same model of

23  taser that is carried by the Lancaster County

24  Sheriff's Department?

Page 16

1        A.    I don't know.

2        Q.    And what was the name of the sheriff who

3    you spoke with?

4        A.    Rodriguez was her last name.

5        Q.    Had you ever encounter her before?

6        A.    Not that I recall.

7        Q.    Have you talked to her about the incident

8    since it happened?

9        A.    No.

10        Q.    You ever encounter Andrew Good before?

11        A.    No.

12        Q.    Have you ever encountered Kristi Good

13    before, his mom?

14        A.    Not that I recall.

15        Q.    And what was -- Sheriff Rodriguez, what

16    was her demeanor at the time you were talking to

17    her?

18        A.    She seemed worried.

19        Q.    Anything else that you can remember about

20    her demeanor?

21        A.    No.

22        Q.    Did you have any other conversations with

23    her?

24        A.    She -- she pointed in the direction to the

Page 17

1    woods and said that he kind of ran in that

2    direction.

3        Q.    And what did you do?

4        A.    I then got on my radio, relayed the

5    information she told me to our other officers that

6    were also in the area, or getting to the area to

7    look for him, and I did that on our private channel.

8        Q.    And so that was not broadcast over the

9    dispatch channel, correct?

10       A.    Correct.

11       Q.    Did anyone respond to you over the radio?

12       A.    I believe someone -- they just

13   acknowledged me.  I don't remember specifics.

14       Q.    And then what did you do next after the --

15   making the radio call?

16       A.    The deputy and I decided to walk into the

17   woods in the direction she thought he ran.

18       Q.    And can you describe what direction that

19   was?

20       A.    North, east, south or west or --

21       Q.    Yes.

22       A.    It would have been north.

23       Q.    Towards the creek?

24       A.    Correct.

Page 18

1     Q.   Did you ever see him?

2     A.   I saw him after she pointed him out to me.

3     Q.   Were you two -- about how far apart were

4 you two when you were looking for him?

5     A.   We were five feet or so of each other.

6     Q.   At that time when she pointed him out to

7 you, were there any other officers around?

8     A.   There were no officers from the police

9 department with me.

10    Q.   Were there any officers from the Sheriff's

11 Department other than Sheriff Rodriguez with you?

12    A.   No.

13    Q.   And what was Andrew Good doing when

14 Sheriff Rodriguez pointed him out to you?

15    A.   He appeared to be laying in the water

16 right along the shore line, and like I could see his

17 head, but it appeared that he was laying on his

18 stomach.

19    Q.   In an effort not to be seen, would that

20 be --

21    A.   Yeah.  It appeared that he was hiding from

22 us.

23    Q.   He wasn't sitting up, correct?

24    A.   I couldn't see below the water, but from

Page 19

1    the angle of his head it didn't look like it.

2         Q.   When you initially saw him, was his body

3    in the water?

4         A.   All I saw was his head, so yeah.

5         Q.   Did you -- did you call out to him or yell

6    to him?

7         A.   I did.

8         Q.   What did you say?

9         A.   I called out his name.

10         Q.   Anything else?

11         A.   And eventually I just called out his name.

12         Q.   And was he wearing any clothes when you

13    saw him?

14         A.   I couldn't tell.

15         Q.   And all you could see was his head,

16    correct?

17         A.   Correct.

18         Q.   And it appeared as though he was laying

19    down on his stomach?

20         A.   Correct.

21         Q.   About how far away from him were you when

22    you initially saw him?

23         A.   We were probably 40 or 50 feet away.

24         Q.   Was there anything between you and him?

Page 20

1      A.     Yes, trees.  And then it was -- down an
2  embankment is the woods.
3      Q.     Can you estimate as to how steep the
4  embankment was, do you know?
5      A.     I don't know.
6      Q.     And how many times did you call out his
7  name to him?
8      A.     Several times, I think, looking for a
9  response for him to respond to me.
10     Q.     Did you see him respond or react to him at
11  all of you calling out his name?
12     A.     He didn't say anything?
13     Q.     At that point could you see him react,
14  like hunker down, or anything like that?
15     A.     I don't remember.
16     Q.     And did you ever -- did you maintain sight
17  of him, or did you lose sight of him?
18     A.     No, I maintained sight of him.
19     Q.     And tell me what you did next after you're
20  calling out to him?
21     A.     I told the other officers that I located
22  him, or that we located him, and we're looking at
23  him in the water, so that they could start to come
24  to that area, and then the deputy and I began to go

Page 21

1  down this embankment toward him.

2      Q.   Were you calling out to him again while

3  you were going down the embankment?

4      A.   Yeah.   That's when I was like -- several

5  times, I guess I said his name, and we were slowly

6  making our way down because it was steep.

7      Q.   What was he doing while you are making

8  your way down?

9      A.   As I -- as we started to get closer to

10 him, he started to drift toward the center of the

11 creek.

12     Q.   And when you say "drift towards the center

13 of the creek," can you explain what you mean by

14 that?

15     A.   I just saw his head moving from where it

16 had been toward the center of the creek.

17     Q.   Was he moving backwards into the creek?

18     A.   It was more of an angle.   It was backwards

19 and to my right.   If I was looking at him, it was to

20 my right and back.

21     Q.   And was he following along the current of

22 the stream?

23     A.   The current was going east, so he was

24 going the same direction as the current.

Page 22

1    Q.   To your right?

2    A.   Correct.

3    Q.   And was he still down on his stomach, or

4    was he walking in or backing in?

5    A.   I don't know.

6    Q.   What -- were you thinking about how you

7    were going to capture him, or apprehend him at that

8    point?

9    A.   I wasn't sure.  I wasn't sure what he was

10   doing.  So we were still in the process of getting

11   down to the water's edge.

12   Q.   About how long did it take you to get down

13   to the water's edge after initially seeing him?

14   A.   I'd say about 15 seconds or -- 15 or 20

15   seconds.

16   Q.   Do you know whether Sheriff Rodriguez was

17   saying anything to him at the time?

18   A.   I only remember her saying that she

19   thought he was faking.

20   Q.   And when you say "faking," what do you

21   mean?

22   A.   Well, that came a little bit after.  You

23   haven't gotten there with me yet.

24   Q.   I'm sorry.  In terms of all the time

Page 23

1   you're calling out to him, Andrew Good, is she

2   saying anything to you?

3        A.   Not that I recall.

4        Q.   Is she saying anything to him or calling

5   out?

6        A.   Not that I recall.

7        Q.   And who -- and how were you making your

8   way down, is someone going first or second or how

9   did that work?

10       A.   I don't remember.  We were next -- we were

11  near each other.  I don't know who was where.

12       Q.   And at that point, did you have any weapon

13  deployed or anything of that nature?

14       A.   No.

15       Q.   Did you have to hold on to the side of the

16  bank to get down, was it that steep?

17       A.   I probably had to hold on to some trees at

18  different times but not the entire time.

19       Q.   Could you tell whether Andrew Good was

20  standing on the -- in the creek or was he floating

21  or swimming, could you tell?

22       A.   I couldn't tell because --

23            MR. BOYLE:  Just objection.  At what

24       point are you talking here?

Page 24

1              MR. BAIRD:   After she sees him kind

2        of move.

3              MR. BOYLE:   Drift out.

4              MR. BAIRD:   Drift out into the creek.

5              MR. BOYLE:   Okay.  Is that how you

6        were answering the question, Officer?

7              THE WITNESS:   Yeah.   I couldn't tell

8        you.

9   BY MR. BAIRD:

10       Q.    Did you ever see him struggling against

11  the current?

12       A.    No.

13       Q.    You ever see him paddle or swim?

14       A.    No.   The -- the water was dark, so it was

15  difficult to see really below it.

16       Q.    At any time, did you observe any taser

17  prongs in Andrew Good?

18       A.    No.

19       Q.    What did you do next after you had walked

20  down the embankment?

21       A.    Andrew began to call out for help.

22       Q.    Is that -- did he just say, "Help, help,"

23  or do you remember what he said specifically?

24       A.    He was just saying, "Help."

Page 25

1     Q.   And where was he when he was calling out

2 for help?

3     A.   He had, like I said, drifted -- drifted

4 from the edge of the shore, and he was maybe, I

5 don't know, ten feet from the shore line at that

6 point, kind of in front of me.

7     Q.   Is that when Sheriff Rodriguez said she

8 thought he was faking when he was calling for help?

9     A.   Yes.

10     Q.   And did you respond to her?

11     A.   I don't recall responding to her.  I was

12 focused on watching him.

13     Q.   And what did you do next after he was

14 calling for help?

15     A.   I was telling him to swim to shore, to

16 come to us.

17     Q.   At that point, did you know whether he was

18 handcuffed or not?

19     A.   I didn't know the status of his handcuffs

20 at that point.

21     Q.   At that point, you knew that a shackle had

22 come loose, correct --

23     A.   Correct.

24     Q.   -- according to Sheriff Rodriguez?

Page 26

1      A.    Correct.

2      Q.    Could you see any shackles or handcuffs on

3  him while he was in the water?

4      A.    No.

5      Q.    Could you see his body out of the water,

6  or was it just his head?

7      A.    It was just his head.

8      Q.    At any time, was his head going under the

9  water?

10     A.    Yes.  Initially, it wasn't.  And then it

11  started to go under and then he would come up, and

12  go under and come up.

13     Q.    When in the sequence of this did Sheriff

14  Rodriguez say that she thought he was faking?

15     A.    Initially, when he was calling for help,

16  but he was not going underwater.

17     Q.    At any time, did she -- well, strike that.

18           What did you do next after you were

19  observing his head going underwater?

20     A.    I know I relayed to again on the radio to

21  my officers what was happening so, that they new

22  that he was in the water further out and calling for

23  help.

24     Q.    At this point, did you see any other

Page 27

1    officers from Ephrata Borough in the area?

2         A.    No.

3         Q.    Did you see any other law enforcement

4    officer of any kind in that area?

5         A.    The Ephrata community hospital, the

6    security, they were to my right, like they were one

7    or two officers, I would guess.

8         Q.    And at any time, did you deploy your

9    taser?

10        A.    No.

11        Q.    On Andrew Good?

12        A.    No.

13        Q.    Did you see anyone deploy a taser on

14   Andrew Good?

15        A.    No.

16        Q.    In your performance of your law

17   enforcement duty, have you ever deployed your taser?

18        A.    No.

19             MR. BOYLE:  Asked and answered.  You

20        can answer again.

21             THE WITNESS:  No.

22   BY MR. BAIRD:

23        Q.    And what were -- did you notice the

24   Ephrata Hospital security doing anything at this

Page 28

1    point when Andrew's head was going under the water?

2        A.   No.

3        Q.   Were they calling out to him or -- that

4    you remember?

5        A.   I don't remember.

6        Q.   What did you do next?

7        A.   I continued to call out for him to come to

8    shore, and then I on observed him staying underwater

9    longer and coming up and staying underwater longer

10   than he had those few seconds prior.

11       Q.   At any time, did you have a belief that

12   Andrew Good was faking the -- his need for help?

13       A.   Yes.

14       Q.   You did?

15       A.   Yes.  I was unsure as to if he was or not.

16       Q.   And the point when you had a belief that

17   he was -- he was faking, was that from what Sheriff

18   Rodriguez had told you, as well as your observation?

19       A.   Yes.

20       Q.   Tell me about that.

21       A.   Well, I -- she said that she thought he

22   was faking, and I -- also, from what I was

23   observing, him calling for help but not going

24   underwater, I had that same thought and they were

Page 29

1    with kind of simultaneous of each other.

2         Q.   And at some point, did you change your

3    mind about that?

4         A.   Yes.

5         Q.   And what made you change your mind, what

6    did you observe to make your change your mind?

7         A.   When he started staying underwater longer,

8    that's when my mind started changing to maybe he's

9    in distress.

10        Q.   When you are standing on the embankment,

11   about how far across the creek is the other side of

12   the bank, if you can estimate?

13        A.   My estimate was about 40 feet.

14        Q.   Do you have any estimate as to how deep it

15   was there at that particular time of year?

16        A.   I have no idea.

17        Q.   After the date of the incident, have you

18   ever gone back to that place?

19        A.   No.

20        Q.   How long did it take from the time when

21   you had believed that Andrew had possibly been

22   faking his calls for help to the point where you

23   changed your mind about that, about how long did

24   that take?

Page 30

1        A.    I would say ten or ten seconds.

2        Q.    And after you had changed your mind and

3    you observed him going underwater a little bit

4    longer, what did you do then?

5        A.    I decided to take my gear off and go in

6    the water and I first relayed to my officers that I

7    was going in the water.

8        Q.    Are you trained in water rescue?

9        A.    No.

10       Q.    What made you make that decision?

11       A.    Because he was underwater, and he had not

12   come back up.

13       Q.    What gear did you have to remove to go in?

14       A.    My duty belt, which included my radio.

15   It's attached to my shirt.  And I had my phone in my

16   side pocket.  And that's what I took off.

17       Q.    What else is on your duty belt?

18       A.    I had my gun.  I have two loaded

19   magazines, taser, handcuffs, a flashlight, my radio.

20   I forget if I said that.  I think that's it.

21       Q.    And then what did you do, can you explain

22   how you went into the water?

23       A.    Yeah.  I took that stuff off.  I laid it

24   up on shore -- or on the shore, and then I stepped

Page 31

1  into the water.  It was kind of a step down a little

2  bit because it was kind of a like a drop to get in

3  there, and there was a log that was nearby.  I

4  grabbed a hold of that.

5       Q.   And did you try to walk out into the

6  creek?

7       A.   Yeah.  I started to walk out there, and

8  then it like dropped off.

9       Q.   Did you swim?

10       A.   Yeah.

11       Q.   How far out did you swim?

12       A.   To the location where I had seen him, just

13  below the surface, and that was probably 15 feet.

14       Q.   Could you -- was he there?

15       A.   No.

16       Q.   Do you know where he -- what happened to

17  him?

18       A.   No.  I last had seen just like -- I could

19  see his -- like his chest because he wasn't wearing

20  a shirt, and I could see that just below the surface

21  as well as his head, and with -- the flashlights had

22  been shining on there from, I don't know, I guess

23  maybe the deputy, I don't know.  I could see that.

24  But then once I got out there he was not where I

Page 32

1    knew he was just a second prior.

2         Q.    And was the current strong?

3         A.    I don't feel that it was real strong, no.

4         Q.    At any point, did you see him again?

5         A.    I did see him again, yeah.

6         Q.    Tell me about that.

7         A.    Well, that was once he was pulled up from

8    the creek.

9         Q.    And he was dead, correct?

10        A.    Correct.

11        Q.    And were -- did you assist in pulling him

12   out of the creek?  Was that you?

13        A.    No.  I was out in a boat but not the boat

14   that pulled him up.

15        Q.    Tell me about what you did next after you

16   swam to where he was, and you couldn't see him

17   anymore.

18        A.    Other officers arrived at that time, and

19   another officer was taking his gear off to get in

20   the water, so I swam back to shore.

21        Q.    At any time, did Sheriff Rodriguez enter

22   the water?

23        A.    No.

24        Q.    Who was the other officer who had entered

Page 33

1   the water, do you remember?

2        A.   It was Marcos Rodriquez.

3        Q.   Is he still -- and what agency or --

4        A.   Yeah.  He's employed with Ephrata Police

5   Department.

6        Q.   And he's still employed with Ephrata?

7        A.   Yes.

8        Q.   And at this point, there were other

9   officers shining flashlights into the water?

10       A.   Yeah.  To see him, like to light up the

11  water.

12       Q.   Do you remember approximately how many

13  officers there were?

14       A.   I'm not sure.  I guess you would have to

15  be more specific with your questions.  Are you

16  talking about when I entered the water, or after I

17  was already in there?

18       Q.   When you were already in there, when you

19  were swimming, looking for him.

20       A.   Okay.  It was -- the deputy was there.

21  There was the security.  I don't know whose

22  flashlights were shining.  And at some point, like I

23  said, when I was in the water, other officers of

24  mine showed up.

Page 34

1     Q.   About how long did -- were you swimming

2   around trying to find him?

3     A.   About three minutes.

4     Q.   And then at some point, you mentioned that

5   you were in a boat?

6     A.   Yes.

7     Q.   Tell me how that happened.

8     A.   Fire Rescue had arrived.  It was around

9   8:20 or so after this initially occurred, and my

10   supervisor at the time, Officer Lucky, he got into

11   one boat with some of the firemen, and there was a

12   second boat that was about to launch and I asked if

13   they needed an officer for the second boat, and they

14   said they did.

15     Q.   About how long did it take for Fire Rescue

16   and the other officers to find Andrew Good's body?

17     A.   I'd say approximately 30 minutes.

18     Q.   Do you know where he was found in

19   reference to where you had swam in?

20     A.   Yeah.  He was found right near where I had

21   last seen him underwater, like going under.

22     Q.   And at this point, you're not sure how

23   deep that actually was there?

24     A.   Correct.

1    Q.   Did you have any information about

2  Andrew Good's previous criminal history at the time

3  of this incident?

4    A.   I didn't know about his criminal history,

5  but I had known about two other incidents involving

6  him.

7    Q.   And you knew that before you entered the

8  water trying to help him?

9    A.   Correct.

10    Q.   Tell me about those two other incidents

11  that you knew of.

12    A.   The one incident I was not there for.  I

13  just had heard from another officer with our

14  department, and that was approximately six months

15  prior and this officer was trying to make an arrest

16  of him, and he fled into the creek.

17    Q.   And this happened approximately six months

18  before the April 14th incident?

19    A.   That's my estimate, yeah.

20    Q.   And how did you find out about that

21  incident?

22    A.   Just through, I think, talking at shift

23  change, like a debriefing of that day.

24    Q.   Do you remember the name of the officer

Page 36

1   who Andrew had fled from?

2       A.    Yes.   It was Sergeant Eric Schmidt.

3       Q.    Do you remember the location where Andrew

4   had fled from Officer Schmidt in the previous

5   incident?

6               MR. BOYLE:   Objection.   She testified

7           that she wasn't present, so how would she

8           remember the location?

9               MR. BAIRD:   Sorry.

10  BY MR. BAIRD:

11      Q.    Do you know what the location was where

12  Andrew had fled in this prior incident involving

13  Officer Schmidt?

14      A.    It had been at or near the hospital.

15      Q.    Do you know the circumstances of how or

16  what Officer Schmidt was -- why he was in custody or

17  why Andrew was in custody --

18      A.    He.

19              MR. BOYLE:   Wait until he finishes.

20          Are you done, Counsel?

21              MR. BAIRD:   Yes.

22              MR. BOYLE:   You can answer.

23              THE WITNESS:   He wasn't in custody.

24          Sergeant Schmidt was attempting to take

Page 37

1    him into custody.

2 BY MR. BAIRD:

3        Q.    Were you thinking about this prior

4 incident at the time that you found out that

5 Andrew Good had fled from another officer from the

6 sheriff?

7                    MR. BOYLE:  Object to form.

8                    But you can answer.

9                    THE WITNESS:  It was in my mind, just

10               because I know he had fled previously into

11               the creek.

12 BY MR. BAIRD:

13       Q.    Do you remember anybody making a comment

14 about Andrew's body being like a sack of potatoes at

15 the time he was coming out of the water?

16       A.    No.

17       Q.    And you said that you had known about

18 another incident involving Andrew Good prior to

19 April 14th?

20       A.    Yes.

21       Q.    Can you tell me what you know about that

22 other incident?

23       A.    The East Cocalico Police Department had

24 been involved in a pursuit somehow of him and

Page 38

1   requested assistance from our department and myself

2   and Officer Lucky and Officer Hernizen had responded

3   to assist in locating him.  It had turned into a

4   foot pursuit, which is what we responded to assist

5   with, a foot pursuit essentially.

6        Q.   Did you ever apprehend Andrew?

7        A.   No.

8        Q.   Was he ever caught in that foot pursuit?

9        A.   No.  Not to my knowledge, no.

10       Q.   How long before the April 14th, 2018

11   incident was that?

12       A.   I don't remember.  I believe it was -- I

13   believe that happened, though, after the initial

14   incident I told you about with Sergeant Schmidt.

15       Q.   You had given an interview in this matter

16   on the night of the incident, correct?

17       A.   Correct.

18       Q.   All right.  Did you have a chance to look

19   at that interview before your deposition today?

20       A.   Yes.

21       Q.   Is everything in there true and correct,

22   to the best of your knowledge?

23       A.   Yes.

24       Q.   Is there anything in there that's wrong?

Page 39

1      A.    No.

2      Q.    That was a bad question.

3            MR. BOYLE:  Not your worse, though.

4  BY MR. BAIRD:

5      Q.    Did you ever -- and I apologize if I've

6  asked this already, did you ever discuss this

7  incident with Sheriff Rodriguez after it happened?

8      A.    No.

9      Q.    Do you ever hangout with Sheriff

10 Rodriguez, or are you friends with her?

11     A.    No.

12           MR. BAIRD:  I think those are all the

13           questions I have.

14           MR. MACMAIN:  Officer, I have just a

15           few followup.

16                -    -    -

17                CROSS-EXAMINATION

18                -    -    -

19 BY MR. MACMAIN:

20     Q.    As I introduced myself before the

21 deposition, I'm David MacMain and I represent Deputy

22 Sheriff Rodriguez, which is now Sheriff Gunnet.  So,

23 if I call her Sheriff Gunnet I'm talking about the

24 same sheriff's deputy.

Page 40

1     A.    Okay.

2     Q.    Just a few things.

3           So when you first saw Mr. Good, the only

4     part you were able to see that was above the water

5     was kind of the head?

6     A.    Correct.

7     Q.    So everything below the body you wouldn't

8     have seen if he was wearing clothing?

9     A.    Initially, when it looked like he was

10    laying down, that's correct.

11    Q.    You wouldn't have seen if he was

12    handcuffed, unhandcuffed, shackled?

13    A.    Correct.

14    Q.    And you wouldn't have seen if he had any

15    probes, taser probes, or anything on his body?

16    A.    Correct.

17    Q.    And when you first spotted Mr. Good, you

18    were with Sheriff's Deputy Gunnet, correct?

19    A.    Correct.

20    Q.    And you said the two of you were about

21    40 feet or so away from the creek?

22    A.    Correct.

23    Q.    And the entirety of the time that you and

24    Sheriff's Deputy Gunnet made your way from where you

Page 41

1  spotted Mr. Good down to the creek, you were

2  together, correct?

3       A.   Correct.

4       Q.   And at any point during the time that the

5  two of you made your way down to the creek, did you

6  see anyone else besides Mr. Good?

7       A.   There were the security from the hospital.

8  They were, I think, somewhere to my right but not

9  immediately with us.  It was just her and I.

10      Q.   But maybe I wasn't clear.

11           There was nobody else down near the creek

12  where Mr. Good was, he was down there himself?

13      A.   Correct.

14      Q.   At least from what you seen, there was no

15  one that could have pushed him into the creek?

16      A.   Correct.

17      Q.   Nobody there that could have clubbed him

18  with a stick and knock him into the creek?

19      A.   No.

20      Q.   Nobody tasered him into the creek.

21      A.   Correct.

22      Q.   And the entire time from you and the

23  Deputy Sheriff made your way from where you first

24  spotted Mr. Good down the creek, did you -- you

Page 42

1    didn't see anybody enter the creek bed or the creek

2    bank, correct?

3         A.    Correct.

4         Q.    And Mr. Good was in your view the entire

5    time, correct?

6         A.    Correct.

7         Q.    At this point, did anybody taser Mr. Good?

8         A.    No.

9         Q.    At any point, did anybody throw a rock at

10   him or anything towards him while he was in the

11   water?

12        A.    No.

13        Q.    When you first met Sheriff Deputy Gunnet,

14   that was outside the wood line?

15        A.    Mm-humm.

16             MR. BOYLE:   Is that "yes"?

17             THE WITNESS:   Yes.

18   BY MR. MACMAIN:

19        Q.    And the two of you kind of made your way

20   into the woods looking for Mr. Good?

21        A.    Yes.

22        Q.    And she was with you the whole time?

23        A.    Yes.

24        Q.    And then at some point after you went to

Page 43

1   the woods where you first spot Mr. Good, how long of

2   a time period, roughly, was that when you first

3   entered the woods until Deputy Sheriff Gunnet said,

4   "There he is"?

5       A.   Within probably five seconds.  She almost

6   immediately saw him upon us enter the woods.

7       Q.   And I think you had said as you spotted --

8   you're making your way down, you're calling out for

9   him to get out of the water, correct?

10      A.   Correct.

11      Q.   And at this point, did he ever move to get

12  out of the water?

13      A.   No.

14      Q.   Now, you said you were familiar with at

15  least two prior times, one personally, one by

16  hearing it from other officers where he fled from

17  law enforcement?

18      A.   Correct.

19      Q.   And one of those times he fled and is

20  entering this same creek?

21      A.   Correct.

22      Q.   And you were asked some questions when you

23  were interviewed by the detectives from the

24  Lancaster County District Attorney's Office about

Page 44

1  that prior incident, and you had recounted pretty

2  much what you had told us here today?

3      A.   Correct.

4      Q.   Did you think this whole point you were

5  asked about whether he was faking it, were you

6  concerned knowing his history that he may be trying

7  to lure you and the other law enforcement into the

8  water?

9      A.   Yes.

10     Q.   And that would be something that would of

11 concern to you and other law enforcement?

12     A.   Yes.

13     Q.   So this period of time when you hesitated,

14 part of it was concern that he may be laying in wait

15 or playing possum to try to entice the officers to

16 come in the water after him, correct?

17     A.   Correct.

18     Q.   And at the time you went in the water, it

19 was you and Deputy Sheriff Gunnet?

20     A.   Immediately, right there, yes.   There was

21 no other police officer there.

22     Q.   Did you have any concern -- I know this

23 was happening quickly that you both took off of your

24 duty belts and waded into the water and Mr. Good got

Page 45

1    out of the water, he now had access to your weapons?

2         A.    I don't remember thinking that.

3         Q.    Were you concerned if both of you went

4    into the water, there was no law enforcement on the

5    bank in case Mr. Good in fact overpowered you and

6    pulled you under the water and did something to

7    further his escape?

8         A.    I can't say that I was thinking too much

9    about the deputy.  I was thinking about how I was

10   supposed to respond.

11        Q.    After the incident, did you have any

12   conversations with Kristi Good?

13        A.    Yes.

14        Q.    When was that?

15        A.    I don't know how long after incident it

16   was.

17        Q.    Can you tell me where that conversation

18   took place?

19        A.    It was in Ephrata.  I was responding to

20   like some non-emergency call to a store called

21   Complete Inbox.  It's on North Reading Road, just

22   north of the hospital.  I was leaving that store and

23   she saw me as I was about to get into my police car

24   and she kind of said, "You're in the parking lot

Page 46

1   there."

2        Q.   Tell me about the conversation.

3        A.   So she approached me.  I did not know who

4   she was.  She introduced herself and thanked me for

5   doing what I could to save her son, and she said she

6   felt like I -- she said she felt like I was one of

7   the officers that had tried to save him.

8        Q.   Any other conversation besides that?

9        A.   No.

10       Q.   Any other encounters with Ms. Good?

11       A.   No.

12                 MR. MACMAIN:  I think I'm done.  Just

13            give me a second.  Those are all the

14            questions I have.  Thank you.

15                 MR. BOYLE:  Anything else?

16                 MR. BAIRD:  No followup.

17                 MR. BOYLE:  Thank you, Officer.  I

18            appreciate you coming in.  I will walk you

19            out.

20                      -    -    -

21                 (Whereupon, the witness was excused

22            at this time.)

23                      -    -    -

24                 (Whereupon, the deposition concluded

Page 47

1          at 10:44 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 48

1                         -    -    -

2              C-E-R-T-I-F-I-C-A-T-I-O-N

3                         -    -    -

4              I hereby certify that the witness was

5         duly sworn in for this deposition matter

6         by the Court Reporter.

7

8

9

                        Mary Hammond

10                      August 18, 2020

11

12              (The foregoing certification of this

13         transcript does not apply to any

14         reproduction of the same by any means,

15         unless under the direct control and/or

16         supervision of the Registered Professional

17         Reporter.)

18

19

20

21

22

23

24

Page 49

- - -

ERRATA SHEET

- - -

INSTRUCTIONS:  After reading the
transcript of testimony, please note any
change, addition or deletion on this
sheet.  DO NOT make any marks or notations
on the actual transcript.  (Use additional
paper if needed and attach it to this
sheet.)

Please sign and date this errata
sheet and return it to the court reporting
agency indicated below.

Case Name:  Estate of Andrew Davis
                    vs.
            Barbara Rodriguez-Santana, et al
Date Taken:  August 18, 2020
Deposition of:  Officer Beth Rivera
--------------------------------------------
PAGE      LINE      CORRECTION
--------------------------------------------

_____

_____

_____

_____

_____

Page 50

1    PAGE      LINE      CORRECTION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

2    _____

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

| & | | | |
|---|---|---|---|
| **&**  1:14 | **484**  2:17 | **andrew's**  28:1 37:14 | **assist**  11:5 32:11 38:3,4 |
| **1** | **5** | **angle**  19:1 21:18 | **assistance**  11:21 38:1 |
| **10:44**  47:1 | **50**  19:23 | **answer**  6:11,16 7:1,6,7,21 10:12 10:15 27:20 36:22 37:8 | **assume**  7:22,23 |
| **1240**  2:4 | **575-4555**  2:11 | | **attach**  49:9 |
| **14**  5:16 10:16 | **6** | | **attached**  30:15 |
| **1471**  48:9 | **627-9999**  2:5 | **answered**  7:24 27:19 | **attempted**  15:8,9 |
| **14th**  35:18 37:19 38:10 | **6:00**  10:20 | **answering**  24:6 | **attempting**  36:24 |
| **15**  22:14,14 31:13 | **8** | **answers**  6:5,8 | **attorney**  7:4 |
| **1500**  2:4 | **8:20**  34:9 | **anybody**  37:13 42:1,7,9 | **attorney's**  43:24 |
| **18**  1:10 48:10 49:17 | **9** | | **august**  1:10 48:10 49:17 |
| **19102**  2:5 | **9:50**  1:17 | **anymore**  32:17 | **b** |
| **19103**  2:10 | **a** | **apart**  18:3 | **b**  3:15 4:15 |
| **19382**  1:16 2:16 | **a.m.**  1:17 47:1 | **apologize**  39:5 | **bachelor's**  8:22 9:4,7 |
| **2** | **able**  40:4 | **appeared**  18:15,17 18:21 19:18 | **back**  5:15 6:15 10:16 21:20 29:18 30:12 32:20 |
| **20**  22:14 | **academy**  9:24 10:1,4 | **apply**  48:13 | |
| **20-1431**  1:3 | **access**  45:1 | **appreciate**  46:18 | **background**  8:21 |
| **200**  1:15 2:16 | **acknowledged**  17:13 | **apprehend**  22:7 38:6 | **backing**  22:4 |
| **2000**  2:9 | **action**  1:2 | **approached**  13:11 46:3 | **backwards**  21:17 21:18 |
| **2012**  9:3,6 | **actions**  10:7 | | **bad**  39:2 |
| **2014**  9:7,19 | **actual**  49:8 | **approaching**  12:23 14:21 | **baird**  2:3 3:8 4:14 4:15 5:8,11 10:14 14:15,20 24:1,4,9 27:22 36:9,10,21 37:2,12 39:4,12 46:16 |
| **2018**  5:16 10:16 38:10 | **addition**  49:6 | **approximately**  1:17 33:12 34:17 35:14,17 | |
| **2020**  1:10 48:10 49:17 | **additional**  49:8 | **april**  5:16 10:16 35:18 37:19 38:10 | |
| **215**  2:5,11 | **agencies**  5:14 | **area**  9:9 10:19 11:1 12:14 17:6,6 20:24 27:1,4 | **bank**  9:15 23:16 29:12 42:2 45:5 |
| **2300**  2:10 | **agency**  33:3 49:13 | | **barbara**  49:16 |
| **3** | **agreement**  4:4 | **arising**  5:15 | **bed**  14:10 42:1 |
| **30**  34:17 | **ahead**  7:11 13:13 | **arrest**  35:15 | **began**  20:24 24:21 |
| **318-7106**  2:17 | **al**  1:6 49:16 | **arrived**  12:11 14:14 32:18 34:8 | **beginning**  1:16 |
| **39**  3:10 | **alongside**  6:19 | **asked**  15:6 27:19 34:12 39:6 43:22 44:5 | **belief**  28:11,16 |
| **4** | **andrew**  1:3 2:6,15 4:16 5:1 13:22 15:8 16:10 18:13 23:1,19 24:17,21 27:11,14 28:12 29:21 34:16 35:2 36:1,3,12,17 37:5 37:18 38:6 49:15 | | **believe**  13:9 17:12 38:12,13 |
| **4**  3:8 | | | |
| **40**  19:23 29:13 40:21 | | | |
| **433**  1:14 2:15 | | | |

[believed - degree]                                    Page 2

| | | | |
|---|---|---|---|
| **believed** 29:21 | **capture** 22:7 | **comment** 37:13 | **courtesy** 6:24 |
| **belonging** 12:12 | **car** 45:23 | **community** 12:24 | **cpboyle** 2:11 |
| **belt** 30:14,17 | **carried** 15:23 | 27:5 | **creek** 14:7,9,16,23 |
| **belts** 44:24 | **carry** 15:20 | **complete** 7:1 | 15:1 17:23 21:11 |
| **best** 6:5 38:22 | **case** 45:5 49:15 | 45:21 | 21:13,16,17 23:20 |
| **beth** 1:12 3:6 4:10 | **caught** 38:8 | **concern** 44:11,14 | 24:4 29:11 31:6 |
| 4:20 8:9 49:18 | **center** 2:3 21:10 | 44:22 | 32:8,12 35:16 |
| **bit** 8:20 22:22 30:3 | 21:12,16 | **concerned** 44:6 | 37:11 40:21 41:1 |
| 31:2 | **certainly** 6:24 | 45:3 | 41:5,11,15,18,20 |
| **boat** 32:13,13 34:5 | **certification** 4:5 | **concluded** 46:24 | 41:24 42:1,1 |
| 34:11,12,13 | 48:12 | **connection** 10:7 | 43:20 |
| **body** 19:2 26:5 | **certify** 48:4 | **connell** 1:14 | **criminal** 8:22,24 |
| 34:16 37:14 40:7 | **chance** 38:18 | **continued** 28:7 | 35:2,4 |
| 40:15 | **change** 29:2,5,6 | **control** 48:15 | **cross** 39:17 |
| **borough** 2:12 4:19 | 35:23 49:6 | **conversation** 15:4 | **current** 8:12 21:21 |
| 10:3,8 12:3 27:1 | **changed** 29:23 | 45:17 46:2,8 | 21:23,24 24:11 |
| **boulevard** 2:4 | 30:2 | **conversations** | 32:2 |
| **boyle** 2:9 3:9 4:18 | **changing** 29:8 | 14:2 16:22 45:12 | **currently** 8:10 |
| 4:18 5:4 10:10 | **channel** 17:7,9 | **correct** 11:10 12:9 | **custody** 11:15 |
| 14:12,17 23:23 | **checks** 9:16 | 13:19 17:9,10,24 | 36:16,17,23 37:1 |
| 24:3,5 27:19 36:6 | **chest** 31:19 | 18:23 19:16,17,20 | |
| 36:19,22 37:7 | **chester** 1:15 2:16 | 22:2 25:22,23 | **d** |
| 39:3 42:16 46:15 | **christopher** 2:9 | 26:1 32:9,10 | **d** 3:3 4:2,15 |
| 46:17 | 4:18 | 34:24 35:9 38:16 | **dark** 24:14 |
| **break** 7:10,12 8:4 | **circumstances** | 38:17,21 40:6,10 | **date** 29:17 49:11 |
| **broadcast** 17:8 | 36:15 | 40:13,16,18,19,22 | 49:17 |
| | **civil** 1:2 | 41:2,3,13,16,21 | **david** 2:14 4:21 |
| **c** | **clear** 6:16 41:10 | 42:2,3,5,6 43:9,10 | 39:21 |
| **c** 2:1 4:2 48:2,2 | **clearly** 7:17 | 43:18,21 44:3,16 | **davis** 1:3 2:6,15 |
| **call** 11:3,8,12,14 | **closer** 21:9 | 44:17 | 5:1,1 49:15 |
| 11:16,17,20 12:1 | **clothes** 19:12 | **correction** 49:19 | **day** 10:18 35:23 |
| 17:15 19:5 20:6 | **clothing** 40:8 | 50:1 | **dead** 32:9 |
| 24:21 28:7 39:23 | **clubbed** 41:17 | **counsel** 2:6,12,18 | **debriefing** 35:23 |
| 45:20 | **cocalico** 37:23 | 4:4 14:18 36:20 | **decided** 17:16 |
| **called** 19:9,11 | **come** 15:11,13 | **counterfeit** 9:16 | 30:5 |
| 45:20 | 20:23 25:16,22 | **county** 1:6 2:18 | **decision** 30:10 |
| **calling** 20:11,20 | 26:11,12 28:7 | 4:22,23,23 5:2,3 | **deep** 29:14 34:23 |
| 21:2 23:1,4 25:1,8 | 30:12 44:16 | 12:16 15:23 43:24 | **defendant** 2:12,18 |
| 25:14 26:15,22 | **coming** 28:9 37:15 | **court** 1:1 6:9 48:6 | **defendants** 1:7 |
| 28:3,23 43:8 | 46:18 | 49:12 | 5:13 |
| **calls** 11:11 12:9 | | | **degree** 8:22,24 9:2 |
| 29:22 | | | 9:5,10 |

**deletion** 49:6
**demeanor** 16:16
   16:20
**dennehey** 2:8
**department** 8:11
   9:19 11:6 15:24
   18:9,11 33:5
   35:14 37:23 38:1
**depending** 7:7
**deploy** 27:8,13
**deployed** 23:13
   27:17
**deposition** 1:12
   5:17,18 38:19
   39:21 46:24 48:5
   49:18
**deputy** 4:24 5:2
   17:16 20:24 31:23
   33:20 39:21,24
   40:18,24 41:23
   42:13 43:3 44:19
   45:9
**describe** 17:18
**description** 3:17
**detectives** 43:23
**different** 23:18
**difficult** 24:15
**direct** 5:6 48:15
**direction** 16:24
   17:2,17,18 21:24
**disciplinary** 10:7
**discuss** 39:6
**dispatch** 11:11
   17:9
**dispatched** 11:2,4
   11:5 12:16
**distress** 29:9
**district** 1:1,1
   43:24
**dmacmain** 2:17

**doing** 10:17,21
   18:13 21:7 22:10
   27:24 46:5
**drift** 21:10,12 24:3
   24:4
**drifted** 25:3,3
**drop** 31:2
**dropped** 31:8
**drove** 12:9
**duly** 4:11 48:5
**dusk** 13:20
**duty** 27:17 30:14
   30:17 44:24

**e**

**e** 2:1,1 3:3,15 4:2,2
   48:2
**east** 17:20 21:23
   37:23
**eastern** 1:1
**edge** 22:11,13 25:4
**educational** 8:21
**effort** 18:19
**embankment** 20:2
   20:4 21:1,3 24:20
   29:10
**emergency** 45:20
**employed** 8:17
   33:4,6
**employment** 9:9
   9:13 10:8
**encounter** 16:5,10
**encountered** 16:12
**encounters** 46:10
**enforcement** 5:14
   8:18 9:9 27:3,17
   43:17 44:7,11
   45:4
**enter** 32:21 42:1
   43:6
**entered** 10:3 32:24
   33:16 35:7 43:3

**entering** 43:20
**entice** 44:15
**entire** 23:18 41:22
   42:4
**entirety** 40:23
**entities** 5:14 8:18
**ephrata** 2:12 4:19
   8:11 9:19 10:3,8
   10:18 11:1 12:3
   12:24 27:1,5,24
   33:4,6 45:19
**eric** 2:2 36:2
**ericshore.com** 2:6
**errata** 49:2,11
**escape** 45:7
**escaped** 11:14
**esquire** 2:3,9,14
   2:15
**essentially** 38:5
**estate** 1:3 2:6 4:16
   49:15
**estimate** 14:19
   20:3 29:12,13,14
   35:19
**et** 1:6 49:16
**eventually** 19:11
**examination** 5:6
   39:17
**examined** 4:11
**excused** 46:21
**exhibits** 3:18
**expect** 8:3
**explain** 21:13
   30:21
**explained** 15:7

**f**

**f** 2:4 48:2
**fact** 10:11 45:5
**faking** 22:19,20
   25:8 26:14 28:12
   28:17,22 29:22

   44:5
**familiar** 43:14
**far** 12:5 14:9,23
   18:3 19:21 29:11
   31:11
**feel** 32:3
**feet** 18:5 19:23
   25:5 29:13 31:13
   40:21
**felt** 46:6,6
**field** 9:14
**filed** 5:13
**filing** 4:5
**find** 34:2,16 35:20
**finishes** 36:19
**fire** 34:8,15
**firemen** 34:11
**first** 4:11 12:11
   14:13,14,21 15:4
   23:8 30:6 40:3,17
   41:23 42:13 43:1
   43:2
**five** 13:8 18:5 43:5
**flashlight** 13:18,21
   30:19
**flashlights** 31:21
   33:9,22
**fled** 35:16 36:1,4
   36:12 37:5,10
   43:16,19
**floating** 23:20
**focused** 25:12
**following** 21:21
**follows** 4:12
**followup** 39:15
   46:16
**foot** 38:4,5,8
**foregoing** 48:12
**forget** 30:20
**form** 4:6 37:7

**found** 34:18,20 37:4
**four** 8:16
**fraud** 9:15
**friends** 39:10
**front** 25:6
**full** 8:7
**further** 26:22 45:7

**g**

**g** 4:2,14
**gear** 30:5,13 32:19
**getting** 17:6 22:10
**give** 5:20 6:24 46:13
**given** 5:18 38:15
**giving** 6:8
**go** 5:21 6:15 7:11 8:3 9:24 20:24 26:11,12 30:5,13
**going** 5:20 7:22,23 9:24 10:18 11:1 21:3,23,24 22:7 23:8 26:8,16,19 28:1,23 30:3,7 34:21
**good** 1:3 2:6 4:16 4:17 5:9,10 13:22 15:8 16:10,12 18:13 23:1,19 24:17 27:11,14 28:12 37:5,18 40:3,17 41:1,6,12 41:24 42:4,7,20 43:1 44:24 45:5 45:12 46:10
**good's** 34:16 35:2
**gotten** 22:23
**grab** 15:8
**grabbed** 31:4
**graham** 2:3 4:14 5:11

**grahamb** 2:6
**group** 2:14
**guards** 14:22
**guess** 7:19 21:5 27:7 31:22 33:14
**guidance** 5:21
**gun** 30:18
**gunnet** 4:24 5:2 39:22,23 40:18,24 42:13 43:3 44:19

**h**

**h** 3:15 4:14
**half** 8:16
**hammond** 1:18 48:9
**handcuffed** 25:18 40:12
**handcuffs** 25:19 26:2 30:19
**hangout** 39:9
**happened** 15:6 16:8 31:16 34:7 35:17 38:13 39:7
**happening** 26:21 44:23
**hard** 6:13
**harrisburg** 9:1
**head** 6:12,12 18:17 19:1,4,15 21:15 26:6,7,8,19 28:1 31:21 40:5
**hear** 7:15
**heard** 7:17 35:13
**hearing** 43:16
**held** 1:13
**help** 24:21,22,22 24:24 25:2,8,14 26:15,23 28:12,23 29:22 35:8
**helpful** 6:9

**hernizen** 38:2
**hesitated** 44:13
**hiding** 18:21
**hired** 9:19
**history** 35:2,4 44:6
**hold** 23:15,17 31:4
**home** 10:22
**hospital** 10:18 11:1,7 12:6,9,13 12:24 13:4 14:3 27:5,24 36:14 41:7 45:22
**huh** 6:12
**humm** 42:15
**hunker** 20:14

**i**

**idea** 29:16
**immediately** 9:8 12:8 41:9 43:6 44:20
**inbox** 45:21
**incident** 5:15 6:2 10:16 16:7 29:17 35:3,12,18,21 36:5 36:12 37:4,18,22 38:11,14,16 39:7 44:1 45:11,15
**incidents** 35:5,10
**included** 30:14
**including** 6:9
**indicated** 49:13
**individual** 5:13
**individuals** 13:3
**information** 11:19 17:5 35:1
**initial** 11:12,16,20 38:13
**initially** 11:5,23 19:2,22 22:13 26:10,15 34:9

40:9
**instruct** 7:6
**instructions** 5:20 8:3 49:4
**interview** 38:15,19
**interviewed** 43:23
**introduced** 39:20 46:4
**investigator** 9:16
**involved** 37:24
**involvement** 6:2
**involving** 35:5 36:12 37:18
**issue** 13:23

**j**

**job** 8:12,15 9:21 9:23 10:2
**john** 2:4
**justice** 8:23,24

**k**

**k** 4:17
**keep** 9:21
**kennedy** 2:4
**kfc** 12:13,15,21
**kind** 9:14 17:1 24:1 25:6 27:4 29:1 31:1,2 40:5 42:19 45:24
**knew** 25:21 32:1 35:7,11
**knock** 41:18
**know** 6:3 7:11,16 8:5 13:5 14:11,24 15:22 16:1 20:4,5 22:5,16 23:11 25:5,17,19 26:20 31:16,22,23 33:21 34:18 35:4 36:11 36:15 37:10,21 44:22 45:15 46:3

knowing 44:6
knowledge 38:9
  38:22
known 35:5 37:17
kristi 4:17 16:12
  45:12

**l**

laid 30:23
lancaster 1:6 2:18
  4:22,22,23 5:1,2
  15:23 43:24
launch 34:12
law 2:2,14 5:14
  8:18 9:9 27:3,16
  43:17 44:7,11
  45:4
lawsuit 5:12
lawyer 5:11
lawyers 5:24
laying 18:15,17
  19:18 40:10 44:14
leave 9:23
leaving 11:13
  45:22
leg 15:11,12
legal 6:4
leinhauser 1:14
light 13:17 33:10
line 12:19,23 13:1
  13:13 14:7,15,17
  14:18 18:16 25:5
  42:14 49:19 50:1
little 8:20 22:22
  30:3 31:1
llc 2:14
loaded 30:18
located 20:21,22
locating 38:3
location 31:12
  36:3,8,11

log 31:3
long 8:4,15 9:21
  11:16 14:17 22:12
  29:20,23 34:1,15
  38:10 43:1 45:15
longer 28:9,9 29:7
  30:4
look 17:7 19:1
  38:18
looked 40:9
looking 18:4 20:8
  20:22 21:19 33:19
  42:20
loose 25:22
lose 20:17
lot 12:12 45:24
lucky 34:10 38:2
lure 44:7

**m**

m 4:14
macmain 1:14
  2:14,14 3:10 4:21
  4:21 39:14,19,21
  42:18 46:12
macmainlaw.com
  2:17
magazines 30:19
maintain 20:16
maintained 20:18
making 17:15 21:6
  21:7 23:7 37:13
  43:8
marcos 33:2
marked 3:19
market 1:15 2:9
  2:15
marks 49:7
marshall 2:8
mary 1:17 48:9
master's 8:23 9:2
  9:7,10,18

matter 38:15 48:5
mdwcg.com 2:11
mean 21:13 22:21
means 48:14
meet 14:5
mentioned 34:4
messiah 8:23
met 14:13 42:13
metro 9:15
miles 12:7
mind 29:3,5,6,8,23
  30:2 37:9
mine 33:24
minutes 34:3,17
mm 42:15
model 15:22
mom 16:13
months 9:22 35:14
  35:17
morning 5:9,10
move 24:2 43:11
moving 21:15,17
municipal 5:14

**n**

n 2:1 3:3 4:2 48:2
name 3:17 5:11
  8:7 16:2,4 19:9,11
  20:7,11 21:5
  35:24 49:15
nature 23:13
near 12:13,14,15
  12:20,21 14:6
  23:11 34:20 36:14
  41:11
nearby 31:3
need 7:10 8:4
  13:18 28:12
needed 34:13 49:9
new 26:21
night 38:16

nodding 6:12
non 45:20
north 17:20,22
  45:21,22
notary 1:19
notations 49:7
note 49:5
notice 1:13 27:23

**o**

o 4:2 48:2
object 37:7
objection 7:5,7
  10:10 14:12 23:23
  36:6
objections 4:6
objects 7:4
obligation 6:4
observation 28:18
observe 24:16
  29:6
observed 28:8
  30:3
observing 26:19
  28:23
obtaining 9:10
occurred 5:15
  10:16 34:9
office 43:24
officer 1:12 3:6
  4:10,20 8:14 24:6
  27:4 32:19,24
  34:10,13 35:13,15
  35:24 36:4,13,16
  37:5 38:2,2 39:14
  44:21 46:17 49:18
officers 12:22 17:5
  18:7,8,10 20:21
  26:21 27:1,7 30:6
  32:18 33:9,13,23
  34:16 43:16 44:15
  46:7

offices 2:2
okay 5:22,23 6:17
6:21,22 7:2,3,8,9
7:12,13,17,18,24
8:5 24:5 33:20
40:1
once 31:24 32:7
opportunities 9:14
oral 1:12
original 11:8
outside 42:14
overpowered 45:5

**p**

p 2:1,1,9 4:2
p.m. 10:20 11:2
paddle 24:13
page 3:7,17 49:19
50:1
paper 49:9
parking 12:12
45:24
part 40:4 44:14
particular 29:15
patrol 8:14
penn 2:3 8:24
pennsylvania 1:1
1:16,20 2:5,10,16
people 14:2
performance
27:16
period 43:2 44:13
person 6:20
personally 43:15
philadelphia 2:5
2:10
phone 30:15
place 7:5 29:18
45:18
plaintiff 1:4 2:6
5:12

plaintiffs 4:16
playing 44:15
please 6:23 7:16
7:21 49:5,11
pocket 30:16
point 13:14,22
14:3 20:13 22:8
23:12,24 25:6,17
25:20,21 26:24
28:1,16 29:2,22
32:4 33:8,22 34:4
34:22 41:4 42:7,9
42:24 43:11 44:4
pointed 16:24 18:2
18:6,14
police 8:11 9:19
10:1,3 12:5 18:8
33:4 37:23 44:21
45:23
possible 5:22
possibly 29:21
possum 44:15
potatoes 37:14
present 36:7
pretty 44:1
previous 35:2 36:4
previously 37:10
prior 10:21 28:10
32:1 35:15 36:12
37:3,18 43:15
44:1
prisoner 11:6,14
11:22 13:23
private 17:7
probably 11:18
19:23 23:17 31:13
43:5
probes 15:10,16
40:15,15
problem 13:21

process 22:10
professional 1:18
48:16
prongs 24:17
provide 6:4
public 1:19
pulled 12:12 32:7
32:14 45:6
pulling 32:11
pursuant 1:13
pursuit 37:24 38:4
38:5,8
pushed 41:15

**q**

question 4:7 6:11
6:23 7:2,24 24:6
39:2
questions 6:1,5 7:5
7:15,15,20 33:15
39:13 43:22 46:14
quickly 5:21 44:23

**r**

r 2:1 4:2,14,15,17
48:2
radio 17:4,11,15
26:20 30:14,19
ran 15:10 17:1,17
rank 8:12
react 20:10,13
read 5:4 6:15
reading 7:22
45:21 49:4
real 32:3
really 24:15
reason 7:11 8:5
recall 13:16,17
14:24 16:6,14
23:3,6 25:11
receive 11:11

received 11:9,17
record 7:6,22 8:8
recounted 44:1
reference 34:19
regard 11:21
registered 1:18
48:16
relayed 17:4 26:20
30:6
relevance 10:11
remember 6:2
10:17,23 11:3,24
16:19 17:13 20:15
22:18 23:10 24:23
28:4,5 33:1,12
35:24 36:3,8
37:13 38:12 45:2
remove 30:13
removed 15:10,15
reporter 1:19 6:9
48:6,17
reporting 49:12
represent 4:15,22
39:21
represents 5:12
reproduction
48:14
requested 38:1
required 11:21
rescue 30:8 34:8
34:15
reserved 4:7
respond 17:11
20:9,10 25:10
45:10
responded 12:8
38:2,4
responding 25:11
45:19
response 20:9

| | | | |
|---|---|---|---|
| **return** 49:12 | **security** 9:14 13:1 | **shift** 10:20,22 | **states** 1:1 |
| **right** 7:10,19,20 | 13:4,10 14:2,22 | 35:22 | **station** 11:13 12:2 |
| 8:1 9:12 18:16 | 27:6,24 33:21 | **shining** 31:22 33:9 | 12:6 |
| 21:19,20 22:1 | 41:7 | 33:22 | **status** 25:19 |
| 27:6 34:20 38:18 | **see** 12:11,22,24 | **shirt** 30:15 31:20 | **stay** 6:13 |
| 41:8 44:20 | 13:14,16,18,22 | **shore** 2:2 18:16 | **staying** 28:8,9 |
| **rivera** 1:13 3:6 | 14:7 18:1,16,24 | 25:4,5,15 28:8 | 29:7 |
| 4:10,20 5:9 8:9 | 19:15 20:10,13 | 30:24,24 32:20 | **steep** 20:3 21:6 |
| 49:18 | 24:10,13,15 26:2,5 | **showed** 33:24 | 23:16 |
| **road** 45:21 | 26:24 27:3,13 | **side** 23:15 29:11 | **step** 31:1 |
| **rock** 42:9 | 31:19,20,23 32:4,5 | 30:16 | **stepped** 30:24 |
| **rodriguez** 16:4,15 | 32:16 33:10 40:4 | **sight** 20:16,17,18 | **stick** 41:18 |
| 18:11,14 22:16 | 41:6 42:1 | **sign** 5:4 49:11 | **stomach** 18:18 |
| 25:7,24 26:14 | **seeing** 13:21 14:24 | **signature** 48:9 | 19:19 22:3 |
| 28:18 32:21 39:7 | 22:13 | **simultaneous** 29:1 | **stop** 7:5,11 |
| 39:10,22 49:16 | **seek** 9:8 | **sitting** 18:23 | **store** 45:20,22 |
| **rodriquez** 33:2 | **seen** 18:19 31:12 | **six** 9:22 35:14,17 | **stream** 21:22 |
| **room** 6:11 | 31:18 34:21 40:8 | **slowly** 21:5 | **street** 1:15 2:9,15 |
| **roughly** 43:2 | 40:11,14 41:14 | **smoothly** 5:21 | **strike** 26:17 |
| **running** 15:11,13 | **sees** 24:1 | **son** 46:5 | **strong** 32:2,3 |
| **s** | **sequence** 26:13 | **sorry** 22:24 36:9 | **struggling** 24:10 |
| **s** 2:1 3:15 4:2,17 | **sergeant** 36:2,24 | **south** 17:20 | **stuff** 30:23 |
| **sack** 37:14 | 38:14 | **speak** 7:21 | **subject** 10:6 |
| **santana** 49:16 | **shackle** 15:10,12 | **speaking** 6:20 | **suite** 1:15 2:4,10 |
| **save** 46:5,7 | 25:21 | **specific** 33:15 | 2:16 |
| **saw** 18:2 19:2,4,13 | **shackled** 40:12 | **specifically** 24:23 | **supervision** 48:16 |
| 19:22 21:15 40:3 | **shackles** 26:2 | **specifics** 17:13 | **supervisor** 34:10 |
| 43:6 45:23 | **shaking** 6:12 | **spoke** 16:3 | **supposed** 45:10 |
| **saying** 22:17,18 | **sheet** 49:2,7,10,12 | **spot** 43:1 | **sure** 8:6 15:1 22:9 |
| 23:2,4 24:24 | **sheriff** 4:23 5:3 | **spotted** 40:17 41:1 | 22:9 33:14 34:22 |
| **schmidt** 36:2,4,13 | 13:12,15 14:4,13 | 41:24 43:7 | **surface** 31:13,20 |
| 36:16,24 38:14 | 15:2 16:2,15 | **staff** 13:1,4,11 | **swam** 32:16,20 |
| **scuffle** 15:7 | 18:11,14 22:16 | **standing** 14:6,22 | 34:19 |
| **sealing** 4:5 | 25:7,24 26:13 | 23:20 29:10 | **swim** 24:13 25:15 |
| **second** 11:17 23:8 | 28:17 32:21 37:6 | **start** 20:23 | 31:9,11 |
| 32:1 34:12,13 | 39:7,9,22,22,23 | **started** 10:20 | **swimming** 23:21 |
| 46:13 | 41:23 42:13 43:3 | 12:18,23 21:9,10 | 33:19 34:1 |
| **seconds** 11:18 | 44:19 | 26:11 29:7,8 31:7 | **sworn** 4:11 48:5 |
| 22:14,15 28:10 | **sheriff's** 4:23 11:6 | **starting** 10:21 | |
| 30:1 43:5 | 15:24 18:10 39:24 | **state** 1:19 8:7,24 | |
| | 40:18,24 | | |

| t | | | |
|---|---|---|---|

**t**

t  3:15 4:17 48:2,2
take  7:12 22:12
  29:20,24 30:5
  34:15 36:24
taken  1:13 49:17
talk  10:15 13:10
  15:2
talked  16:7
talking  16:16
  23:24 33:16,35:22
  39:23
tase  15:9
tased  15:16
taser  15:9,16,18
  15:20,23 24:16
  27:9,13,17 30:19
  40:15 42:7
tasered  41:20
tell  8:20 15:4
  19:14 20:19 23:19
  23:21,22 24:7
  28:20 32:6,15
  34:7 35:10 37:21
  45:17 46:2
telling  25:15
ten  25:5 30:1,1
terms  8:3 22:24
testified  4:12 36:6
testimony  49:5
thank  46:14,17
thanked  46:4
things  40:2
think  8:2 20:8
  30:20 35:22 39:12
  41:8 43:7 44:4
  46:12
thinking  22:6 37:3
  45:2,8,9
thought  17:17
  22:19 25:8 26:14

28:21,24
three  12:7 34:3
throw  42:9
time  3:19 4:8 6:20
  9:20 10:3,24
  12:23 14:1 16:16
  18:6 22:17,24
  23:18 24:16 26:8
  26:17 27:8 28:11
  29:15,20 32:18,21
  34:10 35:2 37:4
  37:15 40:23 41:4
  41:22 42:5,22
  43:2 44:13,18
  46:22
times  20:6,8 21:5
  23:18 43:15,19
title  8:13
today  4:20 5:16
  38:19 44:2
told  12:14,15
  13:12 15:12,15
  17:5 20:21 28:18
  38:14 44:2
trained  30:8
transcribing  6:10
transcript  6:16
  7:23 48:13 49:5,8
transmitted  11:20
trees  20:1 23:17
trial  4:8
tried  46:7
true  38:21
try  6:13 7:16 31:5
  44:15
trying  34:2 35:8
  35:15 44:6
turned  38:3
twice  15:9
two  2:3 12:7 18:3
  18:4 27:7 30:18

35:5,10 40:20
41:5 42:19 43:15

**u**

uh  6:12
un  6:13,13
understand  6:6,14
  7:14,20
understood  7:23
underwater  26:16
  26:19 28:8,9,24
  29:7 30:3,11
  34:21
undone  15:11,13
unhandcuffed
  40:12
united  1:1
unsure  28:15
updated  11:14
use  49:8

**v**

v  1:5
vehicle  12:18 15:8
verbally  6:11
view  42:4
vs  49:15

**w**

waded  44:24
wait  6:23,24 36:19
  44:14
waived  4:6
walk  17:16 31:5,7
  46:18
walked  13:1 24:19
walking  12:19
  22:4
want  14:19
watching  25:12
water  18:15,24
  19:3 20:23 24:14
  26:3,5,9,22 28:1

30:6,7,8,22 31:1
32:20,22 33:1,9,11
33:16,23 35:8
37:15 40:4 42:11
43:9,12 44:8,16,18
44:24 45:1,4,6
water's  22:11,13
way  21:6,8 23:8
  40:24 41:5,23
  42:19 43:8
weapon  23:12
weapons  45:1
wearing  19:12
  31:19 40:8
wellspan  10:18
  11:1
went  30:22 42:24
  44:18 45:3
west  1:14,15 2:15
  2:16 17:20
witness  3:5 4:19
  10:11,13 24:7
  27:21 36:23 37:9
  42:17 46:21 48:4
wood  12:19,23
  13:1,13 14:6,15,17
  14:18 42:14
woods  12:20,20
  14:9 17:1,17 20:2
  42:20 43:1,3,6
work  8:10 23:9
worked  9:15
worried  16:18
worse  39:3
wrong  38:24

**x**

x  3:3,15

**y**

yeah  13:20 18:21
  19:4 21:4 24:7

**[yeah – yell]**                                                    Page 9

30:23 31:7,10
32:5 33:4,10
34:20 35:19
**year**  29:15
**years**  8:16
**yell**  19:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(I) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 49

1                      –   –   –

2                   ERRATA SHEET

3                      –   –   –

4              INSTRUCTIONS:  After reading the

5       transcript of testimony, please note any

6       change, addition or deletion on this

7       sheet.  DO NOT make any marks or notations

8       on the actual transcript.  (Use additional

9       paper if needed and attach it to this

10      sheet.)

11              Please sign and date this errata

12      sheet and return it to the court reporting

13      agency indicated below.

14

15  Case Name:  Estate of Andrew Davis

                        vs.

16          Barbara Rodriguez-Santana, et al

17  Date Taken:  August 18, 2020

18  Deposition of:  Officer Beth Rivera

19  ---------------------------------------------

    PAGE     LINE     CORRECTION

20  ---------------------------------------------

    9        24       Delete this entire answer and replace with

21                    "I was hired by the Ephrata Police Dept."

    20       20       Change "is" to "in"

22

    20       12       Remove question mark. This was a statement

23

    27       6        Change "they." to "there" (the second "they")

24

    26       7        Please add after this sentence, " I saw his
                      shoulders and chest just below the water surface
                      at this point.

Page 50

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 28 | 8 | Remove "on" |
| 29 | 1 | Remove "with" |
| 33 | 2 | Change name spelling to "Rodriguez" |
| 36 | 2 | Change name spelling to "Schmitt" |
| 36 | 4 | "        " "Schmitt" |
| 36 | 13 | "        " "Schmitt" |
| 36 | 16 | "        " "Schmitt" |
| 36 | 24 | "        " "Schmitt" |
| 38 | 2 | "        " "Hirneisen" |
| 38 | 14 | "Schmitt" |
| 43 | 6 | Change "enter" to "entering" |
| 45 | 24 | Remove quote "You're in the parking lot there". She did not say this. Maybe MacMain asked me this as clarification or said it as reaffirming what I just said, that I was in the parking lot. |

Beth Rivera

Beth Rivera          9/13/20

# EXHIBIT E

## FORENSIC PATHOLOGY
### Lancaster County Coroner's Office

| | |
|---|---|
| Dr. Stephen Diamantoni, Coroner | Lancaster County Forensic Science Center |
| Mr. Eric Bieber, Chief Deputy Coroner | 2080 Spring Valley Rd |
| Dr. Wayne K. Ross, Forensic Pathologist | Lancaster PA 17601 |

## POSTMORTEM REPORT

**Name:** **Good, Andrew D.**   **Age:** **24**   **Race:** **White**   **Sex: Male**

**Autopsy:** **ALC18-063/LC18-1020**   **Date:** **04/16/2018**   **Time:** **8:00 a.m.**

**Demise:**   **Cause:**   **Fresh Water Drowning**
**Manner:**   **Accidental**
**Date Pronounced:**   **04/14/2018**   **Time Pronounced:**   **11:37 p.m.**

### CASE INFORMATION:

The following narrative is based upon the case information available at time of autopsy and provided by Lancaster County Deputy Coroner, Ms. Shannon Blosser. The death of this individual, in light of the surrounding circumstances, comes under the jurisdiction of the coroner's office and a post mortem examination is performed to determine the cause and manner of death. The autopsy process utilizes the scientific methodology as part of the overall forensic analysis.

### CORONER'S REPORT:

SCENE/HISTORY: This deputy spoke via telephone with Sgt. Snavely, Ephrata Police Department who was on scene and reported death of above mentioned 24-year-old male who had been in custody of Lancaster County Sheriff's Department while at Ephrata Community Hospital, escaped custody, fled on foot, jumped into Cocalico Creek which was located to rear of Ephrata Community Hospital and subsequently died. Sgt. Snavely reported that deceased was shackled and handcuffed and had reportedly escaped from Lancaster County Sheriffs custody and ran to rear of Ephrata Community Hospital where Cocalico Creek is located and dove in to creek.

Creek depth is estimated to be approximately 12 feet deep. Deceased had been unable to be located for some time but was then discovered unresponsive in water, retrieved and pulled out of creek onto shore. At time of preliminary telephone report Sgt. Snavely was unable to answer the majority of this deputy's questions, indicating that he did not have the proper information at this point in time but that other sources on scene did.

This deputy arrived on location to rear of Ephrata Community Hospital 169 Martin Avenue Ephrata, PA 17522 tonight 4/14/2018 at 11:28 PM and was met outside by Officer Herneisen, Ephrata Police Department who indicated other officers were set up and staging at command post. Upon entering command post this deputy met with and interviewed Lt. Mckim, Sgt. Snavely, Detective Schmitt, Officers Rivera, Albaugh and Martin, all with Ephrata Police Department. Throughout investigation



Good, Andrew D. (ALC18-063/LC18-1020)

this deputy also met with and interviewed Jeff Krause and Jeff Bell, Lancaster County Detectives. Also noted to be in command post is Chief Deputy Bieber who is assisting this deputy with investigation. The following information was gathered upon interviewing Ephrata Police Department.

Apparently deceased, a 24-year-old male, has had previous run ins with law enforcement as Ephrata Police are readily familiar with deceased. Law enforcement indicated that Akron Borough Police Department were serving a bench warrant on deceased tonight 4/14/2018 for parole violation on a burglary charge. Apparently, there was physical interaction between law enforcement and deceased. Deceased fled from law enforcement to which deceased was tased multiple times and was tackled by law enforcement.

Once in police custody, deceased claimed he had hurt his shoulder from the physical scuffle and he was transported to Ephrata Community Hospital to be checked out. While at Ephrata Community Hospital, Lancaster County Sheriff's Department was contacted to come to Ephrata Community Hospital to take deceased into their custody and escort him to Lancaster County Prison once deceased had been examined by medical staff. While at Ephrata Community Hospital deceased repeatedly verbalized that he was not going back to prison.

Lancaster County Sheriff's Deputy Rodriguez-Santana took deceased into her custody after medical examination was completed. Deceased was placed in handcuffs which were secured to a chain around his waist. Deceased was also placed in ankle shackles but only one was placed and secured (around left ankle) with the right ankle shackle hanging free. Once deceased was ready to be escorted from Ephrata Community Hospital to Lancaster County Prison, he was walked out of hospital by Deputy Sheriff Rodriguez-Santana and a hospital nurse. Nurse only followed Deputy Sheriff Rodriguez-Santana and deceased part way out to waiting vehicle and then returned back into hospital. Once back inside hospital, nurse was told that deceased had managed to get out of Deputy Sheriff Rodriguez-Santana's custody and fled on foot to rear of Ephrata Community Hospital, in the direction of the Cocalico Creek.

Officer Rivera indicated both she and Deputy Sheriff Rodriguez-Santana walked along the bank of the Cocalico Creek searching for deceased. At this point in time it had become dark outside and lights were set up on the bank. Law enforcement finally were able to lay their eyes on deceased to which they called out to deceased. Deceased continued to float further and further out and finally began to call out for help.

Officer Rivera reported that deceased was seen bobbing up and down and went under water several times and was noted to remain under water for a longer period of time with each time he became submerged. Officer Rivera noted that she dove into water in search of deceased.

Pioneer Fire Company/Station 1 put a boat into the water with Officer Lucky in the boat in search of deceased. Deceased was finally located in a prone position in the creek at a depth of between 12-13

2

COPY

Good, Andrew D. (ALC18-063/LC18-1020)

feet. Deceased was pulled out of the creek by Pioneer Fire Company/Station 1 and Officer Lucky at 9:21 PM and brought to the bank of Cocalico Creek. Deceased was unresponsive and it was determined resuscitative efforts would be futile.

Detective Schmitt reported he had interaction with deceased last year sometime in the same general location as to tonight's incident. The interaction became physical and the two rolled down the hill with deceased escaping from Detective Schmitt. At this point in time deceased ran across Cocalico Creek from one bank of the creek to the other bank with ease; water level at this point in time was very shallow and easily maneuvered through by walking or running.

EXAM: Deceased, a young Caucasian male, is noted to be lying supine on bank of Cocalico Creek. Deceased's feet are several inches from the surface of creek. Deceased is laying in amongst some brush. Bank of creek is dirt with leaves and other natural materials mixed in. Creek bank is at base of fairly steep hill and is noted to be to rear of Ephrata Community Hospital property.

Deceased is partially clothed in a pair of blue jeans, boxer shorts, a belt, black socks bilaterally and black sneakers bilaterally. Deceased's wrists are noted handcuffed in front with hands resting on waistband of jeans. Handcuffs are attached to a metal chain which encircles deceased's waist at his abdomen/above waistband of jeans. Posteriorly, chain is noted doubled around. Ace bandage is noted wrapped around left wrist/proximal end of left forearm. Shackle is noted secured around left ankle and is attached to another shackle which is hanging loose (not attached to any part of deceased's body).

Taser wire is noted tangled on deceased's left sneaker. Two taser barbs with attached wire noted to posterior right upper extremity, superior to right elbow. Two additional taser barbs with attached wire noted to lower back, one at his thoracic region and the other at the lumbar region.

Photographs taken of scene and remains by this deputy using a Nikon D7000 camera and 18-105m lens. Deceased was rolled by Chief Deputy Bieber when the time was appropriate.

Temperature of creek is 59 degrees Fahrenheit. Depth of creek is between 12 and 13 feet deep. Ambient temperature is 66 degrees and breezy.

HEENT: Head region palpated and visually examined. No trauma/deformities noted. No blood noted to my gloves. Skin cool and dry to the touch. Blood noted on right ear. Abrasion noted to right forehead. Abrasions and blood noted to lips bilaterally. Multiple abrasions noted to tip of nose. No other facial trauma noted. Superficial scratch noted to anterior neck. No other anterior neck trauma noted. Mottling noted to posterior neck. Pupils fixed, dilated and non-reactive to external stimulus. Petechial hemorrhages noted bilaterally. Sclera noted to be hemorrhaged and injected bilaterally. Blood noted draining from nares bilaterally. Upper dentition noted to be in poor condition. Clear fluid noted draining from right side of oral cavity. No rigor mortis noted in jaw at time of exam.

3



Good, Andrew D.  (ALC18-063/LC18-1020)

THORAX: Tattoo of "Rosie" and a rose to upper right thorax. Tattoo of skull with flames noted to upper left thorax. Mottling noted to upper thorax posteriorly. Superficial scratches noted inferior to right nipple. No other trauma noted to thorax. No trauma noted to back. Livor mortis noted posteriorly dependent appropriate for position of deceased and is blanchable.

ABDOMEN: Cool and firm to the touch. No trauma noted to abdomen. No trauma noted to back. Livor mortis noted posteriorly dependent appropriate for position of deceased and is blanchable.

EXTREMITIES: Upper extremities unclothed. Lower extremities clothed. Mottling noted to bilateral upper extremities. Superficial abrasions noted to left upper shoulder. Superficial scratches and road rash noted to right upper shoulder posteriorly. "Buddha" tattoo with image noted to right upper extremity. Cross tattoo noted to right ventral forearm. Superficial scratches and abrasions noted to right posterior elbow/right posterior upper extremity proximally. Superficial scratches noted to right forearm. Skull tattoo noted to upper left extremity. Tattoo noted to anterior right hand. Multiple tattoos noted to each knuckle, anteriorly. No rigor mortis noted in extremities at time of exam.

LIVOR MORTIS: Posteriorly dependent appropriate for position of deceased and is blanchable.
RIGOR MORTIS: None noted at time of exam.

Consult with Chief Deputy Bieber. Deceased transported to Lancaster County Coroner's Office by Deputy Transporter Don Harrod for further medical evaluation. Electronic death certificate completed by this deputy via EDRS system. Cause of death is Pending, manner of death is Pending, date of death is 4/14/2018 and time of death is 11:37 PM. No funeral home chosen at this time.

Per telephone conversation with Kristi Good, mother/next of kin of deceased she reported deceased had recently (within the past two weeks) gotten out of Cove Forge Behavioral Health Center, a rehabilitation facility in Gettysburg for drug usage. Mother indicated deceased had a history of using heroin. Mother also noted that deceased has had multiple run ins with law enforcement in the past and has been arrested on multiple occasions for probation violation, theft, assault on police officer and simple assault. Mother indicated deceased was not presently employed and had been staying with her part of the time since getting out of rehabilitation and had been staying with a neighbor for part of the time. Mother indicated she last saw deceased this evening prior to Akron Borough Police Department serving deceased his bench warrant.

## FORENSIC EXAMINATION OF BODY:

- CLOTHING:
  - The body is received in a black disaster bag on top of a white sheet.
  - He is wearing blue jean trousers, zippered and buttoned appropriately, drenched with water.
  - Red/blue striped boxers, water-drenched.
  - Black shoe, off the right foot.

4



Good, Andrew D. (ALC18-063/LC18-1020)

- o Black sock, water-drenched, left foot.
- o Black shoe, left foot, water-drenched. Grass debris is noted in the laces. Soil transfer noted at the toe region.
- o Black sock, water-drenched, right foot.
- o Ankle cuff is attached to left lower leg; right ankle cuff is attached to a shackle and is open.
- o Taser wire, wrapped around left ankle cuff. Probe is not appreciated.
- o Handcuffs, tightly cuffed to both wrist regions in front of body. A chain shackle is attached to both handcuffs, wrapped once around; a second section is wrapped twice and attached to the pin on the left side; the pin is noted in the front. The handcuff overlies a bandage noted on the left wrist.
- o The ankle shackle is removed and the taser wire is wrapped around the actual ankle cuff. It is photographed.
- o The cuff lock was not activated on the left handcuff; the right handcuff was locked. Once the handcuff was removed on the right side, a significant pressure mark is noted over the right wrist region.
- o Two probes are noted to the back of the right arm; two probes are noted to the left mid-back and left lower back. The two probes to the back of the right arm have wires attached; the probe to the left mid-back has a wire attached, but the probe to the lower back does not have a wire attached; that wire is noted around the left ankle. The back of the chain has a clip which is attached to a chain link in the back.
- o While removing the shackles, multiple photographs are obtained showing how shackles/cuffs were fastened together. Upon removal, there are pressure marks noted to the abdomen as well as the back region from the chain link.
- o There is an extensive amount of green leafy material, scratch marks, grass, soil stains, linear abrasions noted to the left upper back; circular abrasions to the mid-upper back; large scuff-mark abrasion to the right shoulder.

- • MEDICAL EFFECTS:
  - o ID tag, right 1st toe.
  - o EKG patch, inner right lower leg.

- • TATTOOS ON BODY:
  - o Tattoo of the name Nicole, right upper arm.
  - o Tattoo of Rest in Peace Buddha, right upper arm.
  - o Tattoo of the word Country, back of right hand.
  - o Tattoo of the word Fuck extending from the little finger to the 4th, 3rd and 2nd fingers.
  - o Tattoo of a name, right forearm.
  - o Tattoo of a cross, right forearm.
  - o Tattoo of the letters EW, right wrist.
  - o Tattoo of a skull, right lateral chest.
  - o Tattoo of the name Rosie, right upper chest.



COPY  5

Good, Andrew D. (ALC18-063/LC18-1020)

- o   Tattoo of a skull with fire, left upper chest.
- o   Tattoo of a heart and initials CK, left upper chest.
- o   Tattoo of 3 skulls, left upper arm.
- o   Tattoo of the name Kristi, left mid-axillary line.
- o   Tattoo of the word Fear extending from the left index finger to the left little finger.

- **BODY BUILD AND DECOMPOSITIONAL CHANGES:**

  This is the unembalmed body of a well-built muscular white male who measures 70" and weighs 213 +/- pounds. There is generalized rigor mortis and posterior, fixed, purple lividity. No other decompositional changes are noted, and the overall appearance of the body is compatible with the stated age.

- **EXAMINATION OF BODY:**

  *Head:* The face is plethoric. The head hair is blonde/brown and short. There is a blonde/brown mustache and beard. The irides are hazel. The eyes are congested. There is no evidence of petechial hemorrhages or scleral icterus. The nose shows no evidence of septal perforations. Bloody fluid is noted about the nose and on or about the lips. White froth is noted in the mouth. The inner oral cavity shows upper and lower dentition in poor condition; multiple teeth are missing. Dental caries or dental amalgams are appreciated in the teeth. Blood is noted around the right and left ears.

  *Neck:* The neck is plethoric. The trachea is midline. Bilateral jugular venous distention is noted.

  *Chest, Abdomen, and Back:* Plethoric changes are noted to the upper chest. The chest is symmetrically developed and of a normal AP diameter. The abdominal region is free of palpable organomegaly

  *Upper Extremities:* The upper arms, forearms, and hands are examined. The hands are well formed.

  *Lower Extremities:* The lower extremities are examined. The feet are well formed.

  *External Genitalia/Ano-Rectal Region:* The external genitalia display normal adult features. The ano-rectal region is without note.

- EVIDENCE OF INJURY AND OTHER ABNORMALITIES:
  - o   Head:
    1. Abrasion, polygonal shape, overlying right forehead, fresh, 1" x 1 ½".
    2. Abrasion, linear, right forehead, fresh, 1" x 1/8".
    3. Abrasion, circular, mid-forehead, fresh, ¼" x ¼".
    4. Abrasion, linear, left forehead, fresh, 5/8" x 1/8".
    5. Abrasion, circular, right central upper forehead, fresh, 1/8" x 1/8".
    6. Plethoric changes, face.

6



Good, Andrew D. (ALC18-063/LC18-1020)

    7. Blood around nose and lips.
    8. Abrasion, right lateral distal end of nose, fresh, ¼" x ½".
    9. Abrasions, multiple left size of nose, fresh, ¾" x 7/8".
    10. Froth in mouth.
    11. Dried blood, upper and lower lips.
    12. Abrasions x 2, punctate, 1/8" x 1/8", left lower lip.

o  Neck:
    1. Plethoric changes, neck.
    2. Bilateral jugular venous distention.
    3. Abrasion, linear, left central region of neck, fresh, 1 ¼" x 1/16".

o  Chest, Abdomen, and Back:
    1. Multiple linear abrasions, right lateral chest, beneath left breast and nipple area, 2" x 1 ¾".
    2. Abrasions, multiple, irregular shaped, left upper shoulder, fresh, in an area measuring 1 ¼" x 1".
    3. Abrasions, multiple, linear and irregular shaped, anterior left upper shoulder, fresh, in an area measuring 2 ¾" x 1 ½".
    4. Abrasions x 2, punctate, ¼" x ¼", left lateral chest.
    5. Contused abrasion, fresh, left lower quadrant of abdomen, 1 ½" x 2 ½". The abrasion is linear; the contusion is red/pink.
    6. Abrasion, linear, left upper back, fresh, 2 ¾" x ¼".
    7. Abrasion, circular, right upper back, fresh, in an area measuring ¾" x ¾".
    8. Abrasions, multiple, parallel, vertically oriented, fresh, right upper back, in an area measuring 4" x 5" with extension to the right shoulder.
    9. Grass/soil transfer, pressure marks, blanch marks, chain marks from shackles, lower back region.
    10. Probe, left mid-back and left lower back.
    11. Soil/grass transfer, leafy material, back region.
    12. Two vertically oriented impressions/pressure marks/abrasions, left upper back/shoulder region.

o  Upper Extremities:
    1. Contused abrasion, ill-defined, 2" x 2", left upper outer arm.
    2. Erythematous area, back of left forearm, 2" x 2".
    3. Contusion, dark red, ½" x ½", back of left upper arm.
    4. Contusion, base of left thumb/back of hand/back of left 2nd, 3rd, 4th, 5th knuckles, in an area measuring 3" x 4".
    5. Superficial laceration/tear, ¼" x ¼", left hand/base of left 3rd finger.
    6. Pressure marks from handcuff, abrasion, linear, left wrist region, 4" x 1/8".
    7. Abrasions, multiple, circular, irregular shaped, back of left elbow region, in an area measuring 2 ¼" x 3".
    8. Two probes, back of right arm.
    9. Multiple abrasions, right elbow region, in an area measuring 3" x 3".

7



Plaintiff

Good, Andrew D. (ALC18-063/LC18-1020)

10. Abrasion, brush-burn type, right forearm, in an area measuring 4 5/8" x 1 ½".
11. Multiple abrasions, back of right forearm/wrist region, in an area measuring 3 ½" x 2 ½".
12. Pressure marks from handcuff, irregular and linear scar, back of right forearm.
13. Multiple abrasions, back of right upper arm, in an area measuring 1" x 1".
14. Abrasion, linear, fresh, right antecubital fossa, medial region, 1 ½" x ¼".
15. Other irregular shaped abrasions, right mid-upper forearm, measuring 1" x 2".
16. Multiple abrasions, linear, transverse, right upper arm, measuring 1" x ¾".
17. Abrasion, circular, ¼" x ¼", right lateral forearm.
18. Abrasion, brush-burn type, right shoulder, with extension to right back, in an area measuring approximately 7" x 4".
19. Multiple parallel abrasions, right upper shoulder, fresh, measuring 1" x ¼".

o  Lower Extremities:

1. Multiple red marks on or about the lateral right knee and medial right knee compatible with contusions; laterally measures 2 ¼" x 1", medially is ¾" x 1".
2. Multiple contusions x 5, anterior right lower leg, in an area measuring approximately 8" x 2 ½".
3. Abrasion, anterior right lower leg, ¼" x 5/8".
4. Elliptical scar, anterior right lower leg.
5. Contusions x 2, right syndesmosis, in an area measuring 1 ¾" x ¼".
6. No overt pressure marks noted from ankle cuff or other.
7. Contused abrasions, overlying left knee, in an area measuring 2" x 3".
8. Multiple contusions, anterior lower leg, upper leg, in an area measuring 3 ½" x 2".
9. Multiple parallel transverse contusions, anterior left lower leg, anterior syndesmosis, left lateral malleolus, in an area measuring 2 ½" x 4".
10. Erythematous mark, parallel, red, left ankle region.

o  External Genitalia and Ano-Rectal Region:

1. Intact.

**INTERNAL EXAMINATION OF THE BODY, ORGAN SYSTEMS:**

- ORGAN WEIGHTS & FLUID VOLUMES:

| Brain: | 1,596 | Grams |
|---|---|---|
| Heart: | 440 | Grams |
| Right lung: | 652 | Grams |
| Left lung: | 582 | Grams |
| Liver: | 2,431 | Grams |
| Spleen: | 224 | Grams |
| Right kidney: | 116 | Grams |
| Left kidney: | 160 | Grams |

8

COPY

Good, Andrew D.  (ALC18-063/LC18-1020)

Stomach Contents:
  o   215 grams of creek-smelling water and partially digested food, brown appearance.
Gallbladder:
  o   Bile is present.
Urinary Bladder:
  o   Urine is present.
Abnormal Fluid Collections:
  o   Pericardial Sac:  None
  o   Right Thoracic Cavity:  None
  o   Left Thoracic Cavity:  None
  o   Abdominal Cavity:  None
  o   Sphenoid Sinus: A couple cc of creek-smelling fluid
Fractures:
  o   Head:  None
  o   Neck:  None
  o   Chest:  None
  o   Pelvis:  None

- HEAD AND CENTRAL NERVOUS SYSTEM:
  The skin of the scalp is reflected in the usual manner, and there is no evidence of soft tissue trauma to the scalp other than a contusion to the right lateral parietal and right posterolateral superoparietal regions of the scalp.  The calvarium is intact; and upon its removal, there are no abnormal fluid collections noted to the epidural, subdural or subarachnoid spaces.  The dura is clean and glistening.  The superior sagittal sinus is patent.  The leptomeninges are translucent. The cerebral convexities are examined and show edema, but no evidence of asymmetry, atrophy, softening, or hemorrhage.  The circle of Willis is intact.  The uncal, cerebellar tonsil, and cingulate gyral regions are examined. There are bilateral uncal grooves.  No cerebellar tonsillar cones. The cingulate gyrus is not shifted.  Gross examination of the brain stem and cerebellum is performed.

  Coronal sectioning of the brain demonstrates an intact cortical gray ribbon and centrum semiovale.  The basal ganglia and thalamus are unremarkable, and the ventricular system is not dilated.  The mammillary bodies are without note. The hippocampi and pineal gland show no abnormalities.  The substantia nigra is depigmented, and the cerebral aqueduct is not dilated. The pons is examined.  The fourth ventricle is examined.  The inferior olivary nucleus and the remainder of the medulla oblongata are examined.  The cerebellar folia are well formed.  The dentate nucleus is unremarkable bilaterally.  The pituitary gland is obtained and shows no abnormalities.  The dura is reflected from the basilar portion of the skull and there is no evidence of basilar skull trauma. The sphenoid sinus is opened and there is a large cyst within same. Beneath that are a few cc of creek-smelling fluid.

- NECK:
  The skin of the neck is dissected up to the angle of the jaw.  The anterior strap muscles are without evidence of hemorrhage. The hyoid bone, thyroid cartilage, cricoid cartilage and thyroid

9



Good, Andrew D. (ALC18-063/LC18-1020)

are intact. There is no evidence of aspirated gastric contents, food particles, or foreign bodies noted within the neck lumen. White froth is noted in the neck lumen.

- CHEST AND ABDOMEN:
  The skin of the chest and abdomen is opened with the usual, Y-shaped incision and demonstrate moderate amounts of yellow subcutaneous adipose tissue at the level of the umbilicus. Upon removal of the chest plate, various organs are examined in situ and/or are removed by the Virchow technique for serial examination. These organs are of intrinsically normal size, morphology, and anatomic position for this age and sex individual with no trauma noted to the organs of the chest or abdomen.

  - o  No contusions, heart.
  - o  No contusions, lungs.
  - o  Frothy, pulmonary edema and fluid, lungs, compatible with drowning.
  - o  Water identified in stomach, compatible with drowning.
  - o  Liver, spleen, right and left kidneys, intact.

- CARDIOVASCULAR SYSTEM:
  - o  Heart: All vessels originate from, or terminate in, the usual portions of the heart. The coronary arteries are mildly serpiginous. The following atherosclerotic changes are noted: left main artery (0%), left anterior descending artery (0%), circumflex artery (0%), and right coronary artery (0%). The coronary ostia are patent. The cardiac chambers are examined. There is evidence of cardiomegaly, left ventricular hypertrophy and borderline right ventricular hypertrophy. The right ventricle measures 5 mm up to 6 mm laterally, the left ventricle measures 2 cm. The left intraventricular distance measures 2 cm; the right intraventricular distance measures 3 cm. There are no interatrial or interventricular defects. All the valves are freely mobile. The chordae tendineae, papillary muscles, and myocardium are examined. The endocardial surface is clean and glistening. The epicardial surface is without abnormalities and displays a normal amount of fat. The pericardial sac is clean and glistening and free of adhesions.
  - o  Aorta/Blood Vessels: The root, arch, and descending aorta are examined. The aorta is intact.

- RESPIRATORY SYSTEM:
  - o  Lungs: The tracheobronchial tree, pulmonary vasculature, and hilar regions are examined. The lung parenchyma shows pulmonary edema and congestion. Water is identified in the bronchi. The parietal and visceral pleura are examined. The hemidiaphragms are well formed bilaterally.

10

COPY

Good, Andrew D. (ALC18-063/LC18-1020)

- **HEPATOBILIARY SYSTEM:**
  - The liver capsule is clean and glistening and free of adhesions. The liver shows hepatomegaly and diffuse fatty change. The liver parenchyma is golden-brown in color. The gallbladder is intact. There is no evidence of obstruction of the ducts. No stones or cholecystitis are noted.

- **SPLEEN:**
  - The splenic capsule is intact and has a normal purplish hue. On sectioning, the parenchyma is without note.

- **PANCREAS:**
  - The pancreas has a normal club shape and firm consistency. On sectioning, it has a tan lobulated parenchyma. Hemorrhagic changes are noted to the pancreas.

- **BONE MARROW:**
  - The bone marrow is red in color and gritty in texture.

- **LYMPHATIC SYSTEM:**
  - No lesions are identified.

- **URINARY SYSTEM:**
  - The kidney capsules strip with ease and reveal normal fetal lobulations. The medullary rays are hyperemic. The pelvic regions are unremarkable. The urinary bladder mucosa is grossly without note.

- **REPRODUCTIVE SYSTEM:**
  - The prostate gland is intact.

- **GASTROINTESTINAL SYSTEM:**
  - The esophageal mucosa is clean and glistening. The GE junction is patent. The stomach wall is normally rugated. The pyloric sphincter is patent. There is no evidence of gastritis. The small and large bowels are anatomically correct and normally oriented. There is no evidence of volvulus or infarction.

- **MUSCULOSKELETAL SYSTEM:**
  - The muscles show no significant gross abnormalities. The skeletal system is without evidence of natural disease.

- **ENDOCRINE SYSTEM:**
  - Adrenal Glands: There is no evidence of hyperplasia or tumor in the adrenal glands.
  - Thyroid Gland: The thyroid is symmetrical and full bilaterally.

11



       318875:005        000018

Good, Andrew D. (ALC18-063/LC18-1020)

**ADDITIONAL FORENSIC PROCEDURES:**

- Subclavian blood, vitreous, urine, gastric contents, and liver are sent for toxicology to National Medical Services. The Chain of Custody number is ALC18-063/LC18-1020.
- Tissue is retained for histology, which is not processed.
- Urine is submitted for a TLC presumptive drug screen and is positive for THC and Oxycodone.
- Glucometer reading is 163, which represents hyperglycemia.
- A purple top tube of blood and DNA card are collected.
- The handcuffs, corresponding shackle and the ankle holders are forwarded with the police department.
- Four probes are recovered, designated origins of the body, and forwarded with police department.
- All clothing and Ace wrap from left forearm are forwarded with police department.
- A purple top tube of blood is forwarded with the police department.
- CD card is supplied to Jeff Bell.
- Photographs are taken by the coroner's office.
- The following are in attendance:
  - Katie Kelly, Autopsy Assistant
  - Eric Bieber, Lancaster County Chief Deputy Coroner
  - Shannon Blosser, Lancaster County Coroner's Office
  - Dr. Stephen Diamantoni, Lancaster County Coroner
  - Jeff Bell, CID, Lancaster City Police Department
  - Dr. Wayne K. Ross, Prosector

**OVERALL FORENSIC ANALYSIS:**

As per the scientific method, our office performed a forensic analysis including traumatic, disease, and toxicology causation analysis. After review of this information, we can offer the following conclusions:

- PAST MEDICAL HISTORY ANALYSIS:
  - Past Medical History: drug use.
  - Past Medication History: unknown.

- TOXICOLOGY CAUSATION ANALYSIS:
  - The post mortem levels indicate the following:



12

Good, Andrew D. (ALC18-063/LC18-1020)

**Positive Findings:**

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Delta-9 Carboxy THC | 8.8 | ng/mL | 001 - Subclavian Blood |
| Delta-9 THC | 3.8 | ng/mL | 001 - Subclavian Blood |
| Ethanol | 13 | mg/dL | 004 - Urine |
| Delta-9 Carboxy THC - Total | 170 | ng/mL | 004 - Urine |
| Oxymorphone - Free | 5.5 | ng/mL | 004 - Urine |

**OPINION:**

After autopsy and forensic causation analysis, it is my opinion that the cause of death is **Fresh Water Drowning**. The manner of death is **Accidental.**

Wayne K. Ross, M.D.

WKR/le

13

COPY