

Deposition of:
## Kristi Good

*August 17, 2020*

In the Matter of:

## Estate of Andrew Davis Good v. Rodriguez-Santana, Barbara

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com  | 215-241-1000

Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2
                        - - -

3
    ESTATE OF ANDREW DAVIS      :
4   GOOD,                       :
                               :
5           Plaintiff,          :
                               :
6   v.                         :   DOCKET NO. 20-1431
                               :
7   BARBARA RODRIGUEZ-SANTANA,  :
    LANCASTER COUNTY,           :
8   CHRISTOPHER LEPPLER,        :
    BOROUGH OF EPHRATA,         :
9                              :
            Defendants.         :
10
11                      - - -
12           Monday, August 17, 2020
13                      - - -
14
15          Oral Deposition of KRISTI GOOD, held in
16  the Law Offices of MAC MAIN LAW GROUP, LLC, located
17  at 433 West Market Street, Suite 200, West Chester,
18  Pennsylvania, commencing approximately at 10:05 a.m.
19  on the above date before Holly J. Cross, a
20  Registered Professional Reporter and Notary Public.
21
22                      - - -
             VERITEXT LEGAL SOLUTIONS
23                MID-ATLANTIC REGION
           1801 Market Street, Suite 1800
24        Philadelphia, Pennsylvania 19103

Page 2

1 A P P E A R A N C E S :
2
3   LAW OFFICES OF ERIC A. SHORE, P.C.
     BY:  GRAHAM BAIRD, ESQUIRE
4   Two Penn Center
     1500 John F. Kennedy Boulevard, Suite 1240
5   Philadelphia, PA  19110
     (215) 627-9999
6   GrahamB@EricShore.com
     Counsel for Plaintiff
7
8
     MAC MAIN LAW GROUP, P.C.
9   BY:  DAVID J. MAC MAIN, ESQUIRE
     BY:  ANDREW DAVIS, ESQUIRE
10  433 West Market Street, Suite 200
     West Chester, PA  19382
11  (484) 318-7106
     DMacMain@MacMainLaw.com
12  Counsel for Defendants
     Barbara Gunnett, Lancaster County, Christopher
13  Leppler
14
15  MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
     BY:  CHRISTOPHER P. BOYLE, ESQUIRE
16  2000 Market Street, Suite 2300
     Philadelphia, PA  19103
17  (215) 575-4555
     CPBoyle@mdwcg.com
18  Counsel for Defendant
     Borough of Ephrata
19
20
     ALSO PRESENT:
21
     Barbara Gunnett
22
23
24

Page 3

1          I N D E X
              - - -
2
3   Testimony of:  KRISTI GOOD
4   By Mr. MacMain...................5, 87
5   By Mr. Boyle........................79
6
7
          - - -
8          E X H I B I T S
              - - -
9
     NUMBER          DESCRIPTION          PAGE
10
     Good Exhibit 1    Complaint          29
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          DEPOSITION SUPPORT INDEX
2
3   INSTRUCTION NOT TO ANSWER:
4   Page     Line
5   (None)
6
7   REQUEST FOR PRODUCTION OF DOCUMENTS:
8   Page     Line     Description
9   (None)
10
11  STIPULATIONS:
12  Page     Line
13   5        1
14
15  QUESTIONS MARKED:
16  Page     Line
17  (None)
18
19
20
21
22
23
24

Page 5

1              (It is hereby stipulated and
2        agreed by and among counsel for the
3        respective parties that reading, signing,
4        sealing, certification and filing are
5        waived and that all objections, except as
6        to the form of the question, be reserved
7        until the time of trial. )
8              - - -
9              KRISTI GOOD, having been duly sworn, was
10  examined and testified as follows:
11              - - -
12          EXAMINATION
13  BY MR. MAC MAIN:
14  Q    Could you please state your full name for
15  the record?
16  A    Kristi Ann Good.
17  Q    Kristi, my name is David MacMain.  I
18  represent the Lancaster County Sheriff's Department
19  and Deputy Gunnett in this case, and I'm going to
20  ask you some questions here, what's called a
21  deposition.  Have you ever had your deposition taken
22  before?
23  A    No.
24  Q    Okay.  How do you prefer that I call you?

KRISTI GOOD

1 Kristi? Ms. Good?
2     A     Kristi is fine.
3     Q     Okay. So, Kristi, as I'm sure your
4 counsel has explained to you, a deposition is a
5 question-and-answer session. I'm going to ask you
6 questions about you, about your son, about the
7 incident, what information you have about the
8 lawsuit, damages, and so forth. This is not like
9 TV. I'm not trying to trick you. I just want to
10 know what information you can provide to me related
11 to the claims as well as the damages that you're
12 seeking.
13        If at any time I ask you a question that
14 doesn't make sense, if I talk like a lawyer and I
15 use terms that normal people don't use, let me know,
16 and I'll rephrase it. I want you to understand the
17 questions I'm asking you.
18        All your answers have to be verbal. So
19 this young lady to my right and to your left is
20 taking down everything that's said. So in ordinary
21 conversation, if I ask you a question and you shrug
22 your shoulders or nod your head, I kind of know what
23 you mean, but she can't take that down. It's got to
24 be a verbal answer, so make sure all your answers

1 are verbal.
2        The other thing that's unlike normal
3 conversation is you need to let me finish my
4 question before you begin your answer, and I'll let
5 you finish your answer before I begin my next
6 question, because the court reporter can only take
7 one of us down at a time.
8     A     Okay.
9     Q     So we'll try not to talk over one
10 another.
11        If at any point in time you need a break,
12 need some fresh air, need a drink, need to use the
13 restroom, let me know, and we'll accommodate you. I
14 don't think we'll be terribly long. I would
15 estimate an hour to two hours maybe; but if you feel
16 you need to break for any reason, say so. The only
17 exception is if I ask a question, you have to answer
18 it before we take a break, because I assume you're
19 going to want to talk to your counsel during breaks.
20 So we can't leave if there's a question pending.
21        If at any point during the deposition you
22 realize an answer you had given me earlier in the
23 deposition, whether it be the prior question or an
24 hour earlier, is incorrect in any way, something

1 needs to be clarified or changed or added to or you
2 realize an answer you had given me previously was
3 incorrect, just let me know, and we'll let you put
4 on the record what needs to be changed or added to
5 or corrected from a prior answer. Okay?
6     A     Yes.
7     Q     Okay. The final thing, as I said, all
8 your answers do have to be verbal. So even if like
9 just now you shook your head yes, I knew you meant
10 yes, but the court reporter needs to be able to
11 record it.
12        Do you have any questions of me before we
13 begin?
14     A     No.
15     Q     And I probably should have asked: Have
16 you ever been deposed before?
17     A     No.
18     Q     And I think I did ask that in the
19 beginning. Okay.
20     A     Yes.
21     Q     And I'll try not to repeat a question. I
22 apologize.
23        Prior to filing this lawsuit, what
24 information did you know about what happened with

1 the incident in which your son died? Either from
2 talking to people, from reading the newspaper, or
3 from any source whatsoever, what information did you
4 have about what had happened?
5     A     Well, I heard the scanner going, so I
6 went out to the hospital. I got stopped by fire
7 police. I got boxed in, and I heard over the
8 scanner, "DOA has been found. Should we bring him
9 in like a sack of -- should I carry him like a sack
10 of potatoes, or is somebody going to come help me
11 bring him in?"
12        After that I went -- they had me go to
13 the police in the hospital.
14     Q     Okay.
15     A     And they said that this looks like a
16 complete accident. They have to investigate, and
17 they apologized, and then they had us go to the
18 police barracks for four hours.
19     Q     Okay.
20     A     And then after I seen the DA, I got to --
21 at the DA I seen the video. I got to see her tase
22 my son numerous times.
23     Q     Okay.
24     A     I saw him fall down the hill. I didn't

3 (Pages 6 - 9)

KRISTI GOOD

1 understand, and I heard from the DA different
2 stories, so I didn't know what was what yet, but I
3 kept watching that video, and it just -- just seeing
4 him get -- keep getting tased, and it didn't make
5 sense to me.
6     Q     Okay.  So let me break some of that down.
7 So you said that you heard over the scanner what you
8 heard.  Do you know who said -- who was speaking on
9 the scanner?
10     A     No.  It's a scanner that's online.  It
11 just said that a prisoner escaped Ephrata Hospital.
12     Q     And you actually heard that as that was
13 being broadcast?
14     A     Yes.
15     Q     And did you know at that point it was
16 your son that was fleeing from them?
17     A     No.
18     Q     Okay.  Had your son fled from the police
19 before?
20     A     Yes.
21     Q     How many times had he run from the police
22 when he was being arrested prior to this instance?
23     A     I only know of one.
24     Q     And what was the other one that you know

1 of?
2     A     It was like a year prior.
3     Q     Did he jump into the same creek during
4 that prior escape attempt?
5     A     It was at a different area where it was
6 only like three inches.  It was on the other side.
7     Q     Right, but he had escaped -- prior to
8 this incident, jumped into the same creek and was
9 able to escape; correct?
10     A     I don't know exactly how it happened.  I
11 was not there.
12     Q     Okay.  After that incident did you ever
13 tell your son, "Hey, you probably shouldn't run from
14 the police if you're being arrested"?
15     A     Yes.
16     Q     And what was his response?
17     A     He knows.
18     Q     Okay.  So he knew better, that when
19 you're being arrested, you should cooperate and not
20 run from the police?
21     A     Yes, but --
22         MR. BAIRD:  Object to the form, but you
23 can answer.
24 BY MR. MAC MAIN:

1     Q     As his mother you told him, "Hey, not a
2 good idea if you're being arrested to run from the
3 police"?
4     A     Yes.
5     Q     Okay.  Did you tell him as his mother,
6 "Hey, not a good idea if you're being arrested not
7 to fight with the police"?
8     A     Yes.
9     Q     And what was his response when you told
10 him those things?
11     A     He was -- he had a lot of problems.  He
12 was -- had drug problems, so he didn't say much, and
13 I can't remember every response he told me.  I'm
14 sorry.  I can't.
15     Q     Okay.  I'm not asking for every response.
16 It's a pretty simple --
17     A     Yes, but I -- I just -- since -- I don't
18 know what he said, and I don't want to make
19 something up I do not know.
20     Q     That's fine.  So you had those
21 conversations with him prior to this incident that
22 it's not a good idea to run from the police when
23 you're being arrested?
24     A     Yes, I had that.

1     Q     And you don't know what his response was?
2     A     No.
3     Q     And you told him between that prior
4 incident when he ran from the police and ran into
5 the same creek and escaped not a good idea to fight
6 with the police?
7     A     Yes.
8     Q     Okay.  And you don't know what his
9 response was?
10     A     No.
11     Q     Okay.
12     A     Well, I do remember one thing.  I
13 remember him telling me he would never go in a creek
14 again, because he was terrified, because even though
15 the water was so low, the rapids were pulling him
16 under, and he was terrified for his life.  That, I
17 do remember.
18     Q     Okay.  Let me ask you about -- he was
19 arrested prior to the incident at the hospital;
20 correct?
21     A     Correct.
22     Q     Have you read any of the reports from
23 what he said or did or what the officer said and did
24 for that arrest?

4 (Pages 10 - 13)

KRISTI GOOD

1    A    I read some of them, but I was not there,
2  so I cannot -- I was taking my mom home when he got
3  arrested, so I cannot comment on that.
4    Q    Have you spoken to anybody who was
5  present during that arrest?
6    A    Yes.
7    Q    Who have you spoken with?
8    A    My fiancé, Officer Rogers, and one of my
9  neighbors.
10    Q    Okay.  And who's your fiancé?
11    A    Brian Whitman.
12    Q    Okay.  Brian was present when he was
13  arrested?
14    A    But they didn't see the actual -- he was
15  in the house.  He heard the commotion.  He ran out
16  and ran across the street and seen him being tackled
17  and put in the handcuffs.
18    Q    Okay.  So Brian your -- let me just
19  finish.  Brian your fiancé saw him running from the
20  police?
21    A    Yes.
22    Q    Okay.  Did he see what initially
23  happened?
24    A    Right.

1    Q    And then he sees as -- did he go by
2  Andrew or Andy?
3    A    Andrew.
4    Q    As Andrew was running from the police,
5  the police tackled him.  That's what your fiance
6  saw?
7    A    Yes.
8    Q    Okay.  You said that one of your
9  neighbors also saw some part of the -- and the
10  arrest I'm talking about very specifically happened
11  on April 15th, 2018.  It looks like around --
12  sometime in the late afternoon.  He was going to --
13    A    That's wrong.
14        MR. BAIRD:  Just wait for him to ask a
15  question and then answer.  Just one at a time.
16        THE WITNESS:  Sorry.
17  BY MR. MAC MAIN:
18    Q    Okay.  The police reports indicate that
19  he was being arrested about 4:30 in the afternoon by
20  Ephrata and Akron, so I just want to make sure we're
21  talking about the same incident; correct?
22    A    Yes.
23    Q    Okay.  And you didn't witness any of this
24  arrest?

1    A    No.
2    Q    Okay.  So you spoke to your fiancé.  What
3  he told you was he saw Andrew running from the
4  police --
5    A    Yes.
6    Q    -- and the police tackle him?
7    A    Yes.
8    Q    Okay.  Anything else that your fiancé
9  saw?
10    A    He said he saw a bunch of Tasers.
11    Q    Okay.  Where was -- your fiancé, I'm
12  sorry, his name is?
13    A    Brian Whitman.
14    Q    Brian -- last name is what?
15    A    Whitman.
16    Q    Where was Brian located while he was
17  witnessing this?
18    A    He was in the house coming out.
19    Q    The house where Andrew was being arrested
20  or a different house?
21    A    At our house.
22    Q    Okay.  And where was Andrew when he was
23  arrested?
24    A    Over at the apartments somewhere next

1  door.
2    Q    So Andrew lived at a different place than
3  you and your fiancé Brian lived?
4    A    Yes.  He was staying over there because I
5  wouldn't...
6    Q    He was staying there because you didn't
7  want him living with you?
8    A    At that time, yes.
9    Q    And why didn't you want him living with
10  you?
11    A    Because I knew he was -- he left -- I was
12  mad at him for leaving rehab early.  I wanted him to
13  finish his rehab.
14    Q    Sorry.  Just give me one second.
15        Okay.  Are you okay to continue?  If at
16  any point you need to take a break because it gets
17  emotional, just say so.  Okay?
18        So Andrew was in rehab prior to this
19  incident?
20    A    Yes.
21    Q    And what was he in rehab for?
22    A    For his drug abuse of heroin and I don't
23  know what else.
24    Q    Where was he in rehab?

KRISTI GOOD

Page 18

1    A    I don't remember the place.  I know it
2  was two hours away.  I don't remember what it was
3  called.
4    Q    Okay.
5    A    It was set up through the jail.
6    Q    Okay.  And was this in relation to a
7  prior arrest of some sort?  It was a condition that
8  he get rehab?
9    A    Yes.
10    Q    Okay.  And he was supposed to be at this
11  facility, but he left before his time was up?
12    A    Yes.
13    Q    And how did you know that he had left?
14  Did he come back to the house or...
15    A    My ex-husband picked him up and dropped
16  him off close to my house, so he knocked on my door
17  to grab some clothes and stuff.
18    Q    And your ex-husband is also Andrew's
19  father?
20    A    Yes.
21    Q    And what's his name?
22    A    Robert Good.
23    Q    How close in time to this incident, the
24  April 14th incident, did Andrew leave the rehab

Page 19

1  facility?
2    A    Not even a week.
3    Q    Okay.  So he comes, he gets dropped off
4  at your house, and you don't want him living there
5  because you're mad at him that he left rehab?
6    A    Yes.
7    Q    So who was he living with at the time of
8  the incident?
9    A    I can't answer that.  He was friends with
10  everybody in the apartment over there.
11    Q    So he was living with somebody.  You
12  don't even know who he was living with.
13    A    Right.
14    Q    Okay.  So getting back to the arrest, you
15  said that Brian witnessed him running from the
16  police, the police arresting him, and you said there
17  were some Tasers used?
18    A    Yes.
19    Q    And how far away was Brian when he was
20  witnessing this arrest?
21    A    I don't know.  I wasn't there.
22    Q    But was he on, like, the porch of your
23  apartment?
24    A    I don't know.  I really don't.

Page 20

1    Q    Okay.  And what did Brian tell you that
2  he saw?
3    A    That he just saw that there was Tasers in
4  the back, and he went over so he could get Andrew's
5  stuff.  When he was arrested, Andrew gave him his
6  wallet and his belongings that were on him.
7    Q    Okay.
8    A    And that was -- and they were taking him
9  to the hospital.
10    Q    Okay.  And you said -- regarding this
11  arrest you also said there was a neighbor that
12  witnessed some of it.
13    A    Yes.
14    Q    And who was that?
15    A    Shawn Newell.
16    Q    Shawn?
17    A    Newell.
18    Q    N-E-W-E-L-L?
19    A    Yes, and Beth, but I don't know her last
20  name.
21    Q    And what did Shawn tell you he witnessed
22  regarding the arrest?
23    A    Basically the same thing that Brian did,
24  and Beth said that he was up on the porch when the

Page 21

1  cops got there, and they chased him down.
2    Q    Okay.  Well, he ran, and they chased him;
3  right?
4    A    Yeah.
5    Q    Okay.  And then you said there was -- was
6  there anyone else who witnessed any part of the
7  arrest?
8    A    No.
9    Q    Okay.  Do you know what he was arrested
10  for?
11    A    Leaving the rehab early.
12    Q    And that would have been a violation of
13  his probation?
14    A    Correct.
15    Q    And in terms of what happened inside the
16  hospital, you weren't present for that?
17    A    No.
18    Q    And in terms of him running from law
19  enforcement, particularly Deputy Sheriff Gunnett in
20  the hospital parking lot, you didn't witness any of
21  that?
22    A    No.  I got to see it on video.
23    Q    Okay.  But you didn't witness what had
24  happened?

6 (Pages 18 - 21)

KRISTI GOOD

1  A  No.
2  Q  Have you spoken to anybody who actually
3 did witness him running from the sheriff's deputy in
4 the parking lot?
5  A  I talked to people that were there that
6 night. I don't know if they actually witnessed
7 that. I talked to a fireman that was -- that was at
8 Lincoln Fire Company. I also talked to one of
9 Andrew's ex-girlfriends, who happened to be a
10 rescuer, and her name is Jess. And they told me
11 that everything was a disaster. They acted like he
12 was a piece of crap, that nobody acted professional
13 about any of it.
14  Q  Okay. So what did Jess witness?
15  A  Jess was the one that helped pull him out
16 of the water.
17  Q  Okay. So she --
18  A  She witnessed him coming out with four
19 Tasers in him. Out of the creek, he had four Tasers
20 when he was pulled out.
21  Q  And what's Jess's last name?
22  A  I do not know offhand. I'm sorry.
23  Q  Okay. And who is Jess? Jess is a friend
24 of Andrew's?

1  A  One of his ex-friends, but's she's a
2 rescuer.
3  Q  Okay.
4  A  She works for the rescue. She was on the
5 boat.
6  Q  Okay. Jess didn't witness, though,
7 Andrew fleeing from the law enforcement; correct?
8  A  Correct.
9  Q  And she didn't witness anything that
10 happened as to how he went in the water and while he
11 was in the water; only she helped recover his body
12 afterwards.
13  A  Correct.
14  Q  You had mentioned some other people. Did
15 any of the people that you mentioned during your
16 prior answer actually witness any part of what
17 happened with the flight from the sheriff's deputy?
18  A  I don't know offhand. I can't say yes or
19 no.
20  Q  Did any of the people that you spoke with
21 witness any of what happened at the creek other than
22 pulling the body out of the water?
23  A  Not that I know of. I think they got
24 there afterwards.

1  Q  Does Jess -- this rescue, where she
2 worked for some -- like a volunteer fire company
3 or --
4  A  Yes.
5  Q  Okay. Does she work in law enforcement?
6  A  No.
7  Q  Has she ever worked in law enforcement to
8 your knowledge?
9  A  No.
10  Q  And these other folks you spoke with who
11 said things weren't done right, any of them work in
12 law enforcement?
13  A  Well, I did talk to one person that was
14 there.
15  Q  Okay.
16  A  And that was Officer Schmidt.
17  Q  Schmidt. Okay. And what did Officer
18 Schmidt tell you?
19  A  I spoke to him when I got to the police
20 station. He said this was a big mistake. He must
21 have fell or slipped.
22  Q  Okay.
23  A  And I said, "What happened?"
24      He said, "It was an accident."

1      And that's all he said.
2  Q  Okay. Do you know if Officer Schmidt
3 witnessed Andrew going into the water?
4  A  I don't know.
5  Q  Okay. Have you ever worked in law
6 enforcement?
7  A  No.
8  Q  Do you have any family members that have
9 ever worked in law enforcement?
10  A  No.
11  Q  Have you used or been around a Taser?
12  A  No.
13  Q  Have you ever been tasered?
14  A  No.
15  Q  What about Brian? What does Brian do for
16 a living?
17  A  He does side jobs of construction and so
18 forth.
19  Q  Okay. Has Brian ever worked in law
20 enforcement?
21  A  No.
22  Q  How about your ex-husband, Robert Good?
23  A  No.
24  Q  Okay. Anything else prior to filing the

KRISTI GOOD

1 lawsuit that you knew or heard about the incident?
2 Either the arrest with Ephrata and Akron, what
3 happened at the hospital inside, or what happened
4 with Andrew's fleeing from Deputy Sheriff Gunnett,
5 or at the creek, any one of those four things, any
6 other information you had prior to filing suit?
7    A    Well, I'm trying to remember. I did go
8 to the DA's Office.
9    Q    Okay.
10    A    We got to watch a couple of videos.
11    Q    Okay.
12    A    And I talked to an officer, and the one
13 officer told me that, "You're not supposed to tase
14 anybody that's in handcuffs and shackles," first of
15 all.
16        And when I seen that video, it didn't
17 make sense why she didn't reach out and grab him.
18 When she was going down the hill, she was only this
19 much away from him when he fell. And if you
20 watch -- I watched the video at least a hundred
21 times, so I know she could have reached and grabbed
22 him. It made no sense why she tased him again and
23 didn't grab him and save his life instead of --
24 sorry -- instead of tasing him again.

1    Q    Okay. He continued to run, though;
2 correct? After that.
3    A    Yeah, but she could have reached out
4 three times. How can you run -- his hands were like
5 this (indicating).
6    Q    Well, let me ask you this: Do you blame
7 your son for running from the police, that part of
8 this was his fault?
9    A    No, I don't.
10    Q    No? Is it okay to run from the police?
11    A    No.
12    Q    Okay. And in terms of what happened at
13 the creek in terms of how he went and what happened,
14 you don't have any knowledge whatsoever, do you?
15    A    No.
16    Q    Have you read any of the reports --
17    A    Yes, I have.
18    Q    -- from the people that were present?
19 Okay. Did you see any person in any of those
20 reports from what happened at the creek, did anybody
21 Taser him while he was in the creek?
22    A    Not -- I didn't read that exact thing,
23 but I did see the autopsy where he was brought out
24 of the thing with four Tasers, so somebody shot more

1 than two Tasers, because the x-rays from the
2 hospital, they had all the Tasers out of him from
3 the other day. So when he got to her, that's when
4 the Tasers started.
5        And how did them four Tasers get in him?
6 I know that hospital to that creek, because I used
7 to swim in that creek. I know the area. The two
8 Tasers there, he had to get to the woods. He was
9 less than three to four feet from the creek. The
10 two Tasers got tased there.
11    Q    Well, that's what you believe. Do you
12 have any witnesses that saw that?
13    A    I've got proof from the autopsy.
14    Q    My question very simply is: Do you have
15 any evidence other than your theory that he was
16 tasered at the creek?
17    A    No, I don't.
18    Q    Have you had any experts look at this to
19 determine that the factual evidence doesn't add up
20 to what is in the reports from everybody that was
21 present at the creek?
22    A    I haven't.
23    Q    Do you know of anybody who has?
24    A    I don't know if my lawyer has or not.

1        MR. MAC MAIN: Okay. I'm going to show
2 you what we're going to mark as Good 1.
3        (Good Exhibit 1 was marked for
4 identification.)
5 BY MR. MAC MAIN:
6    Q    Kristi, I've put in front of you a copy
7 of the complaint or what starts the lawsuit. Have
8 you seen this before?
9    A    No.
10    Q    Have you seen anything like this that
11 lays out the -- what's alleged to have happened and
12 what the claims are and...
13    A    Oh, yes.
14    Q    Okay.
15    A    Yeah, I've seen this part.
16    Q    Okay. What you're pointing to are the
17 pages -- the actual complaint, not the cover sheets
18 that go with the complaint?
19    A    Yes, I've seen this.
20    Q    Okay. So I want to ask you about a few
21 things that you have in the complaint. If you
22 turn -- let me ask you this: When you reviewed it,
23 was everything in there that's factual in nature --
24 I'm not talking about the legal wording, but the

8 (Pages 26 - 29)

KRISTI GOOD

1 factual averments, did you believe they were all
2 true when you filed this?
3     A     Yes.
4     Q     And that's based on what you told me you
5 knew about the incident and didn't know about the
6 incident?
7     A     Yes.
8     Q     Okay.  If you turn to paragraph number
9 18 -- okay.  Paragraph 18 says, "At all times
10 material hereto, Defendants knew or otherwise had
11 notice of his opioid addiction due to his past
12 criminal history and current fugitive status as of
13 April 14, 2018."
14           I want to ask you very specifically about
15 Deputy Sheriff Gunnett.  Do you believe she knew
16 that he had an opioid addiction?
17     A     That, I can't answer.
18     Q     Okay.  And do you know if she knew
19 anything at all about your son's past criminal
20 history?
21     A     Yes, I believe she did.
22     Q     And why do you believe she knew about his
23 past criminal history?
24     A     Because they usually look before coming

1 over.
2     Q     Do you have any information that she knew
3 anything or had any prior encounters at all with
4 your son?
5     A     Not that I know of.
6     Q     Okay.  And the opioid addiction, why is
7 his opioid addiction -- why is that important in
8 your view for this incident?
9     A     Because part -- when I was reading
10 different things, you're not supposed to tase
11 anybody on opiates, and you're also -- it also puts
12 their mental state in a whole different situation.
13     Q     Where did you read that you're not
14 supposed to tase somebody on opioids?
15     A     Online.
16     Q     Online, what --
17     A     Under Tasers.
18     Q     Okay.  And do you know who wrote this
19 article?  Was it someone --
20     A     I don't know.
21     Q     Okay.  So you read online an article that
22 says that -- whoever the author was said you're not
23 supposed to tase somebody on opioids.
24     A     Correct.

1     Q     But you have no idea who the person was,
2 what their background --
3     A     I don't remember.  I'm sorry.
4     Q     Okay.  The reason I'm asking -- and let
5 me finish my question -- is people have all kinds of
6 theories about all kinds of things, and I'm trying
7 to figure out if it's someone that actually knows
8 what they're talking about or has any credentials or
9 whether it's just somebody commenting.
10           So you don't know who wrote this article,
11 just that somebody said on some article you saw
12 online that you're not supposed to Taser somebody
13 who's on opioids.
14     A     Right.
15     Q     Okay.
16     A     Yeah.  I Googled laws on tasing, and
17 that's how I got it.
18     Q     Okay.  Paragraph 20, "During his arrest
19 of April 14, 2018, Plaintiff was tased and/or shoved
20 and held upon the ground without good reason or
21 lawful justification."
22           That was the arrest that we talked about
23 which prompted him then being taken to the hospital;
24 correct?

1     A     Yes.
2     Q     Okay.  And what's the basis that he was
3 shoved or tasered without good reason or lawful
4 justification?  What's that mean?
5     A     The way I understand by the three people
6 that had seen it, they said they already had him
7 down.  They scraped his face against the cement.
8 They shoved him, and three more officers -- after he
9 was already down, after he was already in
10 handcuffs -- jumped on top of him, and he was tased
11 while he was already down.
12     Q     Okay.  This is what Shawn, Beth, and
13 Brian told you?
14     A     Yes.
15     Q     Where was Shawn located in relation to
16 what was happening?
17     A     He was over -- Andrew ran over to the
18 park, and that's where the arrest took place, and
19 they both ran over when they heard Andrew scream.
20           And they were both telling him, "That's
21 enough.  That's enough."
22     Q     Do you know who Denny is?  Is there a guy
23 Denny that would have witnessed some of this?
24     A     Denny?

9 (Pages 30 - 33)

KRISTI GOOD

Page 34

1    Q    And if you don't, there's a Denny
2 mentioned in one of the reports.  That's why I was
3 asking --
4    A    I don't know.
5    Q    -- maybe you know who that person is.
6 Okay.
7         And did Shawn and Beth and Brian tell you
8 that your son was fighting with the officers after
9 he ran from them?
10    A    He said -- they said he did try to get
11 away from them, yes.
12    Q    Okay.  In terms of -- I'm going to jump
13 ahead to the hospital.  So he's taken to the
14 hospital where he gets, I guess, some kind of
15 treatment.  Have you spoken to anybody at the
16 hospital about his conduct or his behavior while at
17 the hospital?
18    A    Yes.  I talked to Officer Rogers, who
19 took him, and Officer Stone, and they both said he
20 was in a great mood.  Matter of fact, they were
21 telling me he was joking around with them.  They
22 both knew Andrew, and they said he was in good
23 spirits.  He didn't want to go back to jail, but he
24 still was joking around with them.

Page 35

1    Q    Okay.  So let me break that down.  So you
2 spoke to Stone.  When did you speak to Officer
3 Stone?
4    A    Actually just a couple of weeks ago, and
5 I just wanted to know what Andrew's last words were
6 before anything happened.
7         And his words were like, "He was great.
8 He was joking around about how he got -- he was off
9 drugs for a little, but he had to get out of there,
10 because of slipping up and this and that, and that
11 he was bigger," and just -- just talking.
12    Q    Okay.
13    A    Just joking around and Officer Rogers I
14 talked to right after, like two weeks after, because
15 my daughter tried to kill herself after her
16 brother's death, and Rogers had to come out to check
17 on her.
18    Q    And what did Rogers tell you?
19    A    The same thing.  I mean, he didn't want
20 to go to jail.  But once they got to the hospital,
21 they were watching TV and joking around until Stone
22 got there.  That's Andrew.  Once he's calmed down
23 he'll joke with you.  He didn't fight with them at
24 all there at the hospital.

Page 36

1    Q    Okay.  You said --
2    A    And Stone told me he was in good spirits
3 up until -- towards the sheriff when she was taking
4 him to x-ray.
5    Q    Did they each also tell you that he
6 didn't want to go to prison?
7    A    Oh, yeah, he didn't want to go to prison.
8 We all know that.  Who does?
9    Q    Okay.  In terms of -- I'm going to jump
10 ahead now to the parking lot.  Okay?
11    A    Okay.
12    Q    So all you know is -- everything you know
13 about what happened in the parking lot and the creek
14 is what you've told me already; correct?
15    A    Correct.
16    Q    Okay.
17    A    All but one thing.  I don't know if this
18 matters or not.  Maybe I shouldn't say nothing.  Why
19 would she park two parking lots down with all the
20 law enforces pulled right up to the door?  And why
21 wouldn't she put him right in the car?  She stood
22 outside for three minutes talking to him.
23    Q    Do you know what the conversation was?
24    A    No, but he -- when an officer arrests

Page 37

1 somebody, they're supposed to put them right in the
2 car.  Both officers I talked to told me that, and
3 the DA told me that at the DA's meeting.  They don't
4 understand why she parked down there and why she
5 didn't put him straight in the car.
6    Q    Okay.  So let me ask you a question:
7 Have you read the reports as to what happened while
8 they're outside the car?
9    A    I did not get them.  I got -- I just got
10 told by the DA's that there was a lot of little
11 mistakes, but little mistakes you can't get -- you
12 can't get in trouble for.  So she made tons of
13 little mistakes, and my son's dead now.
14    Q    Do you think your son made any little
15 mistakes?
16    A    Oh, yeah, but not enough to kill him.
17    Q    Well, let me ask you this with the creek:
18 You've read the reports.  Everyone said he jumped
19 into the creek himself; correct?
20    A    No.
21    Q    No?  Did you see anybody that said he
22 was --
23    A    Yeah, the DA, he told me --
24         MR. BAIRD:  Hold on.

10 (Pages 34 - 37)

KRISTI GOOD

1        THE WITNESS:  Sorry.
2        MR. BAIRD:  Let him ask his question.
3  BY MR. MAC MAIN:
4     Q     Tell me what evidence you had that he
5  went into the creek other than by himself.
6     A     At the DA's Office they all told me he
7  backed in; and then when I went to Officer Schmidt
8  who was there that night, he told me it was a
9  complete accident.
10    Q     So my question was:  Is there any person,
11  any evidence whatsoever that you have from any
12  witness that your son went into the creek with the
13  help of anyone else other than himself?
14    A     I believe that he went into the creek
15  with help with the Taser, because there was four
16  Tasers.
17    Q     That's what you said you believe, but I'm
18  asking for evidence.  You have to have evidence, if
19  you bring a suit, to sustain it.  So my question is:
20  What evidence do you have that anybody other than
21  your son jumped in the creek all by himself?
22    A     I have the words from other officers
23  that's saying it was -- that he did not.
24    Q     Well, you said other officers said it was

1  an accident; right?
2     A     Yes.
3     Q     Did they say he accidentally went in
4  himself or somebody accidentally pushed him or...
5     A     At that point they told me they were
6  investigating it more.
7     Q     Okay.  You said someone told you that
8  your son backed into the creek; correct?
9     A     Correct.
10    Q     Did anybody say that he backed in by
11  somebody pushing him?
12    A     No.
13    Q     So as I understand it, you have no
14  evidence whatsoever that your son went into the
15  creek other than on his own?
16    A     Yeah, I guess.
17    Q     Okay.  Paragraph 26 of your complaint, it
18  says, "Plaintiff ran towards Cocalico Creek and upon
19  information and belief entered the water" -- and we
20  already established you have no evidence that he
21  went into the water other than on his own; correct?
22    A     Yes.
23    Q     Do you know he would have jumped into the
24  creek by himself?

1     A     He wouldn't have.
2     Q     Well, he jumped into the creek a few
3  months before this trying to --
4     A     That was --
5     Q     Let me finish.  He's run from the police
6  before, and he's jumped into that very creek before.
7  So my question is:  Why wouldn't he do this same
8  thing again if he successfully got away the first
9  time he did it?
10    A     Because he was terrified.  He told at
11  least eight of us he was terrified of that -- the
12  current pulling him down, that he would never go in
13  the creek again because the current killing him.
14    Q     When he went to rehab, did he tell you
15  that he was never going to use drugs again?
16    A     He said he was working on it.
17    Q     And when he left the rehab facility, he
18  shouldn't have done that either; correct?
19    A     Correct.
20    Q     Had he never left the rehab facility,
21  none of this would have happened; correct?
22    A     Yes, I guess.
23    Q     Had he not gotten himself arrested, none
24  of this would have happened; correct?

1     A     Yes.
2     Q     Had he not ran from the sheriff's deputy,
3  none of this would have happened; correct?
4     A     Yes.
5     Q     Had he not jumped into the creek, none of
6  this would have happened; correct?
7     A     Yes.
8     Q     Okay.  So I'm going to go to the next
9  part of paragraph 26.  It says, "Upon information
10  and belief, he was tased multiple times by Defendant
11  Santana and other John Doe Defendants while in the
12  creek."
13         I think I already asked you:  You have no
14  witnesses to support that.  You just believe that
15  because you think there were too many Taser probes;
16  correct?
17    A     Yes.
18    Q     Okay.  And who do you think tasered him
19  multiple times?
20    A     Well, I know she did for a fact, Officer
21  Santana, because I seen it on TV.
22    Q     Sure.  That was the video he was running
23  from the parking lot and went down that hill;
24  correct?

11 (Pages 38 - 41)

KRISTI GOOD

Page 42

1    A    Correct.
2    Q    And your criticism is that she should
3 have grabbed him rather than tasered him?
4    A    Yeah.  He was right in front of her.
5    Q    Okay.
6    A    If she would have grabbed him, he would
7 still be alive.
8    Q    Well, let's say -- let's take that.
9 Okay?  Had he not continued to run he'd still be
10 alive; correct?
11   A    I don't know.  I can't say that.
12   Q    Okay.  Well, had she grabbed him, you
13 think he would still be alive, so you believe that,
14 but had he not run he'd still be alive; correct?
15   A    I don't know.
16   Q    Had he not jumped in the creek, he'd
17 still be alive; correct?
18   A    I can't say that.
19   Q    Okay.  So you believe -- your theory is
20 that he was tased while he was in the creek because
21 you saw that he had been tasered earlier; correct?
22   A    (No audible response.)
23   Q    Yes?
24   A    Yes.

Page 43

1    Q    Okay.  In terms of very specifically,
2 what evidence or facts do you have that he was
3 tasered while he was in the creek?
4    A    I don't have any, but I have...
5    Q    I think I asked you this before, but let
6 me be certain:  You've read some of the reports
7 regarding the incident; correct?
8    A    Correct.
9    Q    Okay.  Have you read the reports of
10 Officer Rivera from Ephrata?
11   A    Yes.
12   Q    You read her report where she said nobody
13 tasered him when he was in the creek; correct?
14   A    Yes.
15   Q    Have you read the report of the hospital
16 security guy, whose name is --
17   A    I did not get anything from him.
18   Q    Okay.  Simo, Corey Simo, S-I-M-O.  Did
19 you read anything where he said that your son wasn't
20 tasered when he was in the creek, he drowned all by
21 himself?  Did you read that report?
22   A    No.
23   Q    Have you read the report of anybody who
24 said that your son was tasered while he was in the

Page 44

1 creek?
2    A    No.
3    Q    Have you read the reports of multiple
4 officers who said that they actually went into the
5 creek at risk of their own life to try to save your
6 son?
7    A    Yeah, eight minutes after he went in.
8 And I also read her report where she watched him bob
9 up and down three and four times till he stopped
10 coming up.  Why wouldn't she jump in and save him?
11   Q    My question is:  Did you read officers at
12 the risk of their own life jumped into the creek to
13 try to save your son from his own decision to jump
14 in the creek?
15        MR. BAIRD:  Object to the form.
16        You can answer.
17        MR. MAC MAIN:  Let me rephrase it.
18 BY MR. MAC MAIN:
19   Q    You read reports where officers at risk
20 of their own life jumped into the creek to try to
21 save your son; correct?
22   A    Yes.
23   Q    And, in fact, you thanked some of those
24 officers since this incident, haven't you?

Page 45

1    A    Yes.
2    Q    Okay.  How many officers have you
3 thanked?
4    A    One.
5    Q    And who was that?
6    A    I think it was Cruz.
7    Q    Officer Cruz?
8    A    I believe so.
9    Q    Do you remember speaking to a Detective
10 Graham Quinn and a Detective Shepherd shortly after
11 this incident?
12   A    Yeah.  They were at the DA's Office.
13   Q    Do you remember anything about the
14 conversation?
15   A    Yeah.  At that point in time I was so
16 confused by everything they were saying.  That was
17 only a week and a half after my son died.  Yes, I
18 thanked them for trying to save him, but at that
19 time my mind was everywhere.
20   Q    Do you recall telling them that you
21 thought your son was suicidal?
22   A    No, I did not say that.  I said I called
23 the hospital and told them please -- I asked to talk
24 to him.  "Please take care of him," because I was

12 (Pages 42 - 45)

KRISTI GOOD

1 afraid of what the officers were going to do to him
2 after what I heard about my house.
3        So I told them, "Please watch out for
4 him," is what I told the nurse.
5    Q    You recall telling them that someone told
6 you their -- your son told the police just to kill
7 him?
8    A    No, that, I don't recall.
9    Q    Do you recall talking to an Officer
10 Michelle Cook and saying she -- that you wanted to
11 pass along your thanks for helping to try to save
12 your son?
13   A    When I heard officers went in, the ones
14 that actually went in the water and tried to save
15 him, I was thankful, because at least somebody tried
16 to save him.
17   Q    Okay.  Next paragraph in your complaint,
18 number 27, it says, "Upon information and belief,
19 Mr. Good was tased causing him to fall unconscious
20 in the creek while shackled where he then drowned."
21        Same question as the prior one:  Do you
22 have any evidence whatsoever of that?
23   A    No.
24   Q    In terms of -- I'm going to kind of jump

1 off for a second.  In terms of assets, do you own a
2 home?
3    A    No.
4    Q    What assets do you have?  Do you have any
5 assets?  A bank account?
6    A    Yeah, I have a savings account.
7    Q    Are you employed currently?
8    A    No, I'm on disability.
9    Q    Okay.  And what are you on disability
10 for?
11   A    When I was working as a flagger, I got
12 hit by a drunk driver, and I broke my back in four
13 different places.
14   Q    And how long have you been on disability?
15   A    Since 2007.
16   Q    Other than your bank account, do you have
17 any other assets?
18   A    No.
19   Q    Where you currently reside, that's a
20 rental property?
21   A    Yes.
22   Q    Okay.  What about Brian?  Is Brian
23 employed?  Your fiancé.
24   A    He works for an Amish man as a driver,

1 and he also does construction for him.
2    Q    And you said you were engaged?
3    A    Yes.
4    Q    And when do you -- I guess in this crazy
5 time, is there a date for the marriage?
6    A    No.
7    Q    In terms of the estate, have you been
8 appointed as the administrator?
9    A    Yes.
10   Q    And when was that?
11   A    Like a month after he died or two.  His
12 dad signed everything over to me.
13   Q    Sure.  And as I understand, Andrew was
14 never married?
15   A    No.
16   Q    No children?
17   A    No.
18   Q    And what did the estate consist of?  What
19 were the assets, and what were the debts?
20   A    I don't think he even had assets.
21   Q    Okay.  I thought I saw something in the
22 answers to discovery where he had a $7,000 medical
23 bill of some sort?
24   A    That was his burial.

1    Q    Okay.  Were there any other debts, credit
2 cards, any other debts other than --
3    A    Yeah, he had a hospital -- a couple of
4 hospital bills, and he had -- what was -- he had
5 fines that I was paying on him -- for him.
6    Q    That was for the criminal cases?
7    A    Yeah.
8    Q    And you were paying it?
9    A    When he wasn't working, yes.
10   Q    Okay.  Was he employed at the time of the
11 incident?
12   A    No, because he just got out of rehab.  He
13 was employed at Specialty Bakery for a while, but
14 then they burned down.  That was prior to him being
15 in trouble.
16   Q    Okay.  What was the longest he ever held
17 a job?
18   A    Specialty Bakery was a couple of months,
19 so I don't know exactly.  I would say about four
20 months.
21   Q    And when was that in relation to this
22 incident?
23   A    About a year or two ago.
24   Q    Okay.  Other than the two or four

13 (Pages 46 - 49)

1  months --
2    A    It was like four to five months, I'd say.
3    Q    Four to five. Okay.
4    A    He worked through a temp service.
5    Q    Other than that job were there any other
6  jobs that he held for more than a month?
7    A    No. He did temp jobs off and on.
8    Q    Okay.
9    A    He was getting better, though. He was
10  going to see a counselor.
11    Q    Was that before he fled from the rehab
12  facility he was seeing a counselor?
13    A    Yes, and when he came home and he was
14  trying to find -- the reason he left the rehab
15  facility is because somebody snuck heroin in, and he
16  didn't want to take a chance of relapsing. That's
17  why he left.
18    Q    That's what he told you?
19    A    And I checked with the rehab, and the
20  rehab had five other incidents where people were
21  bringing drugs in. I can't prove that particular
22  day, but there was other incidents of that
23  particular place having drugs brought in.
24    Q    How many rehab facilities had your son

1  been at other than this one prior to this incident?
2    A    One when he was 15, and one in -- he was
3  at three other ones.
4    Q    Did he complete any of them?
5    A    Yes.
6    Q    Where were the other facilities that he
7  received treatment?
8    A    White Deer Run. He completed that when
9  he was 15.
10    Q    Okay.
11    A    And he went back and completed it again
12  as an adult.
13    Q    Same facility?
14    A    No. This one was in Lebanon. The other
15  one was a children's facility with --
16    Q    Both White Deer Run, just two different
17  locations?
18    A    Yes, yes. I have certificates at home to
19  prove it. He also completed Doe Rehab that they had
20  in the prison?
21    Q    Doe, D-O-E?
22    A    Yes.
23    Q    As in like a deer doe?
24    A    Yes.

1    Q    Okay. Is that affiliated with White
2  Deer?
3    A    Yeah, that's what White Deer Run is.
4    Q    Okay. How many times had he been
5  incarcerated at Lancaster County Prison?
6    A    I don't know exactly.
7    Q    Was it more than once?
8    A    Yes.
9    Q    And do you know what he was incarcerated
10  for, what the crimes were?
11    A    One was for trespassing.
12    Q    And where was he when he was trespassing?
13    A    I don't remember. I think it was -- what
14  was it? One, I think, was like a -- it was a
15  misdemeanor theft, but I -- theft by deception or
16  something, but I don't remember them all. Sorry.
17    Q    And the theft by deception, was that
18  also -- and we'll go through it in more detail, but
19  were any of Andrew's crimes, were you also charged
20  with the same crime at the same time?
21    A    Was I?
22    Q    Yeah.
23    A    No.
24    Q    No?

1    A    No.
2    Q    Okay. So I think I originally asked you
3  how many times he was incarcerated at Lancaster
4  County Prison, and you weren't sure.
5    A    Right.
6    Q    But it was more than once?
7    A    Yes.
8    Q    Was he incarcerated in any other prisons
9  besides Lancaster?
10    A    Yes.
11    Q    Where else was he incarcerated?
12    A    Lebanon.
13    Q    Lebanon?
14    A    Yes.
15    Q    And what was that for?
16    A    I think that was for taking recyclables.
17    Q    Any place other than Lebanon and
18  Lancaster where he was incarcerated?
19    A    No, and he -- I just thought of this for
20  rehab, but I don't know if you consider it rehab.
21  He had problems as a child, and I had him in Philly
22  Haven Psychiatric Hospital, and he finished that
23  three times.
24    Q    So three different stays at Phil Haven?

KRISTI GOOD

Page 54

1   A   It was outgoing.
2   Q   I'm sorry?
3   A   Outgoing.
4   Q   Outpatient --
5   A   It was like school. They'd pick him up
6 at 8:00 and brought him home at 2:00.
7   Q   Okay. So I guess we call that
8 outpatient. He wasn't living there. He would go
9 for treatment.
10   A   Right, he did counseling.
11   Q   And there was, say, three different time
12 periods?
13   A   Yes.
14   Q   And what was that for?
15   A   It's when he was younger. He got
16 molested by the babysitter, and his dad beat him
17 when he was real young.
18   Q   That's John Good?
19   A   Robert Good.
20   Q   I'm sorry. Robert Good. Okay. So let
21 me go through some background stuff now. What was
22 the highest grade Andrew completed?
23   A   11th, but in 12th he did complete
24 construction at vo-tech and he graduated.

Page 55

1   Q   What high school did he go to?
2   A   Ephrata.
3   Q   And we already talked about his
4 employment history. Other than the four to five
5 months at the bakery --
6   A   Oh, you know what, it wasn't Ephrata.
7 Sorry. It was Manheim Central. I forgot. We were
8 living in Manheim at the time.
9   Q   Did he go to more than one high school
10 for different grades?
11   A   Yeah, we -- Manheim and Ephrata.
12   Q   And why two different high schools?
13   A   Because we moved.
14   Q   Okay. Other than the four to five months
15 you think working at the bakery, any other
16 employment?
17   A   Not that I -- I mean, he did side jobs,
18 but not that I can remember now.
19   Q   In this lawsuit, I'm just trying to
20 figure out: Are you seeking damages for yourself
21 personally or just for the estate?
22   A   For both.
23   Q   Okay. So tell me about -- let me go to
24 the complaint then. Have you received any kind of

Page 56

1 counseling as a result of your son's death?
2   A   I spoke with my preacher. I have to see
3 a doctor regularly for my anxiety. I also had to
4 get -- what is it? An emotional support dog,
5 because my anxiety is so bad sometimes I just shake,
6 and I can't stop, and I cry. I didn't sleep for
7 weeks in a row.
8   Q   Who is your doctor that you get -- you
9 take anxiety medication?
10   A   Yes, I do.
11   Q   And who's the doctor that prescribes
12 that?
13   A   Can I look?
14   Q   Sure, absolutely.
15   A   It's with WellSpan. Her name is Diane.
16 I just can't remember her last name. Diane Vazquez.
17   Q   Is she like a family doctor, or is she a
18 psychiatrist or...
19   A   She's a family doctor.
20   Q   How long has she been your family doctor?
21   A   For a little over a year.
22   Q   And who was your --
23   A   Well, actually, it was longer than that.
24 It might have been two years.

Page 57

1   Q   Wasn't she your family doctor prior to
2 this incident?
3   A   I think right around that incident I
4 started going there because of my insurance.
5   Q   Okay. Prior to the incident had you had
6 any kind of treatment for anxiety, depression, any
7 other kind of emotional --
8   A   Yeah, I did have some depression before
9 that with him being in jail, but it got ten times
10 worse after.
11   Q   And who did you see for your depression
12 prior to this incident?
13   A   I went to Shepherd's Touch for a while.
14   Q   And what's Shepherd's Touch?
15   A   It's a counseling facility.
16   Q   And is that located in Lancaster?
17   A   It's on 322 going towards Lebanon.
18   Q   Okay.
19   A   I also went to -- I think it's called
20 Lebanon -- what is it? Lebanon Family Counseling or
21 Lancaster Family --
22   Q   This was all prior to this incident?
23   A   Some of -- no, some of it was after. I'm
24 sorry.

15 (Pages 54 - 57)

KRISTI GOOD

1    Q    Okay.  Lebanon Family Counseling.  And
2 Shepherd's Touch was prior to the incident or --
3    A    Prior and I had to go back after again.
4 I had started back up, and I talk to my pastor a lot
5 about it.
6    Q    Who's your pastor?  What church do you
7 attend?
8    A    It's called Victory, and it's Pastor
9 Jeremiah.  I can't think of his last name right now.
10 I'm sorry.  We just call him Pastor Jeremiah.
11    Q    Sure.  And where is Victory located?
12    A    The one we go to is in Lititz, and I also
13 talked to another pastor at Victory before that that
14 dealt with loss of family, and -- but he's -- he
15 retired.  He was at the Victory in Lancaster.
16 Victory has five churches.
17    Q    Right.  I know that, so the one in
18 Lancaster is the one right downtown.  They meet in
19 the hotel?
20    A    This one ain't in the hotel.  This one
21 is -- what is that called?
22    Q    But they have their own building?
23    A    Yeah.  Victory has its own building
24 there.

1    Q    So you attended sometimes in that Victory
2 location in Lancaster and sometimes in Lititz?
3    A    Yes.
4    Q    Okay.  In your complaint you list some of
5 the damages, and so one of the damages says economic
6 loss.  What's the economic loss that you're seeking?
7    A    I had to pay for his -- all my money went
8 towards his funeral for two months.  It took us
9 quite a while to pay on the funeral.
10    Q    And what was the total cost of the
11 funeral?
12    A    It was between six and eight.  I can't
13 tell you the exact number.
14    Q    And you have receipts for all this?
15    A    Yes, I do.
16    Q    Any other economic loss?  Let me be more
17 specific.  Did your son provide any kind of
18 financial support to you at any point in his life?
19 Did he help pay for your rent?  Did he give you
20 money for food?  Did he do anything to help support
21 you financially?
22    A    Yeah.  When he was working, he would help
23 with rent.
24    Q    Well, at the time of the incident, he was

1 living somewhere else; correct?
2    A    Yes.
3    Q    So did he give you any money to help pay
4 for your rent or food?
5    A    No.
6    Q    Okay.  You've been on disability for a
7 number years, so you haven't lost any time from
8 work?
9    A    No.
10    Q    Other than the funeral expenses, which
11 were about somewhere between six and eight, any
12 other economic loss that you can think of?
13    A    Not economic, but I lost a chance to have
14 grandkids.  I lost a chance of having a
15 daughter-in-law, everything he wanted in life.  His
16 dream was to have -- to get married and have three
17 kids, and I have his diary at home that came from
18 the rehab.  He had dreams.  I'll never have
19 grandkids from him.  I'll never have any of that.  I
20 lost his whole life.  He was only 24 years old.  He
21 was healthy.  I lost his whole entire life to this,
22 which could have been grandkids, would have been his
23 wife.  He wanted kids so bad.  He just wanted to be
24 loved.  That was the paper I got from him.

1        It just said, "I want to be loved.  I
2 want to feel loved.  I want to have kids.  I want to
3 be married.  I want to have a normal life like
4 everybody else."
5        And that was taken from him.  He never
6 got that chance.
7    Q    Did he have a girlfriend at the time of
8 this incident?
9    A    Yes.
10    Q    And who was his girlfriend?
11    A    Kim.
12    Q    What's Kim's last name?
13    A    Rhee.
14    Q    Reed?
15    A    Rhee.
16    Q    How do you spell that?
17    A    R-H-E-E, but he just got with her.  He
18 was in a long-term relationship with Andi Garber.
19 They were planning on getting married.  They were
20 together over two years.
21    Q    How did that end then?
22    A    Because he ran into Kim, and something
23 happened with him and Kim, and he didn't want to --
24 he knew he was going back to jail, and he didn't

16 (Pages 58 - 61)

1 want to hurt Andi again by going back to jail,
2 because Andi went through it the first time with
3 him.
4          And he told Andi, "I can't put you
5 through this again. I care too much about you."
6          She still has his ring.
7      Q      The complaint also talks about lost
8 economic opportunity. What's that? It says, "Lost
9 economic opportunity."
10     A      His opportunity get a job and do what he
11 wanted to do. He wanted to finish school. He
12 passed his class in construction. He was going
13 to -- started to be an electrician. He had so
14 many credits to be -- his dream was to go back and
15 finish his credits at vo-tech. He went to
16 Brownstown Vo-Tech.
17     Q      When was he first diagnosed with having
18 an addiction, a drug addiction?
19     A      Probably when he was about 16 he started
20 struggling.
21     Q      What was the longest period of time
22 between 16 -- and you said he was 24 when he died?
23     A      Yeah.
24     Q      During that eight years what was the

1 longest period of time that he was not using drugs?
2      A      About a year and a half.
3      Q      And when was that in relation to this
4 time span?
5      A      Well, it was right before -- about two
6 years prior. I can't say for sure. I don't -- I
7 just know --
8      Q      So let me just kind of -- let's walk
9 backwards. So this happened April of 2018; right?
10     A      Yeah.
11     Q      And you said he had been in a rehab
12 facility prior to this incident.
13     A      And in jail before that.
14     Q      And in jail prior to that. So,
15 obviously, when he was in jail he was not using.
16     A      Correct.
17     Q      We would hope not anyhow.
18     A      Right.
19     Q      What was the longest period of time, this
20 period you mentioned? Was that before he went in
21 the jail?
22     A      Yes.
23     Q      And what was he in jail for the last time
24 that he ended up with rehab?

1      A      Dirty urine.
2      Q      So he was at least using then; right?
3      A      Yes.
4      Q      Okay. So to your knowledge the longest
5 period of time that he wasn't using drugs he may
6 have actually been using drugs after all if he had
7 dirty urine; correct?
8      A      Yeah, but it -- I don't know how to
9 explain it. The hard drugs is what he was really
10 struggling with.
11     Q      What were the hard drugs that he had
12 addictions to?
13     A      Heroin and coke.
14     Q      Okay.
15     A      But he also smoked marijuana.
16     Q      Okay. Give me a second here. I'm going
17 to stick with the damage piece. It has lost
18 economic opportunity. It talks about lost future
19 earning capacity. That's what you've told me, that
20 he was going to get himself clean and get a job and
21 have a life.
22     A      Right.
23     Q      Okay.
24     A      When he first got out of his rehab, we

1 were calling different rehabs for him to try to get
2 him so he could call his probation so he wouldn't --
3 the cops wouldn't get him. We've called three of
4 them to try to get him in, but there was no space.
5 He wanted to go in right after -- even though he ran
6 from that one, he wanted to get right into another
7 one so he wouldn't get in trouble.
8      Q      So he ran from the last one, and that
9 weekend between that running and -- I guess they
10 call it eloping, I think is the word they use --
11 from a rehab facility up to the week of this
12 incident, he was trying to get into another
13 facility?
14     A      Right.
15     Q      Okay. And what facilities did he try to
16 get into?
17     A      I know he tried White Deer Run, but they
18 said he couldn't go back there.
19     Q      And why was that?
20     A      The Lancaster one is the one he ran from
21 before. Lebanon, he passed; but Lancaster, he ran.
22     Q      So this wasn't the first time he left a
23 rehab facility.
24     A      Correct.

KRISTI GOOD

1    Q    How many times did he run from the rehab
2  facility?
3    A    Two.
4    Q    The one just prior to this incident in
5  White Deer Run in Lancaster.
6    A    Right.  He stayed in one in Lebanon and
7  not the Lancaster one.
8    Q    Okay.  So in that week in between he
9  tried to get back into the White Deer at Lancaster,
10  and they said, "No.  Because you ran from here
11  before, we want don't you back"?
12    A    Pretty much.
13    Q    Okay.
14    A    And then he tried one in Reading, but I
15  don't know what it was called.
16    Q    Okay.  Any others that you know of?
17    A    No.
18    Q    And how did you know this?  You said you
19  wouldn't let him live with you because you were so
20  mad at him for leaving the rehab facility.  Did you
21  have any conversation with him that week?
22    A    Yes.
23    Q    Okay.  When did you have a conversation
24  with him?

1    A    Out back when I took him chicken.
2    Q    When you took him chicken?
3    A    He had a vodka bottle in his hand, and I
4  took him -- this was the day he was getting
5  arrested.  And I know when he was drinking, he
6  probably didn't eat anything, and I wanted him to
7  eat something, because he looked so bad.  So I took
8  a plate of fried chicken out to him.
9    Q    Okay.
10    A    And I told him I loved him.
11       And he said, "Mom, I'm trying to get in."
12       And he told me he was trying, and that
13  was it.
14       He goes, "You know I'm going back."
15    Q    And this conversation was the day of this
16  incident?
17    A    (No audible response.)
18    Q    Yes?
19    A    Yeah.
20    Q    And he had a bottle of vodka in his hand?
21    A    Yes.
22    Q    And do you know how much of the vodka he
23  had drank?
24    A    I don't know.

1    Q    Did he appear to be under the influence
2  of either alcohol or drugs when you had this
3  conversation with him?
4    A    Yes.
5    Q    Do you know which?
6    A    No, I can't say.  I wasn't with him the
7  whole time.  I know he had alcohol, and I don't know
8  if he had drugs.  I can't answer that.
9    Q    Sure.  I'm just asking you -- you as his
10  mom would probably know him better than anybody.
11  When you're having the conversation with him the day
12  of his arrest, was it your --
13    A    He wasn't himself.  I can say that.
14    Q    Okay.  And what was different about him?
15  What was -- when you say he wasn't himself, what was
16  your intuition as his mom as to what was going on
17  with him?
18    A    That he was partying, but I can't say for
19  sure.
20    Q    Okay.  So he's telling you he wants to
21  get help, but while you're talking to him about him
22  wanting to get help, he had been partying, or at
23  least that's what you thought?
24    A    Which is why he wants help, because he

1  was always afraid with the heroin that he would --
2  somebody would give him heroin with fentanyl and it
3  would take his life, so he knew he needed help.
4    Q    Okay.  I'm not talking about
5  unintentional, but had Andrew ever tried to take his
6  life?  Did he ever try to commit suicide at any
7  point?
8    A    I don't know for sure.  I know in jail
9  there was an incident that he had to go into a
10  special unit, but I don't know what happened.
11       MR. MAC MAIN:  Okay.  Tell you what, why
12  don't we take a short break, get some fresh air.
13       (A recess was taken.)
14  BY MR. MAC MAIN:
15    Q    I said in the beginning if there was
16  anything that you thought was incorrect in your
17  answers, you thought of something that you wanted to
18  add.  Are there any in your answers given so far
19  that you think you need to add to, correct, or
20  change in any way?
21    A    No.
22    Q    Okay.  You had answered some questions --
23  they're called interrogatories -- that we sent
24  through your attorney about different things.  I

18 (Pages 66 - 69)

KRISTI GOOD

1 just wanted to follow up on a couple.

2      So we had asked about his work history.

3 You say here he worked at a bakery in Lititz earning

4 $12 an hour.  When did that employment end?  That

5 was the one about -- you thought maybe four or five

6 months.  Would that have been --

7   A    2016 or 2017.  It burned down.

8   Q    And then he ends up at some point after

9 that going to Lancaster County Prison, then he --

10   A    Well, he was working through temp

11 services, and then that's when he ended up --

12   Q    Okay.  So it goes on.  It says TempForce

13 and Engage Temp Services.  What was he doing?

14   A    Construction and different things,

15 packing, whatever they had for him.

16   Q    And what was the longest assignment he

17 had during that time period?

18   A    They were always temps, like a week here,

19 a week there.

20   Q    Did he file tax returns?

21   A    No.

22   Q    Do you know what his highest income ever

23 was for a single year?

24   A    No.  I'm trying to think about what that

1 would have been, but I can't do it in my head.

2   Q    He had no life insurance at the time of

3 his death?

4   A    No.

5   Q    And no medical insurance either?

6   A    Well, he did through the state, but when

7 you're in jail, I think they take them away.

8   Q    Okay.

9   A    I still get a hospital bill from that

10 day.

11   Q    You had told me earlier you heard, like,

12 radio transmissions, and you heard somebody say

13 something about taking his body out like a sack of

14 potatoes.  Do you know who said that?

15   A    No, I don't.

16   Q    Okay.

17   A    When I heard this stuff over the radio

18 where I was blocked in, none of it made sense.  They

19 were really ignorant.  I couldn't believe what I was

20 hearing, and even the firemen that I talked to after

21 the -- after everything -- I can't think of his name

22 right now.  I know his last name now, but now I

23 can't think of his first name.

24   Q    What's his last name?

1   A    Miller.

2   Q    Okay.

3   A    He's with Akron Fire Company.  He said he

4 never in his life seen anything handled like this

5 before, that it was -- no profession whatsoever.  It

6 was the worst.

7   Q    Okay.  This was about the recovery of the

8 body?

9   A    I guess.  The whole thing, since the time

10 he got there -- the way they talked on the radio and

11 everything, he couldn't believe it.  That one point

12 they said there was an officer missing, well, she

13 was at the park.  She wasn't even missing.

14   Q    Okay.  So it's things like that is what

15 you think he was referring to?

16   A    And the sack of potatoes kind of things

17 and --

18   Q    Okay.  So my question very specifically

19 with the sack of potatoes, did you hear that on the

20 radio?

21   A    Yes, I did.

22   Q    Was it a male voice or a female voice?

23   A    A male voice.

24   Q    But you don't know who it was?

1   A    No, I do not.

2   Q    Okay.  So Jessica Trout was the person

3 you talked about before that was a friend of

4 Andrew's who --

5   A    Yeah, this was the hardest recovery she

6 ever had to do.  She didn't know it was Andrew.  She

7 didn't even know I was there, because I was blocked

8 in at the top.

9   Q    Other than the people you've already told

10 me about you spoke with -- you've told me a number

11 of people -- is there anybody else you recall

12 speaking to about the incident?

13   A    My family.

14   Q    Your family.  Anyone else?  Your pastor,

15 you talked about two counselors --

16   A    I talked to my -- a couple of my close

17 friends.

18   Q    Okay.  Have you written anything down,

19 any kind of, like -- the conversations you had --

20   A    Yeah.

21   Q    -- you kind of wrote down what people

22 said?

23   A    Yes.

24   Q    And where is that?  In a diary or on a

19 (Pages 70 - 73)

KRISTI GOOD

Page 74

1 piece of paper? Where?
2    A    It was on a piece of paper.
3    Q    Okay. And what do you recall you wrote
4 on a piece of paper?
5    A    Like the tasing, why he -- why she didn't
6 grab him. Why --
7         (There was a telephonic interruption
8 in the proceedings.)
9         THE WITNESS: I'm so sorry. I thought I
10 had it off.
11 BY MR. MAC MAIN:
12    Q    Sure, it's okay. It's fine.
13    A    So sorry. I wrote about how I didn't
14 understand, and then -- I'm trying to think.
15    Q    These are just --
16    A    I sent it to you -- and different things
17 about -- I meant I sent the notes to him.
18    Q    Oh, okay. I thought you were sending him
19 a text during the deposition.
20    A    No, no. I'm saying I sent the notes I
21 had to him.
22    Q    Okay. Referring to Attorney Baird?
23    A    Yes.
24    Q    Okay.

Page 75

1         MR. BAIRD: We're not texting during the
2 deposition, just --
3         MR. MAC MAIN: I didn't think you were,
4 but she picked up her phone and said, "I sent that
5 to you."
6         THE WITNESS: No, I was trying to turn it
7 off. I can't figure out how to turn my new phone
8 off. I'm sorry.
9 BY MR. MAC MAIN:
10    Q    That's okay.
11    A    But it was different questions about --
12 that didn't make sense with the DA and everything
13 that questioned at the time.
14    Q    And they were notes you sent to your
15 counsel.
16    A    Right.
17    Q    Okay. I'd asked earlier what you looked
18 at, and I -- let me ask you -- let me be more
19 specific. There were 115 pages that we sent, which
20 would have been interviews from the district
21 attorney's office, some reports, statements by
22 different officers. Have you ever looked at any of
23 that?
24    A    No.

Page 76

1    Q    Okay. And then there was an internal
2 review done by the sheriff's department. Have you
3 ever looked at that?
4    A    No.
5    Q    Okay. So what you've looked at is the
6 video, which you talked about that you think Deputy
7 Sheriff Gunnett was so close she could have grabbed
8 Andrew?
9    A    In one time.
10    Q    Okay. Anything else other than what
11 you've already told me you've looked at?
12    A    I got to hear him in the police car. I
13 got to hear his voice.
14    Q    From the radio calls?
15    A    No.
16    Q    How did you hear his voice in the police
17 car?
18    A    The DA actually had a recording of him
19 talking in the police car.
20    Q    And what did you hear him say?
21    A    Just that he knew he was going back to
22 jail. He didn't want to, that nobody knows how
23 Ephrata is, and that to tell us he loves us.
24    Q    He said that in the police car?

Page 77

1    A    Yes.
2    Q    And that was -- do you know if that was
3 being transported --
4    A    To the hospital.
5    Q    To the hospital. Okay.
6    A    And I -- I also got to another -- there
7 was another video where I seen him a little more
8 that the DA had. I forget what it was, that -- it
9 was a little more processive (ph.) than that, when
10 that was on TV.
11    Q    A little more what?
12    A    It had -- it was a little longer than the
13 one on TV. It went in a little bit more into
14 detail.
15    Q    And what was the -- it was the DA's press
16 conference?
17    A    Not his press conference. He met with us
18 before that. He called me in before he put anything
19 on the news.
20    Q    What video are you talking about that
21 was --
22    A    The one that he showed at the press
23 conference, but he didn't show the whole thing.
24    Q    Okay.

20 (Pages 74 - 77)

Page 78

1    A    He kept some it and -- like, the whole
2 shackle thing don't make sense.  The shackles worked
3 perfectly fine.  Somebody should have been checking
4 shackles.
5    Q    Do you know why the shackles were put on
6 your son?
7    A    Yes, so he wouldn't run.
8    Q    Okay.  And why?  Were they concerned that
9 he was going to run from them?
10    A    Because of the last incident.  I won't
11 lie to you, but why wouldn't they be checked is my
12 question.  She put -- Officer Stone had to take his
13 off, and he watched her start to put hers on.  So at
14 some point she forgot to check the shackles, because
15 at the press conference, guess what?  The shackles
16 worked perfect at the DA's Office.  But either way
17 his hands were like this (indicating) the whole
18 time, and the other shackles were on a belt.  I got
19 to see that up close at the DA.  The belt and how
20 his hands were like this (indicating), he couldn't
21 reach anywhere.
22        MR. MAC MAIN:  Okay.  Those are all the
23 questions I have.  Attorney Boyle may have questions
24 for you.

Page 79

1            EXAMINATION
2 BY MR. BOYLE:
3    Q    Hello again.
4    A    Hi.
5    Q    My name is Chris Boyle.  I represent the
6 Ephrata defendants.  Can you hear me okay, Ms. Good?
7    A    Yes.
8    Q    I'm going to call you Kristi, too, if
9 that's all right.
10    A    That's fine.
11    Q    I just have a handful of questions.  I
12 think Mr. MacMain went over just about everything I
13 would have asked you as well, but specific to the
14 Ephrata Police Department, do you have any
15 information that any Ephrata officer was physically
16 present when your son went into the Cocalico Creek?
17    A    Yes.  On the video it showed that she had
18 waited for an officer to get there before acting,
19 because they said it was for her own safety.
20    Q    Okay.  So it's your belief that your son
21 was already in the creek when the Ephrata officers
22 showed up?
23    A    I don't exactly know.  They said --
24 because they told me they saw him standing in the

Page 80

1 woods, that they actually spotted him before going
2 into the creek.
3    Q    Who told you that?
4    A    The officers.  I think it was Officer
5 Shepherd or Officer Schmidt.  One of those two said
6 it at the DA's, that he was standing on the bank
7 present before he went into the water.
8    Q    So Officer Schmidt was present when he
9 went into the water?
10    A    I believe -- I can't say which officer
11 for sure.  I don't -- I know there was an officer
12 there, because they saw him on the bank.  They told
13 me they saw him on the bank before going into the
14 water.
15    Q    Okay.  We provided copies of the
16 interviews with the Ephrata officers to you through
17 your counsel.  Have you had the opportunity to --
18    A    No, I did not.
19    Q    Okay.  So is it safe to say you don't
20 have any firsthand information about an Ephrata
21 officer being present when your son went in the
22 creek?
23    A    Well, they told me they were there and
24 seen him on the bank, so they were there when he

Page 81

1 went in the creek.  They told me themselves.
2    Q    And that was Schmidt?
3    A    It was either Schmidt or Shepherd, the
4 ones that were at the DA, and you can look it up.
5 Whoever was at the DA told me, and it was the
6 officer, that they seen him on the bank before he
7 went into the water.
8    Q    Do you have any information that those
9 officers or any other Ephrata officer tased him
10 while he was at or near the creek?
11    A    I don't know who shot the other two
12 Tasers.
13    Q    Okay.  So the answer is no, you have no
14 firsthand information as to that.
15    A    Right.
16    Q    Have you already described all
17 conversations you had with Ephrata -- and not just
18 the police department, anybody from Ephrata
19 whatsoever --
20    A    Yes.
21    Q    I'm sorry.  I didn't get it all out -- in
22 relation to the tragic death of your son?  Have you
23 had -- now I'm done.  I'm sorry.
24    A    Yes.

21 (Pages 78 - 81)

1    Q    Okay. That was very nice of you to wait.
2  I'm sorry.
3    A    I'm sorry.
4    Q    I'm asking bad lawyer questions today.
5         Have you ever -- do you recall any
6  conversations with Officer Rivera, whose deposition
7  is tomorrow, Beth Rivera?
8    A    See, I don't remember the officer's name.
9  I remember talking to one female officer right
10 after, because at that point I was very confused,
11 and my heart was broken. To this day I lost a piece
12 of me. I lost my son.
13   Q    I understand.
14   A    And at that point I didn't get to really
15 focus on the video. I didn't know what I was going
16 to do at that point, but I knew a female officer
17 jumped in the water.
18   Q    Okay.
19   A    And it was only two female officers that
20 jumped in the water, and I thanked them for at least
21 doing that.
22   Q    Okay.
23   A    Even if they were the ones to tase him,
24 at least they went in the water to hopefully save

1  him.
2    Q    Okay. But, again, you have no firsthand
3  information that these female officers tased him
4  either; correct?
5    A    Correct.
6    Q    Okay.
7    A    I just know they went -- two females went
8  in the water.
9    Q    Okay. Do you know the one -- you
10 mentioned a missing officer. Were you aware that
11 one officer laid her radio and other equipment down
12 to search further down the creek?
13   A    She was way over at the park.
14   Q    Right. Were you aware that she had laid
15 her equipment down so she could search in the creek
16 further down for your son?
17   A    No, I was not aware of that.
18   Q    This is the first you're hearing that?
19   A    Yes.
20   Q    Okay. Your attorney sent us 1658 pages,
21 I think, of records, which I went over over the
22 weekend. Just two questions come up on that: When
23 was your son first diagnosed with attention deficit
24 disorder?

1    A    When he was like 12.
2    Q    Okay. Did he treat for -- and how about
3  ADHD?
4    A    Yeah, he got treated for that.
5    Q    Was he treating for that at the time of
6  his death?
7    A    No.
8    Q    When was the last time he had received
9  treatment for ADD or ADHD?
10   A    Before he went into jail, and then they
11 kept playing with his medicine in there.
12   Q    Okay. So he didn't get proper treatment
13 in the jail for his ADD and his ADHD.
14   A    Correct.
15   Q    And he didn't seek any treatment for it
16 after he eloped from the rehab, did he?
17   A    No.
18   Q    I would imagine that wouldn't be number
19 one of the list of priorities after you leave rehab,
20 but I have to ask.
21   A    Right.
22   Q    Is there anything else you think is
23 important for the attorney for Ephrata Police
24 Department to know about this case?

1    A    My only thing is I know that creek very
2  well, and I've already said it to you. I don't know
3  who shot those other two Tasers, but I did read
4  everybody's statement in the back of the autopsy,
5  that it took me almost two years to get, and them
6  statements, half of them don't make sense, because
7  it said it had four Tasers in him.
8         And my thing is -- and this goes out to
9  her and other officers is to protect -- to serve and
10 protect. Why he was on -- instead of trying to talk
11 him off the bank, at one point -- I wished I knew
12 the officer's name that did say he was tased. I
13 don't know who tased him, and I don't know the
14 officer's name, because my memory from two years ago
15 isn't the best, because that was my baby. My memory
16 to this day isn't the best, but you have -- but four
17 Tasers were in him when he was pulled out, and
18 there -- from this to the end of that table -- from
19 the woods to the end of the table, that's the creek.
20 Watching the video, there's two Tasers in him. So
21 somebody tased him from this end of the table to
22 that end of the table twice.
23   Q    Okay.
24   A    Which to me makes me believe, okay, he

KRISTI GOOD

Page 86

1  was tased. Maybe he wasn't tased in the water, but
2  he fell in the water with the Taser in him.
3      Q     Okay. So this is an alternate theory as
4  to how he got into the water, that he was tased on
5  the side and then fell.
6      A     Correct.
7      Q     That's another possibility.
8      A     And that was said by an officer, too.
9      Q     Okay. Did you have the opportunity to
10  review that autopsy report with your attorney before
11  coming in here today to testify, or did you just
12  read it on your own?
13      A     We talked about.
14      Q     I don't want to hear exactly what you
15  said, because that's privileged information, but you
16  did have the opportunity to go over it with counsel
17  before testifying under oath today; correct?
18      A     Yes.
19          MR. BOYLE: Okay. That's all I have for
20  you, Ms. Good. Ms. Good, I am truly sorry for your
21  loss. No parent should ever bury a child.
22          THE WITNESS: Thank you.
23          MR. BOYLE: God bless. Nothing further.
24          MR. MAC MAIN: Just had a couple of

Page 87

1  follow-ups.
2          FURTHER EXAMINATION
3  BY MR. MAC MAIN:
4      Q     I have Andrew's criminal history, and I
5  have your criminal history, and there was -- I'm not
6  going to go through it all, but there was one that
7  just struck me as odd. It looks like --
8  October 1st, 2012, it looks like Andrew was charged
9  with theft by unlawful taking, conspiracy, and
10  receiving stolen property, and you were charged the
11  same date with conspiracy, receiving stolen
12  property, and theft by unlawful taking.
13      A     That was dropped by me. The charges of
14  that was dropped. That was in Lebanon. What
15  happened was my ex and Andrew were recycling. They
16  went to knock on the door to ask if they could have
17  the things. I was sleeping in the car. That's
18  why -- I never got out of the car, which the people
19  at the house testified. I was yelling at them that
20  they shouldn't be taking them without permission.
21          I said, "Andrew, that's not the way to do
22  it, no."
23          And they heard me yelling, no, no, so
24  they -- when we got to court, it was dropped against

Page 88

1  me right away.
2      Q     Okay. What about with Andrew and your
3  ex-husband? Were they charged or --
4      A     Andrew was charged.
5      Q     And what happened with his charges?
6      A     He got -- he only got probation for that.
7  That was his first charge ever.
8      Q     What about your ex-husband?
9      A     He also got probation.
10      Q     And you were also charged, but you're
11  saying they were dismissed as to you?
12      A     Yes. You can look.
13          MR. MAC MAIN: Okay. That's all the
14  questions I have. Thank you.
15          MR. BAIRD: I have no questions.
16              - - -
17          (The witness was excused.)
18              - - -
19          (The deposition concluded at
20  approximately 11:30 a.m.)
21
22
23
24

Page 89

1          C E R T I F I C A T E
2
3
4      I do hereby certify that I am a Notary
    Public in good standing; that the aforesaid
5  testimony was taken before me at the time and place
    indicated; that said deponent was by me duly sworn
6  to tell the truth, the whole truth, and nothing but
    the truth; that the testimony of said deponent was
7  correctly recorded in machine shorthand by me and
    thereafter transcribed under my supervision with
8  computer-aided transcription; that the deposition is
    a true and correct record of the testimony given by
9  the deponent; that a review of the transcript by the
    deponent was not requested; and that I am neither of
10  counsel nor kin to any party in said action nor
    interested in the outcome thereof.
11
        I declare under penalty of perjury that
12  the foregoing is true and correct. Dated this
    1st day of September, 2020.
13
14
15
16
17
18          _Holly J. Cross_
19          Holly J. Cross
            Notary Public
20
21
22
23
24

23 (Pages 86 - 89)

**&**

**&** 2:15

**1**

**1** 3:10 4:13 29:2,3
**10:05** 1:18
**115** 75:19
**1194** 89:18
**11:30** 88:20
**11th** 54:23
**12** 70:4 84:1
**1240** 2:4
**12th** 54:23
**14** 30:13 32:19
**14th** 18:24
**15** 51:2,9
**1500** 2:4
**15th** 15:11
**16** 62:19,22
**1658** 83:20
**17** 1:12
**18** 30:9,9
**1800** 1:23
**1801** 1:23
**19103** 1:24 2:16
**19110** 2:5
**19382** 2:10
**1st** 87:8 89:12

**2**

**20** 32:18
**20-1431** 1:6
**200** 1:17 2:10
**2000** 2:16
**2007** 47:15
**2012** 87:8
**2016** 70:7
**2017** 70:7
**2018** 15:11 30:13
  32:19 63:9
**2020** 1:12 89:12

**215** 2:5,17
**2300** 2:16
**24** 60:20 62:22
**26** 39:17 41:9
**27** 46:18
**29** 3:10
**2:00** 54:6

**3**

**318-7106** 2:11
**322** 57:17

**4**

**433** 1:17 2:10
**484** 2:11
**4:30** 15:19

**5**

**5** 3:4 4:13
**575-4555** 2:17

**6**

**627-9999** 2:5

**7**

**7,000** 48:22
**79** 3:5

**8**

**87** 3:4
**8:00** 54:6

**a**

**a.m.** 1:18 88:20
**able** 8:10 11:9
**absolutely** 56:14
**abuse** 17:22
**accident** 9:16
  24:24 38:9 39:1
**accidentally** 39:3
  39:4
**accommodate**
  7:13
**account** 47:5,6,16

**acted** 22:11,12
**acting** 79:18
**action** 89:10
**actual** 14:14 29:17
**add** 28:19 69:18
  69:19 84:9,13
**added** 8:1,4
**addiction** 30:11,16
  31:6,7 62:18,18
**addictions** 64:12
**adhd** 84:3,9,13
**administrator**
  48:8
**adult** 51:12
**affiliated** 52:1
**aforesaid** 89:4
**afraid** 46:1 69:1
**afternoon** 15:12
  15:19
**ago** 35:4 49:23
  85:14
**agreed** 5:2
**ahead** 34:13 36:10
**aided** 89:8
**ain't** 58:20
**air** 7:12 69:12
**akron** 15:20 26:2
  72:3
**alcohol** 68:2,7
**alive** 42:7,10,13,14
  42:17
**alleged** 29:11
**alternate** 86:3
**amish** 47:24
**andi** 61:18 62:1,2
  62:4
**andrew** 1:3 2:9
  15:2,3,4 16:3,19
  16:22 17:2,18
  18:24 20:5 23:7
  25:3 33:17,19

34:22 35:22 48:13
  54:22 69:5 73:6
  76:8 87:8,15,21
  88:2,4
**andrew's** 18:18
  20:4 22:9,24 26:4
  35:5 52:19 73:4
  87:4
**andy** 15:2
**ann** 5:16
**answer** 4:3 6:5,24
  7:4,5,17,22 8:2,5
  11:23 15:15 19:9
  23:16 30:17 44:16
  68:8 81:13
**answered** 69:22
**answers** 6:18,24
  8:8 48:22 69:17
  69:18
**anxiety** 56:3,5,9
  57:6
**anybody** 14:4 22:2
  26:14 27:20 28:23
  31:11 34:15 37:21
  38:20 39:10 43:23
  68:10 73:11 81:18
**apartment** 19:10
  19:23
**apartments** 16:24
**apologize** 8:22
**apologized** 9:17
**appear** 68:1
**appointed** 48:8
**approximately**
  1:18 88:20
**april** 15:11 18:24
  30:13 32:19 63:9
**area** 11:5 28:7
**arrest** 13:24 14:5
  15:10,24 18:7
  19:14,20 20:11,22

21:7 26:2 32:18
32:22 33:18 68:12
**arrested** 10:22
11:14,19 12:2,6,23
13:19 14:3,13
15:19 16:19,23
20:5 21:9 40:23
67:5
**arresting** 19:16
**arrests** 36:24
**article** 31:19,21
32:10,11
**asked** 8:15 41:13
43:5 45:23 53:2
70:2 75:17 79:13
**asking** 6:17 12:15
32:4 34:3 38:18
68:9 82:4
**assets** 47:1,4,5,17
48:19,20
**assignment** 70:16
**assume** 7:18
**atlantic** 1:23
**attempt** 11:4
**attend** 58:7
**attended** 59:1
**attention** 83:23
**attorney** 69:24
74:22 78:23 83:20
84:23 86:10
**attorney's** 75:21
**audible** 42:22
67:17
**august** 1:12
**author** 31:22
**autopsy** 27:23
28:13 85:4 86:10
**averments** 30:1
**aware** 83:10,14,17

**b**

**b** 3:8
**baby** 85:15
**babysitter** 54:16
**back** 18:14 19:14
20:4 34:23 47:12
51:11 58:3,4
61:24 62:1,14
65:18 66:9,11
67:1,14 76:21
85:4
**backed** 38:7 39:8
39:10
**background** 32:2
54:21
**backwards** 63:9
**bad** 56:5 60:23
67:7 82:4
**baird** 2:3 11:22
15:14 37:24 38:2
44:15 74:22 75:1
88:15
**bakery** 49:13,18
55:5,15 70:3
**bank** 47:5,16 80:6
80:12,13,24 81:6
85:11
**barbara** 1:7 2:12
2:21
**barracks** 9:18
**based** 30:4
**basically** 20:23
**basis** 33:2
**beat** 54:16
**beginning** 8:19
69:15
**behavior** 34:16
**belief** 39:19 41:10
46:18 79:20
**believe** 28:11 30:1
30:15,21,22 38:14

38:17 41:14 42:13
42:19 45:8 71:19
72:11 80:10 85:24
**belongings** 20:6
**belt** 78:18,19
**best** 85:15,16
**beth** 20:19,24
33:12 34:7 82:7
**better** 11:18 50:9
68:10
**big** 24:20
**bigger** 35:11
**bill** 48:23 71:9
**bills** 49:4
**bit** 77:13
**blame** 27:6
**bless** 86:23
**blocked** 71:18
73:7
**boat** 23:5
**bob** 44:8
**body** 23:11,22
71:13 72:8
**borough** 1:8 2:18
**bottle** 67:3,20
**boulevard** 2:4
**boxed** 9:7
**boyle** 2:15 3:5
78:23 79:2,5
86:19,23
**break** 7:11,16,18
10:6 17:16 35:1
69:12
**breaks** 7:19
**brian** 14:11,12,18
14:19 16:13,14,16
17:3 19:15,19
20:1,23 25:15,15
25:19 33:13 34:7
47:22,22

**bring** 9:8,11 38:19
**bringing** 50:21
**broadcast** 10:13
**broke** 47:12
**broken** 82:11
**brother's** 35:16
**brought** 27:23
50:23 54:6
**brownstown**
62:16
**building** 58:22,23
**bunch** 16:10
**burial** 48:24
**burned** 49:14 70:7
**bury** 86:21
**but's** 23:1

**c**

**c** 2:1 89:1,1
**call** 5:24 54:7
58:10 65:2,10
79:8
**called** 5:20 18:3
45:22 57:19 58:8
58:21 65:3 66:15
69:23 77:18
**calling** 65:1
**calls** 76:14
**calmed** 35:22
**capacity** 64:19
**car** 36:21 37:2,5,8
76:12,17,19,24
87:17,18
**cards** 49:2
**care** 45:24 62:5
**carry** 9:9
**case** 5:19 84:24
**cases** 49:6
**causing** 46:19
**cement** 33:7
**center** 2:4

**central** 55:7
**certain** 43:6
**certificates** 51:18
**certification** 5:4
**certify** 89:4
**chance** 50:16
  60:13,14 61:6
**change** 69:20
**changed** 8:1,4
**charge** 88:7
**charged** 52:19
  87:8,10 88:3,4,10
**charges** 87:13
  88:5
**chased** 21:1,2
**check** 35:16 78:14
**checked** 50:19
  78:11
**checking** 78:3
**chester** 1:17 2:10
**chicken** 67:1,2,8
**child** 53:21 86:21
**children** 48:16
**children's** 51:15
**chris** 79:5
**christopher** 1:8
  2:12,15
**church** 58:6
**churches** 58:16
**claims** 6:11 29:12
**clarified** 8:1
**class** 62:12
**clean** 64:20
**close** 18:16,23
  73:16 76:7 78:19
**clothes** 18:17
**cocalico** 39:18
  79:16
**coke** 64:13
**coleman** 2:15

**come** 9:10 18:14
  35:16 83:22
**comes** 19:3
**coming** 16:18
  22:18 30:24 44:10
  86:11
**commencing** 1:18
**comment** 14:3
**commenting** 32:9
**commit** 69:6
**commotion** 14:15
**company** 22:8
  24:2 72:3
**complaint** 3:10
  29:7,17,18,21
  39:17 46:17 55:24
  59:4 62:7
**complete** 9:16
  38:9 51:4 54:23
**completed** 51:8,11
  51:19 54:22
**computer** 89:8
**concerned** 78:8
**concluded** 88:19
**condition** 18:7
**conduct** 34:16
**conference** 77:16
  77:17,23 78:15
**confused** 45:16
  82:10
**consider** 53:20
**consist** 48:18
**conspiracy** 87:9
  87:11
**construction**
  25:17 48:1 54:24
  62:12 70:14
**continue** 17:15
**continued** 27:1
  42:9

**conversation** 6:21
  7:3 36:23 45:14
  66:21,23 67:15
  68:3,11
**conversations**
  12:21 73:19 81:17
  82:6
**cook** 46:10
**cooperate** 11:19
**copies** 80:15
**cops** 21:1 65:3
**copy** 29:6
**corey** 43:18
**correct** 11:9 13:20
  13:21 15:21 21:14
  23:7,8,13 27:2
  31:24 32:24 36:14
  36:15 37:19 39:8
  39:9,21 40:18,19
  40:21,24 41:3,6,16
  41:24 42:1,10,14
  42:17,21 43:7,8,13
  44:21 60:1 63:16
  64:7 65:24 69:19
  83:4,5 84:14 86:6
  86:17 89:8,12
**corrected** 8:5
**correctly** 89:7
**cost** 59:10
**counsel** 2:6,12,18
  5:2 6:4 7:19 75:15
  80:17 86:16 89:10
**counseling** 54:10
  56:1 57:15,20
  58:1
**counselor** 50:10
  50:12
**counselors** 73:15
**county** 1:7 2:12
  5:18 52:5 53:4
  70:9

**couple** 26:10 35:4
  49:3,18 70:1
  73:16 86:24
**court** 1:1 7:6 8:10
  87:24
**cover** 29:17
**cpboyle** 2:17
**crap** 22:12
**crazy** 48:4
**credentials** 32:8
**credit** 49:1
**credits** 62:14,15
**creek** 11:3,8 13:5
  13:13 22:19 23:21
  26:5 27:13,20,21
  28:6,7,9,16,21
  36:13 37:17,19
  38:5,12,14,21 39:8
  39:15,18,24 40:2,6
  40:13 41:5,12
  42:16,20 43:3,13
  43:20 44:1,5,12,14
  44:20 46:20 79:16
  79:21 80:2,22
  81:1,10 83:12,15
  85:1,19
**crime** 52:20
**crimes** 52:10,19
**criminal** 30:12,19
  30:23 49:6 87:4,5
**criticism** 42:2
**cross** 1:19 89:18
**cruz** 45:6,7
**cry** 56:6
**current** 30:12
  40:12,13
**currently** 47:7,19

| d |
|---|

**d** 3:1 51:21
**da** 9:20,21 10:1
  37:3,23 75:12

76:18 77:8 78:19
81:4,5
**da's** 26:8 37:3,10
38:6 45:12 77:15
78:16 80:6
**dad** 48:12 54:16
**damage** 64:17
**damages** 6:8,11
55:20 59:5,5
**date** 1:19 48:5
87:11
**dated** 89:12
**daughter** 35:15
60:15
**david** 2:9 5:17
**davis** 1:3 2:9
**day** 28:3 50:22
67:4,15 68:11
71:10 82:11 85:16
89:12
**dead** 37:13
**dealt** 58:14
**death** 35:16 56:1
71:3 81:22 84:6
**debts** 48:19 49:1,2
**deception** 52:15
52:17
**decision** 44:13
**declare** 89:11
**deer** 51:8,16,23
52:2,3 65:17 66:5
66:9
**defendant** 2:18
41:10
**defendants** 1:9
2:12 30:10 41:11
79:6
**deficit** 83:23
**dennehey** 2:15
**denny** 33:22,23,24
34:1

**department** 5:18
76:2 79:14 81:18
84:24
**deponent** 89:5,6,9
89:9
**deposed** 8:16
**deposition** 1:15
4:1 5:21,21 6:4
7:21,23 74:19
75:2 82:6 88:19
89:8
**depression** 57:6,8
57:11
**deputy** 5:19 21:19
22:3 23:17 26:4
30:15 41:2 76:6
**described** 81:16
**description** 3:9
4:8
**detail** 52:18 77:14
**detective** 45:9,10
**determine** 28:19
**diagnosed** 62:17
83:23
**diane** 56:15,16
**diary** 60:17 73:24
**died** 9:1 45:17
48:11 62:22
**different** 10:1 11:5
16:20 17:2 31:10
31:12 47:13 51:16
53:24 54:11 55:10
55:12 65:1 68:14
69:24 70:14 74:16
75:11,22
**dirty** 64:1,7
**disability** 47:8,9
47:14 60:6
**disaster** 22:11
**discovery** 48:22

**dismissed** 88:11
**disorder** 83:24
**district** 1:1,1
75:20
**dmacmain** 2:11
**doa** 9:8
**docket** 1:6
**doctor** 56:3,8,11
56:17,19,20 57:1
**documents** 4:7
**doe** 41:11 51:19,21
51:23
**dog** 56:4
**doing** 70:13 82:21
**door** 17:1 18:16
36:20 87:16
**downtown** 58:18
**drank** 67:23
**dream** 60:16
62:14
**dreams** 60:18
**drink** 7:12
**drinking** 67:5
**driver** 47:12,24
**dropped** 18:15
19:3 87:13,14,24
**drowned** 43:20
46:20
**drug** 12:12 17:22
62:18
**drugs** 35:9 40:15
50:21,23 63:1
64:5,6,9,11 68:2,8
**drunk** 47:12
**due** 30:11
**duly** 5:9 89:5

**e**

**e** 2:1,1 3:1,8 20:18
20:18 51:21 61:17
61:17 89:1,1

**earlier** 7:22,24
42:21 71:11 75:17
**early** 17:12 21:11
**earning** 64:19
70:3
**eastern** 1:1
**eat** 67:6,7
**economic** 59:5,6
59:16 60:12,13
62:8,9 64:18
**eight** 40:11 44:7
59:12 60:11 62:24
**either** 9:1 26:2
40:18 68:2 71:5
78:16 81:3 83:4
**electrician** 62:13
**eloped** 84:16
**eloping** 65:10
**emotional** 17:17
56:4 57:7
**employed** 47:7,23
49:10,13
**employment** 55:4
55:16 70:4
**encounters** 31:3
**ended** 63:24 70:11
**ends** 70:8
**enforcement**
21:19 23:7 24:5,7
24:12 25:6,9,20
**enforces** 36:20
**engage** 70:13
**engaged** 48:2
**entered** 39:19
**entire** 60:21
**ephrata** 1:8 2:18
10:11 15:20 26:2
43:10 55:2,6,11
76:23 79:6,14,15
79:21 80:16,20
81:9,17,18 84:23

**equipment** 83:11
  83:15
**eric** 2:3
**ericshore.com** 2:6
**escape** 11:4,9
**escaped** 10:11
  11:7 13:5
**esquire** 2:3,9,9,15
**established** 39:20
**estate** 1:3 48:7,18
  55:21
**estimate** 7:15
**everybody** 19:10
  28:20 61:4
**everybody's** 85:4
**evidence** 28:15,19
  38:4,11,18,18,20
  39:14,20 43:2
  46:22
**ex** 18:15,18 22:9
  23:1 25:22 87:15
  88:3,8
**exact** 27:22 59:13
**exactly** 11:10
  49:19 52:6 79:23
  86:14
**examination** 5:12
  79:1 87:2
**examined** 5:10
**exception** 7:17
**excused** 88:17
**exhibit** 3:10 29:3
**expenses** 60:10
**experts** 28:18
**explain** 64:9
**explained** 6:4

**f**

**f** 2:4 89:1
**face** 33:7
**facilities** 50:24
  51:6 65:15

**facility** 18:11 19:1
  40:17,20 50:12,15
  51:13,15 57:15
  63:12 65:11,13,23
  66:2,20
**fact** 34:20 41:20
  44:23
**facts** 43:2
**factual** 28:19
  29:23 30:1
**fall** 9:24 46:19
**family** 25:8 56:17
  56:19,20 57:1,20
  57:21 58:1,14
  73:13,14
**far** 19:19 69:18
**father** 18:19
**fault** 27:8
**feel** 7:15 61:2
**feet** 28:9
**fell** 24:21 26:19
  86:2,5
**female** 72:22 82:9
  82:16,19 83:3
**females** 83:7
**fentanyl** 69:2
**fiance** 15:5
**fiancé** 14:8,10,19
  16:2,8,11 17:3
  47:23
**fight** 12:7 13:5
  35:23
**fighting** 34:8
**figure** 32:7 55:20
  75:7
**file** 70:20
**filed** 30:2
**filing** 5:4 8:23
  25:24 26:6
**final** 8:7

**financial** 59:18
**financially** 59:21
**find** 50:14
**fine** 6:2 12:20
  74:12 78:3 79:10
**fines** 49:5
**finish** 7:3,5 14:19
  17:13 32:5 40:5
  62:11,15
**finished** 53:22
**fire** 9:6 22:8 24:2
  72:3
**fireman** 22:7
**firemen** 71:20
**first** 26:14 40:8
  62:2,17 64:24
  65:22 71:23 83:18
  83:23 88:7
**firsthand** 80:20
  81:14 83:2
**five** 50:2,3,20 55:4
  55:14 58:16 70:5
**flagger** 47:11
**fled** 10:18 50:11
**fleeing** 10:16 23:7
  26:4
**flight** 23:17
**focus** 82:15
**folks** 24:10
**follow** 70:1 87:1
**follows** 5:10
**food** 59:20 60:4
**foregoing** 89:12
**forget** 77:8
**forgot** 55:7 78:14
**form** 5:6 11:22
  44:15
**forth** 6:8 25:18
**found** 9:8
**four** 9:18 22:18,19
  26:5 27:24 28:5,9

**38:15 44:9 47:12
  49:19,24 50:2,3
  55:4,14 70:5 85:7
  85:16
**fresh** 7:12 69:12
**fried** 67:8
**friend** 22:23 73:3
**friends** 19:9 23:1
  73:17
**front** 29:6 42:4
**fugitive** 30:12
**full** 5:14
**funeral** 59:8,9,11
  60:10
**further** 83:12,16
  86:23 87:2
**future** 64:18

**g**

**garber** 61:18
**getting** 10:4 19:14
  50:9 61:19 67:4
**girlfriend** 61:7,10
**girlfriends** 22:9
**give** 17:14 59:19
  60:3 64:16 69:2
**given** 7:22 8:2
  69:18 89:8
**go** 9:12,17 13:13
  15:1 26:7 29:18
  34:23 35:20 36:6
  36:7 40:12 41:8
  52:18 54:8,21
  55:1,9,23 58:3,12
  62:14 65:5,18
  69:9 86:16 87:6
**god** 86:23
**goes** 67:14 70:12
  85:8
**goggin** 2:15
**going** 5:19 6:5
  7:19 9:5,10 15:12

25:3 26:18 29:1,2
34:12 36:9 40:15
41:8 46:1,24
50:10 57:4,17
61:24 62:1,12
64:16,20 67:14
68:16 70:9 76:21
78:9 79:8 80:1,13
82:15 87:6
**good**  1:4,15 3:3,10
5:9,16 6:1 12:2,6
12:22 13:5 18:22
25:22 29:2,3
32:20 33:3 34:22
36:2 46:19 54:18
54:19,20 79:6
86:20,20 89:4
**googled**  32:16
**gotten**  40:23
**grab**  18:17 26:17
26:23 74:6
**grabbed**  26:21
42:3,6,12 76:7
**grade**  54:22
**grades**  55:10
**graduated**  54:24
**graham**  2:3 45:10
**grahamb**  2:6
**grandkids**  60:14
60:19,22
**great**  34:20 35:7
**ground**  32:20
**group**  1:16 2:8
**guess**  34:14 39:16
40:22 48:4 54:7
65:9 72:9 78:15
**gunnett**  2:12,21
5:19 21:19 26:4
30:15 76:7
**guy**  33:22 43:16

## h

**h**  3:8 61:17
**half**  45:17 63:2
85:6
**hand**  67:3,20
**handcuffs**  14:17
26:14 33:10
**handful**  79:11
**handled**  72:4
**hands**  27:4 78:17
78:20
**happened**  8:24 9:4
11:10 14:23 15:10
21:15,24 22:9
23:10,17,21 24:23
26:3,3 27:12,13,20
29:11 35:6 36:13
37:7 40:21,24
41:3,6 61:23 63:9
69:10 87:15 88:5
**happening**  33:16
**hard**  64:9,11
**hardest**  73:5
**haven**  53:22,24
**he'll**  35:23
**head**  6:22 8:9 71:1
**healthy**  60:21
**hear**  72:19 76:12
76:13,16,20 79:6
86:14
**heard**  9:5,7 10:1,7
10:8,12 14:15
26:1 33:19 46:2
46:13 71:11,12,17
87:23
**hearing**  71:20
83:18
**heart**  82:11
**held**  1:15 32:20
49:16 50:6

**hello**  79:3
**help**  9:10 38:13,15
59:19,20,22 60:3
68:21,22,24 69:3
**helped**  22:15
23:11
**helping**  46:11
**hereto**  30:10
**heroin**  17:22
50:15 64:13 69:1
69:2
**hey**  11:13 12:1,6
**hi**  79:4
**high**  55:1,9,12
**highest**  54:22
70:22
**hill**  9:24 26:18
41:23
**history**  30:12,20
30:23 55:4 70:2
87:4,5
**hit**  47:12
**hold**  37:24
**holly**  1:19 89:18
**home**  14:2 47:2
50:13 51:18 54:6
60:17
**hope**  63:17
**hopefully**  82:24
**hospital**  9:6,13
10:11 13:19 20:9
21:16,20 26:3
28:2,6 32:23
34:13,14,16,17
35:20,24 43:15
45:23 49:3,4
53:22 71:9 77:4,5
**hotel**  58:19,20
**hour**  7:15,24 70:4
**hours**  7:15 9:18
18:2

**house**  14:15 16:18
16:19,20,21 18:14
18:16 19:4 46:2
87:19
**hundred**  26:20
**hurt**  62:1
**husband**  18:15,18
25:22 88:3,8

## i

**idea**  12:2,6,22
13:5 32:1
**identification**  29:4
**ignorant**  71:19
**imagine**  84:18
**important**  31:7
84:23
**incarcerated**  52:5
52:9 53:3,8,11,18
**inches**  11:6
**incident**  6:7 9:1
11:8,12 12:21
13:4,19 15:21
17:19 18:23,24
19:8 26:1 30:5,6
31:8 43:7 44:24
45:11 49:11,22
51:1 57:2,3,5,12
57:22 58:2 59:24
61:8 63:12 65:12
66:4 67:16 69:9
73:12 78:10
**incidents**  50:20,22
**income**  70:22
**incorrect**  7:24 8:3
69:16
**index**  4:1
**indicate**  15:18
**indicated**  89:5
**indicating**  27:5
78:17,20

**influence** 68:1
**information** 6:7
  6:10 8:24 9:3 26:6
  31:2 39:19 41:9
  46:18 79:15 80:20
  81:8,14 83:3
  86:15
**initially** 14:22
**inside** 21:15 26:3
**instance** 10:22
**instruction** 4:3
**insurance** 57:4
  71:2,5
**interested** 89:10
**internal** 76:1
**interrogatories**
  69:23
**interruption** 74:7
**interviews** 75:20
  80:16
**intuition** 68:16
**investigate** 9:16
**investigating** 39:6

**j**

**j** 1:19 2:9 89:18
**jail** 18:5 34:23
  35:20 57:9 61:24
  62:1 63:13,14,15
  63:21,23 69:8
  71:7 76:22 84:10
  84:13
**jeremiah** 58:9,10
**jess** 22:10,14,15
  22:23,23 23:6
  24:1
**jess's** 22:21
**jessica** 73:2
**job** 49:17 50:5
  62:10 64:20
**jobs** 25:17 50:6,7
  55:17

**john** 2:4 41:11
  54:18
**joke** 35:23
**joking** 34:21,24
  35:8,13,21
**jump** 11:3 34:12
  36:9 44:10,13
  46:24
**jumped** 11:8
  33:10 37:18 38:21
  39:23 40:2,6 41:5
  42:16 44:12,20
  82:17,20
**justification** 32:21
  33:4

**k**

**keep** 10:4
**kennedy** 2:4
**kept** 10:3 78:1
  84:11
**kids** 60:17,23 61:2
**kill** 35:15 37:16
  46:6
**killing** 40:13
**kim** 61:11,22,23
**kim's** 61:12
**kin** 89:10
**kind** 6:22 34:14
  46:24 55:24 57:6
  57:7 59:17 63:8
  72:16 73:19,21
**kinds** 32:5,6
**knew** 8:9 11:18
  17:11 26:1 30:5
  30:10,15,18,22
  31:2 34:22 61:24
  69:3 76:21 82:16
  85:11
**knock** 87:16
**knocked** 18:16

**know** 6:10,15,22
  7:13 8:3,24 10:2,8
  10:15,23,24 11:10
  12:18,19 13:1,8
  17:23 18:1,13
  19:12,21,24 20:19
  21:9 22:6,22
  23:18,23 25:2,4
  26:21 28:6,7,23,24
  30:5,18 31:5,18,20
  32:10 33:22 34:4
  34:5 35:5 36:8,12
  36:12,17,23 39:23
  41:20 42:11,15
  49:19 52:6,9
  53:20 55:6 58:17
  63:7 64:8 65:17
  66:15,16,18 67:5
  67:14,22,24 68:5,7
  68:7,10 69:8,8,10
  70:22 71:14,22
  72:24 73:6,7 77:2
  78:5 79:23 80:11
  81:11 82:15 83:7
  83:9 84:24 85:1,2
  85:13,13
**knowledge** 24:8
  27:14 64:4
**knows** 11:17 32:7
  76:22
**kristi** 1:15 3:3 5:9
  5:16,17 6:1,2,3
  29:6 79:8

**l**

**l** 20:18,18
**lady** 6:19
**laid** 83:11,14
**lancaster** 1:7 2:12
  5:18 52:5 53:3,9
  53:18 57:16,21
  58:15,18 59:2

  65:20,21 66:5,7,9
  70:9
**late** 15:12
**law** 1:16,16 2:3,8
  21:18 23:7 24:5,7
  24:12 25:5,9,19
  36:20 60:15
**lawful** 32:21 33:3
**laws** 32:16
**lawsuit** 6:8 8:23
  26:1 29:7 55:19
**lawyer** 6:14 28:24
  82:4
**lays** 29:11
**leave** 7:20 18:24
  84:19
**leaving** 17:12
  21:11 66:20
**lebanon** 51:14
  53:12,13,17 57:17
  57:20,20 58:1
  65:21 66:6 87:14
**left** 6:19 17:11
  18:11,13 19:5
  40:17,20 50:14,17
  65:22
**legal** 1:22 29:24
**leppler** 1:8 2:13
**lie** 78:11
**life** 13:16 26:23
  44:5,12,20 59:18
  60:15,20,21 61:3
  64:21 69:3,6 71:2
  72:4
**lincoln** 22:8
**line** 4:4,8,12,16
**list** 59:4 84:19
**lititz** 58:12 59:2
  70:3
**little** 35:9 37:10,11
  37:13,14 56:21

77:7,9,11,12,13
**live** 66:19
**lived** 17:2,3
**living** 17:7,9 19:4
  19:7,11,12 25:16
  54:8 55:8 60:1
**llc** 1:16
**located** 1:16 16:16
  33:15 57:16 58:11
**location** 59:2
**locations** 51:17
**long** 7:14 47:14
  56:20 61:18
**longer** 56:23 77:12
**longest** 49:16
  62:21 63:1,19
  64:4 70:16
**look** 28:18 30:24
  56:13 81:4 88:12
**looked** 67:7 75:17
  75:22 76:3,5,11
**looks** 9:15 15:11
  87:7,8
**loss** 58:14 59:6,6
  59:16 60:12 86:21
**lost** 60:7,13,14,20
  60:21 62:7,8
  64:17,18 82:11,12
**lot** 12:11 21:20
  22:4 36:10,13
  37:10 41:23 58:4
**lots** 36:19
**loved** 60:24 61:1,2
  67:10
**loves** 76:23
**low** 13:15

**m**

**m** 43:18
**mac** 1:16 2:8,9
  5:13 11:24 15:17
  29:1,5 38:3 44:17

44:18 69:11,14
  74:11 75:3,9
  78:22 86:24 87:3
  88:13
**machine** 89:7
**macmain** 3:4 5:17
  79:12
**macmainlaw.com**
  2:11
**mad** 17:12 19:5
  66:20
**main** 1:16 2:8,9
  5:13 11:24 15:17
  29:1,5 38:3 44:17
  44:18 69:11,14
  74:11 75:3,9
  78:22 86:24 87:3
  88:13
**male** 72:22,23
**man** 47:24
**manheim** 55:7,8
  55:11
**marijuana** 64:15
**mark** 29:2
**marked** 4:15 29:3
**market** 1:17,23
  2:10,16
**marriage** 48:5
**married** 48:14
  60:16 61:3,19
**marshall** 2:15
**material** 30:10
**matter** 34:20
**matters** 36:18
**mdwcg.com** 2:17
**mean** 6:23 33:4
  35:19 55:17
**meant** 8:9 74:17
**medical** 48:22
  71:5

**medication** 56:9
**medicine** 84:11
**meet** 58:18
**meeting** 37:3
**members** 25:8
**memory** 85:14,15
**mental** 31:12
**mentioned** 23:14
  23:15 34:2 63:20
  83:10
**met** 77:17
**michelle** 46:10
**mid** 1:23
**miller** 72:1
**mind** 45:19
**minutes** 36:22
  44:7
**misdemeanor**
  52:15
**missing** 72:12,13
  83:10
**mistake** 24:20
**mistakes** 37:11,11
  37:13,15
**molested** 54:16
**mom** 14:2 67:11
  68:10,16
**monday** 1:12
**money** 59:7,20
  60:3
**month** 48:11 50:6
**months** 40:3 49:18
  49:20 50:1,2 55:5
  55:14 59:8 70:6
**mood** 34:20
**mother** 12:1,5
**moved** 55:13
**multiple** 41:10,19
  44:3

**n**

**n** 2:1 3:1 20:18
**name** 5:14,17
  16:12,14 18:21
  20:20 22:10,21
  43:16 56:15,16
  58:9 61:12 71:21
  71:22,23,24 79:5
  82:8 85:12,14
**nature** 29:23
**near** 81:10
**need** 7:3,11,12,12
  7:12,16 17:16
  69:19
**needed** 69:3
**needs** 8:1,4,10
**neighbor** 20:11
**neighbors** 14:9
  15:9
**neither** 89:9
**never** 13:13 40:12
  40:15,20 48:14
  60:18,19 61:5
  72:4 87:18
**new** 75:7
**newell** 20:15,17
**news** 77:19
**newspaper** 9:2
**nice** 82:1
**night** 22:6 38:8
**nod** 6:22
**normal** 6:15 7:2
  61:3
**notary** 1:20 89:4
  89:19
**notes** 74:17,20
  75:14
**notice** 30:11
**number** 3:9 30:8
  46:18 59:13 60:7
  73:10 84:18

**numerous** 9:22
**nurse** 46:4

**o**

**o** 43:18 51:21
**oath** 86:17
**object** 11:22 44:15
**objections** 5:5
**obviously** 63:15
**october** 87:8
**odd** 87:7
**offhand** 22:22
  23:18
**office** 26:8 38:6
  45:12 75:21 78:16
**officer** 13:23 14:8
  24:16,17 25:2
  26:12,13 34:18,19
  35:2,13 36:24
  38:7 41:20 43:10
  45:7 46:9 72:12
  78:12 79:15,18
  80:4,5,8,10,11,21
  81:6,9 82:6,9,16
  83:10,11 86:8
**officer's** 82:8
  85:12,14
**officers** 33:8 34:8
  37:2 38:22,24
  44:4,11,19,24 45:2
  46:1,13 75:22
  79:21 80:4,16
  81:9 82:19 83:3
  85:9
**offices** 1:16 2:3
**oh** 29:13 36:7
  37:16 55:6 74:18
**okay** 5:24 6:3 7:8
  8:5,7,19 9:14,19
  9:23 10:6,18
  11:12,18 12:5,15
  13:8,11,18 14:10

14:12,18,22 15:8
15:18,23 16:2,8,11
16:22 17:15,15,17
18:4,6,10 19:3,14
20:1,7,10 21:2,5,9
21:23 22:14,17,23
23:3,6 24:5,15,17
24:22 25:2,5,19,24
26:9,11 27:1,10,12
27:19 29:1,14,16
29:20 30:8,9,18
31:6,18,21 32:4,15
32:18 33:2,12
34:6,12 35:1,12
36:1,9,10,11,16
37:6 39:7,17 41:8
41:18 42:5,9,12,19
43:1,9,18 45:2
46:17 47:9,22
48:21 49:1,10,16
49:24 50:3,8
51:10 52:1,4 53:2
54:7,20 55:14,23
57:5,18 58:1 59:4
60:6 64:4,14,16,23
65:15 66:8,13,16
66:23 67:9 68:14
68:20 69:4,11,22
70:12 71:8,16
72:2,7,14,18 73:2
73:18 74:3,12,18
74:22,24 75:10,17
76:1,5,10 77:5,24
78:8,22 79:6,20
80:15,19 81:13
82:1,18,22 83:2,6
83:9,20 84:2,12
85:23,24 86:3,9,19
88:2,13
**old** 60:20

**once** 35:20,22 52:7
  53:6
**ones** 46:13 51:3
  81:4 82:23
**online** 10:10 31:15
  31:16,21 32:12
**opiates** 31:11
**opioid** 30:11,16
  31:6,7
**opioids** 31:14,23
  32:13
**opportunity** 62:8
  62:9,10 64:18
  80:17 86:9,16
**oral** 1:15
**ordinary** 6:20
**originally** 53:2
**outcome** 89:10
**outgoing** 54:1,3
**outpatient** 54:4,8
**outside** 36:22 37:8

**p**

**p** 2:1,1,15
**p.c.** 2:3,8
**pa** 2:5,10,16
**packing** 70:15
**page** 3:9 4:4,8,12
  4:16
**pages** 29:17 75:19
  83:20
**paper** 60:24 74:1,2
  74:4
**paragraph** 30:8,9
  32:18 39:17 41:9
  46:17
**parent** 86:21
**park** 33:18 36:19
  72:13 83:13
**parked** 37:4
**parking** 21:20
  22:4 36:10,13,19

41:23
**part** 15:9 21:6
  23:16 27:7 29:15
  31:9 41:9
**particular** 50:21
  50:23
**particularly** 21:19
**parties** 5:3
**party** 89:10
**partying** 68:18,22
**pass** 46:11
**passed** 62:12
  65:21
**pastor** 58:4,6,8,10
  58:13 73:14
**pay** 59:7,9,19 60:3
**paying** 49:5,8
**penalty** 89:11
**pending** 7:20
**penn** 2:4
**pennsylvania** 1:1
  1:18,24
**people** 6:15 9:2
  22:5 23:14,15,20
  27:18 32:5 33:5
  50:20 73:9,11,21
  87:18
**perfect** 78:16
**perfectly** 78:3
**period** 62:21 63:1
  63:19,20 64:5
  70:17
**periods** 54:12
**perjury** 89:11
**permission** 87:20
**person** 24:13
  27:19 32:1 34:5
  38:10 73:2
**personally** 55:21
**ph** 77:9

phil 53:24
philadelphia 1:24
  2:5,16
philly 53:21
phone 75:4,7
physically 79:15
pick 54:5
picked 18:15 75:4
piece 22:12 64:17
  74:1,2,4 82:11
place 17:2 18:1
  33:18 50:23 53:17
  89:5
places 47:13
plaintiff 1:5 2:6
  32:19 39:18
planning 61:19
plate 67:8
playing 84:11
please 5:14 45:23
  45:24 46:3
point 7:11,21
  10:15 17:16 39:5
  45:15 59:18 69:7
  70:8 72:11 78:14
  82:10,14,16 85:11
pointing 29:16
police 9:7,13,18
  10:18,21 11:14,20
  12:3,7,22 13:4,6
  14:20 15:4,5,18
  16:4,6 19:16,16
  24:19 27:7,10
  40:5 46:6 76:12
  76:16,19,24 79:14
  81:18 84:23
porch 19:22 20:24
possibility 86:7
potatoes 9:10
  71:14 72:16,19

preacher 56:2
prefer 5:24
prescribes 56:11
present 2:20 14:5
  14:12 21:16 27:18
  28:21 79:16 80:7
  80:8,21
press 77:15,17,22
  78:15
pretty 12:16 66:12
previously 8:2
prior 7:23 8:5,23
  10:22 11:2,4,7
  12:21 13:3,19
  17:18 18:7 23:16
  25:24 26:6 31:3
  46:21 49:14 51:1
  57:1,5,12,22 58:2
  58:3 63:6,12,14
  66:4
priorities 84:19
prison 36:6,7
  51:20 52:5 53:4
  70:9
prisoner 10:11
prisons 53:8
privileged 86:15
probably 8:15
  11:13 62:19 67:6
  68:10
probation 21:13
  65:2 88:6,9
probes 41:15
problems 12:11,12
  53:21
proceedings 74:8
processive 77:9
production 4:7
profession 72:5
professional 1:20
  22:12

prompted 32:23
proof 28:13
proper 84:12
property 47:20
  87:10,12
protect 85:9,10
prove 50:21 51:19
provide 6:10
  59:17
provided 80:15
psychiatric 53:22
psychiatrist 56:18
public 1:20 89:4
  89:19
pull 22:15
pulled 22:20 36:20
  85:17
pulling 13:15
  23:22 40:12
pushed 39:4
pushing 39:11
put 8:3 14:17 29:6
  36:21 37:1,5 62:4
  77:18 78:5,12,13
puts 31:11

**q**

question 5:6 6:5
  6:13,21 7:4,6,17
  7:20,23 8:21
  15:15 28:14 32:5
  37:6 38:2,10,19
  40:7 44:11 46:21
  72:18 78:12
questioned 75:13
questions 4:15
  5:20 6:6,17 8:12
  69:22 75:11 78:23
  78:23 79:11 82:4
  83:22 88:14,15
quinn 45:10

quite 59:9

**r**

r 2:1 61:17 89:1
radio 71:12,17
  72:10,20 76:14
  83:11
ran 13:4,4 14:15
  14:16 21:2 33:17
  33:19 34:9 39:18
  41:2 61:22 65:5,8
  65:20,21 66:10
rapids 13:15
ray 36:4
rays 28:1
reach 26:17 78:21
reached 26:21
  27:3
read 13:22 14:1
  27:16,22 31:13,21
  37:7,18 43:6,9,12
  43:15,19,21,23
  44:3,8,11,19 85:3
  86:12
reading 5:3 9:2
  31:9 66:14
real 54:17
realize 7:22 8:2
really 19:24 64:9
  71:19 82:14
reason 7:16 32:4
  32:20 33:3 50:14
recall 45:20 46:5,8
  46:9 73:11 74:3
  82:5
receipts 59:14
received 51:7
  55:24 84:8
receiving 87:10,11
recess 69:13
record 5:15 8:4,11
  89:8

recorded 89:7
recording 76:18
records 83:21
recover 23:11
recovery 72:7 73:5
recyclables 53:16
recycling 87:15
reed 61:14
referring 72:15
74:22
regarding 20:10
20:22 43:7
region 1:23
registered 1:20
regularly 56:3
rehab 17:12,13,18
17:21,24 18:8,24
19:5 21:11 40:14
40:17,20 49:12
50:11,14,19,20,24
51:19 53:20,20
60:18 63:11,24
64:24 65:11,23
66:1,20 84:16,19
rehabs 65:1
relapsing 50:16
related 6:10
relation 18:6
33:15 49:21 63:3
81:22
relationship 61:18
remember 12:13
13:12,13,17 18:1,2
26:7 32:3 45:9,13
52:13,16 55:18
56:16 82:8,9
rent 59:19,23 60:4
rental 47:20
repeat 8:21
rephrase 6:16
44:17

report 43:12,15,21
43:23 44:8 86:10
reporter 1:20 7:6
8:10
reports 13:22
15:18 27:16,20
28:20 34:2 37:7
37:18 43:6,9 44:3
44:19 75:21
represent 5:18
79:5
request 4:7
requested 89:9
rescue 23:4 24:1
rescuer 22:10 23:2
reserved 5:6
reside 47:19
respective 5:3
response 11:16
12:9,13,15 13:1,9
42:22 67:17
restroom 7:13
result 56:1
retired 58:15
returns 70:20
review 76:2 86:10
89:9
reviewed 29:22
rhee 61:13,15
right 6:19 11:7
14:24 19:13 21:3
24:11 32:14 35:14
36:20,21 37:1
39:1 42:4 53:5
54:10 57:3 58:9
58:17,18 63:5,9,18
64:2,22 65:5,6,14
66:6 71:22 75:16
79:9 81:15 82:9
83:14 84:21 88:1

ring 62:6
risk 44:5,12,19
rivera 43:10 82:6
82:7
robert 18:22 25:22
54:19,20
rodriguez 1:7
rogers 14:8 34:18
35:13,16,18
row 56:7
run 10:21 11:13
11:20 12:2,22
27:1,4,10 40:5
42:9,14 51:8,16
52:3 65:17 66:1,5
78:7,9
running 14:19
15:4 16:3 19:15
21:18 22:3 27:7
41:22 65:9

## s

s 2:1 3:8 43:18
sack 9:9,9 71:13
72:16,19
safe 80:19
safety 79:19
santana 1:7 41:11
41:21
save 26:23 44:5,10
44:13,21 45:18
46:11,14,16 82:24
savings 47:6
saw 9:24 14:19
15:6,9 16:3,9,10
20:2,3 28:12
32:11 42:21 48:21
79:24 80:12,13
saying 38:23 45:16
46:10 74:20 88:11
says 30:9 31:22
39:18 41:9 46:18

59:5 62:8 70:12
scanner 9:5,8 10:7
10:9,10
schmidt 24:16,17
24:18 25:2 38:7
80:5,8 81:2,3
school 54:5 55:1,9
62:11
schools 55:12
scraped 33:7
scream 33:19
sealing 5:4
search 83:12,15
second 17:14 47:1
64:16
security 43:16
see 9:21 14:14,22
21:22 27:19,23
37:21 50:10 56:2
57:11 78:19 82:8
seeing 10:3 50:12
seek 84:15
seeking 6:12 55:20
59:6
seen 9:20,21 14:16
26:16 29:8,10,15
29:19 33:6 41:21
72:4 77:7 80:24
81:6
sees 15:1
sending 74:18
sense 6:14 10:5
26:17,22 71:18
75:12 78:2 85:6
sent 69:23 74:16
74:17,20 75:4,14
75:19 83:20
september 89:12
serve 85:9
service 50:4

**services** 70:11,13
**session** 6:5
**set** 18:5
**shackle** 78:2
**shackled** 46:20
**shackles** 26:14
  78:2,4,5,14,15,18
**shake** 56:5
**shawn** 20:15,16,21
  33:12,15 34:7
**sheets** 29:17
**shepherd** 45:10
  80:5 81:3
**shepherd's** 57:13
  57:14 58:2
**sheriff** 21:19 26:4
  30:15 36:3 76:7
**sheriff's** 5:18 22:3
  23:17 41:2 76:2
**shook** 8:9
**shore** 2:3
**short** 69:12
**shorthand** 89:7
**shortly** 45:10
**shot** 27:24 81:11
  85:3
**shoulders** 6:22
**shoved** 32:19 33:3
  33:8
**show** 29:1 77:23
**showed** 77:22
  79:17,22
**shrug** 6:21
**side** 11:6 25:17
  55:17 86:5
**signature** 89:18
**signed** 48:12
**signing** 5:3
**simo** 43:18,18
**simple** 12:16

**simply** 28:14
**single** 70:23
**situation** 31:12
**six** 59:12 60:11
**sleep** 56:6
**sleeping** 87:17
**slipped** 24:21
**slipping** 35:10
**smoked** 64:15
**snuck** 50:15
**solutions** 1:22
**somebody** 9:10
  19:11 27:24 31:14
  31:23 32:9,11,12
  37:1 39:4,11
  46:15 50:15 69:2
  71:12 78:3 85:21
**son** 6:6 9:1,22
  10:16,18 11:13
  27:7 31:4 34:8
  37:14 38:12,21
  39:8,14 43:19,24
  44:6,13,21 45:17
  45:21 46:6,12
  50:24 59:17 78:6
  79:16,20 80:21
  81:22 82:12 83:16
  83:23
**son's** 30:19 37:13
  56:1
**sorry** 12:14 15:16
  16:12 17:14 22:22
  26:24 32:3 38:1
  52:16 54:2,20
  55:7 57:24 58:10
  74:9,13 75:8
  81:21,23 82:2,3
  86:20
**sort** 18:7 48:23
**source** 9:3

**space** 65:4
**span** 63:4
**speak** 35:2
**speaking** 10:8
  45:9 73:12
**special** 69:10
**specialty** 49:13,18
**specific** 59:17
  75:19 79:13
**specifically** 15:10
  30:14 43:1 72:18
**spell** 61:16
**spirits** 34:23 36:2
**spoke** 16:2 23:20
  24:10,19 35:2
  56:2 73:10
**spoken** 14:4,7 22:2
  34:15
**spotted** 80:1
**standing** 79:24
  80:6 89:4
**start** 78:13
**started** 28:4 57:4
  58:4 62:13,19
**starts** 29:7
**state** 5:14 31:12
  71:6
**statement** 85:4
**statements** 75:21
  85:6
**states** 1:1
**station** 24:20
**status** 30:12
**stayed** 66:6
**staying** 17:4,6
**stays** 53:24
**stick** 64:17
**stipulated** 5:1
**stipulations** 4:11
**stolen** 87:10,11

**stone** 34:19 35:2,3
  35:21 36:2 78:12
**stood** 36:21
**stop** 56:6
**stopped** 9:6 44:9
**stories** 10:2
**straight** 37:5
**street** 1:17,23 2:10
  2:16 14:16
**struck** 87:7
**struggling** 62:20
  64:10
**stuff** 18:17 20:5
  54:21 71:17
**successfully** 40:8
**suicidal** 45:21
**suicide** 69:6
**suit** 26:6 38:19
**suite** 1:17,23 2:4
  2:10,16
**supervision** 89:7
**support** 4:1 41:14
  56:4 59:18,20
**supposed** 18:10
  26:13 31:10,14,23
  32:12 37:1
**sure** 6:3,24 15:20
  41:22 48:13 53:4
  56:14 58:11 63:6
  68:9,19 69:8
  74:12 80:11
**sustain** 38:19
**swim** 28:7
**sworn** 5:9 89:5

**t**

**t** 3:8 89:1,1
**table** 85:18,19,21
  85:22
**tackle** 16:6
**tackled** 14:16 15:5

take   6:23 7:6,18
  17:16 42:8 45:24
  50:16 56:9 69:3,5
  69:12 71:7 78:12
taken   5:21 32:23
  34:13 61:5 69:13
  89:5
talk   6:14 7:9,19
  24:13 45:23 58:4
  85:10
talked   22:5,7,8
  26:12 32:22 34:18
  35:14 37:2 55:3
  58:13 71:20 72:10
  73:3,15,16 76:6
  86:13
talking   9:2 15:10
  15:21 29:24 32:8
  35:11 36:22 46:9
  68:21 69:4 76:19
  77:20 82:9
talks   62:7 64:18
tase   9:21 26:13
  31:10,14,23 82:23
tased   10:4 26:22
  28:10 32:19 33:10
  41:10 42:20 46:19
  81:9 83:3 85:12
  85:13,21 86:1,1,4
taser   25:11 27:21
  32:12 38:15 41:15
  86:2
tasered   25:13
  28:16 33:3 41:18
  42:3,21 43:3,13,20
  43:24
tasers   16:10 19:17
  20:3 22:19,19
  27:24 28:1,2,4,5,8
  28:10 31:17 38:16
  81:12 85:3,7,17,20

tasing   26:24 32:16
  74:5
tax   70:20
tech   54:24 62:15
  62:16
telephonic   74:7
tell   11:13 12:5
  20:1,21 24:18
  34:7 35:18 36:5
  38:4 40:14 55:23
  59:13 69:11 76:23
  89:6
telling   13:13 33:20
  34:21 45:20 46:5
  68:20
temp   50:4,7 70:10
  70:13
tempforce   70:12
temps   70:18
ten   57:9
term   61:18
terms   6:15 21:15
  21:18 27:12,13
  34:12 36:9 43:1
  46:24 47:1 48:7
terribly   7:14
terrified   13:14,16
  40:10,11
testified   5:10
  87:19
testify   86:11
testifying   86:17
testimony   3:3 89:5
  89:6,8
text   74:19
texting   75:1
thank   86:22 88:14
thanked   44:23
  45:3,18 82:20
thankful   46:15

thanks   46:11
theft   52:15,15,17
  87:9,12
theories   32:6
theory   28:15
  42:19 86:3
thereof   89:10
thing   7:2 8:7 13:12
  20:23 27:22,24
  35:19 36:17 40:8
  72:9 77:23 78:2
  85:1,8
things   12:10 24:11
  26:5 29:21 31:10
  32:6 69:24 70:14
  72:14,16 74:16
  87:17
think   7:14 8:18
  23:23 37:14 41:13
  41:15,18 42:13
  43:5 45:6 48:20
  52:13,14 53:2,16
  55:15 57:3,19
  58:9 60:12 65:10
  69:19 70:24 71:7
  71:21,23 72:15
  74:14 75:3 76:6
  79:12 80:4 83:21
  84:22
thought   45:21
  48:21 53:19 68:23
  69:16,17 70:5
  74:9,18
three   11:6 27:4
  28:9 33:5,8 36:22
  44:9 51:3 53:23
  53:24 54:11 60:16
  65:3
till   44:9
time   5:7 6:13 7:7
  7:11 15:15 17:8

  18:11,23 19:7
  40:9 45:15,19
  48:5 49:10 52:20
  54:11 55:8 59:24
  60:7 61:7 62:2,21
  63:1,4,19,23 64:5
  65:22 68:7 70:17
  71:2 72:9 75:13
  76:9 78:18 84:5,8
  89:5
times   9:22 10:21
  26:21 27:4 30:9
  41:10,19 44:9
  52:4 53:3,23 57:9
  66:1
today   82:4 86:11
  86:17
told   12:1,9,13 13:3
  16:3 22:10 26:13
  30:4 33:13 36:2
  36:14 37:2,3,10,23
  38:6,8 39:5,7
  40:10 45:23 46:3
  46:4,5,6 50:18
  62:4 64:19 67:10
  67:12 71:11 73:9
  73:10 76:11 79:24
  80:3,12,23 81:1,5
tomorrow   82:7
tons   37:12
top   33:10 73:8
total   59:10
touch   57:13,14
  58:2
tragic   81:22
transcribed   89:7
transcript   89:9
transcription   89:8
transmissions
  71:12

**transported** 77:3
**treat** 84:2
**treated** 84:4
**treating** 84:5
**treatment** 34:15
51:7 54:9 57:6
84:9,12,15
**trespassing** 52:11
52:12
**trial** 5:7
**trick** 6:9
**tried** 35:15 46:14
46:15 65:17 66:9
66:14 69:5
**trouble** 37:12
49:15 65:7
**trout** 73:2
**true** 30:2 89:8,12
**truly** 86:20
**truth** 89:6,6,6
**try** 7:9 8:21 34:10
44:5,13,20 46:11
65:1,4,15 69:6
**trying** 6:9 26:7
32:6 40:3 45:18
50:14 55:19 65:12
67:11,12 70:24
74:14 75:6 85:10
**turn** 29:22 30:8
75:6,7
**tv** 6:9 35:21 41:21
77:10,13
**twice** 85:22
**two** 2:4 7:15 18:2
28:1,7,10 35:14
36:19 48:11 49:23
49:24 51:16 55:12
56:24 59:8 61:20
63:5 66:3 73:15
80:5 81:11 82:19
83:7,22 85:3,5,14

85:20

**u**

**unconscious** 46:19
**understand** 6:16
10:1 33:5 37:4
39:13 48:13 74:14
82:13
**unintentional** 69:5
**unit** 69:10
**united** 1:1
**unlawful** 87:9,12
**ups** 87:1
**urine** 64:1,7
**use** 6:15,15 7:12
40:15 65:10
**usually** 30:24

**v**

**v** 1:6
**vazquez** 56:16
**verbal** 6:18,24 7:1
8:8
**veritext** 1:22
**victory** 58:8,11,13
58:15,16,23 59:1
**video** 9:21 10:3
21:22 26:16,20
41:22 76:6 77:7
77:20 79:17 82:15
85:20
**videos** 26:10
**view** 31:8
**violation** 21:12
**vo** 54:24 62:15,16
**vodka** 67:3,20,22
**voice** 72:22,22,23
76:13,16
**volunteer** 24:2

**w**

**w** 20:18
**wait** 15:14 82:1
**waited** 79:18
**waived** 5:5
**walk** 63:8
**wallet** 20:6
**want** 6:9,16 7:19
12:18 15:20 17:7
17:9 19:4 29:20
30:14 34:23 35:19
36:6,7 50:16 61:1
61:2,2,2,3,23 62:1
66:11 76:22 86:14
**wanted** 17:12 35:5
46:10 60:15,23,23
62:11,11 65:5,6
67:6 69:17 70:1
**wanting** 68:22
**wants** 68:20,24
**warner** 2:15
**watch** 26:10,20
46:3
**watched** 26:20
44:8 78:13
**watching** 10:3
35:21 85:20
**water** 13:15 22:16
23:10,11,22 25:3
39:19,21 46:14
80:7,9,14 81:7
82:17,20,24 83:8
86:1,2,4
**way** 7:24 33:5
69:20 72:10 78:16
83:13 87:21
**we've** 65:3
**week** 19:2 45:17
65:11 66:8,21
70:18,19

**weekend** 65:9
83:22
**weeks** 35:4,14
56:7
**wellspan** 56:15
**went** 9:6,12 20:4
23:10 27:13 38:5
38:7,12,14 39:3,14
39:21 40:14 41:23
44:4,7 46:13,14
51:11 57:13,19
59:7 62:2,15
63:20 77:13 79:12
79:16 80:7,9,21
81:1,7 82:24 83:7
83:7,21 84:10
87:16
**west** 1:17,17 2:10
2:10
**whatsoever** 9:3
27:14 38:11 39:14
46:22 72:5 81:19
**white** 51:8,16 52:1
52:3 65:17 66:5,9
**whitman** 14:11
16:13,15
**wife** 60:23
**wished** 85:11
**witness** 15:16,23
21:20,23 22:3,14
23:6,9,16,21 38:1
38:12 74:9 75:6
86:22 88:17
**witnessed** 19:15
20:12,21 21:6
22:6,18 25:3
33:23
**witnesses** 28:12
41:14
**witnessing** 16:17
19:20

| | |
|---|---|
| **woods** 28:8 80:1 85:19 | **yelling** 87:19,23 |
| **word** 65:10 | **young** 6:19 54:17 |
| **wording** 29:24 | **younger** 54:15 |
| **words** 35:5,7 38:22 | |
| **work** 24:5,11 60:8 70:2 | |
| **worked** 24:2,7 25:5,9,19 50:4 70:3 78:2,16 | |
| **working** 40:16 47:11 49:9 55:15 59:22 70:10 | |
| **works** 23:4 47:24 | |
| **worse** 57:10 | |
| **worst** 72:6 | |
| **written** 73:18 | |
| **wrong** 15:13 | |
| **wrote** 31:18 32:10 73:21 74:3,13 | |

**x**

**x** 3:1,8 28:1 36:4

**y**

**yeah** 21:4 27:3
29:15 32:16 36:7
37:16,23 39:16
42:4 44:7 45:12
45:15 47:6 49:3,7
52:3,22 55:11
57:8 58:23 59:22
62:23 63:10 64:8
67:19 73:5,20
84:4
**year** 11:2 49:23
56:21 63:2 70:23
**years** 56:24 60:7
60:20 61:20 62:24
63:6 85:5,14

Commonwealth of Pennsylvania Rules of Civil

Procedure

Title 231, Chapter 4000

Depositions and Discovery

Rule 4017


(c) When the testimony is fully transcribed a copy
of the deposition with the original signature page
shall be submitted to the witness for inspection
and signing and shall be read to or by the witness
and shall be signed by the witness, unless the
inspection, reading and signing are waived by the
witness and by all parties who attended the taking
of the deposition, or the witness is ill or cannot
be found or refuses to sign. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the person before
whom it was taken with a statement of the reasons
given by the witness for making the changes. If the
deposition is not signed by the witness within
thirty days of its submission to the witness, the
person before whom the deposition was taken shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the refusal to sign together with the reason, if

any, given therefor; and the deposition may then be
used as fully as though signed, unless the court
holds that the reasons given for the refusal to
sign require rejection of the deposition in whole
or in part.


DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.