Lancaster County Sheriff's Office

# Internal Review

In-custody Death, 14 April 2018

LC 0117

# CONTENTS

Purpose and Scope of the Review…………………………………Page 2

Brief Description of the Incident………………………………..Page 2

Persons Involved in the Incident……………………………….Page 3

Detail of the Incident……………………………………………Page 7

    Interview of Deputy Barbara Rodriguez-Santana……………..Page 8

    Synopsis of Ephrata Community Hospital
        Surveillance Video………………………………Page 16

    Interview of Deputy David Cole…………………………....Page 22

    Interview of Sergeant David Bolton and his Critique…………Page 23

    Review of Lancaster County-Wide Communications Audio…Page 26

Review of Applicable Law, Policy and Procedures…………………Page 27

Sources………………………………………………………Page 35

Conclusions/Recommendations………………………………...Page 36

LC 0118

07 May 2018

## *Purpose and Scope of the Review*

On 17 April 2018, you, Sheriff Christopher R. Leppler, tasked me, Lieutenant Marc J. Shaffer, with conducting an internal review for an in-custody death that occurred on 14 April 2018.  The purpose of the review is to determine if the conduct and actions taken by Lancaster County Sheriff's Office employees involved in the incident comported with current Sheriff's Office policy, procedure and protocol.  The scope of the review is limited to the Sheriff's Office employees who were involved in the incident, and their actions immediately before, during and after the incident.  This is not a criminal investigation, and the information derived from this review is not to be disseminated beyond the Sheriff's Office without your approval.

## *Brief Description of the Incident*

At about 1838 hours on Saturday, 14 April 2018, Deputy Barbara Rodriguez-Santana responded to the Ephrata Community Hospital Emergency Department to assume custody of and transport a male prisoner to the Lancaster County Prison.  The male, Andrew Good, had an outstanding Lancaster County bench warrant for his arrest.  After Deputy Rodriguez-Santana assumed custody of Good, she escorted him to her Sheriff's Office vehicle so she could transport him to prison.  Despite the efforts of Deputy Rodriguez-Santana, Good violently resisted her and subsequently escaped from Rodriguez-Santana before she could place him in her vehicle.  The leg restraints on Good failed as he fled on foot.  Good was handcuffed with a waist chain when he fled.  In his continuing attempts to flee from pursuing law enforcement officers, Andrew Good drowned in the Cocalico Creek.

LC 0119

## Persons Involved in the Incident

<u>Andrew Davis GOOD.</u>  Good was a 24-year-old, white male.  His date of birth was 06 February 1994.  His date of death was 14 April 2018.  His last known address was 9 North 9th Street, Akron, PA.  Good was about 5'9" tall, and weighed approximately 180 pounds.

According to Good's criminal history, he was first charged with a criminal offense when he was 15 years old when, on 06 October 2009, he was arrested by the Lititz Borough Police and charged with Possession of a Weapon on School Property.  He was subsequently not adjudicated delinquent on the charge.  As a juvenile, Good's criminal record included charges for:

> False Identification to Law Enforcement Authorities, Burglary, Criminal Conspiracy, Theft by Unlawful Taking and Criminal Mischief.

As an adult, Good's criminal record was comprised of many different criminal charges, some of which he was charged with more than once for different criminal conduct/activities.  The charges included:

> Criminal Trespass, Corruption of Minors, Criminal Mischief, Burglary, Criminal Conspiracy, Possession of Drug Paraphernalia, Disorderly Conduct, Aggravated Assault, Resisting Arrest, False Identification to Law Enforcement, Fleeing or Attempting to Elude Police, Theft by Unlawful Taking, Receiving Stolen Property, Driving without a License, Driving while Operating Privilege is Suspended or Revoked, Duties at Stop Signs, Driving Vehicle at Safe Speed, Reckless Driving, Operating Vehicle without Valid Inspection and a violation of a skateboarding ordinance.

On the date of the incident, Good had an outstanding Lancaster County bench warrant for probation and parole violations for three different criminal actions (dockets).  The supervising agency was Lancaster County Adult Probation and Parole Services, and his probation officer was Tamra Boyd.  The violations were caused by Good's failure to abide by the terms of his supervision, in that he had absconded from his commitment at White Deer Run Cove Forge drug treatment facility and his whereabouts were unknown.  Good had been committed to White Deer Run on 27 March 2018, upon his release from Lancaster County Prison.  He absconded from the facility sometime over the weekend of 30 March 2018.  On 02 April 2018, Probation Officer Boyd was notified by White Deer Run that Good had absconded from their facility, and the bench warrant was issued on 09 April 2018.  The charges, criminal docket and OTN numbers (in parentheses) for which Good was on parole/probation on the date of the incident:

> Burglary, Criminal Conspiracy CP-36-CR-472-2014 (T4133662) parole violation,
>
> Simple Assault, Resisting Arrest CP-36-CR-4038-2017 (T9542190) parole violation, and
>
> False Identification to Law Enforcement CP-36-CR-5179-2017 (T9484775) probation violation.

According to Boyd, Good had four prior parole violations on docket 472-2014, the Burglary and Criminal Conspiracy charges.

On the night of the incident, Ephrata Borough Police Officers related that Good was well known to both them and officers of the Akron Borough Police Department, as they had, on many occasions, arrested and charged him. The officers stated that Good had repeatedly run from them and violently resisted arrest. On one occasion, he was charged with Aggravated Assault after he had punched an officer.

Pennsylvania Department of Transportation records indicated that Good had a Pennsylvania State Photo Identification Card. At the time of the incident, his driving privilege was suspended.


Barbara RODRIGUEZ-SANTANA.  Rodriguez-Santana is a 26-year-old, white female of Hispanic ethnicity. Her date of birth is 03 June 1991. She is currently employed as a deputy with the Lancaster County Sheriff's Office. Rodriguez-Santana is about 5'5" tall and weighs approximately 208 pounds. She speaks fluent Spanish and English.

Rodriguez-Santana attended YTI Career Institute from November of 2012, to August of 2014. She majored in Criminal Justice and graduated with an Associates Degree. She was subsequently employed by the Dauphin County Sheriff's Office in October of 2014, as a deputy sheriff. She then attended the Sheriff's Academy and obtained her Act 2 certificate.

In 2016, Rodriguez-Santana discontinued her employment with the Dauphin County Sheriff's Office, and on 08 February 2016, she began employment with the Lancaster County Sheriff's Office, as a deputy sheriff.

Immediately after the start of her employment with the Lancaster County Sheriff's Office, Rodriguez-Santana received training for: use of force, the use of oleoresin capsicum spray, the use of an X2 Taser Conducted Electrical Weapon (CEW), firearms to include her duty pistol and shotgun, first aid, cardio pulmonary resuscitation (CPR), automated external defibrillator (AED), the use of Narcan and court security – to include the use of temporary restraints (handcuffs, chain belts and leg shackles). She has maintained her good standing as deputy sheriff with the Commonwealth of Pennsylvania with completion of the required, bi-annual, in-service, update training. Since her initial training, Rodriguez-Santana has successfully completed update training/qualification for each discipline, as required. At the time of the incident she was up to date on all her required training.

Of particular note: Rodriguez-Santana passed her Court Security Practical Test on 29 February 2016, at which time she acceptably demonstrated her skill with the use and application of handcuffs, chain belts and leg shackles. She received her latest use of force training on 24 January 2018. She completed her most recent annual Taser CEW recertification on 27 July 2017. She achieved a score of 100% on her written exam and satisfactorily demonstrated her ability to use and deploy the device. Her training records are up to date.

LC 0121

Since the start of her employment with the Lancaster County Sheriff's Office, Deputy Rodriguez-Santana has become proficient in the performance of her duties of: courtroom security, security post/screening, the service of civil process, the service of court of common pleas bench warrants, prisoner transportation, managing the deployment of deputies for court security when assigned as a desk deputy, clerical/office duties including processing Pennsylvania Licenses to Carry Firearms and Duty Deputy functions.

Between the time Deputy Rodriguez-Santana began her employment with the Lancaster County Sheriff's Office in February of 2016, and the date of this incident, she worked a total of eleven (11) Duty Deputy assignments (weeks). She assumed custody of 92 defendants and transported them to the Lancaster County Prison. She safely transported all 92 defendants to Lancaster County Prison. Not one of the 92 defendants escaped the custody of Rodriguez-Santana.

Since she began her employment with the Lancaster County Sheriff's Office, Deputy Rodriguez-Santana has received three Performance Evaluations. According to these evaluations, her work performance has steadily improved over the past two years. She has received a rating of "ME," meets expectations, on each evaluation. She has received higher marks for her quality of work, relationship with people, dependability and quantity of work. She was praised for her willingness to use her bilingual abilities to assist the Sheriff's Office and the public.

On 01 February 2018, Deputy Rodriguez-Santana was admonished by sergeants for complaining to a sergeant about a duty assignment. At the same time, she was advised that fellow deputies perceived that she was lazy and complained about daily assignments. Sergeants told Deputy Rodriguez-Santana that this type of behavior should not continue. Later in the day on 01 February 2018, Deputy Rodriguez-Santana sent an email to the sergeants regarding the earlier admonishment. In her email, Deputy Rodriguez-Santana explained that she strongly disagreed with the assertion that she was lazy, and defended her work ethic.

On 06 March 2018, Deputy Rodriguez-Santana received a counseling statement for "Falling asleep in a courtroom, sitting during a criminal trial." The counseling statement intimated that the complaints of Deputy Rodriguez-Santana sleeping were unsubstantiated. She was advised to remain standing when providing courtroom security during criminal trials.

I interviewed Deputy Rodriguez-Santana, and the interview is detailed later in this review.


The following persons had an indirect or assistive role in the incident. I interviewed Deputy David Cole and Sergeant David Bolton. Their interviews are detailed later in this review. I did not interview the listed police officers of Akron Borough or Ephrata Borough, nor did I interview anyone from Ephrata Community Hospital.

David Cole. Cole is employed by the County of Lancaster, PA, as a deputy sheriff. Cole holds the rank of Deputy with the Lancaster County Sheriff's Office. He is assigned as a K-9 deputy.

LC 0122

<u>David Bolton.</u>  Bolton is employed by the County of Lancaster, PA, as a deputy sheriff.  Bolton holds the rank of Sergeant with the Lancaster County Sheriff's Office.  He is assigned as a K-9 sergeant and training sergeant.

<u>Gregory Stone and Mitchell Rogers.</u>  Stone and Rogers are employed by the Borough of Akron, PA, as  police officers.  Stone holds the rank of Sergeant and Rogers holds the rank of officer.

<u>William Harvey.</u>  Harvey is employed by the Borough of Ephrata, PA, as the Chief of Police.

<u>Daniel Albaugh, Eric Schmitt, Bryce Davis, Beth Rivera, Scott Martin, John Herneisen, Brian Dell Isola, Christopher McKim, Philip Snavely, Matthew Lucky and Marco Rodriguez-Muriel.</u>  All of these individuals are employed by the Borough of Ephrata, PA, as police officers.

LC 0123

## *Details of the Incident*

The Lancaster County Sheriff's Office is responsible for the service of bench warrants issued by the Court of Common Pleas of Lancaster County. Outside of normal business hours, deputies are assigned to serve these warrants. These "Duty Deputies" are responsible for communicating with the initial arresting law enforcement agency, assuming custody of the defendant from the arresting law enforcement agency, the transportation of the defendant to Lancaster County Prison and the completion of documentation associated with the service of the warrants. This Duty Deputy assignment is a week-long assignment that begins on Monday and ends on Sunday. During the week, the Duty Deputy assignment is broken into two shifts. One deputy is assigned per shift. The shift for the first deputy starts at 0001 hours and ends at 0800 hours. The second deputy begins their shift at 1600 hours and it ends at 2400 hours. The weekend is also broken into two shifts, however they are of longer duration. On Friday night, the deputy who begins their shift at 0001 hours, ends their shift at 1200 hours Saturday. The second deputy then begins their shift at 1200 hours Saturday, and ends their shift at 2400 hours Saturday night. This weekend schedule is repeated for Sunday, and then a new Duty Deputy shift begins on Sunday at 0100 hours and continues on Monday at 1600 hours.

Earlier in the day on 14 April 2018, Akron Borough and Ephrata Borough Police Officers arrested Andrew Good on an outstanding Lancaster County Bench Warrant. According to the Lancaster County-Wide Communications (LCWC) incident detail for the incident, the warrant arrest incident began at approximately 1630 hours 14 April 2018. The LCWC event number for the incident was 1804-017136, and Akron Borough Police Officer Mitchell Rogers was the primary officer responsible for the event. The arrest occurred in Akron Borough, and incident detail comments indicate that officers used two CEW ("Taser") deployments in their efforts to take Good into custody. Good was subsequently transported to Ephrata Community Hospital for treatment for injuries sustained during his arrest. It was after this violent confrontation with police, and when Good was receiving treatment at the hospital, that police officers called LCWC to request that the Lancaster County Sheriff's Office Duty Deputy respond and take custody of Good.

Deputy Rodriguez-Santana was working the 1200 to 2400 hour, Saturday, Duty Deputy shift when she responded to the Ephrata Community Hospital to assume custody of Andrew Good. The details of the incident were obtained through an interview of Deputy Rodriguez-Santana, review of the recorded surveillance video obtained from the Ephrata Community Hospital and reports obtained from Lancaster County Detectives. I also interviewed Deputy David Cole and Sergeant David Bolton. Their involvement was limited to duties associated with the search for Andrew Good, subsequent to his escape from the custody of Deputy Rodriguez-Santana. Sgt. Bolton, who is the Training Sergeant for the Lancaster County Sheriff's Office, also provided information and opinion related to the use of force, and procedures employed by Deputy Rodriguez-Santana. Several Ephrata Borough Police Officers provided details and background information to me on the night of the incident. Much, if not all of that information was confirmed by the additional listed sources.

At the time of the incident, on 14 April 2018, I responded to the Ephrata Community Hospital, the location of Sergeant Bolton, Deputy Cole and Deputy Rodriguez-Santana.  I arrived at the hospital at about 2200 hours and met with Bolton, Cole and Rodriguez-Santana in the southeast parking lot of the hospital.  Deputy Rodriguez-Santana was in the front seat of Sergeant Bolton's vehicle.  Prior to my arrival, I had spoken with Sergeant Bolton by telephone, and told him that Deputy Rodriguez-Santana should be sequestered in his vehicle until she could speak with investigators.  I checked on the well-being of Rodriguez-Santana and then spoke with Sgt. Bolton and Deputy Cole.  As I was speaking with deputies and officers, we were approached by Chief William Harvey of the Ephrata Borough Police Department.

Chief Harvey told us that he had spoken with Chief Lancaster County Detective Kent Switzer, and it was decided that we should all proceed to the Ephrata Borough Police Department to follow up on the investigation of the incident.  At about 2240 hours we arrived at the Ephrata Borough Police Department.  Sheriff Christopher Leppler had already arrived, and arrangements were made to have other deputies assigned to cover the duties of Deputy Rodriguez-Santana.  Sheriff Leppler checked on the well-being of Deputy Rodriguez-Santana and it was subsequently decided that, after she had spoken with investigators, she would be placed on paid administrative leave, pending the outcome of the investigations of the incident.  Deputy Rodriguez-Santana was effectively relieved of duty after she spoke with Lancaster County Detectives the night of 14-15 April 2018.  She was officially placed on leave on Monday, 16 April 2018.

Interview of Deputy Barbara Rodriguez-Santana.

At about 1505 hours, Friday, 20 April 2018, Chief Deputy Christopher Riggs accompanied Deputy Barbara Rodriguez-Santana into the Criminal Division Office.  I approached both of them in the main office area where we all greeted each other.  I then invited Deputy Rodriguez-Santana to my office, which is located within the Criminal Division Office.  After we entered my office, I closed the door.  The blinds on my office windows remained open, permitting people to view us from the main area of the Criminal Division Office.  Deputy Rodriguez-Santana and I were the only people in my office.  I sat in a chair at my desk and she sat in a chair to the right of my desk.  Deputy Rodriguez-Santana was dressed in casual street clothes, not in a uniform, as she was off duty and on paid administrative leave.

Throughout our conversation, Deputy Rodriguez-Santana exhibited a calm demeanor.  She appeared at ease and confident.  She did not hesitate when providing her account, nor when responding to my questions and requests for occasional clarification.  She spoke in a direct, matter-of-fact manner.

I began my interview of Deputy Rodriguez-Santana at about 1510 hours 20 April 2018.  I asked her to recount to me the details of her work day on 14 April 2018, beginning with the first call she received while on duty.  I detailed her account below, and attempted to represent the same verbiage and manner in which Deputy Rodriguez-Santana spoke as she related the details to me.  As we spoke about the details of the incident, we often referred to an Internet, Google Earth satellite view of the Ephrata Community Hospital and surrounding area.

Deputy Rodriguez-Santana provided the following account:

At about 1646 hours I received a telephone call on my Duty Deputy cellular telephone from County (LCWC) for a male named "Ricardo" who had an outstanding bench warrant. Ricardo was in the custody of the Ephrata Borough Police, and the original charge was for Possession of a Small Amount of Marijuana. I received the call while I was at home. I telephoned the Ephrata Borough Police Department and spoke with Sergeant Cook who informed me that there were no additional charges for the defendant, and he was ready to be picked up. I finished eating dinner and put on my uniform. I then got my paperwork ready, printed the defendant's warrant to the Lancaster County Prison (LCP) and started my Deputy Daily Log. My LCWC unit name was 12-52 and I was driving Sheriff's Office vehicle number 12-24. This was my first call of the evening and I left my residence about 40 minutes after I received the initial telephone call from County Radio. I drove directly to Ephrata from my residence.

When I arrived at the Ephrata Borough Police Station, I pulled my vehicle into an open garage bay at the rear of the police station. After I got out of my vehicle, I locked my gun in a lock box inside of the garage. I knocked on the interior door, and after about three or four minutes, a male Ephrata Police Officer walked out to the garage. Because the garage door was open, I assumed that they knew I had arrived, but evidently, that was not the case. I accompanied the Ephrata Officer into the holding cell area of the police station and the officer brought Ricardo out from his holding cell. Ricardo was identified as Ricardo Lopez.

I patted down Lopez and did not find him in possession of any property. The Ephrata Officer gave me a bag containing a hair tie that belonged to Lopez. Lopez told me that he had the hair tie for four years. After I patted down Lopez, I put a chain belt, handcuffs and leg shackles on him. I double-locked the handcuffs and leg shackles. The Ephrata Police Officer then led the way out to the garage where my vehicle was parked. I held onto the back of the chain belt that I had placed on Lopez as I escorted him to my vehicle. Lopez was nice, respectful and cooperative. I placed Lopez in the right rear seat of my vehicle and seat belted him. I then retrieved my gun from the lockbox and got back in my vehicle. I backed out of the garage bay and radioed LCWC to inform them that I was on my way to LCP. I provided County with the last three digits of my vehicle's mileage.

I drove Lopez to prison, and I had a conversation with him on the way there. Upon my arrival at LCP, I advised County and provided my mileage. Immediately before the outside gate of the prison opened, I received a telephone call from County Radio. The dispatcher told me that an officer from Akron Borough wanted to speak with me about someone that they had in custody. County transferred me to the Akron Officer. The Akron Officer introduced himself as Officer Rogers and said that they had someone in custody. The telephone call then disconnected, as I lost service because I entered the prison sally port. I turned off my vehicle and Lopez asked me if he could take off his seatbelt. I told him that he could. I then got out of my vehicle and locked up my weapons in a prison lockbox. After I locked up my weapons I got Lopez out of my vehicle and walked him in to commitment. I do not recall who the corrections officer was who

LC 0126

was working in commitment.  I unhooked Lopez and was in commitment for no more than ten minutes.  Lopez caused no problems for me and said, "Nice meeting you," as I left commitment.

After I walked out of commitment, I retrieved my weapons from the lockbox and drove out of the prison.  After I exited the last gate, I stopped in the prison driveway and telephoned County Radio.  I told County that I did not have good reception when they originally transferred me to the Akron Officer.  After I told County I needed to speak with Officer Rogers, I can't recall if they transferred my call to him, or I disconnected with them and he called me back.  I remember that the next time I spoke with Officer Rogers, I was driving on West Orange Street in the area of Marietta Avenue.  I was driving toward home.  Officer Rogers told me that they had a guy for me, and that he was at the Ephrata Hospital.  The prisoner was going to get a CAT Scan and hospital security would call when he was done.  Rogers told me that he could not stay with the prisoner, and I told him that I couldn't stay with him either.  We agreed that hospital security could call when the prisoner was ready to be picked up.  I provided my Duty Deputy cell phone number to Officer Rogers.  After I finished my call with Officer Rogers, I continued to drive toward home.

As I was driving on Marietta Pike, past the West Hempfield Township Police Department, I received a telephone call from County and was told that an Akron Officer wished to speak with me.  I was about 10 or 15 minutes from home when County transferred the call to me from the Akron Officer.  I couldn't recall the name of the officer who I spoke with, but he did introduce himself.  Later, when I arrived at the hospital, I met the officer and now know that it was Sergeant Stone of the Akron Borough Police.  When I spoke on the phone with Sergeant Stone, he told me that he was at the hospital with the guy who had a bench warrant, and that he would be done in ten minutes.  Stone said that he couldn't sit and wait with him.  I told Sergeant Stone that the officer who called me before you said that hospital security was going to call when the prisoner was released.  Stone replied that he couldn't leave until I got there.  I told Sergeant Stone that it would be at least 45 minutes for me to get there (it was now about 1830 hours).  Stone said, Ok, I can't sit here, come get this guy.  Sergeant Stone's attitude was – like an asshole.

After I spoke with Sergeant Stone, I turned around and headed back toward Ephrata.  After about three or four minutes, I called County Radio on the radio and told them that I was on my way to Ephrata Hospital.  I arrived at the Ephrata Community Hospital at about 1907-1910 hours.  I pulled into a parking space, facing south in the first row of the emergency department parking lot.  I was in the easternmost space of the row that was closest to the north side of the building.  I radioed County to let them know that I had arrived.

After I got the gear from the rear of my vehicle, I locked my vehicle.  I walked into the hospital emergency department and met with a nurse who was standing by a counter just inside the door.  There was also a hospital security guard standing at the counter.  The nurse escorted me around the counter to the patient room where the prisoner was located.  The prisoner's name was Andrew Good.  Before we arrived at Good's room, I asked the nurse how long it would be before he was ready to go.  The nurse told me that she would go find out an answer.  As I stood outside

LC 0127

of Good's room, I watched as a doctor walked up to the nurse and told her that Good was handcuffed for the first X-ray, so they would have to do a second X-ray because the handcuff was visible on the first one. I turned toward Good's treatment room and saw that Good and Sergeant Stone were in the room.

Sergeant Stone walked out of the treatment room and approached me. He appeared agitated when he spoke with me. Stone stated, "I can't sit here with him, I have to go and take calls." I told him that I can't sit either because I'm on call for the whole county. I told Sergeant Stone that I would have to call my supervisor. The nurse then told us that we can't leave the prisoner alone, one of us has to stay with him. Stone then said that it's, "Not my bench warrant, I shouldn't have to stay here with him." Sergeant Stone appeared irritated. I tried to use my cell phone to check my email to find out who was the on-call supervisor. Because I was inside of the hospital, my phone's service was slow. I called Deputy DiClemente who told me that Sergeant Breneman was the on-call sergeant. I then telephoned Sergeant Breneman as I walked to the X-ray room with Good. I followed behind Sergeant Stone who was following Good. They were wheeling Good in his hospital bed. Good had on leg shackles and his left hand was handcuffed to the bed. Good was not talking. As we walked, I spoke with Sergeant Breneman. He told me that I would have to stay at the hospital with Good. If I received another call, I would have to explain to that agency that they would have to wait until I finished transporting this prisoner.

After we arrived at the X-ray room, Sergeant Stone removed the handcuff from Good's left wrist. Stone and I waited in a side room as Good was X-rayed. We could not see Good while he was being X-rayed. While we were waiting, Sergeant Stone told me that Good was an asshole. He said that the last time they had to take him to the hospital, officers had to leave prior to him being discharged. When Good was ready to be discharged, the hospital staff could not hold him for the police. When officers later attempted to arrest Good, he assaulted an officer. Stone kept stressing to me that Good was an asshole, and that he didn't want to leave him alone at the hospital before I arrived. When the X-ray technicians said that they were done X-raying Good, I asked Sergeant Stone if he wanted to switch stuff now. I told him that I would put my gear (handcuffs, leg restraints) on so he could leave. Stone said that was fine, and agreed to switch restraints. Stone removed his leg shackles, and I put mine on and double-locked them while Good was still lying on the bed. Good said something I couldn't hear, and Sergeant Stone told him that I was the one who was going to take him to prison. Stone asked Good if he was going to be cool with me and Good said, "I don't hit women."

Before I could place handcuffs on Andrew Good, a nurse said that he needed to use the bathroom. Good got out of bed, and while pushing his IV bag stand, went into the bathroom. The bathroom was in the same room as Sergeant Stone and I were waiting in while Good was being X-rayed. After Good entered the restroom, the nurse closed the restroom door. Stone and I waited outside the restroom, about ten feet away from the restroom door. While we waited for Good, Sergeant Stone again told me that Good was an asshole.

Andrew Good was in the restroom for about two to three minutes. After he came out of the restroom, he walked back to his bed while pushing his IV stand. Good was still shackled, but I

Page **11** of **39**

did not notice how he was walking.  Good got back on the bed and I handcuffed him with his hands in front of him.  The nurse then pushed Good, in his bed, back to his original treatment room.  Sergeant Stone and I followed Good back to his room.

After we arrived back in the treatment room, Good, Sergeant Stone and I remained in the room after the nurse left.  Good and Stone then had a conversation.  During the conversation, Good accused Sergeant Stone of interrogating his 17-year-old sister to find out where he was.  Stone said that it wasn't him.  No one was upset during the conversation, it was just a normal conversation.  It lasted no more than five minutes.  Sergeant Stone then said goodbye and left the treatment room and hospital.

After Sergeant Stone left the hospital, I remained in the room with Andrew Good.  Good was still handcuffed with his hands in front of him.  Good asked me if I would change his handcuffs so that he was handcuffed with one hand to the bedrail.  I changed Good's handcuffs so that only his left hand was handcuffed to the bedrail.  Good had scratches and bruises to his shoulders, hands and face.  He was not wearing a shirt.

I stood at the foot of Good's bed, about four or five feet away from the bed.  As I was waiting, I noticed that Good was staring at my duty belt.  Good continued to stare for a few seconds and it made me uncomfortable.  To make him stop staring, I moved and sat in a chair along the right side of Good's bed.  I told Good that he looked familiar and I asked him if I had picked him up before.  Good replied, no, that maybe I recognized him from the prison because he's in and out all the time.

I waited for about five or ten minutes and the nurse walked into the room with discharge papers.  A doctor also walked in and told Good that he had no fractures and he was cleared to go.  Andrew Good asked the doctor if they could provide medicine for his pain.  The doctor told him that he only had swelling and he should be fine with Advil, and that they could wrap his wrist.  The nurse then asked me if it would be ok to wrap Good's wrist.  I told the nurse it would be ok as long as I could handcuff him after it was wrapped.  The nurse told Good that she would remove his IV and then wrap his wrist.  Good then started to take his IV out and the nurse stopped him.  She told him he was going to make a mess.  The nurse then took out Good's IV.  I took the handcuff off of Good's left wrist so that the nurse could wrap it because of his pain.  After the nurse wrapped Good's wrist, she told me that she was done.  I asked her if Good had a shirt and Good told me that he did not have one.  Good asked the nurse for a paper shirt, and she said no.  Both the nurse and I told Good that the weather was nice and he wouldn't need one.

The nurse finished wrapping Good's wrist and I told him to stand up and face away.  Good stood up and faced away from me.  He placed his hands behind his back while he complained about being handcuffed behind his back.  I told Good that I going to handcuff him up front.  I told him to just turn around and face away from me.  Good then turned around and moved his hands in front of him.  As I was putting the chain belt on, Good tried to turn and look at me.  I told Good to turn and face away from me.  Good complied.  After I put the chain belt on Good, I placed the handcuffs through the large link in the belt.  I then spun the chain belt around the left side of

Page **12** of **39**

Good while holding the handcuffs.  While Good kept his hands in front of him, I put the handcuffs on his right wrist first, and then his left wrist.  I made sure that the tightness was ok, and then double locked them.

*At this time, Deputy Rodriguez-Santana and I ended our conversation for the day.  It was 1640 hours, Friday, 20 April 2018.  I escorted Deputy Rodriguez-Santana out of the courthouse, and we made arrangements to continue the interview at 0900 hours, Monday, 23 April 2018, in my office.

At about 0900 hours, Monday, 23 April 2018, I met Deputy Barbara Rodriguez-Santana inside the front entrance of the courthouse and accompanied her to my office within the Criminal Division Office.  As on 20 April, after we entered my office, I closed the door.  The blinds on my office windows remained open, permitting people to view us from the main area of the Criminal Division Office.  Deputy Rodriguez-Santana and I were the only people in my office.  I sat in a chair at my desk and she sat in a chair to the right of my desk.  Deputy Rodriguez-Santana was dressed in casual street clothes, not in a uniform, as she was off duty and on paid administrative leave.

Deputy Rodriguez-Santana continued to exhibited a calm demeanor as she continued to recount the detail of 14 April 2018.  She appeared at ease and confident.  As we spoke, she did not hesitate when providing her account, nor when responding to my questions and requests for occasional clarification.  She spoke in a direct, matter-of-fact manner.

I began my continued interview of Deputy Rodriguez-Santana at about 0905 hours 24 April 2018.  I asked her to pick up where she left off with her account of the details of her work day on 14 April 2018.  As on 20 April 2018, I detailed her account below, and attempted to represent the same verbiage and manner in which Deputy Rodriguez-Santana spoke as she related the details to me.

Deputy Rodriguez continued with her account:

At the end of the evening, I remembered that I had forgot to pat down Andrew Good.

After I had placed handcuffs on Good, I told him that it was time to leave.  The nurse was in the room as I handcuffed Good and walked out of the room ahead of us.  She led us to the door of the emergency room and went back to her duties as we walked out of the hospital.  I held onto Good's chain belt with my left hand and walked along his right side as we walked out of the hospital.  We walked down the sidewalk to my vehicle.  I noticed that Good was walking quickly and keeping pace with me, or actually walking faster than me.  I thought this was odd, because most prisoners walk slowly when shackled.  I looked down at Good's feet at one point to see how he managed to walk so quickly.

I held Good's discharge papers in my right hand as we walked up to the passenger side of my vehicle.  The doors were locked.  My vehicle was vehicle number 12-24.  I told Good to stand close to the rear fender behind the rear door as I unlocked the front door.  I had to use a key to

unlock the front door so I could unlock the rear door.  There was no fob for the vehicle.  I had to release my hold on Good so I could unlock and open the doors of my vehicle.  I was not able to hold onto Good and unlock the door.  After I unlocked the front door, opened it and then unlocked the right rear door, I saw that Good had moved forward and was standing by the back edge of the rear door.  I could not open the door without hitting Good with the door.  I grabbed hold of the right rear door handle to open it and placed my other hand on Good's chest to move him back.  I gently pushed on Good's chest to move him back.  I don't recall if I directed him to move back.  When I pushed Good back, he asked, "Why are you touching me?  Don't touch me."  After Good moved back from the door, I opened it, pointed to the rear seat, and told him to get inside the car.

Good did not get in the car.  He leaned his back against my vehicle and said that he needed to get fresh air.  I told him to get in the car and I would roll down the window for him.  Good started begging, please, I'm gonna be gone for a while, I just want to get some fresh air.  At this time, I glanced back at the security office to see if there was anyone around.  I didn't see anyone.  I did this because Good was not giving me any indication that he was going to cooperate and he was not getting into my vehicle.  I also called for assistance over my radio.  When I called for help, Good asked me why I was calling for more people.  I told Good that if he didn't get into my vehicle I was going to charge him with resisting arrest.  He then said something like, "You're not even touching me."

After Good made this statement, he started to slowly move around to the back of the car, away from me.  I heard a car door open behind me, and Good asked, what is this guy looking at?  I did not look away from Good.  As he continued to move away from my vehicle, I attempted to push him back to it.  He resisted me and continued to move and push me.  In one instance, when Good was resisting, he moved toward me with a quick aggressive movement/posture, as if he was going to attempt to assault me.  During this time, Good also got close to me and I noticed he made an odd motion with his shoulders.  I looked down and saw that his hands were reaching toward my Taser.  I stepped back from Good and he said, "Yeah, I tried to grab your Taser.  What, are you gonna shoot me now?"  I continued to struggle with Good and tried to push him to my vehicle.  He resisted me and I warned him that I was going to Tase him.

Good then turned around and started running from the rear area of my vehicle.  As Good was running away from me, I heard metal dragging on the parking lot asphalt.  I didn't look down because I was drawing my Taser as I was running after Good.  Because of the sound of the metal dragging, I thought that the shackles had come off of Good.  I focused on the upper back of Good as I drew my Taser, aimed for his upper back, and fired at him.  We were still in the parking lot, just before the grassy area.  Good fell to the parking lot, on the edge of the lot, between two vehicles.  He was on the east edge of the parking lot.  My Taser cycled for five seconds.  Good was screaming, "Why did you do this to me?"  I told Good, "Just stay on the ground or I will Tase you again."  Good said, "Ok.  Ok," as he was on his back rolling back and forth, and rubbing his back on the ground.  When he initially fell, after I Tased him, he fell on his right side and his head was close to the curb.

LC 0131

Good rubbed his back on the ground and then rolled to his feet and ran northeast through the grass area next to the parking lot. I fired my Taser again, aiming for Good's upper back. He fell on his butt and then rolled down a hill, through the mulch. I ran after him, calling for help again, as Good ran away from me. I ran down the hill after Good who was pulling away from me. I chased him across a parking lot and hospital driveway. I lost sight of Good when he ran into the woods along the east side of the hospital. As I walked along the edge of the woods and tried to see or hear Good, County asked me for my location. I told them that I was still at the hospital close to KFC.

While I stood at the edge of the woods, looking and listening for Good, I telephoned Sergeant Breneman and told him about the escape of Good. I told him that we were searching for him. A hospital security officer also showed up and attempted to help me look for Good. I continued to look for Good and Ephrata Police Officer Beth Rivera walked up to me. She walked up to me from the North. I was still in the area of where I lost sight of Good. Rivera asked me what happened, and I told her that Good ran away from me. I provided Rivera with a description of Good. I told her that he was wearing jeans, no shirt, that he was handcuffed, but the shackles had come off. Rivera and I then entered the woods to search for Good. We walked into the woods to the right of where I last saw Good. I followed Officer Rivera into the woods and we walked north looking for Good.

As we walked through the woods, I thought I saw Good. It was starting to get dark, and I looked closer and realized it was his back. He was sitting by the creek, next to the water. He was not in the water. I told Officer Rivera that I saw Good. We both walked to where Good was sitting. It was difficult to push through the branches and we were on an elevated position from Good. We walked down to the creek and when we got there, Good was about ten feet away from us. He was in the water. The water was chest or waist high on him. Officer Rivera removed her duty belt and vest, and I moved through the woods to maintain a view of Good. I noticed that a hospital security guard was to my right. When I saw Good again, the water was up to his chin. I kept an eye on Good and Rivera, as Rivera was now in the water moving toward Good. Good said, "Help," three or four times as Rivera moved toward him in the water. Good's head went under the water twice and then he did not surface again. Officer Rivera continued to walk through the water toward Good. I remained on the bank of the creek and lost sight of Good as other Ephrata Officers arrived. A second Ephrata Police Officer got in the water. Everyone was using flashlights to search for Good.

As I was on the bank of the creek looking for Good, I got a telephone call from Lieutenant Armer. I told Lieutenant Armer that I couldn't talk because I was searching for Good. An Ephrata Police Officer then told me that I should call Sheriff Leppler. I telephoned Lieutenant Armer and told him that it did not look good. I continued to search for Andrew Good. I received a telephone call from Sergeant Bolton and he told me that he was on his way to my location. After I hung up with Sergeant Bolton, the police requested that the fire department respond to also assist with the search. I continued to help search for Andrew Good, and also an Ephrata Police Officer who was now missing. I received another call from Sergeant Bolton and he told me he had arrived. I walked back to the edge of the woods to direct him.

LC 0132

I met with Sergeant Bolton and told him where I had last seen Andrew Good.  As I stood by the edge of the woods, a nurse walked up to me and told me that Andrew Good was suicidal.  She handed me the hospital discharge papers for Good.  I stood at the edge of the woods and Deputy Cole arrived.  I spoke with Deputy Cole about what had happened and gave him information for Andrew Good so he could pull-up a photo of him.

Sergeant Bolton returned to our location and I got into Deputy Cole's vehicle.  We drove east from our location and parked in the parking lot of the Weis Grocery Store.  We got out and walked toward the creek.  We crossed the creek and searched along the west side of it.  I then remained in the field in the area of the "We Buy Cars" car dealership, in case Good appeared made it across the creek, while Sergeant Bolton and Deputy Cole continued to search the area.

I waited in my position for about 20 to 30 minutes, and then Sergeant Bolton told me that he would pick me up.  I called him on the telephone to confirm the location where he was going to pick me up.  While I was on the phone with Sergeant Bolton, he told me that they had found Good and that he was dead.  He also told me that they wanted me to ID the body.  I walked back to the Sheriff K-9 vehicles (Sergeant Bolton and Deputy Cole are both K-9 deputies) that were parked in grass field, west of the Weis Grocery Store.

Sergeant Bolton and Deputy Cole met me at their vehicles and I got in Sergeant Bolton's vehicle.  We drove back to the hospital.  After we arrived, Sergeant Bolton checked where the body was and I waited with Deputy Cole.  Sergeant Bolton came back and told me to get in his vehicle and remain in his vehicle.

After some time, Sergeant Bolton drove me to the Ephrata Police Department.  After I arrived, I spoke with the Lancaster County Detectives about what had happened.  I left the Ephrata Police Department at about 0130 hours and drove home in my duty deputy vehicle.

At about 0900 hours the next day, Sunday, I drove vehicle 12-24 to Deputy Paulson's home, and I got a ride back to my home.  At about 1200 hours, Chaplain Wolfe called me to see if I was OK.  He left a voice mail.  I spoke with him by telephone later in the day.  In the afternoon, the Sheriff and Chief called me to see if I was OK and asked me if I needed anything.  The Chief told me to come in to the office at 1330 hours on Monday.

I arrived at the office on Monday (16 April 2018) at 1315 hours and the Sheriff and Chief told me that I would be on paid administrative leave.  They took my weapon, building access card and PCCD card.  After I met with the Sheriff and Chief, I met with Chaplain Wolfe in the Chief's office.  I left the office after I spoke with Chaplain Wolfe.

On Friday (20 April 2018) I met again with the Lancaster County Detectives in their office.

Synopsis/Review of Ephrata Community Hospital Surveillance Video.

*After Deputy Rodriguez-Santana provided me with the account of her involvement in the incident, we reviewed the recorded surveillance video that had been provided by the Ephrata

Community Hospital.  The video confirmed the details of the account that Deputy Rodriguez-Santana provided to me.  There is no sound on the video.

The video is from different cameras positioned at various locations around the exterior of the Ephrata Community Hospital.  The cameras that provided useful video were positioned outside of the emergency room doors, overlooking the parking lots and overlooking the eastern edge of the property.  The times are from the time stamps on the video and do not accurately correspond with LCWC times.

The following is the timeline synopsis of the video:

1927:18 hours, Sergeant Stone left the hospital.

1934:05 Deputy Rodriguez-Santana and Andrew Good walk out of the hospital.  Deputy Rodriguez-Santana is holding onto the rear of Good's chain belt with her left hand and carrying the discharge papers in her right hand.  Good is handcuffed and wearing leg restraints, and appears to be walking at pace with Rodriguez-Santana.  His strides appear normal, and unaffected by the leg restraints.  Deputy Rodriguez-Santana is in full uniform and Good is wearing jeans, dark shoes and no shirt.

1935:10 Deputy Rodriguez-Santana and Good approach the Sheriff's Office vehicle and Rodriguez-Santana releases her hold on Good's chain belt.  She then has Good stand by the right rear passenger door while she unlocks and opens the front passenger door.  After she opens the front passenger door, she pushes Good toward the rear of the vehicle and then opens the rear passenger door.  Good does not enter the vehicle and Deputy Rodriguez-Santana moves to the right of Good, toward the back of the vehicle.  Good has his back to the vehicle and Deputy Rodriguez-Santana is facing him.

1936:16 Deputy Rodriguez-Santana pushes Good toward the open right rear door of the vehicle, and Good steps toward Rodriguez-Santana and appears to push her.

1936:38 Deputy Rodriguez-Santana appears to attempt to push Good back toward the open door and Good appears to push back against her efforts.

1936:47 A male in a red shirt gets out of the driver's side of a white sedan that is parked three vehicles west (to the right) of the Sheriff's vehicle, in the same row of parking spaces.  The male stops and stands on the sidewalk in front of his vehicle.  He faces the direction of Deputy Rodriguez-Santana and Good, and appears to be watching them.

1937:14 Deputy Rodriguez-Santana and Good appear to be pushing each other, although the view is obstructed by a brick pillar.

1937:23 The male in the red shirt continues to watch, but eventually starts to walk toward the hospital.

1937:29 Deputy Rodriguez-Santana said that this is the time on the video where Good had attempted to grab her CEW, and she pushed him away and stepped back from him.

1937:30 Deputy Rodriguez-Santana and Good move further toward the rear of and away from the Sheriff's vehicle.

1937:30 The male in the red shirt stops, steps toward their location and continues to watch the struggle.

1937:31 Good eventually moves so that he is positioned about six to eight feet away from the rear of the Sheriff's vehicle, and Deputy Rodriguez-Santana is between him and the vehicle.

1937:35 The male in the red shirt turns around starts to walk toward the entrance of the hospital.

1937:35 Good turns and runs from Deputy Rodriguez-Santana, and she chases Good.  They run in a northeast direction across the parking lot.

1937:40 The male in the red shirt stops again and looks back toward Rodriguez-Santana and Good.

1937:40 Deputy Rodriguez-Santana chases Good to the east side of the parking lot and out of view between two parked vehicles.

1937:44 The male in the red shirt walks back toward his vehicle while looking in the direction of Rodriguez-Santana and Good.

1937:44 The discharge papers that Deputy Rodriguez-Santana was carrying blow across the parking lot.

1937:50 The male in the red shirt walks back to his vehicle and watches as Deputy Rodriguez-Santana attempts to take Good into custody.

1938:12 The male in the red shirt starts to walk back toward the hospital entrance from the parking lot, where he was watching the struggle.

1938:12 Good is seen turning the corner of the hospital building along the east side of the parking lot.  As Good rounds the corner, he lifts his right leg so that the top of his thigh is parallel to the ground.  With this motion, it appears that the leg restraints are no longer attached to Good's ankles.  Good's next step shows that his left foot is lifted above his right knee, also indicating that the leg restraints are no longer attached to Good's ankles.

LC 0135

1938:12 Good starts to run down the mulch covered hill, east of the parking lot, but falls to his left side and begins to slide down the hill.

1938:13 Deputy Rodriguez-Santana comes into view and she has her CEW in her right hand.  The CEW cartridge wires can be seen extending from the CEW to Good.

1938:14-16 Good continues to slide and roll down the hill as Deputy Rodriguez-Santana also starts down the hill after him.  One cuff of the leg restraints is clearly seen unattached to Good's ankles, specifically off of his right ankle.

1938:17 When Good is about two-thirds of the way down the hill, he stands to his feet and starts to run down the hill.  Deputy Rodriguez-Santana continues to run down the hill after Good while carrying her CEW in her right hand.

1938:19 Good reaches the bottom of the hill and runs toward a lower parking lot, gaining distance on Deputy Rodriguez-Santana.

1938:25 Good crosses the lower parking lot as Deputy Rodriguez-Santana just reaches it.

1938:30 Good successfully crosses the hospital driveway as Deputy Rodriguez-Santana has crossed the parking lot.

1938:31 The male in the red shirt walks into the hospital, out of view.

1938:36 Good enters the woods and is out of view.  Deputy Rodriguez-Santana reaches the far side of the driveway.

 1938:42 Deputy Rodriguez-Santana reaches the wood line, she walks back and forth along the wood line.

1939:57 The male in the red shirt walks out of the hospital and toward his vehicle then out into the parking lot.  He eventually picks up the discharge papers that were dropped by Deputy Rodriguez-Santana.

1940:01 An Ephrata Community Hospital Security Officer runs out of the front door of the hospital toward the location of Deputy Rodriguez-Santana.  Another female employee who is in nurse's clothing has exited the hospital and also runs in the direction of Deputy Rodriguez-Santana.

1941:03 A second Ephrata Community Hospital (ECH) Security Officer exits the front door of the hospital and walks toward the location of Deputy Rodriguez-Santana.

1941:32 The first ECH Security Officer arrives at the location of Deputy Rodriguez-Santana.

LC 0136

1942:04 Deputy Rodriguez-Santana and an ECH Security Officer enter the woods north of where Good had entered.

1942:05 A marked Ephrata Borough Police patrol car drives north on the hospital driveway toward the location of Deputy Rodriguez-Santana. It subsequently stops next to the second ECH Security Officer who is on the grass along the east side of the driveway.

1943:04 A female hospital employee appears, carrying papers, and walks across the east parking lot toward the location of Deputy Rodriguez-Santana.

1943:37 Deputy Rodriguez-Santana exits the woods and walks south along the wood line.

1943:40 The female hospital employee has reached the wood line and an ECH security officer is seen running south along the wood line. Deputy Rodriguez-Santana is walking south along the wood line toward where Good had entered the woods.

1944:01 The female hospital employee meets with Deputy Rodriguez-Santana.

1944:45 An Ephrata police officer meets with Deputy Rodriguez-Santana and the female hospital employee at the wood line.

1944:50 The video ends.

While we were reviewing the video, Deputy Rodriguez-Santana narrated and matched up the activity depicted on the video with the activities and actions she described in her account that she had provided to me. Her narration of the video was identical to the account that she had provided to me. As stated, the video provides a visual confirmation of part of the account provided by Deputy Rodriguez-Santana. The confirmation bolsters the credibility of Deputy Rodriguez-Santana. The video also provides context for the timing of events as she described them in her statement.

To clarify, when Deputy Rodriguez-Santana stated that she crossed the creek while searching with Sergeant Bolton and Deputy Cole, they actually crossed a storm water drainage ditch that is east of the Cocalico Creek.

*We ended our conversation at about 1033 hours 23 April 2018, and I escorted Deputy Rodriguez-Santana out of the courthouse.

At about 1045 hours, Wednesday, 02 May 2018, Deputy Barbara Rodriguez-Santana arrived at my office within the Criminal Division Office. She had come to the office upon my request, to review her statement that she had provided to me on 20 and 23 April 2018. As on 23 April, after we entered my office, I closed the door. The blinds on my office windows remained open, permitting people to view us from the main area of the Criminal Division Office. Deputy Rodriguez-Santana and I were the only people in my office. I sat in a chair at my desk and she

sat in a chair to the right of my desk.  Deputy Rodriguez-Santana was dressed in casual street clothes, not in a uniform, as she was off duty and on paid administrative leave.  I asked Deputy Rodriguez-Santana if she would like to have a union representative with her.  She indicated that she would, and, due to current duty assignments, I was not able to immediately provide her with a union steward.  I asked her if she would like to have a fellow employee who is a member of the union to sit with her.  She said that she would like Deputy Victoria Jones to be present while we spoke.  Deputy Jones then entered my office and sat to the right of Deputy Rodriguez-Santana.  I advised Deputy Jones that no information related to our conversation was to be disseminated.

I printed out the statement that Deputy Rodriguez-Santana had given me and handed it to her.  I asked her to take her time reading it, and to let me know if there were any inaccuracies in the statement.  As she was reading her statement, I received a telephone call from Deputy Travis Schmalhofer, a union steward.  I asked Deputy Schmalhofer to come to my office to act as the union representative for Deputy Rodriguez-Santana.  After about five minutes, Deputy Schmalhofer arrived in my office and Deputy Jones left.  I advised Deputy Schmalhofer that the purpose for my meeting with Deputy Rodriguez-Santana was to have her review her statement that she had provided to me.

After Deputy Rodriguez-Santana finished reading her statement, she told me that there were two minor corrections.  One was how she obtained the hair tie from Ricardo Lopez.  She did not find it on his person, it was in a bag and handed to her by an Ephrata Police Officer.  The second correction involved the timing of when the Ephrata Police requested the assistance of the fire department in relation to her telephone conversations with Sergeant Bolton.  I made both corrections to her statement.

I then asked Deputy Rodriguez-Santana why she did not enter the water to assist Andrew Good.  She explained that, as Officer Rivera had already begun to remove her gear and enter the water before her, she was the only person there with a weapon.  She could not see Good's hands, so she did not know if Good was still restrained, had any weapons and/or had intention to assault them.  She also said that she is not trained in water rescue.

*We ended our conversation at about 1132 hours 02 May 2018, and I accompanied Deputy Rodriguez-Santana and Deputy Schmalhofer out of my office.

Upon reviewing numerous reports provided by the Lancaster County Detectives, I read the reports of Ephrata Borough Police Officer Scott Martin, Detective Graeme Quinn and Ephrata Community Hospital Security Officer Corey Simo.  All three of these reports contained information regarding conversations, and statements made at the hospital by Akron Borough Police Officer Rogers and Sergeant Stone.  Through their conversations with ECH staff, and statements made to the staff and Deputy Rodriguez-Santana, it was clear that, after arriving at the hospital, the Akron Borough Police Officers attempted to relinquish custody of Andrew Good as quickly as possible.  They made repeated inquiries of medical staff regarding how long it would be before Good would be discharged and they could leave the hospital.  Both Rogers and Stone also requested that hospital security watch Good, and if Good ran away, they said that security

LC 0138

should call the Ephrata Borough Police.  These conversations and statements were reported by two nurses, a hospital security officer and Deputy Rodriguez-Santana.

Interview of Deputy David Cole.

Deputy David Cole is assigned to the K-9 unit in the Lancaster County Sheriff's Office.  He has been employed by the Lancaster County Sheriff's office for 7 years, and has been a K-9 Deputy for 2 years.  I interviewed Deputy Cole at about 1255 hours, Monday, 23 April 2018.  We spoke in my office in the Criminal Division of the Lancaster County Sheriff's Office.  We were both on duty at the time of the interview.  Deputy Cole was in full uniform, appeared relaxed and communicated in a confident, matter-of-fact manner.  I asked Deputy Cole to recount his involvement in the in-custody death incident that occurred Saturday, 14 April 2018.  Deputy Cole related the following:

At about 1955 hours 14 April 2018, I received a telephone call from Sergeant Bolton.  I was at home when I received the call.  He told me that a prisoner had escaped from the Duty Deputy and to get ready because we might have to track the prisoner.  He told me to get ready and respond to the Ephrata Community Hospital.  I immediately got dressed and got my dog ready. Sergeant Bolton told me to respond to the Ephrata Community Hospital, but he did not provide a specific location.  I drove directly to the hospital.

I arrived at the Ephrata Community Hospital at about 2032 hours 14 April 2018.  After I arrived, I was directed by the fire police to the east side of the property, near the Cocalico Creek.  I parked behind Sergeant Bolton's vehicle.  Sergeant Bolton was standing outside of his vehicle speaking with Deputy Rodriguez-Santana.  I walked up to them and Sergeant Bolton directed me to get my dog out because we would have to perform an area search.  I waited briefly for Sergeant Bolton who then told me that the plan was to drive to the Weis Markets Grocery Store, park our vehicles in the area, and proceed to search from east of the Cocalico Creek.  Deputy Rodriguez-Santana rode in my vehicle as we drove to Weis Markets.

After we arrived, all three of us searched the area west of the Weis Markets store and east of the Cocalico Creek.  We crossed the creek and proceeded to search further west.  We subsequently met with Ephrata Borough Police Officers in the parking lot of the Kentucky Fried Chicken Restaurant (KFC).  Deputy Rodriguez-Santana did not search as far west as Sergeant Bolton and I.  She remained posted back in the area of the Weis Markets.

While we were in the parking lot of the KFC Restaurant speaking with the Ephrata Officer, the officer said that he believed that the prisoner had been located.  I then heard someone shout from the search area, south of our location, "We got 'em!"  It was then that someone had also told us that the prisoner was dead.  I told Sergeant Bolton, who was on the telephone, and we then walked back to our vehicles.  We met Deputy Rodriguez-Santana on the way back to our vehicles.  All three of us drove back to the staging area at the hospital, which was in the driveway along the east side of the hospital.  Deputy Rodriguez-Santana rode with Sergeant

Bolton in his vehicle.  After we arrived, I locked Deputy Rodriguez-Santana's Duty Deputy vehicle, and then drove to the parking lot on the southeast corner of the Ephrata Community Hospital.  We waited in the parking lot until we were directed to drive to the Ephrata Borough Police Station where I briefly spoke with Lancaster County Detectives about my role in this incident.

My conversation with Deputy Cole ended at about 1315 hours 23 April 2018.  At that time, he left my office to resume his normal duties.


Interview of Sergeant David Bolton.

Sergeant David Bolton is assigned to, and is the supervisor of the K-9 unit in the Lancaster County Sheriff's Office.  He is also the lead training supervisor/coordinator for the Office and oversees or directly provides most of the training received by deputies, to include: use of force, firearms, conducted electrical weapons, oleoresin capsicum spray, defensive tactics, ASP baton, handcuffing and courtroom/courthouse security.  He has been employed by the Lancaster County Sheriff's office for 16 years, has been a K-9 Deputy for 14 years and a supervisor for 13 years.  I interviewed Sergeant Bolton at about 1320 hours, Monday, 23 April 2018.  We spoke in my office in the Criminal Division of the Lancaster County Sheriff's Office.  We were both on duty at the time of the interview.  Sergeant Bolton was in full uniform, appeared relaxed and communicated in a confident, matter-of-fact manner.  I asked Sergeant Bolton to recount his involvement in the in-custody death incident that occurred Saturday, 14 April 2018.  Sergeant Bolton related the following:

At about 1950 hours 14 April 2018, I received a telephone call from Sergeant Breneman.  I was at home when I received the call.  Sergeant Breneman stated that Deputy Rodriguez-Santana had a prisoner escape from her at the Ephrata Community Hospital (ECH).  I told Sergeant Breneman that I would go to ECH and attempt to track the prisoner.  I asked Sergeant Breneman to call me back if he obtained any additional information.  At about 1952 hours, I telephoned Lieutenant Shaffer and left a voice mail message for him regarding the situation.  I telephoned Deputy Cole, twice, and told him to respond to ECH.  I then got dressed and left my home at about 2000 hours.

While I was driving to the hospital, Sergeant Breneman telephoned me and said that Lieutenant Armer was in charge of the incident.  I placed a telephone call to Lieutenant Armer who told me that Sheriff Leppler had been notified, and to call him with any updates.  Lieutenant Armer related that the prisoner had entered the water when he was fleeing.

I arrived at ECH at about 2027 hours.  When I arrived, I parked in the driveway along the east side of the hospital property and met with Deputy Rodriguez-Santana.  She pointed out the location where the prisoner had entered the woods when she lost sight of him.  She also provided me with details related to what had happened prior to my arrival.  I told Deputy Rodriguez-Santana to stand close to my vehicle, near the wood line.  Deputy Cole arrived and remained at the location with Deputy Rodriguez-Santana.  I ran from their location to the fire department

staging area at the intersection of Third Street and Penn Avenue.  My intention was to check in at a command post, however there was no place to check in.

While I was at the staging area, Ephrata Borough Police Chief Harvey walked up to me.  I told Chief Harvey that there were two Sheriff's Office K-9's on the scene to assist with searching for the prisoner.  Chief Harvey told me that there was a police officer missing.  As we were speaking, the officer walked up to us.  I asked Chief Harvey if we had established a perimeter. The Chief said that there was not a perimeter and that it was believed that the prisoner had probably drowned.  I told Chief Harvey that in case the prisoner had not drowned, we would set up a perimeter on the other side of the creek.  The Chief agreed with my plan and told me that he was going to use the fire police to assist with establishing a perimeter.  I asked him the best way to get to the other side of the creek.  He explained that the best route to take was to park at the Weis Markets Grocery Store and proceed from there.  He warned me that the terrain in the area was rough.  As we were speaking, water rescue boats arrived at our location.  I asked Chief Harvey if he was going to place a police officer in the boat with the fire department.  He confirmed that it was his plan to have an officer on board the boat with the fire department in the event that they found the prisoner.  When I finished speaking with the Chief, I noticed that the fire department had begun placing the boats in the water.  I ran back to the location of Deputy Cole and Deputy Rodriguez-Santana.

After I arrived back at the wood line with Deputies Cole and Rodriguez-Santana, someone, I don't recall who, provided information that the prisoner might have headed toward the KFC Restaurant.  I told Cole and Rodriguez-Santana that the prisoner might be deceased, but we were going to set up a perimeter on the other side of the creek in the area of the Weis Markets Grocery Store.  I directed Deputy Rodriguez-Santana to ride with Deputy Cole and they followed me to Weis.

When we arrived at Weis, we pulled into a grass field adjacent to the west side of the store, east of the Cocalico Creek.  We parked so that we were facing west and shone our vehicle lights/spotlights west, toward the creek.  I told Deputy Cole to get his dog ready, as we would use his dog first in our search efforts.  We walked west through the field and crossed a rather substantial drainage ditch that had water flowing through it.  Deputy Cole and I led the way, and Deputy Rodriguez-Santana followed us west, across the drainage ditch.  We searched around a residence that was along North Reading Road, next to a car dealership named "We Buy Cars." We searched behind the car dealership and through thick brush around the location.  I then told Deputy Rodriguez-Santana to return to our Sheriff's vehicles, maintain the perimeter and notify us if she saw anything.

Deputy Cole and I continued to search through the wood/brush in the area.  We moved back toward North Reading Road, walked across the bridge that spans the Cocalico Creek, and then back into the woods/brush on the south side of North Reading Road.  We continued to search west toward the hospital.  We eventually met with an Ephrata Borough Police Officer who was standing behind the KFC Restaurant.  We spoke about the search with the officer, and while we were speaking, we heard over the radio that a body had been recovered.  I then received a request

LC 0141

from the Ephrata Borough Police to have Deputy Rodriguez-Santana identify the body. I cannot recall if the request was made over the radio or in person by an officer. Deputy Cole and I ran back to our vehicles.

After I arrived at our vehicles, I treated Deputy Rodriguez-Santana differently, because of the death of the prisoner. I had her ride in my vehicle and directed her to not speak with anyone about the incident. Upon our return to the Ephrata Community Hospital, I left my vehicle to speak with someone about identifying the body. Deputy Rodriguez-Santana remained with Deputy Cole. I spoke with a couple of different people, and was told the body had not yet been moved from the location where it was found. I returned to Deputy Rodriguez-Santana and Deputy Cole. Deputy Rodriguez-Santana was seated in Deputy Cole's vehicle. I had her sit in my vehicle and remain in it. Deputy Cole secured the Duty Deputy vehicle that Deputy Rodriguez-Santana had been utilizing. After some time, we drove to the Ephrata Borough Police Department and I was interviewed by Lancaster County Detectives.

My conversation with Sergeant Bolton, related to his involvement in the incident, ended at about 1403 hours 23 April 2018.

We then discussed the actions of Deputy Rodriguez-Santana during her contact with Andrew Good. I asked Sergeant Bolton to critique the actions of Deputy Rodriguez-Santana from the point of view of the Sergeant who is tasked with her on-going training, and as a use of force instructor. We reviewed the entire surveillance video from Ephrata Community Hospital that depicted the interactions between Deputy Rodriguez-Santana and Andrew Good. Sergeant Bolton provided the following critique/opinion:

Andrew Good was a fleeing felon who presented a potential immediate danger to others. His history demonstrated this. Sergeant Bolton opined that the incident was within the realm of Tennessee v Garner, and that Deputy Rodriguez Santana was justified in her use of force. He believed that she had followed Sheriff's Office policy, procedures and protocols. Sergeant Bolton based his reasoning on the following totality of circumstances:

- Good was an active resister.
- Deputy Rodriguez-Santana had received information from Sergeant Stone that Good was a violent person who assaulted police officers.
- The leg restraints on Good failed.
- At different times, Good faced Deputy Rodriguez-Santana and moved toward her in an aggressive manner indicating that it was his intent to assault her.
- Good had been staring at the duty belt of Deputy Rodriguez-Santana while in the hospital.
- Good attempted to grab the CEW (Taser) out of Deputy Rodriguez-Santana's holster.
- Good admitted to attempting to disarm Deputy Rodriguez-Santana, of her CEW, and stated, "You gonna shoot me?"

My conversation with Sergeant Bolton, related to his critique/opinion of the actions of Deputy Rodriguez-Santana, ended at 1515 hours 23 April 2018.  Sergeant Bolton then left my office.

<u>Review of Lancaster County-Wide Communications Audio.</u>

On 18 April 2018, I faxed request forms to Lancaster County-Wide Communications requesting audio duplication of police, fire and emergency medical services radio communications for this incident, and the incident involving the arrest of Andrew Good that necessitated his treatment at the Ephrata Community Hospital.  I received four discs that contained audio recordings of the radio communications for these incidents.  I listened to all of the recordings.  Unfortunately, there are very few audio time stamps on these audio files, and the files are compressed to remove periods of time when there are no radio transmissions.  This makes it impossible to determine that time that the transmissions occur.

In the audio recordings, Deputy Rodriguez-Santana is heard identifying herself as unit 12-52 and stating, "I need back-up now."  Her next transmission sounds like, "Subject's running."  Dispatchers attempt to confirm Deputy Rodriguez-Santana's location and she states that, "He's running right behind the KFC in the bushes."  She then confirms with dispatchers that she is still at the hospital.

Later in the recordings, an officer states that Andrew Good is, "One of our burglars."  Another officer states, "When he was taken into custody earlier it took four people.  He's a fighter."

Ephrata Police Officer Beth Rivera transmits that Good is in the water, and that he asks for help, that he's drowning.  She subsequently transmits that he's under the water.

As the search progresses, there are radio transmissions from Ephrata Police Officers that state that, on a prior occasion, Andrew Good ran from them and entered the area of woods that was being searched during this incident.

There are radio communications that Andrew Good's body was found in the water and that he was deceased.

When listening to the audio recordings, I did not hear any improper or unprofessional radio communications made by any deputies of the Lancaster County Sheriff's Office or any other agency.

## *Review of Applicable Law/Policy/Procedures for this Incident*

1. *Pennsylvania Title 234, Rules of Criminal Procedure*

   Rule 515. Execution of Arrest Warrant.
   > (A) A warrant of arrest may be executed at any place within the Commonwealth.
   > (B) A warrant of arrest shall be executed by a police officer (defined in Rule 103).

   Rule 103.  Definitions.
   > Police Officer is any person who is by law given the power to arrest when acting within the scope of the person's employment.

   > <u>Applicability/Compliance:</u> Deputy Rodriguez-Santana is a sworn and certified Deputy Sheriff.  According to Pennsylvania statute, Deputy Rodriguez-Santana had statutory authority to execute the outstanding arrest warrant for Andrew Good, as she was on duty and acting within the scope of her employment.

2. *Lancaster County Sheriff's Office Policy 100, Law Enforcement Authority.*

   Sections 100.3 and 100.3.1 (a) state that certified members of the Lancaster County Sheriff's Office are authorized to exercise law enforcement powers and make arrests in compliance with arrest warrants pursuant to state law.

   > <u>Applicability/Compliance:</u> Deputy Rodriguez-Santana is a certified member of the Lancaster County Sheriff's Office, is authorized by the aforementioned state law, and therefore was authorized to exercise law enforcement powers and effectuate the arrest of Andrew Good in compliance with the outstanding bench warrant.  Deputy Rodriguez-Santana was in compliance with Policy 100.

3. *Lancaster County Sheriff's Office Policy 302, Handcuffing and Restraints.*

   Section 302.2 authorizes the use of restraint devices in accordance with policy, Use of Force Policy and office training.  They are not to be used as punishment, to display authority or as a show of force.
   Section 302.3 details that only deputies who have completed training on the use of restraint devices are authorized to use them.

   > <u>Applicability/Compliance:</u> Deputy Rodriguez-Santana had completed mandatory training on the use of restraint devices on 22 and 29 February 2016, and was therefore authorized to use them.  She used them for the appropriate reason of restraining the free movement of Andrew Good when she took him into custody for an outstanding bench warrant.

Section 302.4 states that, when feasible, handcuffs should be double-locked to prevent tightening of the handcuffs which may lead to discomfort or injury.

> Applicability/Compliance: Deputy Rodriguez-Santana stated that she double-locked the handcuffs she placed on Andrew Good when she took him into custody. According to a report submitted by Officer Thomas Zell of the Akron Borough Police Department, the Charge Nurse on duty at the Ephrata Community Hospital observed Deputy Rodriguez-Santana double-lock the leg restraints when she placed them on Good. Additional reports from the Ephrata Borough Police and Ephrata Community Hospital Security Officer Simo suggest that Jennifer Long was the Charge Nurse.

Section 302.6 states that auxiliary restraint devices, such as waist chains, are intended for use during long distance transports or when a supervisor determines it appropriate due to combative behavior. Only office-authorized devices may be used.

> Applicability/Compliance: Deputy Rodriguez-Santana used a waist chain auxiliary restraint device for the transportation of Andrew Good from the Ephrata Community Hospital to the Lancaster County Prison. The waist chain used by Deputy Rodriguez-Santana was an office-authorized and owned device. The transport takes approximately 30 minutes and Deputy Rodriguez-Santana had received information from Sergeant Stone that Andrew Good had demonstrated a risk of combative behavior and posed a security risk because of his behavior.

Section 302.7 and 302.7.1 addresses the application and use of leg restraints. The sections detail that leg restraints may be used to restrain the legs of a violent or potentially violent person when it is reasonable to do so during the course of detention, arrest or transportation. Only restraint devices approved by the Sheriff's Office shall be used. Considerations for the use of leg restraints include the potential for injury to the deputy and others due to the behavior of the person, protection of the person from his/her own actions and protection of property due to the person's actions. When using leg restraints, deputies should notify a supervisor unless it is due to a long distance transport.

> Applicability/Compliance: Deputy Rodriguez-Santana used leg restraints that were approved by and property of the Sheriff's Office. She stated that she double-locked the leg restraints when she applied them and this was witnessed by the ECH Charge Nurse. The transport from Ephrata Community Hospital to Lancaster County Prison takes approximately 30 minutes. Deputy Rodriguez-Santana had received information from Sergeant Stone that Andrew Good had demonstrated a risk of combative behavior and posed a security risk because of his behavior.

Page **28** of **39**

LC 0145

*It should be noted that it is a required standing Sheriff's Office procedure and practice for deputies to use waist chains and leg restraints, in addition to handcuffs, when arresting and transporting prisoners while working the Duty Deputy assignment.

4.  *Lancaster County Sheriff's Office Policy 304, Conducted Electrical Weapon*

Section 304.2 states that the conducted electrical weapon (CEW) is used to control a violent or potentially violent individual.

Applicability/Compliance: When Deputy Rodriguez-Santana first encountered Andrew Good, he was receiving medical treatment in the emergency department of the Ephrata Community Hospital for injuries he had sustained from his arrest by Akron and Ephrata Borough Police Officers.  Good sustained the injuries as he fled from officers and then resisted arrest.  His actions caused him to be subjected to two CEW exposures administered by the officers who arrested him.  According to the LCWC incident detail for the incident, five police officers were involved in the arrest of Good.  As much as past behavior can be predictive of future behavior, Good's immediate past behavior indicated that he that he had a potential for violence.

Sergeant Stone of the Akron Borough Police had also advised Deputy Rodriguez-Santana that in Good's past interactions with police he had been very combative and uncooperative.  Stone related that the last time Good was at the hospital, he was discharged prior to being taken into custody.  When officers attempted to arrest Good after his release from the hospital, he punched an officer.  Stone told Deputy Rodriguez-Santana that he did not want to leave the hospital before she arrived.  Before Stone left the hospital, he asked Good if he was going to cooperate with Deputy Rodriguez-Santana.  Good replied to Stone, "I don't hit women."

After Sergeant Stone left the hospital, Deputy Rodriguez-Santana was standing in the hospital treatment room, as Andrew Good was lying on the litter.  Rodriguez-Santana observed that Good was intently staring at her duty belt.  Good's staring made Rodriguez-Santana so uncomfortable that she changed her position so that Good would break his stare.

When Deputy Rodriguez-Santana was struggling with Andrew Good outside of her Sheriff's Office vehicle, Good attempted to grab her CEW (Taser) from her duty belt.  When Rodriguez-Santana noticed the attempt, Good stated, "Yeah, I tried to grab your Taser.  What, are you gonna shoot me now?"  Good continued to actively resist the attempts of Deputy Rodriguez-Santana to place him inside of

LC 0146

the vehicle by pushing her and moving away from her.  In addition to shoving Rodriguez-Santana, on at least one occasion Good approached her quickly in an aggressive posture that suggested he was going to attempt to assault Rodriguez-Santana.  Eventually, the leg restraints Good was wearing failed and he fled from Rodriguez-Santana.

Andrew Good demonstrated the ability to be violent, as proven by his prior contacts with arresting police officers.  He also demonstrated this ability as he had pushed and attempted to grab the CEW of Deputy Rodriguez-Santana, even though he was handcuffed and wearing leg restraints.  Good had the opportunity to employ violence against Rodriguez-Santana, as he was in very close proximity to her during their interactions.  Good demonstrated his intent to assault Deputy Rodriguez-Santana as she had observed him staring at her duty belt, pushed her, attempted to grab her CEW and then told her that he had tried to grab her Taser.  Considering the totality of Good's actions and statements, it is obviously concluded that he was a potentially violent person who then proved this potential when he acted out violently toward Deputy Rodriguez-Santana, who employed the use of her CEW in compliance with Lancaster County Sheriff's Office policy.

Section 304.3 details that deputies must successfully complete office-approved training to be issued and carry a CEW.  Deputies are only permitted to use a CEW and cartridges that have been issued by the Lancaster County Sheriff's Office, and uniformed deputies shall only wear the CEW in an approved holster.  The CEW should be spark checked prior to every shift.  Uniformed deputies must carry the CEW in a holster on their tactical vest or belt, on their weak side, so that the CEW is drawn in a cross-draw fashion. Deputies shall have two or more cartridges loaded in the CEW when carrying it, and they should not hold a firearm and CEW at the same time.

> Applicability/Compliance: Deputy Rodriguez-Santana successfully completed office-approved CEW training on 27 July 2017.  At the time of the incident, she was carrying and used an office-issued CEW loaded with two issued 25-foot standard cartridges.  The CEW was a Taser model X2, serial number X29004FWA, black in color.  Deputy Rodriguez-Santana last spark checked her CEW at 1642 hours on 14 April 2018.  She carried her CEW in an approved holster on her duty belt.  It was on her weak side necessitating she cross-draw the weapon.  At no time did Deputy Rodriguez-Santana hold her firearm and CEW at the same time.  Her actions conformed to office policy.

Section 304.4 states that a verbal warning of the intended use of the CEW should precede its application, unless it would endanger the safety of deputies or it is impractical due to circumstances.

    <u>Applicability/Compliance:</u> After Andrew Good attempted to grab the CEW of Deputy Rodriguez-Santana, she provided a verbal warning to Good, telling him that she was going to "Tase" him if he did not stop resisting.  Good continued to struggle with Deputy Rodriguez-Santana and then ran from her.  As Good ran from Rodriguez-Santana, she fired her CEW.  The CEW probes contacted Good on his upper back, causing temporary neuromuscular incapacitation of Good, which caused him to fall to the ground.  There were no other deputies or people in the area of Deputy Rodriguez-Santana when she fired her CEW.  After the CEW completed its cycle, Deputy Rodriguez-Santana again told Good that he should stay on the ground or she would "Tase" him again.  Good did not comply.  He stood to his feet, turned from Rodriguez-Santana and started to run from her.  Deputy Rodriguez-Santana followed through with her warning and fired her CEW a second time.  Deputy Rodriguez-Santana's actions conformed to policy in that she preceded her applications of her CEW with verbal warnings on both occasions.

Section 304.5 states that the CEW should only be used when the deputy can safely approach the person within the operational range of the device.

    <u>Applicability/Compliance:</u> Deputy Rodriguez-Santana was safely within the operational range of 25 feet when she fired her CEW.

Section 304.5.1 details that the deputy may use a CEW when the circumstances perceived by the deputy at the time indicate that the use of CEW is reasonably necessary to control the person.  The circumstances are: (a) when the person is violent or physically resisting, (b) the person has demonstrated, by words or actions, an intention to be violent or physically resist, and reasonably appears to present the potential to harm deputies, himself or others.

    <u>Applicability/Compliance:</u> Andrew Good was violent and physically resisted in that he refused to comply with directives of Deputy Rodriguez-Santana to enter her vehicle, and he physically struggled with Rodriguez-Santana and pushed her.  Good demonstrated his intent to be violent and/or physically resist by his prior noncompliance during his arrest by Ephrata and Akron Borough Police Officers.  This intent was also demonstrated when Deputy Rodriguez-Santana observed Good staring at the weapons on her duty belt and when he told her that he had, "…tried to grab your Taser."  In response to Good's actions and demonstrated intent, Deputy Rodriguez-Santana used her CEW to attempt to control Good.

Section 304.5.2 states that the use of a CEW on certain people should be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective or would present a greater danger to the deputy, subject or others, and the

LC 0148

deputy reasonably believes that the need to control the individual outweighs the risk of using the CEW. Those certain people include: individuals who are handcuffed or otherwise restrained, and people whose position or activity may result in collateral injury.

> Applicability/Compliance: Andrew Good was handcuffed with a waist chain, and was also wearing leg restraints. When Good fled from Deputy Rodriguez-Santana, he ran toward a downhill slope just as or immediately after Rodriguez-Santana fired her CEW at him.

> Deputy Rodriguez-Santana's attempts to control Andrew Good through verbal direction and empty hand methods were not effective. When Deputy Rodriguez-Santana appeared to be able to gain separation from Good so that she could employ the use of different implements to control him, he was turning to run away from her. As Good was not facing Deputy Rodriguez-Santana and moving away from her, the use of her Oleoresin Capsicum spray and ASP baton would have been ineffective. Good had proven to be a violent person who posed an imminent threat to law enforcement officers and the risk posed by his possible escape outweighed the potential risks of Deputy Rodriguez-Santana employing her CEW to control him.

Section 304.5.3 states that the preferred targeting area for the CEW includes the person's back as the most preferred target area.

> Applicability/Compliance: When aiming her CEW at Andrew Good, Deputy Rodriguez-Santana targeted the upper back of Good, on both CEW deployments. According to reports obtained from the Ephrata Borough Police, the CEW probes contacted Good's back and the back of his arms.

Section 304.5.4 details that deputies should apply their CEW for only one standard cycle and then evaluate the situation before applying any subsequent cycles. Certain factors should be considered prior to additional applications of the CEW, if the first application proves ineffective at gaining control. Those factors include: (a) Whether it is reasonable to believe that the need to control the individual outweighs the potentially increased risk posed by multiple applications, (b) Whether the probes are making proper contact, (c) Whether the person has the ability and has been given a reasonable opportunity to comply and (d) Whether verbal commands or other options/tactics may be more effective.

> Applicability/Compliance: In considering the four factors – (a) As was already discussed, Good had proven to be a violent person who posed an imminent threat to law enforcement officers, and the risk posed by his possible escape outweighed the potential risks of Deputy Rodriguez-Santana employing her CEW to control him, including additional applications of her CEW. (b) The probes had made

LC 0149

proper contact on the first application of the CEW, as Good sustained neuromuscular incapacitation. (c) Deputy Rodriguez-Santana provided Good with multiple opportunities to comply, and his ability to comply was never impeded. (d) Deputy Rodriguez-Santana gave numerous verbal commands to Andrew Good in an attempt to gain Good's compliance, however he refused to comply. Rodriguez-Santana requested assistance via radio, and used the options and tactics that were available to her at the time.

5. *Lancaster County Sheriff's Office Policy 320, Standards of Conduct*

Section 320.5.9 states that causes for discipline include (b) unreasonable and unwarranted force to a person encountered or a person under arrest, and (c) exceeding lawful peace officer powers by unreasonable, unlawful or excessive conduct.

Applicability/Compliance: Andrew Good was under arrest and in the custody of Deputy Rodriguez-Santana, who is a peace officer. Deputy Rodriguez-Santana used a level of force that was reasonable and necessary to attempt to control Andrew Good, given the totality of the circumstances. She did not exceed her powers by engaging in unreasonable, unlawful or excessive conduct. She was reasonable in her efforts and conduct related to the arrest, and her attempts to gain the compliance of Andrew Good after she had assumed custody of him. As was determined by the Lancaster County District Attorney Craig Steadman, Deputy Rodriguez-Santana did not violate any criminal laws.

6. *Lancaster County Sheriff's Office Policy 703, Vehicle Use*

Section 703.3.4 states that unattended vehicles should be locked and secured at all times.

Applicability/Compliance: Deputy Rodriguez-Santana used an assigned Sheriff's Office vehicle to respond to Ephrata Community Hospital and transport Andrew Good to the Lancaster County Prison. When she arrived at the hospital, she locked the vehicle when she parked it in the parking lot and entered the hospital. When she returned to the vehicle, while escorting Andrew Good, she had to unlock the vehicle to gain access to it. While her vehicle was unattended, all of the windows were up and the doors were locked (except when she was attempting to control and apprehend Andrew Good).

7. *Lancaster County Sheriff's Office Policy 1023, Uniforms and Civilian Attire*

Section 1023.1 details that the policy is established to ensure that uniformed members will be readily identifiable to the public through the proper use and wearing of the office uniform.

LC 0150

<u>Applicability/Compliance:</u> Deputy Rodriguez-Santana was in full uniform for the entire incident.  I personally observed her in a properly worn, full uniform upon my arrival to the scene that evening.  Surveillance video of the incident also depicts Deputy Rodriguez-Santana in full uniform.

8. *Lancaster County Sheriff's Office Use of Force Continuum*

The Lancaster County Sheriff's Office Use of Force Continuum indicates that the use of a CEW ("Taser") is considered a "Level V (five): Intermediate Weapons" level of force.  This level of force may be used when the level of resistance is "active aggression."  Active aggression is defined as physical actions of assault, to include punches and kicks.  It is detailed on the continuum that "deputies may escalate to the next level of force to effect control (one plus one theory)."

<u>Applicability/Compliance:</u> Andrew Good physically assaulted Deputy Rodriguez-Santana by pushing her and attempting to grab her CEW from her holster – disarm her.  *It should be noted that on the Lancaster County Sheriff's Office Use of Force Continuum, a disarming attempt is considered to be a deadly force assault level of resistance which corresponds to a "Level VI (six): Lethal Force" level of force response, as the deputy is faced with the potential of serious bodily injury or death.  If a person disarms or attempts to disarm a deputy, it is presumed that they will attempt to use the deputies weapon(s) against the deputy to incapacitate, injure or kill the deputy.  Deputy Rodriguez-Santana exhibited restraint in that she did not employ deadly force in response to Andrew Good's attempt to disarm her.  Her use of force response was one level lower than could have been justified by the continuum.

## *Sources*

The sources that were utilized for this review were:

1.  Surveillance video obtained from the Ephrata Community Hospital.
2.  Audio recordings obtained from Lancaster County-Wide Communications.
3.  Interview of Deputy Barbara Rodriguez-Santana.
4.  Interview of Deputy David Cole.
5.  Interview/Conversation with Sergeant David Bolton.
6.  Lancaster County Sheriff's Office Policy Manual.
7.  Lancaster County Sheriff's Office training records for Deputy Rodriguez-Santana.
8.  Lancaster County Sheriff's Office personnel file of Deputy Rodriguez-Santana.
9.  Lancaster County Human Resources personnel file of Deputy Rodriguez-Santana.
10. Lancaster County Performance Evaluation Reports for Deputy Rodriguez-Santana.
11. Lancaster County Sheriff's Office Duty Deputy File.
12. Lancaster County Sheriff's Office Daily Log for Deputy Rodriguez-Santana from 14 April 2018.
13. Taser Report from the Conducted Electrical Weapon (Taser) deployment for the CEW carried by Deputy Rodriguez-Santana.
14. Lancaster County-Wide Communications Computer Aided Dispatch incident details.
15. Lancaster County Sheriff's Office Teleosoft records management system warrant information for Andrew Good.
16. JNet Pennsylvania Department of Transportation driver details for Andrew Good.
17. Lancaster County Adult Probation and Parole Services records.
18. Conversation with Lancaster County Adult Probation Officer Tamra Boyd.
19. UJS/CPCMS Lancaster County Court of Common Pleas secure court summary for Andrew Good.
20. UJS/MDJS Magisterial District Court summary for Andrew Good.
21. NCIC/CLEAN criminal history for Andrew Good.
22. Lancaster County Sheriff's Office use of force procedures/protocols.
23. Pennsylvania Title 234
24. Case Law: Commonwealth v Dobbins, 20 November 2007.
25. Conversations with Lancaster County Detectives.
26. Reports provided by Lancaster County Detectives.
27. Reports provided by the Ephrata Borough Police Department via Lancaster County Detectives.
28. Eleven photographs of Sheriff's Office vehicle number 12-24.

LC 0152

# PRIVILEGED



LC 0153

# PRIVILEGED

LC 0154



# PRIVILEGED

LC 0155



**PRIVILEGED**

Respectfully submitted,

Lieutenant Marc J. Shaffer
Lancaster County Sheriff's Office

LC 0156