**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ESTATE OF ANDREW DAVIS GOOD, et al.** | **:** | **CIVIL ACTION** |
| | **:** | |
| | **:** | |
| **v.** | **:** | **NO.  20-1431** |
| | **:** | |
| **BARBARA RODRIGUEZ-SANTANA** | **:** | |

**MEMORANDUM**

SCHMEHL, J.   /s/ JLS                                    AUGUST   5, 2021

Plaintiffs brought this action under 42 U.S.C. § 1983, claiming in their First Amended Complaint that the Defendant's deployment of her Taser at Plaintiffs' decedent on two occasions each constituted cruel and unusual punishment in violation of the Eighth Amendment (Count One) and excessive force in violation of the Fourth Amendment (Count Two). Presently before the Court is the Defendant's motion for summary judgment. For the reasons that follow, the motion is granted.

**STANDARD OF REVIEW**

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id. (citing Anderson, 477 U.S. at 248).

Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. See *Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**FACTS**

The Court finds the following material facts are not in dispute:

1.  On April 14, 2018, Plaintiff's decedent, Andrew Good ("Good"), was taken into custody by Akron Borough and Ephrata Borough police officers on an outstanding Lancaster County warrant for violation of probation/parole. ECF 40, Ex. A.

2.  Once Good was taken into custody, he was transported by the arresting officers to the Wellspan Ephrata Community Hospital (the "Hospital") for examination. ECF 40, Ex. B, p. 8.

3.  Defendant Deputy Barbara Gunnet[1] is a Sheriff's Deputy for Lancaster County, and has been so employed since February 2016. *Id*. at 7.

4.  On April 14, 2018, Deputy Gunnet was working as the on-call deputy. *Id* at 13-14.

5.  As part of her duties as the on-call deputy, Deputy Gunnet responded to calls from dispatch to pick up and transport arrested individuals to the Lancaster County Prison. *Id*. at 14-15.

6.  On April 14, 2018, Deputy Gunnet was dispatched to the Hospital to pick up and transport Good to Lancaster County Prison following his arrest by Ephrata Borough and Akron Borough police officers. *Id* at 15-16.

7.  Although Deputy Gunnet knew that she was going to the Hospital to pick up someone on a bench warrant for a violation of probation, she did not know anything about Good's criminal history or background. *Id*. at 16.

8.  At approximately 5:00 p.m. on April 14, 2018, Deputy Gunnet arrived at the Hospital to take custody of Good and to transport him to Lancaster County Prison. ECF 40, Ex. A. p. 16.

---

[1] At the time of the incident, Defendant was known by her maiden name, Barbara Rodriguez-Santana.

9.  After arriving at the Hospital, Deputy Gunnet spoke with Sergeant Greg Stone of the Akron Borough Police Department in the entrance to the room where Good was being treated. ECF 40, Ex. B at 20. During the conversation, Sergeant Good mentioned to Deputy Gunnet "some other instances where Andrew wasn't cooperative." *Id*.

10. Deputy Gunnet noticed scratches on Good's face and chest and that he was not wearing a shirt. *Id*. at 22-23.

11. While escorting Good to an x-ray room, Sergeant Stone told Deputy Gunnet about another incident where Good assaulted an officer. *Id*. at 25. According to Deputy Gunnet, Sergeant Stone referred to Good a couple of times as an "asshole" because he assaulted the other officer and was not compliant in the past. *Id*.

12. The transition of custody took place in the Hospital's x-ray room. Deputy Gunnet placed Good in her own leg shackles around his ankles and proceeded to double lock the shackles so that they would be secured. *Id*. 29-30.

13. After Good returned to the examination room, Deputy Gunnet secured Good's handcuffs to the belt loop of his waist chain. *Id*. at 31.

14. Once Good was secured in shackles and handcuffs, Deputy Gunnet escorted Good out of the Hospital on foot by holding onto his waist chain with one hand. *Id*. at 32. Once outside, she escorted Good to her police vehicle which was parked by the main entrance to the Hospital's emergency room. *Id*.

15. When they arrived at the police vehicle, Deputy Gunnet had to let go of Good for a "couple of seconds" so that she could manually unlock the front passenger side door and unlock the rear passenger side door. *Id*. at 33.

4

16. While she was unlocking the doors, Deputy Gunnet instructed Good to face the car and not to move. *Id*.

17. Good was leaning against the rear passenger side door which prevented Deputy Gunnet from opening the door. *Id*. at 35.

18. Several times, Deputy Gunnet verbally directed Good to enter the vehicle. *Id*. at 36.

19. When Godd did not comply, Deputy Gunnet then moved Good with her left hand and opened the door with her right hand. *Id*. at 35-36.

20. Good did not comply, stating he wanted to get some fresh air. *Id*. at 36.

21. Deputy Gunnet grabbed Good by the arm and tried to get him into the car, but Good "kept pushing and pulling away from me." *Id*. at 38.

22. Deputy Gunnet advised Good that he would be charged with resisting arrest if he did not get in the car. *Id*. at 38.

23. Because she was the only officer at the scene, Deputy Gunnet utilized her police radio to request assistance from other officers in the area to assist her in getting Good into her vehicle. *Id*. at 39-40.

24. Deputy Gunnet warned Good that if he did not get into the vehicle she would tase him. *Id*. at 41.

25. While struggling back and forth with Deputy Gunnet, Good attempted to grab Deputy Gunnet's Taser. *Id*. According to Gunnet's testimony, Good stated, "Yeah, I was trying to get your Taser." Gunnet testified that Good then asked her, "What are you going to do? Shoot me now?" *Id*. at 43.

26. Good proceeded to turn away from Deputy Gunnet and fled, on foot, into the hospital parking lot. *Id*. at 44.

27. Deputy Gunnet deployed her Taser at Good, aiming at his upper right back. *Id*. She observed Good fall on the hospital parking lot. *Id*. at 44-45. According to Deputy Gunnet, at the time she deployed her Taser, Good was five to 10 feet away from her. *Id*. at 46.

28. Deputy Gunnet testified that she told Good to stay on the ground or she would deploy her Taser a second time. *Id*. at 45.

29. Good got back on his feet following the first Taser deployment and resumed his flight and ran around the corner of the Hospital. *Id*. at 49.

30. A security video from the Hospital shows Good rounding the corner of the Hospital building and appears to show that his leg restraints were no longer attached to his ankles. ECF 40, Ex. C.

31. The video also shows other people in the Hospital parling lot watching the events unfold and moving vehicles. *Id*.

32. Deputy Gunnet deployed her Taser a second time at Good and radioed that Good was running away from her. ECF 40, Ex. B at 49.

33. Deputy Gunnet testified that she did not believe she had the opportunity to grab Good or restrain him using physical force. *Id*. at 51.

34. After he was tased a second time, Good rolled over on the ground and got up and ran down a small embankment. *Id*. at 50.

35. Deputy Gunnet subjected Good to two five second electric discharges from her Taser, so Good was exposed to the Taser for a total of only ten seconds.

36. The video shows Good continuing to run away from Deputy Gunnet, across a two-lane road on the grounds of the Hospital, down an embankment and into the nearby woods surrounding Cocalico Creek. ECF 40, Ex. C. The video also shows that the right leg restraint is detached from Good's right ankle. *Id*.

37. Deputy Gunnet lost sight of Good when he entered the woods. ECF 40, Ex. B at at 52. She did not pursue him for safety reasons. *Id*.

38. Officer Beth Rivera of the Ephrata Borough Police Department responded to the scene within 5 minutes after Deputy Gunnet radioed for help and began searching for Good with Deputy Gunnet. *Id*. at 54.

39. Deputy Gunnet and Officer Rivera located Good by the Cocalico Creek bank, sitting at the edge with his back to them. *Id*. at 55. Gunnet testified that she did not see any prongs from her Taser on his back. *Id*. at 59.

40. Both Deputy Gunnet and Officer Rivera yelled out Good's name. *Id*. at 56; ECF 40, Ex. D at 20.

41. Deputy Gunnet testified that when she and Officer Rivera arrived at the bank of Cocalico Creek, Good was already in the water "from the chest up." ECF 40, Ex. B at 57.

42. Good submerged in Cocalico Creek, and Deputy Gunnet and Officer Rivera lost sight of Good. *Id*. at 58. ECF 40, Ex. D at 31.

43. Officer Rivera removed her duty belt and attached gear and entered the water in an attempt to rescue and regain control over Good. *Id*. at 61; ECF 40, Ex. D at 30.

44. Another officer from the Ephrata Borough Police Department arrived at the scene and entered the water in an attempt to locate Good. ECF 40, Ex. D at 33. Good was eventually discovered as deceased. *Id*. at 32.

45. Good's cause of death was determined by Forensic Pathologist Dr. Wayne K. Ross to be "Fresh Water Drowning," with the manner of death being ruled "Accidental." ECF 40, Ex. E. p.185.

46. Deputy Gunnet testified that she was aware of Lancaster County's policy regarding the use of an electronic-controlled weapon and had read it before this incident occurred. ECF 40, Ex. B at 62.

47. Deputy Gunnet testified that she is recertified every year for use of an electronic-controlled weapon with the Lancaster County Sheriff's department and had been recertified twice prior to this incident. *Id*. at 63.

48. Deputy Gunnet testified that she had never received any training about not deploying a taser on someone who has opioid addiction or under the influence of drugs. *Id*. at 64.

49. Deputy Gunnet testified that with regard to whether she had received any training from Lancaster County that she should not use a taser on someone who is handcuffed, "It all depends on the totality of the circumstances." *Id*. at 65.

50. The Lancaster County Sheriff's Office conducted an Internal Review of Good's In-custody death. ECF 44-3.

51. With regard to Lancaster County Sheriff's Office Policy 304.2, concerning the deployment of a conducted electrical weapon to control a violent or potentially violent individual, the Review concluded: "Considering the totality of Good's

actions and statements, it is obviously concluded that he was a potentially violent person who then proved this potential when he acted out violently toward Deputy [Gunnet], who employed the use of her CEW in compliance with Lancaster County Sheriff's Office policy." ECF Doc. No. 44-3 at 31.

52. With regard to Lancaster County Sheriff's Office Policy 304.3, detailing that deputies must successfully complete training to be issued and carry a CEW, the Review concluded that Deputy Gunnet successfully completed the required training on July 27, 2017, and on the subject of her use of the CEW, that "[h]er actions conformed to office policy." *Id*.

53. With regard to Lancaster County Sheriff's Office Policy 304.4, concerning a verbal warning of the intended use of the CEW prior to its application, the Review concluded that "Deputy [Gunnet's] actions conformed to policy in that she preceded her applications of her CEW with verbal warnings on both occasions." *Id*. at 32.

54. With regard to Lancaster County Sheriff's Office Policy 304.5, concerning the use of the CEW only when the deputy can safely approach the person within the operation range of the device, the Review concluded that "Deputy [Gunnet] was safely within the operational range of 25 feet when she fired her CEW." *Id*.

55. With regard to Lancaster County Sheriff's Office Policy 304.5.1, concerning the circumstances perceived by the deputy at the time which indicate that the use of CEW is reasonably necessary to control the person, the Review concluded that, "Andrew Good was violent and physically resisted in that he refused to comply with directives of Deputy [Gunnet] to enter her vehicle, and he physically struggled with

[Gunnet] and pushed her" and that "[i]n response to Good's actions and demonstrated intent, Deputy [Gunnet] used her CEW to attempt to control Good."

56. With regard to Lancaster County Sheriff's Office Policy 304.5.2, concerning the avoidance of using a CEW on people who are handcuffed or otherwise restrained, and people whose position or activity may result in collateral injury, unless the totality of the circumstances indicates that other available options reasonably appear ineffective, the Review concluded, "Good had proven to be a violent person who posed an imminent threat to law enforcement officers and the risk posed by his possible escape outweighed the potential risks of Deputy [Gunnet] employing her CEW to control him." *Id*. at 33.

57. With regard to Lancaster County Sheriff's Office Policy 304.5.3, concerning the preferred targeting area for the CEW including the person's back, the Review concluded that "Deputy [Gunnet] targeted the upper back of Good on both CEW deployments." *Id*.

58. With regard to Lancaster County Sheriff's Office Policy 304.5.4, relating to application of CEW for only one standard cycle and evaluating the situation before applying any subsequent cycles, the Review concluded: "(a) …Good had proven to be a violent person who posed an imminent threat to law enforcement officers, and the risk posed by his possible escape outweighed the potential risks of Deputy [Gunnet] employing her CEW to control him, including additional applications of her CEW. (b) The probes had made proper contact on the first application of the CEW, as Good sustained neuromuscular incapacitation. (c) Deputy [Gunnet] provided Good with multiple opportunities to comply, and his ability to comply was

never impeded. (d) Deputy [Gunnet] gave numerous verbal commands to Andrew Good in an attempt to gain Good's compliance, however he refused to comply. [Gunnet] requested assistance via radio, and used the options and tactics that were available to her at the time." *Id*. at 33-34.

59. Finally, with regard to the Lancaster County Sheriff's Office Use of Force Continuum, the Review concluded that "Andrew Good physically assaulted Deputy [Gunnet] by pushing her and attempting to grab her CEW from her holster – disarm her. *It should be noted that on the Lancaster County Sheriff's Office Use of Force Continuum, a disarming attempt is considered to be a deadly force assault level of resistance which corresponds to a 'Level VI (six): Lethal Force' level of force response, as the deputy is faced with the potential of serious bodily injury or death. If a person disarms or attempts to disarm a deputy, it is presumed that they will attempt to use the deputies weapon(s) against the deputy to incapacitate, injure or kill the deputy. Deputy [Gunnet] exhibited restraint in that she did not employ deadly force in response to Andrew Good's attempt to disarm her. Her use of force response was one level lower than could have been justified by the continuum." *Id.* at 35.

**DISCUSSION**

With regard to Plaintiffs' claim for that Defendant acted towards Good with cruel and unusual punishment in violation of the Eighth Amendment, judgment will be summarily entered in favor of the Defendant on this Count because the Eighth Amendment only applies to convicted prisoners, not arrestees. *See Graham v. Connor*, 490 U.S. 386, 398 (1989) (holding that "the less protective Eighth Amendment standard [prohibiting cruel and unusual punishment] applies 'only after the State has complied

with the constitutional guarantees traditionally associated with criminal prosecutions' "
(quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977))).

In a case alleging a police officer's use of force violated the Fourth Amendment,
the ultimate question is whether the use of force was "'objectively reasonable' in light of
the facts and circumstances confronting" the officer at the time. *Graham v. Connor*, 490
U.S. 386, 397 (1989). The "right to make an arrest or investigatory stop necessarily
carries with it the right to use some degree of physical coercion or threat to effect it."
*Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be
judged from the perspective of a reasonable officer on the scene, rather than with the
20/20 vision of hindsight." *Id*. This standard makes "allowance for the fact that police
officers are often forced to make split-second judgments -- in circumstances that are
tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a
particular situation." *Id*. at 396-97.

When assessing the reasonableness of the amount of force used, courts
consider various factors related to the specific circumstances presented, including the
following: (1) the severity of the crime; (2) whether the suspect posed an imminent
threat to the safety of the officer or others; (3) whether the suspect actively resisted or
attempted to evade arrest; (4) whether the force used was of such an extent as to lead
to injury; (5) the possibility that the suspect was violent or dangerous; (6) the duration of
the officer's action; (7) whether the action took place in the context of making an arrest;
(8) the possibility that the suspect was armed; and (9) the number of persons with
whom the officer had to contend at the time. See *Hrezik v. Moyer*, No. 10-4251, 2012

WL 162334, at *6 (E.D. Pa. Jan. 19, 2012) (citing *Graham*, 490 U.S. at 396, and *Sharrar v. Felsing*, 128 F.3d 810, 821-22 (3d Cir. 1997)).

Applying these nine factors to the undisputed facts of this case and when evaluating them from the perspective of a reasonable officer on the scene, the Court finds that almost all weigh heavily in Deputy Gunnet's favor. Although there is no evidence that the circumstances leading to Good's bench warrant were particularly severe, Deputy Gunnet testified that she did not know of the nature of the probation violation leading to Good's bench warrant. Although Deputy Gunnet knew that Good was unarmed, she also knew from speaking with Sergeant Stone at the Hospital that Good had assaulted a police officer in the past and there had been instances where Good had been non-compliant with the police.  At the time of the incident in this case, Good was in custody and about to be taken back to prison. Despite being handcuffed and shackled, Good actively resisted arrest by refusing to comply with both Deputy Gunnet's verbal directives for him to get into her police vehicle and with her physical attempts to get him into her vehicle. At one point during his resistance, Good even attempted to grab Deputy Gunnet's Taser. Indeed, the Review from Lancaster County Sheriff's Office concluded that Good's attempt to grab Deputy Gunnet's taser would have justified Deputy Gunnet responding with deadly force.

Deputy Gunner deployed her Taser not only in the context of making an arrest but in order to prevent an arrestee in custody from fleeing. Before deploying her Taser, Deputy Gunnet verbally warned Good both times that if he did not comply or stop his flight, he would be tased. Good did not heed either warning. During both Taser deployments, Deputy Gunnet was the only officer on the scene and had to regain

physical control of Good by herself. In addition, there is an inherent danger that arises anytime a suspect flees, whether shackled and handcuffed or not, on public property where, as here, other people are present and vehicles are in motion. While in flight, Good could have attempted to take a hostage or commandeer a vehicle in the parking lot. **Indeed, the video appears to show that when Good was rounding the corner of the Hospital, his leg restraints were no longer attached to his ankles.**

The duration of the tasing action was extremely brief. Deputy Gunnet subjected Good to two five second electric discharges from her Taser, so Good was exposed to the taser for a total of only ten seconds. Finally, there is no evidence in the record that Good was injured as a result of the use of the Taser on either occasion. Therefore, there is no reason to believe use of a Taser created a greater risk of injury than any other means Deputy Gunnet could have chosen to end Good's flight (e.g., chasing and tackling Good on the hospital parking lot).

Many courts have upheld the use of Taser's and other similar devices on individuals fleeing or resisting arrest. See *Brown v. Cwynar,* 484 Fed.Appx. 676, 681 (3d Cir.2012) (noting how the use of Taser on a suspect resisting arrest is not inherently "excessive force"); *Woods v. Grant*, 381 F. App'x 144, 145 (3d Cir. 2010) (Taser used against subject of arrest warrant who did not comply with order to lay on ground and moved toward officer instead); see also *McKenney v. Harrison*, 635 F.3d 354, 359- 60 (8th Cir. 2011) (stun gun used against subject of misdemeanor arrest warrants who made gesture indicating intent to flee); *Crowell v. Kirkpatrick*, 400 F. App'x 592 (2d Cir. 2010) (stun gun used against protestors who had chained themselves to large barrels to prevent arrest for trespass). In addition, Good's death was ultimately ruled by Dr. Ross

14

as "Accidental" and the result of a "Fresh Water Drowning." Dr. Ross did not state that Good's death was the result of either Taser deployment.

Weighing all of the factors, no reasonable jury could conclude Deputy Gunnet's use of her Taser on either occasion in response to Good's flight was objectively unreasonable. As a result, judgment will be entered in favor of the Defendant and against the Plaintiffs.